USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: FEB 15 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :        SEALED INDICTMENT

          -v.-                           :        12 Cr.

MICHAEL BINDAY,                          :
JAMES KEVIN KERGIL, and
MARK RESNICK,                                     **12 CRIM 152**
                    Defendants.          :

- - - - - - - - - - - - - - - - - - x


## COUNT ONE

(Conspiracy to Commit Mail Fraud and Wire Fraud)

          The Grand Jury charges:

### THE DEFENDANTS AND RELEVANT ENTITIES

          1.   At all times relevant to this Indictment, MICHAEL
BINDAY, the defendant, was the President and/or owner of an
insurance agency located in Scarsdale, New York.

          2.   At all times relevant to this Indictment, JAMES
KEVIN KERGIL, the defendant, was an independent insurance agent
in Peekskill, New York.

          3.   At all times relevant to this Indictment, MARK
RESNICK, the defendant, was an independent insurance agent in
Orlando, Florida.

          4.   At all times relevant to this Indictment,
American General Life Companies ("American General"), Lincoln
Financial Group ("Lincoln Financial"), Security Mutual Insurance

**Judge McMahon**

Company ("Security Mutual"), and Union Central Life Insurance

Company ("Union Central"), and their subsidiaries, related

entities and affiliates (collectively, the "Life Insurance

Providers" or "Providers"), issued life insurance policies to

individuals in reliance on material misrepresentations caused by

MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the

defendants, and were financially harmed in issuing such

policies.

## BACKGROUND REGARDING LIFE INSURANCE POLICIES

5.    Life insurance policies are among the types of

policies that insurance companies issue.  A life insurance

policy is a contract between a life insurance company and an

insured.  A policy typically requires the insurance company to

pay a sum of money to the insured's beneficiary, who is

typically a relative of the insured, upon the insured's death.

This sum of money is commonly referred to as the "death

benefit."  To maintain the validity of a policy, the insured

typically makes periodic payments, commonly known as premiums,

to the insurance company throughout the policy period.

6.    At all times relevant to this Indictment, the

Life Insurance Providers took the position that the death

benefit — the amount paid to beneficiaries upon the death of the

insured — should correspond to the amount of money that an

insured's dependents or heirs would need in the event of the insured's death.  Typically, this amount was comprised of the amount of the insured's lost income and/or estate taxes and expenses that the insureds' dependents and heirs would be expected to realize after an insured's death.  Accordingly, in determining the maximum policy amount (*i.e.*, death benefit) that the Provider is willing to offer to an applicant, the Provider relied upon the applicant's representations about his or her financial condition and income.

       7.   Universal life policies are one of several types of life insurance policies offered by life insurance companies, including the Life Insurance Providers.  As with other types of life insurance policies, a universal life policy provides a death benefit to the insured's beneficiaries and requires premium payments to the insurance companies.  At all times relevant to this Indictment, a defining feature of the universal life policies offered by the Providers, however, was that the insured typically had the option of paying additional premium amounts above and beyond the amount required to keep the policy valid and to assure payment of the death benefit upon the insured's death.  Insurance companies typically invested the insureds' premiums.  From these investments, insureds could realize a return that accrued on a tax-deferred basis.  The

Providers also generally benefited from the investment profits and realized increased cash flow as premium amounts increased.

8.   A life insurance policy that an insured obtained from an insurance company with the intent to resell the policy to a third-party investor is commonly referred to as a stranger-owned life insurance or stranger-originated life insurance ("STOLI") policy.  At all times relevant to this Indictment, it was the practice of the Life Insurance Providers to deny an application for a universal life insurance policy if the insured intended, from the outset, to later resell the policy, as was the case with STOLI policies.

