**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MICHAEL BINDAY,
JAMES KEVIN KERGIL and
MARK RESNICK,
                    Defendants.

Case No. 12 Cr. 152 (CM)
ECF Case

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT MICHAEL BINDAY'S MOTION TO DISMISS PURSUANT TO
# FEDERAL RULE OF CRIMINAL PROCEDURE 12(B)

STEPTOE & JOHNSON LLP
Michael C. Miller
Matthew J. Gaul
1114 Avenue of the Americas
New York, NY  10036
(212) 506-3900 (phone)
(212) 506-3950 (fax)
mgaul@steptoe.com

*Counsel for Defendant Michael Binday*

Dated: October 1, 2012

<u>T<small>ABLE OF</small> C<small>ONTENTS</small></u>

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.    The Mail and Wire Fraud and Conspiracy Charges Should Be Dismissed Because the
      Alleged Misrepresentations Do Not Violate 18 U.S.C. §§ 1341 and 1343 As A Matter of
      Law. ....................................................................................................................... 2

      A.    The Alleged Misrepresentations Were Not "Essential Elements of the Bargain.".............. 6

      B.    The Insurance Companies Received Exactly What They Bargained For........................... 9

            1.    The Insurance Companies Were Not Harmed By Issuing Larger Policies.................. 10

            2.    A Contracting Party Is Not "Harmed" When The Opposing Party Does Not Exceed Its
                  Contractual Commitments.................................................................................. 10

II.   The Government's Charge of Obstruction of Justice Under 18 U.S.C. § 1512 Fails As
      A Matter of Law.................................................................................................... 13

      CONCLUSION................................................................................................................ 17

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Arthur Andersen LLP v. United States*,
    544 U.S. 696 (2005)..........................................................................................14, 15, 16

*Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*,
    421 Fed. Appx. 52, 2011 WL 1667075 (2d Cir. 2011)..........................................12

*Costello v. United States*,
    350 U.S. 359 (1956)...............................................................................................3

*Dalton v. Harleysville Worcester Mut. Ins. Co.*,
    557 F.3d 88 (2d Cir. 2009).....................................................................................12

*Fountain v. United States*,
    357 F.3d 250 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017 (2005)...........................3

*Grisby v. Russell,*
    222 U.S. 149 (1911)...............................................................................................9

*Hammerschmidt v. United States*,
    265 U.S. 182 (1924)...............................................................................................3

*Kramer v. Phoenix Life Ins. Co.*,
    15 N.Y.3d 539 (2010) ...........................................................................................5

*McNally v. United States*,
    483 U.S. 350 (1987)...............................................................................................3

*Russell v. United States*,
    369 U.S. 749 (1962)...............................................................................................3

*United States v. Aguilar*,
    515 U.S. 593 (1995)..........................................................................2, 14, 15, 16

*United States v. Gray*,
    642 F.3d 371 (2d Cir. 2011)...............................................................................14, 15

*United States v. Kurtz*,
    No. 04-CR-0155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) ....................4, 7

*United States v. Lazore*,
    90 F. Supp. 2d 202 (N.D.N.Y. 2000).....................................................................3

*United States v. Pirro*,
    212 F.3d 86, 92 (2d Cir. 2000)...............................................................................3

*United States v. Regent Office Supply Co.*,
  421 F.2d 1174 (2d. Cir. 1970)...................................................................8

*United States v. Reich*,
  479 F.3d 179 (2d Cir. 2007).............................................................14, 15

*United States v. Schwartz*,
  924 F.2d 410 (2d Cir. 1991)...............................................................3, 9

*United States v. Schwarz*,
  283 F.3d 76 (2d Cir. 2002).............................................................14, 15

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007).......................................................1, 4, 5, 8

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987).......................................................3, 4, 5, 8

## STATUTES AND RULES

FED. R. CRIM. P. 12(b) ..................................................................1, 2

18 U.S.C. §§ 1341 and 1343 ...........................................................1, 2

18 U.S.C. § 1503 ...........................................................................14, 15

18 U.S.C. § 1512(b)(2) ........................................................................15

18 U.S.C. § 1512(c)(2).......................................................13, 14, 15, 16

## TREATISE

GLEN BANKS, NEW YORK CONTRACT LAW § 11:15 (2006)..........................11

Defendant Michael Binday moves this Court to dismiss the Indictment in this case pursuant to Federal Rule of Criminal Procedure 12(b).

