**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MICHAEL BINDAY,
JAMES KEVIN KERGIL and
MARK RESNICK,

           Defendants.

Case No. 12 Cr. 152 (CM)
ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL BINDAY'S
MOTION, IN THE ALTERNATIVE,  FOR ISSUANCE OF SUBPOENAS TO
PURPORTED INSURANCE COMPANY VICTIMS PURSUANT TO RULE 17(C)**

STEPTOE & JOHNSON LLP
Michael C. Miller
Matthew J. Gaul
1114 Avenue of the Americas
New York, NY  10036
(212) 506-3900 (phone)
(212) 506-3950 (fax)

*Counsel for Defendant Michael Binday*

Dated: October 1, 2012

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

ARGUMENT ........................................................................................................ 12

I.     Defendants Should Be Allowed To Issue Rule 17(c) Subpoenas to the Purported
Insurance Company Victims Relating to the Materiality of the Alleged
Misrepresentations in this Case .......................................................................... 12

   A.   Federal Rules of Criminal Procedure 17(c) Authorizes The Court To Order
        The Pretrial Production of Evidence Subpoenaed For Trial ............................ 13

   B.   In This Mail And Wire Fraud Case, The Government Must Prove That Defendants
        Made A Material Misstatement ...................................................................... 15

   C.   A Central Defense Of Michael Binday At Trial Will Be That The Alleged False
        Statements To The Insurance Companies Were Not Material .......................... 17

   D.   The Discovery in this Case and Documents Obtained From Public
        Sources Support the Defense Argument that the Alleged Misrepresentations
        Were Not Material and Make It Clear That Additional Exculpatory
        Documents Must Exist in the Insurance Companies' Files ............................. 18

   E.   The Proposed Subpoenas Meet the Standards Set Forth in Nixon and Nachamie ........... 19

        1.     Mr. Binday's Subpoenas Meet The Requirements Set Out in *Nixon* ................... 20

        2.     Mr. Binday's Subpoenas Meet the Requirements Set Out in *Nachamie* ............. 23

II.    Defendant Binday Respectfully Joins in the Motions of his Co-Defendants ...................... 24

CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Kungys v. United States*,
    485 U.S. 759 (1988)....................................................................................16

*Lincoln Life & Annuity Co. of New York v. Bernstein*,
    No. 08-2641, 2009 WL 1912468 (N.Y. Sup. Ct. June 29, 2009) ..............................................6

*Lincoln Nat. Life Ins. Co. v. Calhoun*,
    596 F. Supp. 2d 882 (D.N.J. 2009) .......................................................3, 6

*Neder v. United States*,
    527 U.S. 1 (1999)....................................................................................15, 16

*Soanes v. Empire Blue Cross/Blue Shield*,
    970 F.Supp. 230 (S.D.N.Y. 1997)....................................................................................10

*United States v. Drakopoulos*,
    No. 02-CR-504, 2003 WL 21143080 (E.D.N.Y. Jan. 13, 2003) ..............................................15

*United States* v. *Finazzo*,
    No. 10-CR-457, 2011 WL 3794076 (E.D.N.Y. Aug. 24, 2011).....................................16, 17

*United States v. Gaudin*,
    515 U.S. 506 (1995)....................................................................................16

*United States v. Giffen*,
    379 F. Supp. 2d 337 (S.D.N.Y. 2004)....................................................................................23

*United States v. Gole*,
    21 F. Supp. 2d 161 (E.D.N.Y. 1997) ....................................................................................16

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994)....................................................................................16, 17

*United States v. Nachamie*,
    91 F. Supp. 2d 552 (S.D.N.Y. 2000)....................................................................................14, 15, 23

*United States v. Nixon*,
    418 U.S. 683 (1974)....................................................................................14, 15, 20

*United States v. Soliman*,
    No. 06 CR 236A, 2009 U.S. Dist. LEXIS 45194 (W.D.N.Y. May 29, 2009).........................15

*United States* v. *Stein*,
488 F. Supp. 2d 350 (S.D.N.Y. 2007)........................................................14

*United States v. Stevens*,
985 F.2d 1175 (2d Cir. 1993)...................................................................23

*United States v. Tucker*,
249 F.R.D. 58 (S.D.N.Y. 2008) ...............................................................14

## PLEADINGS

Complaint, *Am. General Life Ins. Co*. v. *Ellman Savings Irrevocable Trust*,
No. 08-CV-5364 (MLC) (TJB) (D. N.J. filed Oct. 30, 2008)...................8

Complaint, *Fleisher v. Phoenix Life Insurance Co*.,
No. 11 Civ. 8405 (CM) (S.D.N.Y. filed May 1, 2012).........................11

Complaint, *Lima LS plc v. PHL Variable Insurance Co*.,
No. 3:12-cv-01122-WWE (D. Ct. filed Aug. 2, 2012) ........................10

Complaint, *People of the State of New York v. Coventry First LLC, et. al.*,
No. 404620-2006 (N.Y. Sup. Ct. filed Oct. 26, 2006)...........................7

Complaint, *Wilmington Savings Fund Society v. PHL Variable Insurance Co.*,
No. CV-12-04926 (C.D. Ca. filed June 5, 2012) ................................11

## STATUTES AND RULES

FED. R. CRIM. P. 12(b) ........................................................................................1

FED. R. CRIM. P. 17(c) ............................................................................ passim

