UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

UNITED STATES OF AMERICA,

      -against-                                                        12 Cr. 152 (CM)

MICHAEL BINDAY, et al.,

      Defendants.

——————————————————————x

DECISION AND ORDER RELIEVING COUNSEL FOR DEFENDANT
BINDAY DUE TO AN UNWAIVABLE CONFLICT OF INTEREST;
ADJOURNING TRIAL AND ALL OTHER PROCEEDINGS TO ALLOW
MR. BINDAY TO OBTAIN NEW COUNSEL [REDACTED].

McMahon, J.:

      Virtually on the eve of trial, the law firm of Steptoe and Johnson, counsel for defendant

Michael Binday, have petitioned the court for permission to withdraw due to what it has

concluded is an unwaivable conflict of interest. (Steptoe Letter dated March 7, 2013, Docket

#116)

      After consulting with the firm, both in open court and in an *in camera* session, I have

reluctantly reached the conclusion that Steptoe must be relieved. This will result in the

postponement of an imminent trial for three defendants – a particularly painful result for the men

who are in chancery, for the Government, and for the court, which calendared this case long ago.

However, on the record before me, the presumption in favor of a defendant's choice of counsel

has been overcome by "a showing of a serious potential for conflict." *Wheat v. United States*,

486 U.S. 153, 259 (1988).

1

Since the inception of this prosecution, defendant Binday has been represented by a team of attorneys from Steptoe & Johnson, headed by Michael Miller, Esq. At various times during the proceedings before this court, Mr. Miller has advocated that his client is not guilty because the representations made to insurance companies in the course of applying for so-called STOLI life insurance policies that the Government assigns as the basis for its charges of fraud were not material to the companies' decision to issue STOLI policies. That defense lies behind defendants' service, on a number of insurance companies, of Rule 17 subpoenas *duces tecum* demanding the production of documents to the defense.

At the time the indictment was handed down, Steptoe apparently knew that several of the insurance companies identified as victims in the indictment were clients of the firm. The matters on which Steptoe was representing these companies "appeared at the time" to be unrelated to the transactions that underlie the indictment, and Steptoe concluded that no conflict would prevent Mr. Miller from undertaking Mr. Binday's defense. (Docket #116). The court was not apprised of any potential for conflict; I do not believe that the Government was, either.

During the course of trial preparation, it seems that "other issues arose" (*id.*) -- apparently after the defense team served Rule 17 trial subpoenas on a number of insurance companies, more than one of which was a client of Steptoe's. To try to obviate any conflict, the firm, at its own expense, retained Andrew Lankler, Esq., of Lankler, Carragher & Horwitz, to cross examine any witnesses from insurance companies represented by the firm who might be called during trial. The firm also entered into negotiations to see whether this solution would be acceptable to the subpoenaed companies. Finally, Steptoe retained Michael S. Ross, Esq., a former Assistant United States Attorney in this district and a recognized ethics expert, to cast a fresh eye on entire situation. The court was not aware of any of this, either -- until February 27, 2013, when a letter

2

arrived from Mr. Miller. (Docket # 119). It revealed the retention of Mr. Lankler and suggested that everything was under control. Mr. Miller did indicate that it might be appropriate to hold a conference, but his letter gives off no sense of urgency.

On March 7, 2013, I received the letter motion alluded to in the first paragraph of this opinion, advising me that Steptoe, in consultation with outside ethics counsel (Mr. Ross), had concluded that it was required to withdraw from the representation of Mr. Binday. The Government, all defendants and all defense counsel, plus Mr. Lankler, Mr. Ross, and additional representatives of Steptoe appeared for a conference on March 11, 2013. During that proceeding, when all parties and counsel were present, Steptoe (principally through Mr. Ross) advised the court of the following:

(1) A group of several insurance companies that had been subpoenaed, all represented by the same firm, advised Steptoe that the companies would not consent to the use of Mr. Lankler to obviate any conflicts and were moving to quash the subpoenas that had been served on them.

(2) Senior officials of a highly significant Steptoe insurance client ("Client A") -- whose annual book of business with the firm, while not specifically disclosed, was represented to be significant[1] -- had learned about Steptoe's representation of Mr. Binday, the subpoenas, and the efforts to use "conflict counsel" to resolve any conflict. Not only had this client refused to concede that the conflict would be waived if Mr. Lankler cross examined any witness from that company who might be called at trial; it notified the firm that Steptoe's business relationship with Client A would be at risk if Steptoe continued to represent Mr. Binday.