<u>THE LIFE INSURANCE PROVIDERS AND STOLI</u>

9.   The Life Insurance Providers took several steps to prevent the issuance of STOLI policies because, among other things, such policies caused a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received.  To ensure that STOLI policies were not issued, the Providers, among other things, requested and then relied on representations from insurance agents and applicants regarding:

   a.    the applicant's financial information;

   b.    the applicant's intent to resell the policy;

   c.    the existence of third-party financing of premiums;

4

       d.    the purpose of procuring the policy; and

       e.    the existence of other life insurance policies or applications for policies.

       10.  The facts underlying these representations made by and on behalf of the applicants were essential elements of the agreements between the Life Insurance Providers and the insureds.  An insured's financial condition, an insured's intent to resell a policy, third-party financing of premiums, the purpose of the policy, and the existence of other life insurance applications and policies significantly informed the Life Insurance Providers' financial expectations with respect to universal life policies.  Accordingly, where Life Insurance Providers were deceived into issuing a universal life policy based on misrepresentations regarding the above-referenced factors, the Providers were harmed in several ways:

       a.    <u>Earlier and Greater Payout of Death Benefit:</u> It was a standard assumption of the Life Insurance Providers that, notwithstanding other factors, an individual with a net worth of millions of dollars would maintain a healthier lifestyle, receive better medical care and, consequently, live longer than an individual with minimal net worth.  Typically, the longer an insured lives, the more income that a life insurance company realizes.  Accordingly, the fraudulent

5

inflation of an individual's net worth in an effort to secure a high-value universal life policy negatively impacted the Life Insurance Providers in two ways.  First, the Life Insurance Provider insured an individual's life that was likely to end earlier than the Provider expected, resulting in less income from premium payments to the Provider and an earlier payout of a the death benefit to the beneficiaries.  Second, misrepresentations regarding insureds' net worth caused Providers to approve — and later pay out — larger death benefits than they otherwise would have approved.

b.  <u>Less Premium Income</u>:  As discussed in this Indictment, a distinguishing feature of a typical universal life policy was an insured's ability to pay premiums in amounts that exceeded the minimum necessary to sustain the policy.  Aside from allowing the insured to realize tax-free growth, these additional premium amounts typically supplied the Life Insurance Providers with significant increased capital and profit.  By contrast, a policy held or funded by a third-party investor typically would be funded at or near the minimum amount necessary to sustain the policy.  As a result, the Life Insurance Providers received less income than expected from universal life policies when, unbeknownst to the Life Insurance

Providers at the time of issuance, investors and other third
parties held an interest.

c.   Providers' Financial Projections Rendered

Unreliable:  The Life Insurance Providers assumed, and built
into their pricing, the fact that a certain proportion of
insureds would voluntarily terminate their policies, either by
surrendering them or allowing them to lapse (i.e., fail to pay
the required premiums).  The Providers, however, could not
accurately assess the voluntary termination rate for universal
life insurance policies financed and/or owned by third-party
investors.  Thus, misrepresentations by agents and applicants
regarding the existence of third-party premium financing and/or
an insured's intent to resell universal life policies to
investors undermined actuarial assumptions and financial
planning that the Providers used to price their policies.

d.   Delayed Payments Causing Decreased Cash

Flow:  Although third-party investors who secretly funded and/or
owned polices typically did not allow policies to lapse, these
funders and investors typically took advantage of grace periods
and other features that permitted late payments of premiums with
greater frequency than insured persons.  As a result, in
addition to not receiving expected income from higher than
required premium payments, the premium payments that the Life

7

Insurance Providers did receive from investor-funded or -owned universal life policies were typically received later in the payment periods than policies paid for by an actual insured. Accordingly, the cash flow available from those payments decreased where, unbeknownst to the Providers, investors funded and/or owned universal life policies they had issued.

11.   To prevent against the harms described above, at all times relevant to this Indictment, the Providers took substantial steps and incurred significant additional underwriting, investigation and litigation expenses in attempting to detect and prevent the issuance and maintenance of STOLI policies.