## INTRODUCTION

Defendants are charged with conspiracy to commit mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343 and substantive counts of mail and wire fraud, based on alleged misrepresentations made to insurance companies on applications for life insurance policies.

The defendants are accused of making a series of misrepresentations, all of which allegedly hid the fact that the policies issued were likely to be re-sold by the original policyholders to third-party investors.  This is an unusual case, however, because even assuming the alleged misrepresentations were made, they were not as a matter of law an essential element of the life insurance transaction.  The law in this Circuit is clear:  misrepresentations that are not an essential element of the bargain do not constitute a scheme to defraud within the meaning of the mail or wire fraud statutes.  "[S]chemes that do no more than cause their victims to enter into transactions they would otherwise avoid … do not violate the mail or wire fraud statutes . . . ."  *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).  In order to constitute mail or wire fraud, a scheme must "depend for [its] completion on a misrepresentation of *an essential element* of the bargain . . . ."  *Id.* (emphasis added).

In the present case, each of the life insurance policies at issue by its own terms expressly permitted the policyholder to transfer the policy to a third party.  Given that the policies expressly permitted transfer, the purported insurance company victims could have no reasonable expectation that the policies would not be transferred.  Rather, the insurance companies received exactly what they could reasonably expect and what they bargained for –

premium payments in exchange for freely transferable policies.  Whether the policyholder contemplated or intended to transfer the policy was not an essential element of the transaction. The misrepresentations alleged by the Government cannot form the basis of a valid mail or wire fraud prosecution and these criminal charges against the defendants should be dismissed.

In addition, the Government's charge that Mr. Binday obstructed justice by instructing someone to tell his clients either not to speak with an investigator or to provide that investigator with false information fails as a matter of law because the Government has failed to allege that Mr. Binday knew that the investigator was contacting the clients in connection with a grand jury investigation or a judicial proceeding.  In fact, the Government does not even allege that Mr. Binday knew that the "investigator" was an FBI agent as opposed to an investigator from one of the insurance companies with which he dealt.  "[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct."  *United States v. Aguilar*, 515 U.S. 593, 599 (1995).  Because the obstruction charge lacks this essential allegation, that charge should also be dismissed.

## ARGUMENT

**I.    The Mail and Wire Fraud and Conspiracy Charges Should Be Dismissed Because the Alleged Misrepresentations Do Not Violate 18 U.S.C. §§ 1341 and 1343 As A Matter of Law.**

The Indictment should be dismissed because the facts alleged, and accepted as true, do not constitute the crimes of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343.

Rule 12(b) of the Federal Rules of Criminal Procedure provides that a motion to dismiss may raise "any defense, objection, or request which is capable of determination without a trial of the general issue."  In deciding whether to dismiss an indictment, the court must accept as true the facts alleged in the indictment and determine only whether the indictment is "valid on

its face." *Costello v. United States*, 350 U.S. 359, 363 (1956).  While a Rule 12 motion must

satisfy "a high standard," *United States v. Lazore*, 90 F. Supp. 2d 202, 203 (N.D.N.Y. 2000), that

standard is met where, as here, the Indictment fails to "contain[] the elements of the offense

intended to be charged." *Russell v. Unites States*, 369 U.S. 749, 763 (1962).  "An indictment that

fails to allege the essential elements of the crime charged offends both the Fifth and Sixth

Amendments." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).  "[E]very ingredient of

the offense charged must be clearly and accurately alleged in the indictment … to enable the

court to decide whether the facts alleged are sufficient in law to withstand a motion to dismiss

the indictment…." *Russell*, 369 U.S., at 768 n.15 (internal citations omitted).

   The "essential elements of a mail or wire fraud violation are (1) a scheme to

defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to

further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004), *cert. denied*,

544 U.S. 1017 (2005).  Because the mail and wire fraud statutes use the same relevant language,

they are analyzed the same way. *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991).  In

the context of mail and wire fraud, "the words 'to defraud' commonly refer 'to wronging one in

his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of

something of value by trick, deceit, chicane or overreaching.'" *McNally v. United States*, 483

U.S. 350, 358 (1987) (*quoting Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)).  To

allege a valid charge of mail or wire fraud, "a scheme to defraud" does not require that the

intended victim was actually harmed, but requires that the "defendants *contemplated* some actual

harm or injury to their victims." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (emphasis

in original).  As part of a scheme, "the deceit practiced must be related to the contemplated

- 3 -

harm, and that harm must be found to reside in the bargain sought to be struck." *United States v. Kurtz*, No. 04-CR-0155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008).