18 U.S.C. §§ 1341 and 1343 ........................................................................1, 15

18 U.S.C. § 1349 ...............................................................................................15

N.Y. INS. LAW § 3205(b) ....................................................................................4

N.Y. INS. LAW § 3105 .......................................................................................17

## BOOKS AND ARTICLES

Matthew Goldstein, *Profiting from Mortality*, BUSINESS WEEK, July 29, 2007.............................7

Thomas Ashley et al., *Mortality Experience in the Elderly in the Impairment Study Case System,* 40 J INSUR. MEDICINE 110 (2008) ..............................................................3

Defendant Michael Binday has moved this Court for an Order dismissing the Indictment in its entirety pursuant to Federal Rules of Criminal Procedure 12(b) and has filed a separate memorandum of law in support of that motion.  However, if this Court does not dismiss the Indictment, Defendant Michael Binday moves this Court in the alternative for an Order permitting the defendants to issue subpoenas *duces tecum* to insurance companies that are the purported victims of the fraud alleged in this case pursuant to Rule 17(c).  Mr. Binday also joins in the motions of his co-defendants.

## <u>INTRODUCTION</u>

The defendants are charged with conspiracy to commit mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343 and substantive counts of mail and wire fraud, based on alleged misrepresentations made to insurance companies on applications for life insurance policies.

The defendants are accused of making a series of misrepresentations, all of which allegedly hid the fact that the policies issued were likely to be re-sold by the original policyholders to third-party investors.  Defendant Michael Binday has argued in his Motion to Dismiss that the Indictment fails as a matter of law because the alleged misrepresentations were not an "essential element" of the bargain struck between the life insurance companies and their policyholders.

If the case is not dismissed, the defense seeks permission to take discovery from the purported insurance company victims on the question of whether the alleged misrepresentations contained in the insurance applications were material.  To sustain a conviction, the Government would have to prove beyond a reasonable doubt that the alleged misrepresentations were material to the life insurance transaction between the insurance

company and the policyholder.  The materiality of the alleged misrepresentations would be the critical issue at trial.

The defense has already obtained documents showing that the representations at issue were not material to the insurance companies' decision-making because (1) the insurance companies knew that their high value policies sold to people over age 70 were being re-sold to investors; (2) the insurance companies encouraged their sales people to bring in such policies; and (3) the insurance companies re-priced their policies to account for any potential changes associated with investor ownership.

While the Government has produced discovery it obtained from the complaining insurance companies and is in the process of assisting the defense in obtaining additional information from the insurance companies relating to the life insurance underwriting process on a voluntary basis, the Government has refused to compel the insurance companies to respond to further requests that go to the heart of Mr. Binday's materiality defense.  Documents that the defense has obtained independently make it clear that probing, targeted discovery of the insurance companies will produce additional relevant and exculpatory information.  If the Indictment is not dismissed, Mr. Binday moves this Court to allow discovery on the issue of materiality from the purported insurance company victims as set forth in the subpoena schedule ("Schedule") attached to the Declaration of Matthew J. Gaul ("Gaul Declaration") as Exhibit 1.

## BACKGROUND

In the middle years of the last decade, life insurance companies, including the purported victims in this case, sold thousands of high value life insurance policies to seniors. The policies typically had face amounts of $2 million or $4 million and occasionally ranged as high as $10 million or even $50 million.  Such policies required initial yearly premiums of

hundreds of thousands of dollars because of the relatively short life expectancies of the policyholders (who were in their 70s and 80s).  The required premiums also shot up dramatically as a policyholder aged and his or her life expectancy shortened further.  Until recently, high value senior policies made sense for only a tiny group of extremely wealthy individuals who (1) had sufficient cash flow to pay large premiums, and (2) were seeking to cover estate tax liability or to provide liquidity for an estate with significant non-liquid assets such as real estate.

Yet the life insurance industry experienced a sudden explosion of sales of high value senior policies in the years before the financial crisis of 2008.  *See, e.g.*, Thomas Ashley et al., *Mortality Experience in the Elderly in the Impairment Study Case System*, 40 J INSUR. MEDICINE 110, 110 (2008) ("the lure of new premium has led to a considerable increase in sales at ages 70 and up in recent years.")  The reason for this explosion was not mysterious to life insurance companies or any observer of the industry:  seniors had begun purchasing high value policies in order to re-sell them to investors in the rapidly growing secondary market for life insurance.

In the boom economy of the last decade, investors, including banks, hedge funds, pension funds and, in fact, life insurance companies themselves invested heavily in life insurance policies purchased from seniors, creating an enormous demand.  Such purchases were dubbed "life settlements."  *See Lincoln Nat. Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882, 885 (D.N.J. 2009) (noting that life settlements had become a big business, growing from $200 million in transferred death benefits in 1998 to $12 billion less than a decade later in 2005).  Life settlements were developed as a way for investors to acquire existing whole and universal life insurance policies that seniors had purchased years earlier but no longer needed or could no longer afford.  The investor/purchaser of the life settlement paid a cash lump sum to the

policyholder (usually significantly more than the policyholder would receive by surrendering the policy to the insurance company) and continued paying the premiums until the original policyholder died, at which point the investor was entitled to collect the policy benefit.  If the cash purchase price plus the premiums paid while the policyholder was alive was less than the proceeds of the policy, the investor came out ahead.