With the occurrence of these two events, Mr. Ross concluded that Steptoe needed to withdraw from the Binday representation, and that the court needed to be apprised of this development urgently. An *in camera* session followed, at which I learned very little that I did not already know.

---

[1] [redacted]

An additional complication arose because the Government had just learned that Steptoe represented a hedge fund whose employee had recently been served with a trial subpoena. The Government took the position that enough in the way of conflicts and the potential for conflicts had come to light so that the Court would be justified in removing Steptoe as Mr. Binday's counsel. (Gov't Letter of March 11, 2013, Docket #120).

After hearing from everyone, the court adjourned the matter to give it a little thought, and to allow the parties to interpose any further thoughts of their own. No one has augmented the record since Monday's hearing.

The law is clear enough. A defendant has two separate Sixth Amendment rights: to representation by counsel of his choice (as long as he is paying the freight) and to representation by conflict free counsel. While in many circumstances informed defendants are free to waive his lawyer's conflict of interest, the right to conflict-free representation trumps the right to counsel of one's choice where a court determines that the conflict or potential for conflict is so severe as to be unwaivable. In balancing the defendant's Sixth Amendment interests, a trial court has an independent duty to ensure that a criminal defendant receives a fair trial, represented by an effective advocate. *Wheat,* supra., at 162.

Here, Steptoe, and Mr. Ross as its outside conflicts counsel, argue that the Second Circuit's holding in *United States v. Schwarz*, 283 F. 3d 76 (2d Cir. 2002) counsels in favor of a finding that the firm's conflict is unwaivable, because the Firm stands to lose a huge block of business from one of its significant insurance clients if it continues in the representation of Mr. Binday.

4

In *Schwarz*, one of the many reasons for overturning the conviction of Police Officer Charles Schwarz in the notorious Abner Louima assault case was the failure of his attorney to call to the stand a witness whom the attorney had reason to believe could exonerate his client. Schwarz' attorney, Stephen Worth, practiced in a small law office that benefitted from a $10 million retainer from the Police Benevolent Association – in fact, the firm was able to come into existence because of the retainer. The eminent jurist who presided at the trial had held, not one, but two *Curcio* hearings, in order to apprise Schwarz of his right to conflict free representation and the potential for a conflict between Schwarz's interests and those of the PBA, Worth's largest and most lucrative client. At each hearing, Schwarz made what appeared on its face to be a knowing and voluntary waiver of any conflict from the defendant. Nonetheless, the defense argued on appeal that the conflict so predisposed Worth to tailor the defense to curry favor with the PBA that it should have been deemed unwaivable -- no matter that Schwarz wanted Worth to defend him.

The Second Circuit agreed. It held that (1) the Worth Firm's retainer with the PBA -- which included a "hold-back" feature that conditioned payment of a portion of the fee on the union's satisfaction with the Worth Firm's performance -- gave Worth a strong personal interest in refraining from any conduct to which the PBA might object; (2) the PBA's defense in a separate civil action brought by Louima might have been prejudiced by a finding that an officer other than Schwarz was involved in the Louima assault; ergo (3) the conflict was unwaivable, because no rational defendant would knowingly and intelligently desire Worth's representation in the circumstances. It is on this ruling that Steptoe hangs the argument that the conflict in this case is unwaivable.

5

I do not read *Schwarz* to hold (as Steptoe suggests) that every lucrative retainer from a client whose interests conflict with those of a criminal defendant represented by the same firm creates a *per se* unwaivable conflict – or even that a book of business that exceeds the absolute dollar value of the Worth Firm's PBA retainer does. A $10 million retainer to a small, two-person law firm means something entirely different than a book of business (even one larger than the $10 million Worth retainer) to a law firm that has nine offices worldwide and per partner profits (as reported in *The American Lawyer*) of $970,00 per year. I have no idea what percentage of Steptoe's reported gross revenue ($376,500,000) would be lost if  Client A moved its business elsewhere, but I doubt the Firm would be impacted in the same way the Worth Firm would have been had it lost the PBA retainer.

Furthermore, *Schwarz* was decided on appeal, after a trial in which Schwarz' lawyer made the utterly inexplicable decision not to call the only witness who could testify that Schwarz was not present during the assault -- and who was (according to the witness' counsel) fully prepared to do so. It was already apparent that the conflict had in fact adversely affected Worth's representation of Schwarz – who was, after all, convicted of participating in one of the most grotesque instances of police brutality in the City's history – and the Second Circuit specifically noted that calling a witness who would implicate someone other than Schwarz in the assault "could" have affected the PBA's defense in a civil action brought by Mr. Louima. It was indisputable that there existed an actual conflict; Worth's and his client's interests diverged with respect to a material fact or course of action to be taken in the criminal case.