## THE SCHEME TO DEFRAUD THE LIFE INSURANCE PROVIDERS

12.   From at least in or about 2006 up to and including 2011, MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, and others known and unknown, fraudulently procured universal life policies, purportedly on behalf of their clients.   In truth and in fact, and as BINDAY, KERGIL, and RESNICK well knew, the purpose of procuring the policies was to generate millions of dollars of commissions and other profits for BINDAY, KERGIL, and RESNICK, and others known and unknown.   In sum, BINDAY, KERGIL, and RESNICK fraudulently

defrauded or attempted to defraud the life insurance providers into issuing over $100,000,000 of life insurance policies.

13.   The scheme typically worked as follows:  BINDAY, KERGIL, and/or RESNICK recruited elderly clients of modest means (the "Straw Buyers") to apply for universal life insurance policies as part of a scheme to defraud the Life Insurance Providers and other life insurance companies.  Typically, the Straw Buyers were offered the promise of payment upon the resale of the policies.  Once the Straw Buyers agreed to participate in the scheme, BINDAY, KERGIL, and/or RESNICK caused false and fraudulent application documents to be sent to BINDAY's Scarsdale, New York office.  The application documents contained material misrepresentations regarding, among other key elements of the life insurance policy agreements, the Straw Buyers' assets and net worths, the existence of third-party financing of premiums for the policies, the Straw Buyers' intent to resell the policies, the purpose of the policies, and whether the Straw Buyer had other life insurance policies or pending applications for such policies.  For example, BINDAY, KERGIL, and RESNICK caused Straw Buyers' application materials to falsely state that Straw Buyers had net worths of millions of dollars.  In truth and in fact, and as BINDAY, KERGIL, and RESNICK well knew, almost all of the Straw Buyers had net worths of well under

$1,000,000.   Once BINDAY received the Straw Buyers' false and
fraudulent application documents, he caused these materials to
be submitted to the Life Insurance Providers and other life
insurance companies, knowing that they contained materially
false statements.

14.   Despite knowing that the Straw Buyers'
applications submitted to the Providers stated that there would
be no third-party financing of the premiums, MICHAEL BINDAY, the
defendant, arranged for third-party financing of the policies
from investors and others.   In furtherance of and to continue
the scheme after universal life policies were issued to the
Straw Buyers, BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the
defendants, and others known and unknown, engaged in financial
transactions designed to deceive the Providers into believing
that the Straw Buyers were personally paying the premiums for
their universal life policies.   For example, to ensure that the
premium funding from third-party investors and others was not
revealed to the Life Insurance Providers, BINDAY, KERGIL, and
RESNICK arranged for the transfer of funds from the third-party
investors and others to bank accounts held by the Straw Buyers
or trust accounts established in the names of the Straw Buyers.
At or around the same time of these transfers, BINDAY, KERGIL,
and RESNICK, and others known and unknown, directed the Straw

Buyers and others to write checks and authorize wire payments to the Life Insurance Providers from the Straw Buyers' accounts or trust accounts, despite the fact that the true sources of the funds were in fact, unbeknownst to the Providers, undisclosed third-party investors or funders.  These checks and wires were funded by the money that BINDAY, KERGIL, and RESNICK secretly transferred and caused to be transferred to the Straw Buyers.

15.  In addition, despite knowing that the Straw Buyers' applications submitted to the Providers stated that the Straw Buyers did not intend to resell their policies after issuance, MICHAEL BINDAY, the defendant, attempted to and did arrange for the resale of the Straw Buyers' policies on the secondary market at the time the application materials were submitted and prior to the issuance of the policies.  In so doing, BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, and others known and unknown, collected and attempted to collect hundreds of thousands of dollars in fees in connection with the resale of these policies.