Here, the Government advances a "no-sale" theory of mail and wire fraud, alleging, in essence, that the defendants engaged in a scheme to defraud the insurance companies by inducing them to sell insurance to purchasers to whom the insurance companies would not have sold insurance had they known that the purchasers "intended, from the outset, to resell the polic[ies]" (Indictment ¶¶ 4, 8). Such an inducement to make a sale, however, does not constitute a scheme to defraud within the meaning of the mail or wire fraud statutes. "[S]chemes that do no more than cause their victims to enter into transactions they would otherwise avoid … do not violate the mail or wire fraud statutes . . . ." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). "Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). In order to constitute mail or wire fraud, a scheme must "depend for [its] completion on a misrepresentation of *an essential element* of the bargain . . . ." *Shellef*, 507 F.3d at 108 (emphasis added).

To support its theory, the Government alleges a series of misrepresentations – none of which were "essential" to the bargain between the insurance companies and the purchasers of insurance. As detailed below, the alleged misrepresentations revolve around a single issue – whether the purchasers intended at the time of sale to later transfer ownership of their policies. Any intention of the purchasers to re-sell their policies was not "an essential element of the bargain" because each purchaser had the legal and contractual right to re-sell his or her policy at any time. Each insurance contract, though variously worded, expressly provided that "ownership [may be] changed by later transfer of ownership." Phoenix Policy Excerpt attached to Gaul Declaration as Ex. 8, at §17. *See, e.g.*, Security Mutual Policy Excerpt attached

to Gaul Declaration as Ex. 9, at 6 ("The Owner may assign the ownership of this policy.");

Union Central Policy Excerpt attached to Gaul Declaration as Ex. 2, at 6 ("A change of owner

may be made at any time by notice to us."); AIG Policy Excerpt attached to Gaul Declaration as

Ex. 10, at 17 ("You may change the Owner or the Beneficiary at any time during the lifetime of

the Insured unless the previous designation provides otherwise."); Lincoln Policy Excerpt

attached to Gaul Declaration as Ex. 11, at 6 ("While the Insured is alive, the Certificate Owner or

beneficiary may be changed.")

   Furthermore, "New York law permits a person to procure an insurance policy on

his or her own life and immediately transfer it to one without an insurable interest in that life,

even where the policy was obtained for just such a purpose." *Kramer v. Phoenix Life Ins. Co.*,

15 N.Y.3d 539, 536-37 (2010).  A purchaser's intention to re-sell a policy – or even a

misrepresentation regarding his or her intention – is not an "essential element of the bargain"

where the contract expressly states that ownership is freely transferable and such transfers are

permitted by applicable law.

   This Circuit has held that a mail or wire fraud "charge can not apply to situations

where the alleged victims 'received exactly what they paid for' and 'there was no discrepancy

between benefits reasonably anticipated and actual benefits received.'" *Shellef*, 507 F.3d, at 108,

*quoting Starr*, 816 F.2d, at 98-99.  Here, the insurance companies received exactly what they

bargained for – namely, enforceable and transferable contracts on the lives of purchasers with a

particular age and medical condition.  The insurance companies could not have "reasonably

anticipate[d]" that ownership of the policies would not be transferred when the contracts

expressly provide for transfer, and the law requires that it be permitted.

The supposed "harms" to the insurance companies alleged in the Indictment – such as a claim that third-party investors typically do not pay premiums above and beyond contractual requirements (Indictment ¶ 10b) – are "harms" that go well beyond the benefit of the bargain, and are the same "harms" that would result if the purchasers transferred ownership, as they are contractually entitled to do, without any alleged misrepresentation regarding their original intentions.  Simply, there was no discrepancy between what the parties reasonably anticipated based on the contracts and the benefits received.  In fact, far from being harmed, the insurance companies collected – and continue to collect to this day – millions of dollars in premiums as a result of these policies.