A life insurance policy is a contract wherein the policyholder agrees to pay premiums and the insurance company agrees to pay a benefit at the time of death.  The ratio between the premium charges and the death benefit is set by the life insurance company based on its underwriting determination of the life expectancy of the insured life.  The individual life that is insured never changes as a matter of contract.  Life insurance policies, however, are freely transferrable under the laws of New York and every other state at issue.  *See, e.g.*, N.Y. INS. LAW § 3205(b).  Moreover, life insurance policies (as is required by state law) are transferrable by their own terms.  Each of the insurance policies at issue in this case, though variously worded, expressly provided that a "change of owner may be made at any time by notice to us."  *See* Union Central Policy attached to Gaul Declaration as Ex. 2.

A permanent life insurance policy at its core is nothing more than a bet between the life insurance company and the policyholder about the longevity of the policyholder.   The life insurance company wins the bet if the premiums received plus any investment income earned on those premiums are more than the proceeds paid out when the policyholder dies.  The policyholder "wins" if he dies early.

The life insurance company has the advantage of playing the game in the aggregate.  If a company issues enough policies, their actuaries can predict longevity across the pool of policies with great accuracy.  Even if there are outlying policyholders who die young or

- 4 -

live to 110, a large pool of policies will produce very steady returns if the policies are priced correctly to account for the longevity risk.  The life insurance company (like the "house" in Las Vegas) always wins.

The life insurance company also controls the terms of the bet.  As the policyholder ages, and the risk of death in a given year grows, the premium goes up while the benefit that must be paid out upon death remains the same.  As the premiums rise, many policyholders eventually give up on the bet and let their policy lapse.  Such lapses further boost the life insurance company's profits because they never have to pay the death benefit.  In fact, in order to encourage such lapses, almost all permanent insurance policies include a "surrender" provision that allows the policyholder to sell his or her policy back to the insurer for a modest amount.  Life settlements create a market where policyholders can find out if other third parties are willing to pay more for the policy than its "surrender value."

Life settlements do nothing to change the terms of the bet that the life insurance company has made.  The policy language, the insured policyholder and his or her age, health and life expectancy remain exactly the same.  The only difference is that an investor is now on the other side of the bet.

In order to meet the ever-growing investor demand for high value senior policies, some insurance companies and their agents began encouraging seniors to take out large life insurance policies for the purpose of re-selling them to investors.  These efforts were limited, however, because the senior applicants were required to pay the steep initial premiums on the policies, and few were willing to make the investment.

A sea change in the life settlements market occurred with the development of premium finance programs that allowed seniors to take out a loan to pay the initial policy

premiums with the policy itself serving as collateral for the loan.  The senior policyholder could

then decide after a period of time whether to (1) keep the policy and pay back the loan or (2) sell

the policy to investors, pay back the loan and keep the rest of the sales proceeds as profit.  If

there were not any good offers for the policy in the market, the policyholder could also surrender

the policy to the finance company in full satisfaction of the loan.  *See Lincoln Nat.*, 596 F. Supp.,

at 885.  As a practical matter, the vast majority of seniors who purchased policies in this way

ultimately sold them to third-party investors or surrendered them to the finance companies, but

the seniors had significant life insurance coverage in place while they held the policy, and they

could choose to keep the policy if there was a change in circumstances, such as a diagnosis of

serious illness.

Such policies are often called stranger-owned or stranger-initiated life insurance

("STOLI") or investor-owned or investor-originated life insurance ("IOLI").  These terms are

usually used to describe policies that are originated for the primary purpose of re-selling them on

the secondary market as opposed to policies that are taken out primarily for insurance coverage

purposes.  *See, e.g. Lincoln Nat*, 596 F. Supp. 2d, at 884.

Funding from investors in the life settlements market pumped money into the life

insurance market and provided an exciting new source of revenue.  Some life insurance

companies actively encouraged sales of high value senior policies when they knew such policies

were likely to be re-sold.  A number of insurance companies formed subsidiaries to invest in the

life settlements market directly, and some formed or invested in premium finance companies.

*See e.g., Lincoln Life & Annuity Co. of New York v. Bernstein*, No. 08-2641, 2009 WL 1912468

at *3 (N.Y. Sup. Ct. June 29, 2009) ("STOLI arrangements are also legal and many life

insurance companies, plaintiff [Lincoln Life] included, have life settlement subsidiaries active in

the market of buying life insurance policies.")  However, over time, life settlements were characterized in the media as ghoulish "death bonds" where the insurers and investors were merely gambling on the lives of elderly policyholders.  *See, e.g.*, Matthew Goldstein, *Profiting from Mortality*, BUSINESS WEEK, July 29, 2007.  In October 2006, New York Attorney General Eliot Spitzer further tarnished the image of life settlements, filing a lawsuit against a leading life settlements provider, accusing the company of rigging bids and ripping off elderly policyholders. *People of the State of New York v. Coventry First LLC, et. al.*, No. 404620-2006  (N.Y. Sup. Ct., N.Y. Cty. filed Oct. 26, 2006).

In this environment, the life insurance industry began to institute internal "anti-STOLI" or "anti-IOLI" policies purportedly designed to prevent sales of policies that were destined to be re-sold to investors.  The life insurance application questions that are at the heart of this case were developed during this period.  As the Indictment alleges, these questions sought information designed to uncover whether the applicant intended to re-sell his or her policy and related to:   "a. the applicant's financial information; b. the applicant's intent to re-sell the policy; c. the existence of third-party financing of premiums; d. the purpose of procuring the policy; and e. the existence of other life insurance policies or applications for policies."  Indictment ¶9.