Here, by contrast, I am being asked to make a call on the existence and waivability of conflict prior to the trial. No one can point to a decision heretofore taken that would be so adverse to Mr. Binday's interests as to qualify as constitutionally ineffective assistance of

6

counsel, and it is entirely possible that there never will be such a decision. At this moment, any

prejudice to Mr. Binday from Steptoe's continued representation is entirely hypothetical. The

representatives of Steptoe at the hearing were reluctant, even *in camera*, to disclose too much

about their representation of Client A (or the other clients who are moving to quash the

subpoenas), so I do not know if there exists an actual conflict or simply the potential for conflict

– aside, of course, from the type of conflict that lawyers refer to as an "issue conflict."[2] Neither

the Government nor the court has found a case that specifically addresses whether an "issue

conflict" among multiple clients of a large law firm creates an "actual conflict" for purposes of a

criminal representation. When I asked whether ethical issues would prevent Steptoe from helping

new counsel get up to speed, Mr. Ross told me that there will be no problem arising from the

Firm's having access to confidences or secrets from clients other than Mr. Binday that could

inure to Mr. Binday's benefit, but that Steptoe could not disclose because of its duty of loyalty to

those other clients. If that is indeed the case, then Steptoe might be able to solve its problem from

an ethical (as opposed to an economic) perspective by telling Client A, and any other client who

objects to its representation of Mr. Binday, "We understand your concern, but we owe an equal

duty of loyalty to Mr. Binday, and if that means you must take your business elsewhere, we wish

you all the best."

But as the Government rightly points out, it is notoriously hard to predict and assess what

conflicts might arise prior to trial, see *Wheat*, supra., 486 U.S. at 162-63; *United States v. Jones*,

---

[2] There is more than one type of conflict of interest, and not all conflicts are created equal. One type of conflict exists when a firm possesses confidences and secrets from one client (Client B) that should but cannot be disclosed in order to fulfill the firm's duty of zealous representation to another client (Client C). That type of conflict apparently does not exist here. The type of conflict raised by this case, as far as I know presently, is what is called an "issue" conflict – Steptoe may have to take on behalf of Mr. Binday a position that runs counter to the position that would be espoused by Client A (and possibly other firm clients as well) if they were involved in litigation on the same subject. Issue conflicts are not in the most technical sense "conflicts" at all – rather, they reflect a law firm's sensitivity to a client's belief that its lawyers should not be playing both sides of the street on substantive matters that the client deems important. In an era when client loyalty to counsel has eroded significantly and business is portable, lawyers pay a great deal of attention to such matters.

381 F. 3d 114, 120 (2d Cir. 2004), and Client A does not appear to be the only problem – it is only the most pressing problem from Steptoe's perspective.  Other conundrums seem likely to arise.

For example, most of the insurance companies that have received trial subpoenas from Steptoe are moving to quash those subpoenas. Among the movants are clients of the Steptoe firm (although they are represented by other counsel for this purpose). Steptoe, having served the subpoenas because it determined that the information in the insurance company files was material to Mr. Binday's defense, has no choice but to oppose those motions to quash – thereby placing it in an adversarial posture *vis a vis* some of the firm's clients. It tried to obviate the need to act adversely to the insurance companies' interests by negotiating accommodations with the Firm's clients that received subpoenas, but more than one has refused to accept the situation. While only one client has specifically threatened to remove its business from the firm, the sentiments of the others should not be hard to guess. So, I fear, are the sensibilities of the partners at Steptoe who are responsible for (and perhaps receiving compensation credit for) the business of the offended clients.

Then there is the fact that, as noted above, the Government has already subpoenaed at least one Steptoe client to testify at trial, and anticipates the possibility of subpoenaing others. The Government intends to call these witnesses to establish the materiality of the alleged misrepresentations, while the Binday defense is that the allegedly false statements were in any event not material to anyone's decision to insure. If the Government's witnesses work for clients of Steptoe & Johnson, the firm has already concluded that it cannot cross examine them. Indeed, it has gone so far as to hire Mr. Lankler to cross examine them on Mr. Binday's behalf. But if Steptoe cannot cross examine the witnesses, then it cannot do anything to try to discredit their

8

testimony, either – including argue on summation that the client witnesses' testimony about the materiality of the representations should not be believed. It is hard for me to see how Steptoe could possibly give Mr. Binday effective representation in the circumstances; it would have one hand tied behind its back.