16.  In furtherance of the scheme, MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, and others known and unknown, caused the Straw Buyers to make material misrepresentations to the Life Insurance Providers, including, in sum and substance, that:

        a.   the Straw Buyers had assets and net worths of millions of dollars;

        b.   the Straw Buyers did not intend to resell the life insurance policies on the secondary market;

        c.   the Straw Buyers intended to pay the premiums themselves and with their own money;

        d.   the purpose of the insurance policies was estate planning; and

        e.   the Straw Buyers did not have any other pending applications or effective policies for life insurance.

    17.  In truth and in fact, and as MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, well knew, at the time that these statements were made by or on behalf of the Straw Buyers:

        a.   the Straw Buyers had assets and net worths that were significantly less than the amounts indicated to the Providers.  To conceal these misrepresentations, BINDAY and KERGIL caused a co-conspirator not named herein ("CC-1") to falsely verify Straw Buyers' financial information;

        b.   the Straw Buyers, at the direction of BINDAY, KERGIL, and RESNICK, intended to resell their life insurance policies.  Indeed, on several occasions, BINDAY had already brokered the resale of policies by the Straw Buyers to

third-party investors prior to the time that the Life Insurance Providers issued the policies to the Straw Buyers;

c.    the Straw Buyers received financing from premiums typically arranged by, and sometimes funded by, BINDAY;

d.    the purpose of the Straw Buyers' policies was not estate planning; rather, the true purposes of the requests for the policies were: (i) to generate millions of dollars in commissions for BINDAY, KERGIL, and RESNICK; (ii) to allow BINDAY, KERGIL, RESNICK, and Straw Buyers to profit when the policies were resold on the secondary market; and (iii) in some instances, to direct millions of dollars in death benefit proceeds to BINDAY, KERGIL, and RESNICK in connection with Straw Buyers' policies that BINDAY, KERGIL, and RESNICK purchased after fraudulently inducing the Life Insurance Providers to issue the policies; and

e.    BINDAY, KERGIL, and RESNICK caused several life insurance applications for the same Straw Buyer to be submitted at or around the same time to several different life insurance companies, including the Life Insurance Providers, despite knowing that they had caused the Straw Buyer to represent to the Life Insurance Provider that no other policies or applications for policies existed.

18.   Each of these and other misrepresentations by
MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the
defendants, and others known and unknown, were material to and
concerned essential elements of the bargains (a) between the
Life Insurance Providers and the Straw Buyers with respect to
the policies at issue, and (b) between the Life Insurance
Providers and BINDAY with respect to commissions that BINDAY,
KERGIL, RESNICK and others received from the Life Insurance
Providers.  As detailed in this Indictment, the
misrepresentations by BINDAY, KERGIL, and RESNICK created
discrepancies between (a) the benefits that the Life Insurance
Providers reasonably anticipated from issuing the policies at
issue and paying the accompanying millions of dollars in
commissions to BINDAY, KERGIL, and RESNICK, and others known and
unknown, and (b) the actual benefits that the Providers received
in doing so.

19.   By way of example, several of the Straw Buyers'
policies are discussed below.

<u>Straw Buyer-1</u>

20.   In or about 2007, a 76-year old male individual
who resided in Orlando, Florida ("Straw Buyer-1") contacted MARK
RESNICK, the defendant, in response to an advertisement mailed
by RESNICK for burial insurance coverage.  RESNICK told Straw

14

Buyer-1, in sum and substance, that although Straw Buyer-1 did not qualify for the advertised burial insurance, RESNICK could obtain a $4,000,000 life insurance policy on Straw Buyer-1's life.  RESNICK explained that Straw Buyer-1's wife would be the beneficiary of the policy for the first two years, after which time RESNICK would cause the policy to be sold.  RESNICK also told Straw Buyer-1 that the premium payments would be provided by a third party.  After Straw Buyer-1 agreed to apply for the policy, RESNICK directed Straw Buyer-1 to sign numerous documents in support of an insurance policy, including blank application forms that RESNICK completed after Straw Buyer-1 signed them.