**A.      The Alleged Misrepresentations Were Not "Essential Elements of the Bargain."**

The Government alleges that the defendants caused misrepresentations to be made on applications that were "essential elements of the bargain" because the alleged misrepresentations "created discrepancies between (a) the benefits the Life Insurance companies reasonably anticipated from issuing the policies at issue . . . and (b) the actual benefits that the Providers received in doing so."  (Indictment ¶ 18).   The Government's entire theory of mail and wire fraud depends on a finding that the alleged misrepresentations amount to an "essential element of the bargain."  However, as the case law makes clear, the alleged misrepresentations were not essential to the bargain.

The Government alleges misrepresentations regarding:

> (a) the applicant's financial information;
>
> (b) the applicant's intent to re-sell the policy;
>
> (c) the existence of third-party financing of premiums;

(d) the purpose of procuring the policy; and

(e) the existence of other life insurance policies or applications for policies.

Indictment ¶ 9.  All of these representations go to one issue: whether the purchasers at the time of sale intended to later re-sell their policies.

In general, a straw buyer's misrepresentations that he or she is buying property for himself or herself, while intending to later transfer that property to a third party, does not violate the wire or mail fraud statutes.  For example, in *United States v. Kurtz*, No. 04-CR-0155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) the defendant circumvented a supplier's policy of not selling biological materials to private individuals by ordering the materials through a straw buyer who purchased the materials through the University of Pittsburgh's account.  Once the straw buyer obtained the materials he provided them to the defendant.  The court held that "it is clear that the indictment does not sufficiently allege a 'no-sale' theory of fraud," reasoning that "there is no allegation that the defendant's scheme depended on a misrepresentation of an essential element of the bargain," even where "the Material Transfer Agreement which accompanied each shipment provided that the purchaser not transfer the biological materials."  *Id.* at *6.

In *Kurtz* it was at least arguable that the misrepresentations went to an essential element of the bargain because the Material Transfer Agreement prohibited further transfer of the purchased items.  By contrast, the life insurance policies at issue in Mr. Binday's case expressly permit the policyholder to transfer the policy.  Misrepresentations about the policyholder's intent to transfer the policy could not have been essential to the bargain because the insurance company knew that the policyholder had a right to transfer the policy under the terms of the policy itself.

Similarly, in *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), the defendant misrepresented to the manufacturer of a regulated solvent that he was purchasing solvent for resale overseas (which was not subject to excise taxes), when in fact he intended to sell the solvent domestically.  The indictment alleged that the defendant's misrepresentations induced the manufacturer to sell solvent to him that it would not have sold had it known defendant's true intentions.  This Circuit held that the indictment was insufficient to allege a "no-sale" theory of wire fraud because the indictment did not allege that there was a "discrepancy between benefits reasonably anticipated" and actual benefits received.  *Id.* at 109.  "Instead, the indictment states only that [the defendant's] misrepresentation induced [the manufacturer] to enter into a transaction it would otherwise have avoided.  Because it does not assert that [the defendant's] misrepresentation had 'relevance to the object of the contract,'" the indictment was not legally sufficient." *Id.* (internal citations omitted).

There are also a number of cases outside the straw buyer context where this Circuit has held that misrepresentations that are not an essential element of the bargain cannot support a mail or wire fraud charge.  *See, e.g.*, *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d. Cir. 1970) (directing sales personnel to misrepresent their identities to prospective customers was not essential to the bargain because the misrepresentations were "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain"); *United States v. Starr*, 816 F.2d 94, 98-99, 100 (2d Cir. 1987) (concealing high-rate mail in low-rate mail packaging and charging customers for high-rate mailings "ha[d] no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion" and "there was no discrepancy between the benefits 'reasonably anticipated' and actual benefits received").

- 8 -

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) – a case bearing on national security – is an exception rather than the rule in straw buyer cases.  In *Schwartz*, defendants purchased night-vision goggles from a government contractor that was prohibited by the Arms Export Control Act from selling military equipment to designated enemy nations.  *Id.* at 414.  The defendants in *Schwartz* misrepresented to the contractor their intention to not export the military equipment to restricted nations when, in fact, that is what they intended to do.  *Id*. at 414-16.  In *Schwartz*, the court held that the misrepresentations were an essential element of the bargain because the parties had agreed that the equipment would not be transferred.  *Id*. at 421. The facts in *Schwartz* are distinguishable from the Indictment because the parties expressly agreed that the goggles could *not* be transferred to designated third-party nations.  In Mr. Binday's case, the parties expressly agreed that the policies *could* be transferred.  Moreover, while the resale of military equipment to hostile nations is clearly against the national interest, the resale of life insurance is consistent with the well-established public policy that "it is desirable to give to life policies the ordinary characteristics of property" – namely, owners may re-sell their policies freely.  *Grisby v. Russell,* 222 U.S. 149, 156 (1911).