However, despite instituting these policies, the insurance companies did not shut down their sales of high value life insurance policies to seniors – along with the massive revenue stream such policies generated.  There is a growing body of evidence that life insurance companies routinely ignored or curtailed their own anti-STOLI and anti-IOLI policies in practice in order to issue policies they knew were likely to be re-sold.

For example, in May of 2006, American General Insurance Company, a division of AIG and one of the companies named as a purported victim in the Indictment in this case, told

its underwriting staff and agents that it would "no longer approve applications received that are investor owned, stranger owned or viatical transactions" and would require that every application for a proposed insured who was 70 or older with a face amount of $1 million or more be accompanied by "a copy of the proposed insured's most recently filed Federal Tax Return (IRS Form 1040)" to verify the person's stated income.  See Gaul Declaration Ex. 3, at p. 1.  The clear implication is that until May 2006, AIG approved policies that were investor owned.

Nonetheless, in May 2006 AIG apparently changed its mind and seemed to be looking for ways to shut down sales of such policies.  AIG had realized that in many instances applications for policies that would be re-sold to investors overstated the income of the potential insured in order to support the high value on the policy.  Thus, the tax return requirement was an excellent tool for detecting such policies.  After just a few weeks, however, AIG reversed the tax return requirement and decided that it would require tax returns only for policies with a face amount of $5 million or more.   AIG had discovered that its tax return requirement was a little too effective:  its applications for high value senior policies had dropped dramatically.  AIG's Vice President for Underwriting has testified that AIG dropped the tax return requirement because "the product was changed, the product was priced differently."  See Gaul Declaration Ex. 4 at Tr. 154:20-22.  Therefore, AIG made a conscious decision to lift one of its most effective tools for detecting whether a policy was destined to be re-sold to investors, and it did so after it had redesigned and re-priced the policy to take into account investor ownership.  The AIG Memo and Underwriting Vice President's testimony were not provided to the defense as part of the discovery in this case.  Fortunately, they were part of the public record in a civil case in New Jersey.  *Am. General Life Ins. Co*. v. *Ellman Savings Irrevocable Trust*, No. 08-CV-5364 (MLC) (TJB) (D. N.J. filed Oct. 30, 2008).

In another example, in a December 14, 2006 internal Lincoln memo, company officials set forth in extensive detail the steps Lincoln was taking to shut down IOLI policies. See Gaul Declaration Ex. 5. On the fourth page of the memo, however, the authors admitted that a certain number of IOLI policies would still be issued despite the steps taken. Rather than propose stronger steps (such as simply shutting down sales of high value polices to seniors or requiring tax returns to verify income), the authors noted that the company was re-pricing all of its senior business to account for possibly lower lapse rates in policies owned by investors. The pricing adjustment simply assumed that all policies sold to people over the age of 70 would not lapse. In other words, the insurance company assumed that all such policies were IOLI and priced the premiums accordingly. The casino changed the terms of the bet to make sure it got the returns it wanted on IOLI policies: "For this block of ages, we priced so that if we got zero lapses and minimum funded policies (classic IOLI), we would achieve profitability consistent with the products overall pricing returns." In other words, "[I]f we do get IOLI business in these products, it will not adversely impact profitability." *Id*. at 4-5.

The life insurance companies' public anti-STOLI stance and the application questions at issue in this case had an added benefit: when the original policyholders died, and it came time to pay out the policy benefits, the insurance companies' could renege on their bets by arguing that they had been duped into issuing a STOLI policy. Some insurance companies, including purported victims in this case, are doing just that. After collecting millions of dollars in premiums, they routinely deny and litigate claims on life insurance policies owned by investors when the original policyholder dies. Their essential argument in these cases is that the policies should be rescinded because they violate state insurable interest laws and were therefore void at the outset. In a novel theory of rescission, however, the insurance companies have also

argued that they should be able to keep the premiums collected on a policy during the years before the policyholder died.  In general, courts have rejected this theory and forced the insurance companies to pay the benefits under the policy – particularly where it has been shown that the insurance company knew the policy was owned by an investor and continued to collect premiums.  In New York, "an insurance company is not entitled to accept premiums and at the same time repudiate the insurance contract."  *Soanes v. Empire Blue Cross/Blue Shield*, 970 F.Supp. 230, 243 -244 (S.D.N.Y. 1997).

    Meanwhile, investors have begun to fight back, filing lawsuits in a number of jurisdictions.  These lawsuits recognize that it is "no secret that insurance companies … initially helped to create the secondary market for life insurance because it allowed them to sell significantly larger amounts of insurance," and that they did so by "adopted[ing] a sales strategy that involved relaxing or disregarding [their] normal underwriting standards and encouraging consumers to overstate their net worth and income." Complaint, *Lima LS plc v. PHL Variable Insurance Co*., No. 3:12-cv-01122-WWE at ¶¶ 10, 11 (D. Ct. filed Aug. 2, 2012), attached to Gaul Declaration as Ex. 6.