Finally, I cannot pretend to be oblivious to the context in which these issues arise. The court has not been made privy to the Steptoe & Johnson partnership agreement, but I can make certain assumptions – one of which is that, if Mr. Miller's representation of a one-time client with limited financial upside (Mr. Binday) causes the firm to lose the business of ongoing and more lucrative clients (Client A), at least some of his law partners will be mightily displeased. Mr. Miller and his team have advocated vigorously on behalf of Mr. Binday since this matter began, and I am confident that they would never knowingly allow anything to interfere with their continuing duty of zealous representation. However, it is unquestionably in Mr. Miller's self-interest to retain both the support of his law partners and his position in his firm. It is also in his interest to help ensure the firm's profitability, both short and long term, since a partner's compensation ordinarily depends on the profitability of the entire business enterprise. There exists the possibility that he might (albeit subconsciously) be influenced by these personal interests during the course of these proceedings, to Mr. Binday's detriment. It may be simply a matter of appearances, but this court must be concerned with appearances.

In view of the foregoing, I agree with the Government that sufficient facts have come to light to cause me to believe than an actual, unwaivable conflict either has already arisen or may arise at or before the trial. Charged as I am with ensuring -- to the maximum extent possible -- that Mr. Binday has a fair trial and a constitutionally adequate defense, I can see no way out

except to grant Steptoe's motion for leave to withdraw, postpone the trial until next fall, and give Mr. Binday time to obtain new counsel.

I recognize that Mr. Binday does not want to obtain new counsel; he wants the lawyers he has. But while Mr. Binday impresses the court as a perfectly rational human being, the situation in which he, through no fault of his own, finds himself is one in which no one – even a person as intelligent and rational as he is[3] -- would consent to be represented by lawyers whose conflict would be on view in the front of the jury at critical moment throughout the trial.[4]

I continue to find it incredible that Steptoe could have allowed matters to evolve this far before choosing to involve the court in the situation. The firm has known since the indictment was handed down that one or more of its clients are among the "victims" mentioned in the indictment (and not all the victims are mentioned in the indictment). Most law firms would have declined the representation at the outset on that basis alone. Steptoe represents to the court that it has evaluated and reevaluated the potential for conflicts as the facts have evolved, but I have no reason to believe that it ever canvassed existing clients (or even the lawyers who handle their accounts) to ascertain whether Mr. Binday's defense strategy comported with those companies' views. It should not have taken this long for sophisticated business lawyers to comprehend that there was, at the very least, a real "issue conflict" staring them in the face.  Both Mr. Miller and Mr. Ross have ruefully admitted that an apology to all of the persons inconvenienced – the court, the Government, the other defendants and their attorneys, and especially the unfortunate Mr. Binday -- was of scant comfort in the circumstances. That is an understatement.

---

[3] [redacted] [T]here are many superb criminal defense attorneys, including lawyers who specialize in white collar/business matters, who do not practice at law firms with substantial corporate/commercial insurance clientele, and who are quite capable of defending this case to the uttermost.

[4] Without revealing what went on during the *in camera* conference, it is not clear to me exactly how much Steptoe explained to Mr. Binday about the various ways in which its representation of insurance company clients might affect its ability to perform on Mr. Binday's behalf – but then, it is not clear to me that Steptoe thought the problem all the way through until very recently.

Steptoe's motion for leave to withdraw is granted, conditioned on (1) its immediate return to Mr Binday of every penny he has ever paid to the firm, with interest; (2) its continuing to pay for the services of Mr. Lankler and his firm until either (i) Mr. Binday decides to retain Mr. Lankler as his defense counsel, or (ii) Mr. Lankler's services are no longer required; and (3) its promise (already given in open court) to cooperate in every way, and at its own expense, with new counsel's investigation of the case. The trial is adjourned until September 17, 2013. Time is excluded to September 17, 2013, in the interests of justice, because the defendants' interest in a speedy trial is outweighed by Mr. Binday's need to obtain new counsel and for new counsel to familiarize himself with this complicated insurance fraud case. We will hold a status conference on April 16, 2013 at 2:00 PM, at which time I hope to make the acquaintance of Mr. Binday's new attorney.

Dated:  March 14, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

11