21.  After MARK RESNICK, the defendant, collected Straw Buyer-1's signature on the application materials, RESNICK sent the documents by facsimile to MICHAEL BINDAY, the defendant, in Scarsdale, New York.  BINDAY was authorized by Lincoln Financial to serve as general agent for life insurance policies, and RESNICK was designated as a "producing agent" for BINDAY.  In or about December 2007, BINDAY caused Straw Buyer-1's application materials to be submitted to Lincoln Financial. Both BINDAY and RESNICK, however, knew that the application documents contained material misrepresentations regarding, among other things: (a) Straw Buyer-1's assets and net worth;  (b)

15

whether Straw Buyer-1 had any conversations regarding the resale of his policy after issuance; and (c) whether Straw Buyer-1's premium payments would be financed by any third party.  The application materials submitted to Lincoln Financial by BINDAY inflated Straw Buyer-1's net worth by millions of dollars and represented the value of Straw Buyer-1's individual retirement account ("IRA"), 401(k) and pension to be $1,800,000.  In truth and in fact, and as BINDAY and RESNICK well knew, Straw Buyer-1 did not have an IRA, 401(k) savings or a pension.  Moreover, Straw Buyer-1 did not have a net worth of any amount approaching $1,000,000.

        22.  Based on these and other material misrepresentations, Lincoln issued a $4,000,000 life insurance policy on Straw Buyer-1's life and set a planned annual premium of $270,840 for the policy.  Prior to the policy being issued, MICHAEL BINDAY, the defendant, contrary to Straw Buyer-1's representations made to Lincoln Financial, arranged for an investment firm based in New York, New York to finance the premiums of Straw Buyer-1's policy.

### Straw Buyer-2

        23.  In or about 2008, an 86-year old female individual who resided in Cold Spring, New York ("Straw Buyer-2") contacted JAMES KEVIN KERGIL, the defendant, in response to

a mailed advertisement for life insurance.  KERGIL told Straw

Buyer-2, in sum and substance, that he could obtain a life

insurance policy on Straw Buyer-2's life and subsequently sell

the policy to an investor.  KERGIL estimated that Straw Buyer-2

would receive approximately $20,000 to $100,000 from the

policy's sale.  After Straw Buyer-2 agreed to apply for the

policy, KERGIL directed Straw Buyer-2 to sign numerous documents

in support of an insurance policy.

      24.  JAMES KEVIN KERGIL, the defendant, supplied false

and fraudulent information in Straw Buyer-2's application

materials.  In or about April 2008, MICHAEL BINDAY, the

defendant, caused Straw Buyer-2's application materials to be

submitted to Security Mutual.  Both BINDAY and KERGIL, however,

knew that the application documents contained material

misrepresentations regarding, among other things: (a) Straw

Buyer-2's assets and net worth; (b) whether Straw Buyer-2 had

any conversations regarding the resale of her policy after

issuance; (c) whether Straw Buyer-2's premium payments would be

financed any third-party; and (d) the purpose of the policy.

The application materials submitted to Security Mutual by BINDAY

inflated Straw Buyer-2's net worth by millions of dollars,

stating that she had a net worth of $4,650,000.  In truth and in

fact, and as BINDAY and KERGIL well knew, Straw Buyer-2's only

17

regular income was a monthly social security payment of approximately $1,485 and her total net worth was significantly less than $500,000.

25.  In or about April 2008, based on these and other material misrepresentations, Security Mutual issued a $2,000,000 life insurance policy on Straw Buyer-2's life and set a planned annual premium of $108,772 for the policy.  After the policy was issued, MICHAEL BINDAY and JAMES KEVIN KERGIL, the defendants, caused funds for premium payments to be funneled to Straw Buyer-2's personal bank account.  Subsequently, KERGIL met with Straw Buyer-2 at her home, and directed her to sign personal checks for premium payments to Security Mutual.  BINDAY and KERGIL did so in an effort to deceive Security Mutual as to the true source of the premium payments.