### B.     The Insurance Companies Received Exactly What They Bargained For.

The insurance companies bargained for transferable contracts on the lives of specific purchasers with a specific age and medical condition, and that is what they received.  All the "harms" alleged by the Government either ignore a corollary "benefit" (which is why the insurance companies actively sought this business in the first place), or they are simply complaints that the owners of the policies did not exceed their contractual commitments as often as the insurance companies had hoped.  It is not reasonable for a party to a contract to expect that the opposing party will perform above and beyond its contractual commitments.  Yet the

supposed failure of the policy owners to over-perform on the life insurance policies is the only real harm the Government is alleging.

### 1. The Insurance Companies Were Not Harmed By Issuing Larger Policies.

The Government argues that "misrepresentations regarding applicants' net worth caused insurance companies to approve – and later pay out – larger death benefits than they otherwise would have approved."  Indictment ¶10a.  While Defendants do not dispute that larger policies result in larger death benefits, such policies also result in larger premium payments, which the insurance companies actively sought.  This is no different from a casino having $2 blackjack tables and $20 blackjack tables.  If there were sufficient demand, casinos would gladly raise the limits on every table because it means higher profits.  Having reaped the benefits of their bargain, in the form millions of dollars in premium payments, the insurance companies cannot now claim to be harmed by the size of the death benefits.

### 2. A Contracting Party Is Not "Harmed" When The Opposing Party Does Not Exceed Its Contractual Commitments.

The Government attempts to cure this defect in its Indictment by alleging other ways that the alleged misrepresentations upset the reasonable expectations of the insurance companies.  The insurance companies allegedly (1) received less premium income from third-party investors who purchased the polices; (2) experienced lower lapse rates in investor-owned policies and therefore had to pay out more death benefits; and (3) experienced delayed premium payments on investor-owned policies.  Each of these purported harms, however, is simply a different way of saying that the life insurance companies were entitled to expect that the policies they issued would be held by unsophisticated policyholders who would not fully exercise their rights under the policies.  They were entitled to no such thing.  First, as discussed above, the

policies themselves and relevant insurance law expressly permitted transfers, and the insurance

companies willingly entered into the policies knowing that they could be transferred to

sophisticated investors.

Second, the policies themselves explicitly permitted each of the actions that the

Government is now claiming harmed the insurance companies.  The Government has alleged:

- "a policy held or funded by a third-party investor typically would be funded at or near the minimum amount necessary to sustain the policy" as compared to "an insured's ability to pay premiums in amounts that exceeded the minimum necessary to sustain the policy." Indictment ¶10b.

- "a certain proportion of insureds would voluntarily terminate their policies, either by surrendering them or allowing them to lapse" however, the Providers "could not accurately assess the voluntary termination rate for universal life insurance policies financed and/or owned by third party investors." Indictment ¶10c.

- "funders and investors typically took advantage of grace periods and other features that permitted late payments of premiums with greater frequency than insured persons.... Accordingly, the cash flow available from those payments decreased where, unbeknownst to the Providers, investors funded and/or owned universal life policies they had insured."  Indictment ¶ 10d.

It is not reasonable for a contacting party to expect that the opposing party will

exceed its contractual commitments.   Nowhere do the contracts provide that policyholders must

(1) fund the policies above the minimum amount necessary to sustain the policy; (2) voluntarily

terminate their policies; or (3) not take advantage of grace periods that permitted late payments

of premiums.  It is well-settled that "[w]hen an agreement is negotiated by experienced

negotiating personnel, there is no basis to interpret it as impliedly stating something which the

parties neglected to specifically include." GLEN BANKS, NEW YORK CONTRACT LAW § 11:15

(2006).  Furthermore, contracts of adhesion and particularly insurance contracts are construed

against the drafter. *See, e.g.*, *Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co*., 421 Fed. Appx. 52, 54, 2011 WL 1667075, 2 (2d Cir. 2011) ("If the terms of a policy are ambiguous … any ambiguity must be construed in favor of the insured and against the insurer"); *Dalton v. Harleysville Worcester Mut. Ins. Co*., 557 F.3d 88, 90 (2d Cir. 2009).  In sum, the insurance companies cannot claim to be harmed by new terms, not agreed to by the parties, and found nowhere in the unambiguous contracts they drafted.  All that the insurance companies could reasonably expect is that the policyholders would meet their contractual commitments.  That is exactly what the insurers received.