    These civil litigants continue to uncover evidence that insurance companies knowingly issued STOLI/IOLI policies.  For example, Phoenix Life Insurance Company ("Phoenix"), a company referred to (though not by name) in Paragraphs 37(f) and (g) of the Indictment as a purported victim in this case, actively encouraged its sales force to solicit seniors to buy policies for resale.  One Phoenix employee estimated in sworn testimony that "as much as 80% of [Phoenix's] life insurance business was what [Phoenix] now denounce[s] as IOLI."  He also testified that Phoenix's "CEO would have had to have had a 'learning disability' to not know that IOLI had become Defendants' core business" and that "[Phoenix's] managers

encouraged the solicitation of such business and taught employees how to find such business." Another former employee testified that "(i) his compensation rose from $75,000 in 2004 to $1.8 million in 2006 as a result of the sale of policies [Phoenix] now denounce [s] as lOLl; (ii) he generated as much premium revenue as some entire life insurance companies due to the sale of such policies; (iii) [Phoenix] implemented sales quotas which were impossible to meet without selling such policies; and (iv) it 'doesn't take a rocket scientist to figure out what was happening' in [Phoenix's] life insurance operations." *See* Wilmington Compl. ¶ 9 attached to the Gaul Declaration as Ex. 12. Another member of Phoenix's internal sales force testified about Phoenix's attitude toward issuing life insurance policies that would later be sold to investors on the secondary market. According to this employee, his manager, "definitely encouraged that type of business privately." *See* Lima Compl. ¶ 70 attached to the Gaul Declaration as Ex. 6.

       The battle between the insurance companies and the life settlement investors continues to rage in courtrooms around the country. One such action is before this Court. *See Fleisher v. Phoenix Life Insurance Co., No. 11 Civ. 8405 (CM) (S.D.N.Y.)*; *see also* Request IV.Y in the Schedule attached to the Gaul Declaration as Ex. 1 (list of litigations related to high value senior policies involving the purported insurance company victims in this case). Mr. Binday's Indictment is just one small piece of that battle. The investigation of Mr. Binday and the instant criminal Indictment are part of ongoing efforts by some life insurance companies to discredit STOLI policies and boost their own revenues. It is clear from discovery provided by the Government in this case that officials from Lincoln complained to the FBI about Mr. Binday's conduct and have been in close contact with the Government throughout its grand jury investigation. *See* Email from Ken Elder (Lincoln) to Thomas McDonald (FBI) attached to Gaul Declaration as Ex. 7.

Official and unofficial policies concerning STOLI changed over time and varied from company to company.   But one thing is clear in the aggregate:  by not shutting down the sale of high value policies to people in their 70s and 80s when they knew that such policies were being re-sold to investors, many life insurance companies, including the purported victims in this case, willingly entered into a series of bets with the investment community about longevity of their policyholders.  The defendants in this case did nothing more than help the insurance companies enter into bets they already wanted to make.

The defendants should never have been indicted because they did not commit a crime.  At most the insurance companies should be challenging the policies at issue here in civil court, but those cases have generally gone against the insurers because the insurance companies received exactly what they bargained for when they issued thousands of high value senior policies in the years leading up to the financial crisis.

## ARGUMENT

I.     **Defendants Should Be Allowed To Issue Rule 17(c) Subpoenas to the Purported Insurance Company Victims Relating to the Materiality of the Alleged Misrepresentations in this Case.**

The Indictment alleges that defendants caused misrepresentations to be made to life insurance companies on policy applications regarding the financial status of the elderly persons to be insured, the source of the premiums to be paid on the policies, the applicants' intentions with respect to the re-sale of the policies, the purpose of the policies, and whether the applicant had other life insurance policies or pending applications for such policies.  To prove mail or wire fraud, the Government must prove beyond a reasonable doubt that the alleged misrepresentations were material to the insurance company to which that statement was made.

The documents and other discovery sought in each of the subpoenas at issue in this motion go directly to the issue of the materiality of the alleged misstatements and are essential to the preparation of Michael Binday's defense.

A schedule of subpoena requests is attached to the Gaul Declaration as Exhibit 1. Most of the requests are generic and will be sent to (1) the four insurance companies named in Paragraph 4 of the Indictment (American General Life Companies, Lincoln Financial Group, Security Mutual Insurance Company, Union Central Life Insurance Company); (2) PHL Variable Life Insurance Company which is referred to specifically but not by name in Paragraphs 37(f) and (g); and (3) other insurance companies not named in the Indictment that issued high value senior policies to Mr. Binday's clients and may be referred to in Paragraph 13 and 17(e) of the Indictment (AXA Equitable Life Insurance Company, John Hancock Life Insurance Company (U.S.A.), The United States Insurance Company in the City of New York, Aviva Life and Annuity Company of New York, Bankers Life Insurance Company of New York, Indianapolis Life Insurance Company, Lincoln Benefit Life Company, Mass Mutual Life Insurance Company, MetLife Investors USA Insurance Company, Pruco Life Insurance Company, Sun Life Assurance Company of Canada.)  All of these collectively are referred to herein as the "relevant insurance companies."  There are also several requests in the Schedule based on specific facts uncovered by the defense that are directed to specific life insurance companies within the group of "relevant insurance companies."