<u>Straw Buyer-3</u>

26.  In or about 2008, an 83 year-old female individual in North Fort Myers, Florida agreed to apply for life insurance through a co-conspirator not named herein ("CC-2"), who was an insurance agent in Florida.  Straw Buyer-3 agreed with CC-2 to apply for a life insurance policy that would be sold to a third-party investor.  As directed by CC-2, Straw Buyer-3 signed numerous documents in support of an insurance policy application.

18

27.   In or about September 2008, MICHAEL BINDAY, the defendant, caused Straw Buyer-3's application materials to be submitted to Lincoln Financial and Union Central.   Both BINDAY and CC-2 knew, however, that the application documents contained material misrepresentations regarding, among other things, (a) Straw Buyer-3's assets and net worth; (b) whether Straw Buyer-3 had any conversations regarding the resale of her policy after issuance; (c) whether Straw Buyer-3's premium payments would be financed by any third party; (d) the purpose of the policy; and (e) the existence of other applications for life insurance policies for Straw Buyer-3.

28.   With respect to the false representation regarding the existence of other policy applications, MICHAEL BINDAY, the defendant, in an effort to further deceive Lincoln Financial into believing that no other policies for Straw Buyer-3 were sought, directed that JAMES KEVIN KERGIL, the defendant, and not CC-2, be listed on the Union Central application as the producing agent.   In truth and in fact, however, and as BINDAY and KERGIL well knew, CC-2 was the producing agent on both the Unions Central application and the Lincoln Financial application.   Straw Buyer-3 never met or had any communications with KERGIL prior to BINDAY's submission of the application.

19

29. MICHAEL BINDAY and JAMES KEVIN KERGIL, the defendants, caused additional false and fraudulent information regarding Straw Buyer-3's assets and net worth to be submitted to Lincoln Financial and Union Central. In or about September 2008, after CC-2 provided KERGIL with Straw Buyer-3's pedigree information, KERGIL provided CC-1 with false and fraudulent information regarding Straw Buyer-3 for purposes of obtaining a third-party financial report. Among other false information that KERGIL provided to CC-1 was information that Straw Buyer-3 had a net worth of approximately $5,125,000. In truth and in fact, Straw Buyer-3's net worth was approximately $100,000. BINDAY, knowing that CC-1's third-party financial report contained false information regarding Straw Buyer-3's net worth, submitted the report to Lincoln Financial and Union Central as part of Straw Buyer-3's applications to those companies.

30. In or about September 2008, based on these and other material misrepresentations: (a) Lincoln Financial issued a $3,000,000 life insurance policy on Straw Buyer-3's life and set a planned annual premium of $73,363.50 for the policy; and (b) Union Central issued a $3,500,000 life insurance policy on Straw Buyer-3's life and set a planned annual premium of $166,594.93 for the policy.

31.   After the policy was issued, MICHAEL BINDAY, the defendant, and CC-2 caused funds for premium payments to be funneled to Straw Buyer-3's personal bank account.   BINDAY and CC-2 did so in an effort to deceive Lincoln Financial and Union Central as to the true source of the premium payments.

## SCHEME TO DESTROY DOCUMENTS AND OBSTRUCT JUSTICE

32.   In or about June 2010, Federal Bureau of Investigation ("FBI") agents approached MARK RESNICK, the defendant, at his residence in Orlando, Florida, in connection with a Federal grand jury investigation in the Southern District of New York regarding the fraudulent procurement of life insurance policies (the "Grand Jury Investigation").   That same week, FBI agents approached CC-2 at his residence regarding the Grand Jury Investigation.   Within days of being visited by the FBI agents, RESNICK and CC-2 separately spoke by telephone with JAMES KEVIN KERGIL, the defendant, regarding the destruction of documents and computer files that were relevant to the Grand Jury Investigation.   Specifically, KERGIL instructed RESNICK and CC-2, in sum and substance, to delete the contents of the hard drives on their computers, as well as all life insurance-related documents involving KERGIL and MICHAEL BINDAY, the defendant. RESNICK and CC-2 each agreed to follow KERGIL's instructions and

21

attempted to delete documents and files relevant to the Grand
Jury Investigation.