       Moreover, it is fiction that the insurers were harmed by the third-party investors not exceeding contractual commitments.  The insurance companies were fully aware that each and every high value policy they issued to people over age 70 (like the defendants' clients) was likely to end up in the hands of an investor, and they priced such expectations into the policies. For example, in an internal Lincoln memorandum dated December 14, 2006 and obtained by the defense from another litigation, the company admits "For this block of ages [people over 70], we priced so that if we got zero lapses and minimum funded policies . . . we would achieve profitability consistent with the products overall pricing returns."  Lincoln Memo attached to Gaul Declaration as Exhibit 5, at Lincoln-013442.  This is a remarkable admission because the memo predates any of the policy applications referred to in the Indictment.  *See* Indictment ¶ 21 (application submitted by "Straw Buyer-1" in December 2007), ¶ 24 ("Straw Buyer-2," April 2008), ¶ 27 ("Straw Buyer-3," September 2008).  It means that contrary to the Government's allegations that the insurance companies lost money due to third-party ownership of policies, the insurance companies expected high value senior policies would be transferred and adjusted their policy pricing so they would experience no losses.   In the words of the memorandum itself, "if

we do get IOLI business in these products, it will not adversely impact profitability." (*Id*. at Lincoln-013342-013343.)  In short, excessive premium payments, high lapse rates and failure to use contracted grace periods were not (and could not be) essential elements of the life insurance bargain, and there was no harm to the insurance companies.

        The Government's allegations, even if taken as true, do not constitute the crimes of mail or wire fraud.  It is not enough that the defendants' alleged misrepresentations may have induced the insurance companies to enter into transactions they would have otherwise avoided. (And even that claim is exceedingly dubious.)   By the terms of every contract at issue here, the insurance companies bargained for millions upon millions of dollars in premium revenue in return for issuing freely transferable policies – policies that the insurance companies priced with the *expectation* that all of them would be transferred to third-party investors.  The alleged misrepresentations of Mr. Binday, Mr. Resnick and Mr. Kergil did not affect the contractual rights that the insurance companies bargained for.  As the case law of this Circuit demonstrates, the alleged misrepresentations do not constitute mail or wire fraud, and the criminal charges against the defendants should be dismissed.

## II.    The Government's Charge of Obstruction of Justice Under 18 U.S.C. § 1512 Fails As A Matter of Law.

        The Government's charge that Mr. Binday violated 18 U.S.C. § 1512(c)(2) (Indictment ¶¶ 44-45) by instructing "CC-2" to, in turn, instruct "CC-2's" clients to give allegedly false information to an "investigator" (Indictment ¶ 33) fails as a matter of law because the Government has not alleged, as it must, that Mr. Binday knew that his actions were likely to affect an official proceeding or even that the investigator in question was an FBI agent.

- 13 -

Section 1512(c)(2) provides: "(c) Whoever corruptly-- (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both."  The Government's allegations under §1512(c)(2) are insufficient because they fail to allege that Mr. Binday had intent to affect such a proceeding, or even that he was aware of a proceeding.

As the Supreme Court held in *United States v. Aguilar*, 515 U.S. 593, 599 (1995), "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct."  In *Aguilar*, the Court held that a violation of "§ 1503 require[s] ... a 'nexus' between the obstructive act and the proceeding." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-708 (2005).  While *Aguilar* analyzed § 1503, this Circuit has held that "§ 1512(c)(2) incorporates a 'nexus requirement' as articulated in *Aguilar*."  *United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007).  *See also United States  v. Gray*, 642 F.3d 371, 376 (2d Cir. 2011) ("§ 1512(c)(2), which proscribes corruptly obstructing a judicial proceeding or attempting to do so, requires proof of a nexus between the defendant's conduct and the proceeding").  Consequently, the same logic applies to § 1512(c)(2) as it does to § 1503:  a valid charge of obstruction "requires a specific intent to obstruct a federal judicial or grand jury proceeding.... [T]he conduct offered to evince that intent must be conduct that is directed at the court or grand jury and that, in the defendant's mind, has the 'natural and probable effect' of obstructing or interfering with that entity." *United States v. Schwarz*, 283 F.3d 76, 108 -109 (2d Cir. 2002).