**A.    Federal Rules of Criminal Procedure 17(c) Authorizes The Court To Order The Pretrial Production Of Evidence Subpoenaed For Trial.**

Fed R. Crim. P. 17(c) governs the issuance of subpoenas *duces tecum* in federal criminal proceedings.  Rule 17(c) provides in relevant part:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Rule 17(c) is the "proper device for discovering documents in the hands of third parties" and a "crucial" component of the constitutional rights to compulsory process and confrontation.

*United States v. Tucker*, 249 F.R.D. 58, 65, 67 (S.D.N.Y. 2008) (citations omitted).

In *United States v. Nixon*, 418 U.S. 683 (1974), the Supreme Court considered a motion by the prosecution for an order compelling pretrial production of documents demanded from a third-party in a trial subpoena *duces tecum* issued under Rule 17. The Court held:

> [I]n order to require production prior to trial, the moving party must show (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Id.* at 699-700. Courts confronted with a request to order pretrial production of materials called for by a subpoena issued in a criminal case "have applied *Nixon* almost without exception."

*United States* v. *Stein*, 488 F. Supp. 2d 350, 365 (S.D.N.Y. 2007).

However, courts have also noted that *Nixon* addressed a request for pretrial production by the government, and that such a request by a defendant may be entitled to consideration under a more lenient standard. For example, in *United States v. Nachamie*, 91 F. Supp. 2d 552 (S.D.N.Y. 2000), District Judge Scheindlin observed that the Supreme Court's ruling in *Nixon* related specifically to a request by the government and noted that "[a] real question remains as to whether it makes sense to require a defendant's use of Rule 17(c) to

- 14 -

obtain material from a non-party to meet this same standard." *Id.* at 562. The *Nachamie* Court pointed out that the government's use of a 17(c) subpoena "occurs *after* the completion of a grand jury investigation" and that, "[u]nlike the Government, the defendant has not had an earlier opportunity to obtain material by means of a grand jury subpoena." *Id*. at 562-63 (emphasis in original). The Court concluded that this discrepancy warrants a more lenient standard for considering defense applications for an order requiring pretrial production under Rule 17(c) and posited a two-part test for a defense subpoena: "whether the subpoena [is] (1) reasonable, construed using the general discovery notion of 'material to the defense;' and (2) not unduly oppressive for the producing party to respond." *Id*. at 563; *see United States v. Drakopoulos*, No. 02-CR-504 (SJ), 2003 WL 21143080 at *1 (E.D.N.Y. Jan. 13, 2003). *See also United States v. Soliman*, No. 06 CR 236A, 2009 U.S. Dist. LEXIS 45194, at *6-11 (W.D.N.Y. May 29, 2009) (observing that the Supreme Court in *Nixon* did not rule on the standard for subpoenas issued to non-parties, and applying the "less stringent" *Nachamie* standard in authorizing third-party subpoenas; *Nixon*, 418 U.S. at 699 n.12 (different, and less burdensome, standard may be appropriate where a Rule 17(c) subpoenas seeks discovery from a third party as opposed to the government).

**B.      In This Mail And Wire Fraud Case, The Government Must Prove That Defendants Made A Material Misstatement.**

Defendants are charged with mail fraud and wire fraud, conspiracy and attempt under 18 U.S.C. §§1341, 1343 and 1349. To convict a defendant of these charges, the government must prove beyond a reasonable doubt that the defendant made a false statement and, separately, that the false statement was material. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 20 (1999) (in reviewing substantive mail fraud conviction, rejecting holding below that "the failure to submit materiality to the jury was not error because the fraud statutes do not require

that a 'scheme to defraud' employ *material* falsehoods") (emphasis in original); *United States v. Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994) (reversing conviction for conspiracy to commit mail fraud based on erroneous instruction on materiality).

For a misstatement to be material, it "must have 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (*quoting Kungys v. United States*, 485 U.S. 759, 770 (1988)). Thus, materiality must be assessed exclusively from the point of view of the person or entity to whom the false statement is directed, without regard to the defendant's intent. *See, e.g.*, *Neder*, 527 U.S. at 24 (rejecting government's argument that the materiality requirement is satisfied "so long as the defendant *intended* to deceive the victim, even if the particular means chosen turn out to be immaterial, *i.e.*, incapable of influencing the victim") (emphasis in original).

Under the Second Circuit's holding in *Mittelstaedt*, there can be no liability for mail or wire fraud "unless the [false statement] can or does result in some tangible harm," and "[t]o be material, the [false statement] either must be of some independent value or must bear on the ultimate value of the transaction." 31 F.3d at 1217; *see United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) ("the Second Circuit has made clear that even deliberately false statements do not suffice to prove intent to defraud unless they are more than marginally material to 'ultimate value of the transaction'"). In *United States* v. *Finazzo*, No. 10-CR-457 (RRM), 2011 WL 3794076 at *6 (E.D.N.Y. Aug. 24, 2011), Judge Mauskopf elaborated on the *Mittelstaedt* standard: "A misrepresentation is material only if 'the information withheld either [has] some independent value or [] bear[s] on the ultimate value of the transaction, and "[t]he result of [defendant's] misrepresentations is an obvious 'discrepancy' between the 'benefits

- 16 -

reasonably anticipated' by [the victim] … and the 'actual benefits received'…." (Citations omitted).  Thus, in a mail or wire fraud case, the government "ha[s] to establish that the [false statement] caused or was intended to cause actual harm to the [victim] of a pecuniary nature *or* that the victim could have negotiated a better deal for itself if it had not been deceived." *Id*. at *4 (quoting *Mittelstaedt*) (emphasis in original).