33.  At or around the same time, CC-2 engaged in
several e-mail and telephone communications with MICHAEL BINDAY,
the defendant, regarding the fact that investigators had
approached CC-2 and Straw Buyers in Florida who were clients of
CC-2.  In the course of those communications, BINDAY first
instructed CC-2, in sum and substance, to tell CC-2's clients
not to speak with investigators.  Subsequently, BINDAY
instructed CC-2, in sum and substance, to tell CC-2's clients
that if they do speak with investigators, the clients should
tell investigators that the financial information provided in
the policy applications to life insurance companies was
accurate, that they had no intent to sell their policies when
they were issued, and that they sought the policies for estate
planning purposes.  In truth and in fact, and as BINDAY well
knew, the statements proposed by BINDAY were false.

## STATUTORY ALLEGATIONS

34.  From at least in or about 2006, up to and
including in or about 2011, in the Southern District of New York
and elsewhere, MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK
RESNICK, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree

22

together and with each other to commit mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

35.  It was a part and an object of the conspiracy that MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, would and did place in a post office and authorized depository for mail matters and things, to be sent and delivered by the Postal Service, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom, such matters and things, and knowingly caused to be delivered by mail and such carriers according to the direction thereon, and at the place it was directed to be delivered by the person to whom it was addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

36.  It was further a part and an object of the conspiracy that MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, and others known and unknown, willfully

and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>OVERT ACTS</u>

37.   In furtherance of the conspiracy and to effect the illegal objects thereof, MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about November 2007, RESNICK signed a certification regarding investor-owned life insurance as part of Straw Buyer-1's application for universal life insurance.

b.   In or about November 2007, BINDAY, in Scarsdale, New York, caused Straw Buyer-1's application for life insurance to be submitted to one of the Life Insurance Providers.

c.    In or about March 2008, KERGIL signed a universal life insurance application that was subsequently submitted to a Life insurance Provider for Straw Buyer-2.

d.    In or about 2008, KERGIL obtained from Straw Buyer-2 checks for an account maintained by Straw Buyer-2.

e.    On or about December 19, 2008, BINDAY caused Straw Buyer-2 to send a check for $81,579 to a Life Insurance Provider.

f.    In or about June 2008, RESNICK signed a universal life insurance application that was subsequently submitted to a Life insurance Provider for a Straw Buyer ("Straw Buyer-4").

g.    In or about December 2009, BINDAY caused a check for $23,244.33 to be sent to one of the Life Insurance Providers for Straw Buyer-4's life insurance policy.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Mail Fraud)

The Grand Jury further charges:

38.   The allegations contained in paragraphs 1 through 33 and 37 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

39.    From at least in or about 2006 up to and
including in or about 2011, in the Southern District of New York
and elsewhere, MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK
RESNICK, the defendants, willfully and knowingly, having devised
and intending to devise a scheme and artifice to defraud, and
for obtaining money and property by means of false and
fraudulent pretenses, representations, and promises, for the
purpose of executing such scheme and artifice and attempting so
to do, did place in a post office and authorized depository for
mail matter, matters and things to be sent and delivered by the
Postal Service, and did deposit and cause to be deposited
matters and things whatever to be sent and delivered by private
and commercial interstate carriers, and did take and receive
therefrom, such matters and things, and did knowingly cause to
be delivered by mail and such carriers according to the
direction thereon, and at the places at which they were directed
to be delivered by the persons to whom they were addressed, such
matters and things, to wit, BINDAY, KERGIL, and RESNICK engaged
in a scheme to defraud the Life Insurance Providers by using
Straw Buyers to obtain life insurance policies through material
misrepresentations regarding essential elements of the
agreements between the Life Insurance Providers and the Straw
Buyers, and, in the course of executing such scheme, caused

false and fraudulent information to be sent by United Parcel Service, among other carriers.