In *Aguilar*, the defendant, himself, lied to an FBI agent in the course of an investigation and was charged with "corruptly endeavor[ing] to influence, obstruct, and impede … the due administration of justice" under 18 U.S.C. § 1503.  *Aguilar*, 515 U.S., at 601.  The

- 14 -

Supreme Court upheld the reversal of Aguilar's conviction because all the Government had shown was that Aguilar had uttered false statements to an investigating FBI agent "who might or might not testify before a grand jury." *Id.* at 600.   Even though Aguilar was aware of a grand jury investigation and lied to an FBI investigator regarding issues pertinent to that investigation, the Court held that Aguilar "lack[ed] knowledge that his actions [were] likely to affect the judicial proceeding." *Id.* at 599.   It was of no consequence that during the course of the FBI interview, Aguilar asked an FBI agent if he was the target of a grand jury investigation and the agent replied, "[t]here is a Grand Jury meeting ... some evidence will be heard. I'm … I'm sure on this issue." *Id.* at 600.  *See also United States. v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002) (rejecting the government's argument that that defendant had the requisite intent to violate §1503 even where "[defendant] initiated a meeting with the federal investigators and prosecutors that had served him with a federal grand jury subpoena for his documents").

In *Arthur Andersen*, the Supreme Court further extended the reasoning of *Aguilar* to § 1512(b)(2), holding that § 1512(b)(2) requires a "nexus" between a defendant's attempt to persuade another to destroy documents and a pending or foreseeable official proceeding.  *Arthur Andersen LLP v. United States,* 544 U.S. 696, 707-708 (2005) (reasoning that "[a] 'knowingly ... corrup[t] persuade[r]' cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material.")  Likewise, and as detailed above, this Circuit has extended the reasoning of *Aguilar* to § 1512(c)(2). *United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007); *United States v. Gray*, 642 F.3d 371, 376 (2d Cir. 2011).

Here, the only charges against Mr. Binday are that, in or about June 2010, Mr. Binday allegedly instructed "CC-2" to tell his clients not to speak with "investigators," and

- 15 -

subsequently, Mr. Binday allegedly instructed "CC-2" to tell his clients to make false statements to these "investigators."  Indictment ¶ 33.  The law is clear that such conduct, even if true, does not violate § 1512(c)(2) because there is no allegation that Mr. Binday had in contemplation any particular official proceeding.  The Government does not allege that Mr. Binday had knowledge of a judicial proceeding because it cannot.  In fact, the Government does not even allege that Mr. Binday knew that the "investigator" was an FBI agent as opposed to an investigator from one of the insurance companies with which he dealt, much less that Mr. Binday had any awareness that the investigator was contacting "CC-2's" clients in connection with a judicial proceeding.

Finally, it is notable that the conduct that is alleged here, unlike even the conduct at issue in *Aguilar*, is not that Mr. Binday himself made a false statement to the FBI, but that Mr. Binday allegedly persuaded others, who in turn persuaded yet others to make allegedly false statements to an investigator.  As the Supreme Court observed in *Arthur Andersen,* "We have traditionally exercised restraint in assessing the reach of a federal criminal statute…. Such restraint is particularly appropriate here, where the act underlying the conviction—'persua[sion]'—is by itself innocuous." 544 U.S, at 703 (international citations omitted).

Because the Government has failed to allege that Mr. Binday had any knowledge that the "investigator" in question was an FBI agent and that this "investigator" was contacting "CC-2's" clients as part of a judicial proceeding, the Government has not alleged the requisite element of intent under § 1512(c)(2) and that charge should be dismissed.

## **<u>CONCLUSION</u>**

For the reasons set forth above, Defendant Michael Binday respectfully requests that the charges of mail and wire fraud, attempt, conspiracy and obstruction be dismissed.

Dated:  New York, New York
October 1, 2012

Respectfully submitted,

STEPTOE & JOHNSON LLP

s/ Matthew J. Gaul
Michael C. Miller
Matthew J. Gaul
1114 Avenue of the Americas
New York, NY  10036
(212) 506-3900 (phone)
(212) 506-3950 (fax)
mgaul@steptoe.com

*Attorneys for Defendant Michael Binday*