In this case, which is based on alleged misstatements made to insurance companies to induce them to issue life insurance policies, the legal meaning of materiality must be further refined with reference to New York Insurance Law § 3105 and its definition of materiality in the context of misrepresentations made to an insurance company by a would-be purchaser of an insurance policy in order to obtain a policy.  That section provides in relevant part:  "(c) In determining the question of materiality, evidence of the practice of the insurer which made such contract with respect to the acceptance or rejection of similar risks shall be admissible."  This longstanding legal definition of what is or is not considered material to an insurance company in the context of the issuance of a policy necessarily guided the actions of the large and sophisticated insurance companies that issued the policies at issue in this case. Therefore, the materiality of the alleged misrepresentations in this case will hinge on each insurance company's "acceptance or rejection" of similar policies that the company knew to be STOLI or otherwise likely to be re-sold to investors.

### C.     A Central Defense Of Michael Binday At Trial Will Be That The Alleged False Statements To The Insurance Companies Were Not Material.

The government's underlying theory of wrongdoing is that defendants "fraudulently induc[ed]" the life insurance companies to issue policies, Indictment at ¶ 17, by causing the potential insureds, which the government refers to as "Straw Buyers," "to make material misrepresentations" on insurance applications, *Id.* at ¶ 16, and that these

- 17 -

misrepresentations "created discrepancies between (a) the benefits that the Life Insurance companies reasonably anticipated from issuing the policies at issue and paying the accompanying millions of dollars in commissions to [defendants], and others known and unknown, and (b) the actual benefits that the Providers received in doing so." *Id.* at ¶ 18. According to the Indictment, the specific false statements on the applications were that:

> (a) the Straw Buyers had assets and net worths of millions of dollars;
>
> (b) the Straw Buyers did not intend to resell the life insurance policies on the secondary market;
>
> (c) the Straw Buyers intended to pay the premiums themselves with their own money;
>
> (d) the purpose of the insurance policies was estate planning; and
>
> (e) the Straw Buyers did not have any other pending application or effective policies for life insurance.

*Id.* at ¶ 16.

One of Michael Binday's key defenses at trial will be that to the extent any such false statements were made, or caused to be made, by any defendant, those statements were not material to the insurance companies in deciding to issue policies. The lack of materiality will be demonstrated by the fact that in practice the insurance companies routinely loosened, undermined or ignored their stated anti-STOLI policies in order to issue policies they knew were destined to be re-sold.

### D. The Discovery in this Case and Documents Obtained from Public Sources Support the Defense Argument that the Alleged Misrepresentations Were Not Material and Make It Clear that Additional Exculpatory Documents Must Exist in the Insurance Companies' Files.

As discussed in the background section above, documents uncovered so far indicate that the alleged misrepresentations were not material and that while the insurance

companies paid lip service to detecting and rejecting STOLI, they in fact created an environment that made it easier to sell high value senior policies to be re-sold to investors.  The existence of such documents strongly indicates that additional exculpatory documents exist in the insurance companies' files.

The defendants have a reasonable expectation that further targeted discovery will produce powerful evidence to support their defense related to materiality.

### E.    The Proposed Subpoenas Meet the Standards Set Forth in Nixon and Nachamie.

Each of the trial subpoenas *duces tecum* that Michael Binday intends to serve on the relevant insurance companies has attached to it the same "Schedule" of documents requested. This uniform Schedule seeks documents relating to (1) specific individual policies and applicants, and (2) specific policies, procedures and investigations.  There are also several requests on the Schedule that will only be directed to particular insurance companies.

The documents sought by the defense fall into six categories:  (1) documents related to specified individuals who applied for policies through the defendants; (2) documents related to the insurance companies' underwriting policies and procedures; (3) documents related to the insurance companies' anti-STOLI policies, practices and investigations;  (4) documents related to the insurance companies' approved premium financing programs; (5) documents related to other STOLI litigation; and (6) documents related to particular events at particular companies.  Such evidence will prove that the alleged misrepresentations were immaterial to the relevant insurance companies.

### 1.    Mr. Binday's Subpoenas Meet The Requirements Set Out in *Nixon*.

The requests for documents included in Mr. Binday's subpoenas easily meet the tests set out in *United States v. Nixon*.

### a)    Documents sought are evidentiary and relevant.

The documents sought in each of the six categories areas are relevant and evidentiary.

The first category of requests relates to any person over 70 years old who applied for a universal life insurance policy with a face amount of $2 million or more and whose application involved Michael Binday, James Kevin Kergil, Mark Resnick or Paul Krupit in any way. See Gaul Dec. Ex. 1. The Government used these parameters as a proxy for potential STOLI policies when requesting documents during the course of its investigation. Some of the relevant insurance companies produced some of these documents during the grand jury proceedings, and those documents have been produced to the defendants. It is critical to the defense that all of the relevant insurance companies produce all of the documents related to individuals who were potentially involved in STOLI arrangements with the defendants, so that the defense can prepare adequately for trial. Without such discovery the Government will be able to surprise the defendants with alleged misrepresentations at trial related to policies for which the defense does not have a complete record.