(Title 18, United States Code, Sections 1341 and 2.)

COUNT THREE

(Wire Fraud)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 33 and 37 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

41.   From at least in or about 2006 up to and including in or about July 2010, in the Southern District of New York and elsewhere, MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BINDAY, KERGIL, and RESNICK engaged in a scheme to defraud the Life Insurance Providers by using Straw Buyers to obtain life insurance policies through material misrepresentations regarding essential

27

elements of the agreements between the Life Insurance Providers and the Straw Buyers, and, in the course of executing such scheme, caused false and fraudulent information to be sent by facsimile and electronic mail.

(Title 18, United States Code, Sections 1343 and 2.)

COUNT FOUR

(Conspiracy to Destroy Records and Obstruct Justice)

The Grand Jury further charges:

42.   The allegations contained in paragraphs 1 through 33 and 37 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

43.   From at least in or about June 2010 up to and including in or about July 2010, in the Southern District of New York and elsewhere, JAMES KEVIN KERGIL and MARK RESNICK, the defendants, and others known and unknown, did combine, conspire, confederate, and agree together and with each other to willfully, knowingly, and corruptly alter, destroy, mutilate, and conceal records, documents, and other objects, with the intent to impair the objects' integrity and availability for use in an official proceeding, and otherwise obstruct, influence, and impede an official proceeding, in violation of Title 18, United States Code, Section 1512(c), to wit, KERGIL and RESNICK, and others known and unknown, upon learning of a criminal

investigation, agreed with each other to destroy documents and electronic files relevant to a Federal grand jury investigation regarding the fraudulent procurement of life insurance policies.

## OVERT ACTS

44.   In furtherance of the conspiracy and to effect the illegal objects thereof, JAMES KEVIN KERGIL and MARK RESNICK, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about June 2010, in the Southern District of New York and elsewhere, KERGIL, RESNICK, and CC-2 had telephone conversations regarding the destruction of files.

b.   On or about July 6, 2010, RESNICK attempted to delete a computer hard drive at an Apple store in Orlando, Florida.

(Title 18, United States Code, Section 1512(c) and (k).)

## COUNT FIVE

### (Obstruction of Justice)

The Grand Jury further charges:

45.   The allegations contained in paragraphs 1 through 33, 37, and 44 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

29

46.   In or about June 2010, in the Southern District of New York and elsewhere, MICHAEL BINDAY, the defendant, willfully, knowingly, and corruptly attempted to and did obstruct, influence and impede an official proceeding, to wit, in connection with a Federal grand jury investigation regarding the fraudulent procurement of life insurance policies, BINDAY directed CC-2 to tell CC-2's insurance clients to provide false information regarding life insurance applications.

(Title 18, United States Code, Sections 1512(c) and 2.)

## FORFEITURE ALLEGATIONS

47.   As the result of committing one or more of the mail and wire fraud offenses, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349, alleged in Counts One through Three of this Indictment, MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

## Substitute Asset Provision

48.   If any of the above-described forfeitable property, as a result of any act or omission of MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK, the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C.

§ 853(p), to seek forfeiture of any other property of said

defendant up to the value of the above forfeitable property.

   (Title 18, United States Code, Sections 981(a)(1)(C) and 1343;
        Title 21, United States Code, Section 853(p);
        Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

32

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MICHAEL BINDAY, JAMES KEVIN KERGIL, and MARK RESNICK,

Defendants.

INDICTMENT

12 Cr.

(18 U.S.C. §§ 1341, 1343, 1349, 1512, and 2)

PREET BHARARA
United States Attorney.

A TRUE BILL

*Kathleen Smith*

Foreperson.

2/15/12 - Filed Sealed Indictment. Arrest Warrants Issued.

R. Judge Gorenstein
U.S.M.J.