The second category of documents relates to the underwriting policies and practices of each of the relevant insurance companies. The Government has put these underwriting policies and practices of the insurance companies squarely at issue in this case by alleging for example that (1) an insured's intent to re-sell a policy; (2) third-party financing of premiums; and (3) the stated purpose of the policy significantly informed the Insurer's financial expectations with respect to universal life insurance policy. As discussed in the background

- 20 -

section above the defense has already obtained some evidence that these allegations are not true, and further discovery from the relevant insurance companies' own files will provide further exculpatory evidence for the defense.

The documents in the third category are relevant and evidentiary because, as described in the background section above, the insurance companies' stated and public anti-STOLI policies were often ignored or loosened in practice to allow the companies to issue high value senior policies they knew were likely to be re-sold to investors.  As part of these practices the companies also priced their policies to account for their expectation that the policies would be re-sold.  Further, such evidence would show that the defendants' alleged misrepresentations were immaterial.

The documents in the fourth category are relevant and evidentiary because they will show that the insurance companies approved extensive premium finance programs, identical to the ones used by the defendants.  These programs facilitated the very STOLI policies the insurance companies now purport to have tried to screen out.  These documents will show that any alleged misrepresentations concerning the existence of premium financing were immaterial to the life insurance companies.

The documents in the fifth category are relevant and evidentiary because they will show that the life insurance companies helped to create the secondary market for life insurance and that they did so by adopting sales strategies that involved relaxing or disregarding their underwriting standards and encouraging consumers to overstate their net worth and income.  The Lincoln and AIG documents cited in the background section above were obtained from litigants in these other cases, but many of the relevant documents in similar cases were produced under seal and/or pursuant protective orders in these related cases.  The defendants therefore seek the

production of those documents here where they will be subject to a similarly strict protective order.

Finally, the defendants seek documents related to a few specific meetings and events where they understand insurance company policies concerning high value senior policies were discussed. These documents will be relevant because they will show that that the alleged misrepresentations were not material to the insurance companies.

**b)**   **The documents requested are not otherwise procurable in advance of trial.**

There is no means available other than the proffered subpoenas to obtain prior to trial the information Mr. Binday is seeking from the insurance companies. Such documents are not publicly available and the Government has not provided them in discovery.

**c)**   **Mr. Binday cannot properly prepare for trial without pretrial production of the requested documents.**

The materials requested in the subpoenas are essential to Mr. Binday's preparation for trial. In effect, he cannot engage in any preparation with regard to the essential element of materiality – which is assessed exclusively from the point of view of the insurance companies – without knowing what the allegedly false statements are on each policy application that was bound into an issued policy. Similarly, having pretrial access to the details of the insurance companies' actual inquiries into, and findings about, the allegedly false statements is essential to defense preparations, and the same is true for the companies' underwriting guidelines and internal statements about the market for STOLI and IOLI policies.

**d)**   **Mr. Binday's request under Rule 17(c) is made in good faith and is not a fishing expedition.**

For all of the reasons set out in this memorandum, Mr. Binday must have the requested materials in order to prepare his defense and to prepare to use those materials as

evidence at the trial.  The documents that have already been produced and that the defense has

obtained from the public record in other civil litigations show that this is not a fishing expedition

because additional similar documents demonstrating that the defendants' alleged

misrepresentations were not material to the insurance companies must exist in the insurance

companies' files.  The defense has also demonstrated its good faith by working diligently to

obtain documents from other sources, by working with the Government to obtain documents

voluntarily from the insurance companies, and by tailoring its discovery requests to minimize

any burden on the insurance companies.

> **2.     Mr. Binday's Subpoenas Meet the Requirements Set Out in *Nachamie.***

Mr. Binday's subpoena requests are reasonable in that they are material to his

defense, and they would not be unduly oppressive for the subpoenaed insurance companies to

produce, *United States v. Nachamie*, 91 F. Supp. 2d at 563.  A document is material to the

defense if it "could be used to counter the government's case or to bolster a defense."  *United

States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993); *see United States v. Giffen*, 379 F. Supp.

2d 337, 342 (S.D.N.Y. 2004) (Put another way, a document "is material if its pretrial disclosure

will enable a defendant to alter significantly the quantum of proof in his favor.")  For the reasons

discussed in this memorandum, the documents requested in the subpoenas could determine the

outcome of Mr. Binday's trial, and therefore they are unquestionably material to his defense.  In

addition, the requests set out in the subpoenas are focused and targeted, and production in

response to them would not be oppressive for the insurance companies.

II.      **Defendant Binday Respectfully Joins in the Motions of his Co-Defendants**

        Mr. Binday respectfully joins in the motions of his co-defendants to the extent they are applicable to him and/or inure to his benefit and to the extent they do not contradict any of the arguments in Mr. Binday's motions.

## CONCLUSION

        For the reasons set forth above, Defendant Michael Binday respectfully requests that the Court direct the pretrial production of the documents and other materials sought in his trial subpoenas addressed to the insurance companies at issue in this case pursuant to Rule 17(c).

Dated:  New York, New York
       October 1, 2012

                                  Respectfully submitted,

                                  STEPTOE & JOHNSON LLP

                                       s/ Matthew J. Gaul
                                Michael C. Miller
                                Matthew J. Gaul
                                1114 Avenue of the Americas
                                New York, NY  10036
                                (212) 506-3900 (phone)
                                (212) 506-3950 (fax)
                                mgaul@steptoe.com

                                *Attorneys for Defendant Michael Binday*