UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

               *Plaintiff,*

    v.                              Case No. 12-CR-152 (CM)

Michael Binday *et al.*,              ECF Case

               *Defendants.*

# MICHAEL BINDAY'S OPPOSITION TO THE INSURANCE COMPANIES' MOTIONS TO QUASH THE DEFENDANTS' SUBPOENAS

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York  10017
Tel.: (212) 856-9600

*Attorneys for Defendant Michael Binday*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

ARGUMENT .................................................................................................... 6

    **I.** Legal Standard ...................................................................................... 6

        **A.**   The Nachamie Standard ...................................................... 7

        **B.**   The Nixon Standard .............................................................. 9

            **1.**   Relevance ............................................................... 9

            **2.**   Admissibility ...................................................... 10

            **3.**   Specificity .......................................................... 11

    **II.** The July Subpoenas Meet the Requirements of Rule 17(c) and Should Not Be Quashed ..................................................................................... 12

        **A.**   The Partial Motions to Quash Requests for Policy File and Underwriting Documents Should be Denied ..................... 14

        **B.**   The Motions to Quash Requests for Telephone Recordings and Transcripts Should Be Denied .......................... 16

        **C.**   The Motions to Quash Requests for Internal Investigations, Audits, Fraud Alerts, Reviews or Watch Lists Relating to the Defendants or the Relevant Policies Should Be Denied .......................... 19

            **1.**   The Investigations and Watch List Requests Identify a Defined Group of Specific Responsive Materials ........................... 19

            **2.**   The Investigations and Watch List Requests Call For Relevant Groups of Documents ........................... 24

        **D.**   The Motions to Quash Requests for Select Emails from Specific Custodians Should Be Denied .......................... 26

            **1.**   The Email Request Calls For Emails Pertaining Directly to the Defendants Sent or Received by Specific Individuals .......................... 27

            **2.**   The Email Request Calls for Relevant Documents .......................... 30

     3.    The Email Request is Not "Unreasonable and Burdensome" ........................................................................ 33

E.    The Motions to Quash Requests for Compensation Information Should Be Denied ...................................................... 36

F.    The Motions to Quash Requests for "Cost of Insurance" Information Should Be Denied ................................................... 38

     1.    The Cost of Insurance Information is Relevant .............................. 38

     2.    The Cost of Insurance Information is Not Otherwise Publicly Available ......................................................................... 40

     3.    The Cost of Insurance Information is Subject to a Protective Order ............................................................................. 41

G.    The Moving Insurers' Remaining Objections Are Also Meritless ...................................................................... 42

     1.    Lincoln National's Motion to Quash Current Policy Status and Premium Information Requests Should be Denied ................................................................................ 43

     2.    Lincoln National's Motion to Quash the Request for Kenneth Elder Law Enforcement Communications Should be Denied ................................................................... 43

     3.    The Moving Insurers' Motions to Quash Requests For Specifically Identified Documents Must Fail .................................. 44

CONCLUSION ........................................................................ 46

# TABLE OF AUTHORITIES

**Cases**

Aramony v. United Way of America, 254 F.3d 403 (2d Cir. 2001) ............................................ 15

Culligan v. Yamaha Motor Corp., 110 F.R.D. 122 (S.D.N.Y. 1986) .......................................... 41

Fischer v. Cirrus Design Corp., No. 03-cv-0782, 2005 WL 3159658 (N.D.N.Y.
    Nov. 23, 2005) ....................................................................................................................... 41

Fountain v. United States, 357 F.3d 250 (2d Cir. 2004), cert. denied, 544 U.S.
    1017 (2005) ............................................................................................................................. 9

In re Crysen/Montenay Energy Co., 226 F.3d 160 (2d Cir. 2000) ............................................ 15

In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993, 846 F. Supp. 11
    (S.D.N.Y. 1994) ..................................................................................................................... 26

In re Grand Jury Subpoenas to Midland Asphalt Corp., 616 F. Supp. 223
    (W.D.N.Y. 1985) .................................................................................................................... 34

In re Irving, 600 F.2d 1027 (2d Cir. 1979) ............................................................................... 40

In re Martin Marietta Corp., 856 F.2d 619 (4th Cir. 1988) ....................................................... 10

In re Refco Inc. Sec. Litig., No. 07-MDL-1902, 2013 WL 2526661 (S.D.N.Y.
    June 6, 2013) .......................................................................................................................... 15

In re Subpoena Duces Tecum Served on Bell Comm. Research Inc., No. 96-cv-
    45, 1997 WL 10919 (S.D.N.Y. Jan. 13, 1997) ........................................................................ 41

Pennsylvania v. Ritchie, 480 U.S. 39 (1987) ............................................................................. 7

Quotron Sys., Inc. v. Automatic Data Processing, Inc., 141 F.R.D. 37 (S.D.N.Y.
    1992) ...................................................................................................................................... 41

United States v. Debolt, No. 09-cr-24, 2010 WL 4281699 (N.D. W. Va. Oct. 19,
    2010) ...................................................................................................................................... 41

United States v. Berrios, 501 F.2d 1207 (2d Cir. 1974) ............................................................ 10

United States v. Carollo, No. 10-cr-654, 2012 WL 1195194 (S.D.N.Y. Apr. 9,
    2012) ................................................................................................................................ 11, 44

United States v. Gel Spice Co., 601 F. Supp. 1214 (E.D.N.Y. 1985) ......................................... 10

United States v. Libby, 432 F. Supp. 2d 26 (D.D.C. 2006) ............................................... passim

United States v. Martinov, No. 11-cr-312, 2012 WL 3987329 (N.D. Cal. Sept. 11, 2012) ................................................................................................................ 10

United States v. Nachamie, 91 F. Supp. 2d 552 (S.D.N.Y. 2000) .............................................. 7, 8

United States v. Nixon, 418 U.S. 683 (1974) ................................................ 7, 8, 11, 24

United States v. Nosal, No. 08-cr-00237, 2013 WL 782003 (N.D. Cal. Mar. 1, 2013) ................................................................................................................ 8, 9

United States v. Rajaratnam, 753 F. Supp. 2d 317 (S.D.N.Y. 2011) .................................... *passim*

United States v. RW Prof'l Leasing Servs. Corp., 228 F.R.D. 158 (E.D.N.Y. 2005) ................................................................................................ 20, 23, 27

United States v. Shanahan, 252 F.R.D. 536  (E.D. Mo. 2008) ...................................................... 40

United States v. Shellef, 507 F.3d 82 (2d Cir. 2007) .............................................................. 9, 10

United States v. Smith, 245 F.R.D. 605 (N.D. Ohio 2007) .......................................................... 25

United States v. Soliman, No. 06-cr-236A, 2009 WL 1531569 (W.D.N.Y. May 29, 2009) ................................................................................................ 8, 9

United States v. Tomison, 969 F. Supp. 587  (E.D. Cal. 1997) ...................................................... 8

United States v. Tucker, 249 F.R.D. 58 (S.D.N.Y. 2008) ........................................................ 7, 8

United States v. Vought, No. 05-cr-268, 2006 WL 1662882 (D. Conn. June 15, 2006) ....................................................................................................... *passim*

**Other Authorities**

Robert G. Morvillo, et al., Motion Denied: Systematic Impediments to White Collar Criminal Defendants' Trial Preparation, 42 Am. Crim. L. Rev 157, 160 n.12 (2005) ................................................................................................................ 11

**Rules**

Fed. R. Civ. P. 45 ...................................................................................................................... 41

Fed. R. Crim. P. 17(c)(2) ............................................................................................................ 7

Fed. R. Evid. 401 ......................................................................................................................... 9

Fed. R. Evid. 402 ....................................................................................................................... 10

## INTRODUCTION

On April 16, 2013, this Court afforded the Defendants the opportunity to issue narrowly tailored Rule 17(c) subpoenas.  Cognizant of the Court's directive, Mr. Binday's new counsel, who had only appeared in this case in mid-April, spent the better part of the next two months determining the state of discovery.  That process included conducting a detailed review of the discovery produced to date in order to determine which documents had or had not been produced in this case. This review resulted in the determination that there were glaring production deficiencies by several of the relevant insurance companies, all of whom had been served with Rule 17 Subpoenas from the government.  It also provided us a sound basis on which to propound narrowly-tailored, re-fashioned Rule 17(c) subpoena requests, drawn from our knowledge of the documents already produced, in accordance with the Court's April 16 instructions.

Accordingly, on July 1, 2013, we sought the Court's approval to issue revised subpoenas that both remedied the production deficiencies as we understood them, and requested additional documents specifically tied to and supported by the documents already produced.  These requests differ substantially from the prior subpoenas served by defense counsel because, as set forth below, (1) they are greatly narrowed in scope; (2) the Defendants have followed the Court's directive in tying the requests to specifically identified materials produced in this case; and (3) the requests fit within the ambit of Rule 17 and seek information which is highly relevant to the defense in this action.  Notwithstanding the fact that Defendants' revised subpoenas were narrowly tailored in accordance with this Court's directive, 11 of the 13 insurance companies moved, in part, to quash the subpoenas. For the reasons set forth below, the Court should deny

the instant motions to quash and order the immediate production of any remaining responsive materials.[1]

## BACKGROUND

During the April 16, 2013 status conference, the Court quashed, to the extent not already complied with, twelve Rule 17 subpoenas which were issued by prior counsel for Mr. Binday, and dated February 19, 2013 (the "February Subpoenas") to the thirteen insurance company "victims" in this case.  Ex. 1 (Status Conf. Trans. (Apr. 16, 2013) at 3:18-23).[2]  During the conference, the Court also granted the Defendants' request to offer refashioned subpoenas which met the requirements of Rule 17(c), stating that "[i]f [the Defendants] want to reissue 17C subpoenas . . . see if you can re-tailor a 17C subpoena and pass it by me."  Id. at 5:1-5.  Having just been retained as new counsel for Mr. Binday only one day before the conference, this firm immediately endeavored to review the discovery produced in this case over the course of the prior year, comprising hundreds of thousands of pages of documents, including materials that had been produced by the thirteen relevant insurance companies in response to Grand Jury subpoenas, trial subpoenas issued to the insurance companies by the Government (the "Government Subpoenas") and the February Subpoenas.

The purpose of our review was to assess whether additional specifically identified materials constituting admissible evidence existed in the insurance company files.  During the

---

[1] This brief is being submitted by Mr. Binday's counsel on behalf of all Defendants.  We are submitting an omnibus response to all third-party motions to quash in an effort to efficiently address the issues raised in those motions in a manner most convenient for the Court.  This omnibus brief exceeds the page limit for a responsive filing but is far shorter than the eleven individual opposition briefs we would otherwise have filed.

[2] Unless otherwise specified, references to exhibits relate to the Declaration of Jasmine Juteau in Support of Michael Binday's Opposition to the Insurance Companies' Motions to Quash the Defendants' Subpoenas, filed herewith.

course of this painstaking review, however, the Defendants also learned, for the first time, of

significant subpoena compliance deficiencies by several insurance companies and made

substantial efforts to collect and review outstanding materials.  These include the following:

- A complete failure by American General to produce any documents in response to the Government Subpoena despite not having objected to or moved to quash that subpoena.  After several attempts to secure production from counsel for American General, the Defendants wrote to this Court, resulting in the July 24, 2013 order and production by American General of responsive documents which was completed just two days ago, on August 5, 2013.

- A complete failure by AXA to produce any documents in response to the Government Subpoena despite conceding that it would produce responsive documents subject to certain subpoena request modifications presented in its first motion to quash.  The Defendants contacted AXA directly and the materials responsive to the modified requests were produced on June 5, 2013.

- A complete failure by Sun Life to produce any documents in response to the Government Subpoena despite not having objected to or moved to quash that subpoena.  After communicating directly with Sun Life, such materials were ultimately produced on July 10, 2013.  The Defendants also requested and received outstanding "documents regarding Sun Life's official company policies with regard to stranger originated life insurance ("STOLI")," responsive to the February Subpoena, which Sun Life stated it would provide in its first motion to quash.  Sun Life Mem. Supp. Mot. to Quash 2, ECF No. 113.

- Incomplete production by John Hancock in response to the Government Subpoena, in the form of incomplete copies of underwriting guidelines.  The Defendants contacted John Hancock directly and the complete materials were produced on June 24, 2013.

- The failure by Lincoln Benefit to produce "documents regarding Lincoln Benefit's official company policies with regard to stranger originated life insurance ("STOLI") between January 1, 2006, and December 31, 2010," which according to its first motion to quash, it intended to provide in response to the February Subpoena.  Lincoln Benefit Mem. Supp. Mot. to Quash 2, ECF No. 111.  The Defendants contacted Lincoln Benefit directly and the complete materials were produced on June 7, 2013.

- The production of materials subject to over-broad redactions in response to the Government Subpoena by several insurers—Aviva, MetLife, AXA and American General—including redactions to the identities of the insureds and financial information.  The Defendants have contacted the insurance companies directly, and in

some cases the Government, and have been or will be provided with replacement productions to cure the redactions.[3]

- The Government's failure to produce to the Defendants nearly 22,000 pages of policy files produced to it by Security Mutual on March 1, 2013.  The Government discovered and produced these materials to the Defendants, over four months later, on July 15, 2013.

Given 13 insurance companies, over 26 subpoenas, more than 104 individual subpoena requests, and hundreds of thousands of pages of production materials, along with the production deficiencies identified above, the task of determining the status of each insurer's response to each individual request was a significant undertaking.  Nevertheless, this effort was a necessary predicate to propounding a new set of more specifically-tailored, re-fashioned Rule 17 subpoenas consistent with the Court's April 16 order.

On July 1, 2013, the Defendants wrote to the Court seeking authorization to issue such subpoenas to the thirteen insurance companies, *and attached to the letter each proposed subpoena rider with the precise subpoena requests to be served*.[4]  In addition, the July 1 letter

---

[3] As recently as last week the Defendants sought the Government's help in remedying over-broad redactions to materials responsive to its subpoenas, including key information in the policy files such as:  the names of applicants, the applicants' "Personal Earned Income," "Household Income" and "Net Worth, the amount of insurance being applied for, the "Face Amount" of existing insurance policies, and reporting on the applicants' "Assets and Liabilities," and "Credit Report Summar[ies]."  Ex. 2 (Letter to Zachary Feingold and Sarah McCallum from Elkan Abramowitz (July 31, 2013)); Ex. 3 (Letter to Zachary Feingold and Sarah McCallum from Benjamin S. Fischer (August 2, 2013)).  American General has since provided unredacted policy files and AXA has stated it will do so in the near term.  In an attempt to avoid further delays from going back and forth with various insurers concerning the redactions, the subpoena served by Defendants on July 17, 2013, expressly instructs the insurers that "documents should be produced in complete, unredacted form," and refutes earlier claims that such redactions were required under federal privacy laws.  Ex. 4 (Sch. Part A.12 n.1).

[4] We note that only one subpoena rider, pertaining to American General, was augmented following the submission of the July 1 letter, adding a request for "[a]ll documents relating to the document titled 'Investor Owned Life Insurance,' dated May 22, 2006," which was the subject of a subsequent letter to the Court dated July 18, 2013.  Ex. 4 (Sch. Part B.17).  To the extent any other subpoena riders were changed, it was only to remove requests where the relevant insurer provided responsive documents in advance of the issuance of the subpoenas.

highlighted yet more discovery issues warranting the Court's attention, including (1) the failure of Lincoln National to produce certain documents in its response to the February Subpoenas despite representations in its first motion to quash concerning the search that it undertook for responsive materials which should have—but did not—locate the relevant documents; and (2) the apparent conflict between the Court's April 16 ruling denying the Government's Motion to Preclude evidence concerning Phoenix, but nonetheless quashing all subpoenas served upon Phoenix. The court authorized the Defendants to issue the proposed subpoena on July 16, 2013, and the subpoenas were served on all thirteen insurance companies on July 17, 2013 (the "July Subpoenas").[5]

The following day, on July 18, 2013, the Defendants again wrote the Court with a newly-discovered failure by American General to produce a document which was clearly responsive to the Government Subpoena and the subject of protracted discovery litigation in a STOLI-related civil litigation in the District of New Jersey. On July 24, 2013, the Court held a telephonic conference with the parties to address the various outstanding discovery issues. Responding to the recalcitrant attitude of American General and other insurers in failing to respond to the Government Subpoenas—some of which had been outstanding for nearly one year—the Court was absolutely clear: "I want the wrath of the government brought down on the noncompliant party." Ex. 5 (Status Conf. Trans. (July 24, 2013) at 8:2-13). Moreover, during the July 24 hearing the Court clarified that during the April 16 hearing it had not intended to and did not grant the insurers' motions to quash the *Government* Subpoenas. Id. at 15:3-5 ("I quashed only the defendants' subpoena.").

---

[5] The Court further authorized a subpoena return date of August 7, 2013, and a deadline for the instant motions to quash of July 31, 2013.

By an order issued the same day, American General was ordered to produce documents responsive to the Government Subpoena by July 29, Phoenix was ordered to produce documents responsive to the Government Subpoena by August 2, and the General Counsels for both companies were ordered to submit sworn statements "attesting to the fact that [the company] has produced all documents responsive to the Government's subpoena."  Order 1-2, July 24, 2013, ECF No. 171.  Underscoring the seriousness of the Court's mandate for complete subpoena compliance by the insurers, the Order stated that "the Government should make certain that the companies . . . have complied with those subpoenas, and should make motions to compel, or for contempt, if they have not."  Id. at 2.

On July 31, 2013, eleven of the thirteen insurance companies relevant to this case moved to quash, in whole or in part, one or more subpoena requests in the July Subpoenas (the "Moving Insurers").[6]

## ARGUMENT

The Court should deny the Moving Insurers' motions to quash the July Subpoenas.

## I.   Legal Standard

"Criminal defendants have the right to 'put before a jury evidence that might influence the determination of guilt.' To effect this right, a defendant must have the ability to obtain that

---

[6] The eleven Moving Insurers are:  American General Life Insurance Company ("American General"); Aviva Life & Annuity Company of New York ("Aviva"); AXA Equitable Life Insurance Company ("AXA"); John Hancock Life Insurance Company ("John Hancock"); Lincoln Benefit Life Company ("Lincoln Benefit"); Lincoln National Corporation and The Lincoln National Life Insurance Company (collectively "Lincoln National"); Massachusetts Mutual Life Insurance Company ("Mass Mutual"); PHL Variable Insurance Company and Phoenix Life Insurance Company (collectively "Phoenix"); Pruco Life Insurance Company ("Prudential"); Security Mutual Life Insurance Company of New York ("Security Mutual"); and Sun Life Assurance Company of Canada ("Sun Life").  Two other insurance company "victims" in this case, MetLife Investors USA Insurance Company and The Union Central Life Insurance Company, also received Defendants' July Subpoena but did not move to quash and have indicated that they intend to produce responsive materials.

evidence." United States v. Tucker, 249 F.R.D. 58, 65 (S.D.N.Y. 2008) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987)).  Moreover, the right to "the production of all evidence at a criminal trial" is based on the Constitution's Confrontation, Compulsory Process, and Due Process Clauses.  See United States v. Nixon, 418 U.S. 683, 711 (1974).  Even beyond the Constitution, this right stems from the very heart of the criminal justice system:

> We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.

Id. at 709.

Federal Rule of Criminal Procedure 17(c)(1) allows the criminal defendant, with the permission of the Court, to issue subpoenas to third parties to produce "any books, papers, documents, data or other objects" to be used as evidence.  In response to receiving a subpoena, Rule 17(c)(2) allows a third party to move to quash the subpoena, which the Court may grant if compliance with the subpoena "would be 'unreasonable or oppressive,' but not otherwise." Nixon, 418 U.S. at 698 (quoting Fed. R. Crim. P. 17(c)(2)).

### A.    The Nachamie Standard

When evaluating a defendant's request to issue subpoenas on the government, courts frequently use the test developed in Nixon:  The materials sought by the subpoena must be sufficiently (1) relevant, (2) admissible, and (3) specific.  Nixon, 418 U.S. at 700; Tucker, 249 F.R.D. at 62.  However, a growing number of courts have followed Judge Scheindlin's careful analysis in United States v. Nachamie, 91 F. Supp. 2d 552 (S.D.N.Y. 2000), in holding that where, as here, a criminal defendant is seeking to issue a subpoena to a third party, a more

flexible standard than the Nixon test should be applied.  In Nachamie, Judge Scheindlin looked

to the history of Rule 17, the Advisory Committee Notes and Supreme Court precedent in

recognizing that a higher standard is appropriate when discovery is sought *from the government*.

Id. at 562 ("[The Nixon standard] made sense in the context of a Government subpoena,

especially one seeking evidence from the President."); see also Nixon, 418 U.S. at 700 n.12

(explaining that the Court "need not decide whether a lower standard exists" where "the

subpoena duces tecum is issued to third parties, rather than to government prosecutors," because

the subpoena there satisfied the higher standard).  By contrast, for third parties, "the only test for

obtaining the documents [is] whether the subpoena was (1) reasonable, construed using the

general discovery notion of 'material to the defense;' and (2) not unduly oppressive for the

producing party to respond."  Nachamie, 91 F. Supp. 2d at 563; accord United States v. Nosal,

No. 08-cr-00237, 2013 WL 782003, at *3-5 (N.D. Cal. Mar. 1, 2013); United States v. Soliman,

No. 06-cr-236A, 2009 WL 1531569, at *3-4 (W.D.N.Y. May 29, 2009); Tucker, 249 F.R.D. at

66; cf. United States v. Tomison, 969 F. Supp. 587, 593 n.14 (E.D. Cal. 1997).

Where, as here, the defendant seeks to obtain discovery from third parties that is material

to the defense and which the government has chosen not to collect, courts should apply the more

flexible Nachamie.  See Nachamie, 91 F. Supp. 2d at 561-62.  Under this standard, courts have

routinely approved "reasonable" subpoena requests—that is, requests that seek information

material to the defense—so long as they are not unduly "oppressive" to the subpoenaed third

party.  See Nosal, 2013 WL 782003, at *5-10; Soliman, 2009 WL 1531569, at *4; Tucker, 249

F.R.D. at 65-67; Nachamie, 91 F. Supp. 2d at 56-64.  In determining whether a request is

oppressive under the second Nachamie prong, courts have looked, as a threshold matter, to

whether the subpoenaed party has objected to the request, see id. at 564, and then to whether the

requests are "targeted to ensure production of material evidence," <u>Soliman</u>, 2009 WL 1531569, at *4, or rather are overly "burdensome and duplicative," <u>Nosal</u>, 2013 WL 782003, at *5.

### B.   The Nixon Standard

Even if the Court adopts the <u>Nixon</u> test, the Court should still find that the July Subpoenas meet that standard, and that satisfaction of each prong—relevance, admissibility and specificity—by the subpoenas warrant the denial of the Moving Insurers' motions to quash.

### 1.   Relevance

The relevance prong of the <u>Nixon</u> test "requires the Court to assess whether the documents sought have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" <u>United States v. Libby</u>, 432 F. Supp. 2d 26, 31 (D.D.C. 2006) (<u>quoting</u> Fed. R. Evid. 401). In this case the Government has charged Defendants, *inter alia*, with the crime of mail and wire fraud, which requires proof of "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." <u>Fountain v. United States</u>, 357 F.3d 250, 255 (2d Cir. 2004), <u>cert. denied</u>, 544 U.S. 1017 (2005). Here, the Government advances a "no-sale" theory of mail and wire fraud, alleging, in essence, that the defendants engaged in a scheme to defraud the insurance companies by inducing them to sell insurance to purchasers to whom the insurance companies would not otherwise have sold insurance. Indictment ¶¶ 4, 8, Feb. 15, 2012, ECF No. 1. Such an inducement to make a sale, however, does not constitute a scheme to defraud within the meaning of the mail or wire fraud statutes. Rather, in order to constitute mail or wire fraud, a scheme must "depend for [its] completion on a misrepresentation of *an essential element* of the bargain." <u>United States v. Shellef</u>, 507 F.3d 82, 108 (2d Cir. 2007) (emphasis added). "[S]chemes that do no more than

cause their victims to enter into transactions they would otherwise avoid . . . do not violate the mail or wire fraud statutes."  Id.

In other words, since the relevance of information under Rule 17(c) is determined by whether it has "any tendency" to make the existence of any material fact "more probable or less probable than it would be without the evidence," Libby, 432 F. Supp. 2d at 31 (quotations omitted), in this case, any information that tends to support or refute the existence of a scheme to defraud the insurance companies is relevant, including any information that shines light on whether the alleged misrepresentations at issue were "an essential element of the bargain," Shellef, 507 F.3d at 108.  See United States v. Gel Spice Co., 601 F. Supp. 1214, 1223 (E.D.N.Y. 1985) (citing United States v. Berrios, 501 F.2d 1207, 1212 (2d Cir. 1974), for the proposition that "material produced pursuant to a Rule 17(c) subpoena is that which would tend to establish the elements of a charge or defense"); see also United States v. Martinov, No. 11-cr-312, 2012 WL 3987329, at *2 (N.D. Cal. Sept. 11, 2012) (approving defendant's Rule 17(c) subpoena for documents sought to disprove an element of the crime).  As discussed in greater detail below, the information sought by the July Subpoenas is directly relevant to this issue, among others.

### 2.    Admissibility

Nixon requires that a Rule 17(c) subpoena seek materials that are admissible at trial, but the materials need not actually be used in evidence; rather, they need only be subpoenaed in a good faith effort to obtain evidence.  See In re Martin Marietta Corp., 856 F.2d 619, 622 (4th Cir. 1988).  Evidence that is relevant is presumptively admissible unless it is otherwise privileged. United States v. Rajaratnam, 753 F. Supp. 2d 317, 320 n.1 (S.D.N.Y. 2011) (citing Fed. R. Evid. 402 and noting that "the Nixon court referred to 'potential evidentiary uses' in applying the 'admissibility' requirement").  Accordingly, "[w]hile the request may not be for materials that

might *lead* to [other] admissible evidence, as under the discovery rules, the request can be for materials that will themselves *ripen* into admissible evidence."  United States v. Carollo, No. 10-cr-654, 2012 WL 1195194, at *2 (S.D.N.Y. Apr. 9, 2012).

### 3.   Specificity

While the Nixon standard requires that a subpoena request have an adequate amount of specificity, the defendants' request need not be utterly specific, as the Nixon case itself demonstrates.  Even in assessing a subpoena seeking the production of taped conversations from the President of the United States, the Supreme Court did not require complete specificity as to the particulars of the conversations, but only that "the identity of the participants and the time and place of the conversations, taken in their total context, permit a rational inference that at least part of the conversations relate to the offenses charged in indictment."  Nixon, 418 U.S. at 700. Thus, despite the fact that "the contents of the subpoenaed tapes could not at that stage be described fully," the Court held that "there was a sufficient likelihood that . . . the tapes [contained] conversations relevant to the offenses charged in the indictment."  Id.  Indeed, if defendants had sufficient knowledge of the requested documents so as to be able to describe them with utter specificity, there would be little need for the request.  As Judge Holwell has explained, "requiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity." Rajaratnam, 753 F. Supp. 2d at 320 n.1 (citing Robert G. Morvillo, et al., Motion Denied: Systematic Impediments to White Collar Criminal Defendants' Trial Preparation, 42 Am. Crim. L. Rev 157, 160 n.12 (2005)).

In sum, while Nixon requires that subpoena requests (at least to the government) meet the three requirements of relevance, admissibility, and specificity, courts must assess subpoena requests against the backdrop of the fundamental constitutional rights that Rule 17(c) effectuates.

As described below, the Defendants' carefully limited subpoena requests meet each of the <u>Nixon</u> requirements.

## II. The July Subpoenas Meet the Requirements of Rule 17(c) and Should Not Be Quashed

The narrow, targeted requests in the July Subpoenas can be distilled into the following nine categories, each of which was primarily borne from Defendants' painstaking review of the documents produced in this case and relate to either glaring omissions in the productions made to date or are tied to specific documents produced to date:

- **Policy Files.** A request for the complete contents of the specifically identified policy files, including applications, correspondence, underwriting communications and assessments, and all other contents of the files for policies issued to the insureds. For a select subset of insurance companies—Security Mutual, Lincoln Benefit and Sun Life—we also included an additional, separate request for documents "regarding the underwriting of the specific policies" listed in the request, because upon review of the policy files previously produced by those insurers, the policy files did not appear to contain any substantive underwriting information. This request was specific to these three insurers and was not propounded for the remaining insurers who had produced such information.

- **Telephone Recordings.** A request for telephone recordings or transcripts made in connection with the specifically identified life insurance policies at each insurer. Because Lincoln National has already produced such recordings in response to the Government Subpoena, it was not served with this request.

- **Investigations, Audits, Fraud Alerts or Reviews Relating to the Defendants or to Specifically Identified Life Insurance Policies, or Watch Lists Including the Defendants.** Requests for insurance company documents reflecting any investigations undertaken with respect to a discreet list of life insurance policies, or a discreet list comprising the Defendants, individuals associated with the Defendants' life insurance activities and related entities. Also a request for watch lists including the Defendants and related individuals and entities suspected of the sale of life insurance policies to investors. Because John Hancock previously produced documents reflecting an internal producer watch list, it was not served with this request.

- **Email Reflecting the Insurance Companies' Business With and Communications About the Defendants.** A request for email limited to custodians (1) who were specifically identified employees at each insurance company, and (2) who were employed in business functions relevant to the Defendants' business or to the

12

investigation of STOLI life insurance—sales, marketing, underwriting, legal and compliance—*and* who "communicated about the Relevant Life Insurance Policies." The email request is limited by six specific search terms—the names of the three Defendants, two cooperating witnesses who worked with the Defendants, and one entity, of which Mr. Binday was a principal, through which the relevant life insurance policies were procured.

- **Current Status of Relevant Life Insurance Policies.**  Requests for documents demonstrating whether the policies at issue in this case remain in force (or if not, why not), and the premiums collected by the insurance companies on those policies.

- **Compensation of Insurance Company Sales Personnel.**  A request for documents from certain insurers demonstrating the compensation structure for specifically identified individuals in a sales/marketing function, including the employee's responsibility for premiums collected by the company and the relative impact of life insurance policies sold through the Defendants.

- **Awards and Trips Offered to the Defendants by the Insurance Companies.** Requests for information concerning particular trips, awards and recognition that we know the Defendants received from certain insurance companies, including the criteria for selection, and notes, drafts, recordings or transcripts of speeches delivered at such events and programs.

- **Cost of Insurance Information.**  Requests for information concerning the "cost of insurance" for the types of life insurance policies at issue in this case, specifically the factors and process for calculating the cost of insurance rates applied to such policies, and the insurers' price and cost of insurance filings with state insurance agencies pertaining to such policies.

- **Specifically Identified Materials Referenced in Documents Already Produced.** For certain insurers the Defendants pinpointed documents relevant to the defense which were omitted from prior productions but referenced in those materials.  Using those documents we were able to provide the insurers specific direction on what the requested materials are and how they could be located.

Two insurers relevant to this case—including Union Central, an insurer referenced in the Indictment which issued twenty-nine of the relevant policies—have not moved to quash at all, but instead are simply intending to comply with the July Subpoena by the August 7 deadline. This fact alone undermines the Moving Insurers' strenuous objections as to the burdensome and oppressive nature of these requests.

13

The eleven Moving Insurers, by contrast, which have not responded uniformly to these requests, have objected to a number of requests in the above-listed categories, providing several different bases for their objections. (In many cases the Moving Insurers have presented identical objections, which we will address collectively below.) None of their arguments are sufficient to quash the carefully crafted, narrowly-tailored requests that are contained in the July Subpoenas.

### A.   The Partial Motions to Quash Requests for Policy File and Underwriting Documents Should be Denied

None of the Moving Insurers moved to quash in its entirety the first category of requests, the production of the remaining policy files and underwriting materials in connection with those files. These requests address information that is missing—either complete policy files that have not been produced or apparent gaps, such as no underwriting communications, in policy files which have been—based on the Defendants' comprehensive review of the policy files produced to date. Four Moving Insurers moved to quash, in part, the request for "all documents" relating to policy files and/or "[a]ll notes, records, emails . . . communications or other correspondence regarding the underwriting" of the specified policies, based on the objection that this formulation of these requests amounted to "broad civil-style requests."[7]

These objections overlook the fact that all the Moving Insurers remain subject to compliance with the Government Subpoena Request No. 4 which seeks "all records concerning" the policy files subject to that subpoena, a continuing obligation that the Court forcefully emphasized in the July 24 Order. Order 2, ECF No. 171 ("[T]he Government should make certain that the companies on which it served subpoenas . . . have complied with those subpoenas, and should make motions to compel, or for contempt, if they have not."). Any

---

[7] Security Mutual Mem. 10-11, ECF No. 181; see American General Mem. 3-4, ECF No. 202; AXA Mem. 15-16, ECF No. 175; Lincoln National Mem. 4-6, ECF No. 184.

resistance to the production of relevant policy file information or underwriting materials for additional policies should be carefully considered in light of the insurers' pre-existing obligations under the Government Subpoena.  AXA's contention that the Court "adopted AXA's motion to limit the production of policy-specific documents to the underwriting and application files related to those insurance policies" is simply not correct—the Court denied AXA's motion for such relief because it did not grant AXA's motion to quash the Government Subpoena.  Ex. 5 (Status Conf. Trans. (July 24, 2013), at 15:3-5 (the Court stating with respect to motions to quash the Government Subpoenas, "I quashed only the defendants' subpoena.").[8]

We ask that the Court reject the Moving Insurers' objections to producing additional policy-related documents beyond what are located in the policy file.  Indeed, as discussed in greater detail below, the Defendants have already encountered partial documents in the insurers' policy files, which was one factor prompting the limited request for insurance company email correspondence.  See, e.g., Ex. 6 (an incomplete email chain with the subject "BINDAY CASES" found in a Security Mutual policy file); see also discussion infra Part II.D.2 (discussing the relevance of the email subpoena requests and citing Exhibit 6).  Exhibit 6 undermines

---

[8] AXA has suggested that "law of the case" doctrine should apply in so far as this Court "has previously adopted AXA's request to limit the subpoenas in this case to the time period of 2007 through 2009, to redact certain personal information from the policy files produced by AXA, and to limit production of policy files to the underwriting and application files" and "held . . . that requests for 'all documents' run afoul of Rule 17 and Nixon."  AXA Mem. 13, ECF No. 175.  However, as the Court made clear in the July 24 status conference, it did not approve the insurers' requests regarding their responses to the Government Subpoenas.  Moreover, the Court's prior ruling to quash certain Rule 17(c) subpoenas lacks the specificity implied in AXA's motion.  The Court did not adopt—explicitly or by inference—every argument or suggested limitation made in prior motions by the insurance companies.  Even if that was the Court's intention, AXA concedes the doctrine of the law of the case "is discretionary and does not limit a court's power to reconsider its decisions."  Aramony v. United Way of America, 254 F.3d 403, 410 (2d Cir. 2001) (quoting In re Crysen/Montenay Energy Co., 226 F.3d 160, 165 n.5 (2d Cir. 2000)); In re Refco Inc. Sec. Litig., No. 07-MDL-1902, 2013 WL 2526661, at *4 (S.D.N.Y. June 6, 2013).

Security Mutual's "good faith basis for believing that no further compliance [with Request No. 1] is required." We request that these motions to quash be denied so that during the course of the Defendants' continued review of the policy files produced to date and yet to be produced, the Defendants have the appropriate latitude to pursue, by motion to compel if necessary, additional specific documents or portions of documents that appear to missing from the policy files produced by the insurers.

**B.     The Motions to Quash Requests for Telephone Recordings and Transcripts Should Be Denied**

Four of the Moving Insurers object to a request to produce "telephone recordings, and transcripts of such records, made in connection with the Relevant Life Insurance Policies."[9] <u>See, e.g.</u>, Ex. 4 (Sch. Part B.7). Telephone recordings and transcripts in connection with specifically identified policies at each insurer are properly considered part of the insured's policy file. Telephone recordings may not have been maintained by the insurance companies in the same location as other policy file materials, but they are clearly a component of the insurance company's records pertaining to that policy. Several insurers, including two that have objected to this request, expressly required telephone interviews in their policy underwriting procedures. <u>See, e.g.</u>, Ex. 7 (Aviva underwriting guidelines requiring an "inspection report" for life insurance amounts over $ 1 million and warning agents "to advise your client that they will be contacted for this report."); Ex. 8 (AXA financial underwriting requirements including a "telephone interview, conducted by [a] vendor . . . [which] includes questions that are specific to the older

---

[9] Aviva Mem. 9-11, ECF No. 177; AXA Mem. 15-17, ECF No. 175; Prudential Mem. 1, 4-5, ECF No. 200; Sun Life Mem. 2, 5-6, ECF No. 189.

age market"). AXA's objection that the July Subpoenas "do not seek specific documents known to exist" is refuted by their own underwriting requirements. See AXA Mem. 15, ECF No. 175.[10]

Because the telephone recordings and transcripts constitute part of the relevant policy files, even if the Court agrees to quash this request in the July Subpoenas, the Moving Insurers are nonetheless compelled to produce these materials in response to the Government Subpoena. At least one Moving Insurer, Lincoln National, has already done so. Lincoln National determined that telephone recordings were responsive to Government Subpoena Request No. 4, which calls for "[a]ll records concerning universal life policies," subject to certain criteria. See, e.g., Ex. 9 (Aug. 20, 2012 Government Subpoena served upon Lincoln National). In its first motion to quash, Lincoln National stated with respect to Government Request No. 4 that "[i]n reviewing its subpoena responses . . . Lincoln realized that it had not produced *responsive recorded customer service telephone calls* concerning those policies." Lincoln National Mem. in Supp. of Mot. to Quash 4, Mar. 1, 2013, ECF No. 88 (emphasis added). The recordings were subsequently produced by Lincoln National.

None of the Moving Insurers has objected to the relevance of the specifically identified insurance policy files at issue, nor could they. The heart of the Government's case is the allegation that the Defendants' conspired to falsify information submitted by "straw buyer" life

---

[10] AXA's further objection, to this and other July Subpoena requests, that they "go beyond what Your Honor has authorized" when the Court approved the Defendants' request to issue the July Subpoenas, is without merit. AXA Mem. 15, ECF No. 175; John Hancock Mem. 8, ECF No. 193 (stating certain July Subpoena requests "Should Be Quashed Because They Are Broader than the Descriptions Provided in the July 1, 2013 Letter"). Even if the language in the body of the July 1, 2013 letter to the Court could be construed as narrower than the language of the relevant subpoena requests—if only in an attempt to summarize the requests—AXA and John Hancock ignore the fact that the July 1 letter attached each proposed subpoena schedule, which included the subpoena request language identical to that which was served on the Moving Insurers. The Defendants did not present "a more narrowly tailored request" in the July 1 letter, as AXA claims, AXA Mem. 17, ECF No. 175; rather, the Defendants presented exactly the request that was served.

insurance applicants.  The existing records of telephone calls undertaken by insurance company representatives to "confirm the information that was disclosed in the application and the financial supplements," is directly relevant to this issue.  Ex. 8 (AXA underwriting guidelines).  Objections to the relevance of the policy-related telephone records must fail.

Certain Moving Insurers also object that the request lacks specificity or that the request is overbroad and burdensome.  This is also easily refuted.  The July Subpoenas explicitly identify the name and policy number to which the requested telephone records relate.  The Defendants did not simply request "any" telephone records with no other reference point, but asked specifically for those created in connection with a limited set of identified policies.  With respect to the four insurers who have objected to this request there are seven (7) policies at Aviva, three (3) at AXA, eight (8) at Prudential and three (3) at Sun Life.  The claim that telephone records associated with these policies will be "voluminous and not sufficiently specific," or "overly burdensome" to collect is belied by the limited number and scope of the request.

Moreover, the assertion that the Defendants should have provided "specificity as to the name of the caller, the telephone number of the party contacting [the insurance company], or the date of the call," Sun Life Mem. 5, ECF No. 189, takes the 17(c) specificity requirement too far.  To require that level of detail is the classic example of Judge Holwell's concern in Rajaratnam—demanding such specificity "borders on rendering Rule 17 a nullity."  753 F. Supp. 2d at 320 n.1.  The request for relevant telephone recordings and transcripts clearly meets both the Nixon and Nachamie standards and should not be quashed.[11]

---

[11] Counsel for Mr. Binday had a telephonic meet and confer with counsel for Prudential and Sun Life during which it was agreed that these insurers would produce any relevant system notes or transcripts in response to the request for telephone records—on the understanding that there would be such a document for each telephone call.  It was further agreed that to the extent counsel for Defendants identified specific calls of interest based on the review of such system

C.   **The Motions to Quash Requests for Internal Investigations, Audits, Fraud Alerts, Reviews or Watch Lists Relating to the Defendants or the Relevant Policies Should Be Denied**

Seven of the Moving Insurers object to one or more of three separate but closely related requests to produce (1) "[a]ll documents relating to any internal or external investigations, audits, fraud alerts or reviews" pertaining to a specific list of individuals and entities; (2) the same with respect to a specific list of policy files; and (3) any "watch lists" listing specific individuals and entities the insurer suspected might be "involved in the sale of life insurance policies to investors."[12]  See, e.g., Ex. 4 (Sch. Parts B.2, 3, 4).  The two main arguments presented by the Moving Insurers are that the request is overbroad and lacks sufficient specificity, and that the documents sought are not relevant.

1.   **The Investigations and Watch List Requests Identify a Defined Group of Specific Responsive Materials**

In their objections to this and several other requests, the Moving Insurers assign talismanic significance to the Defendants' use of the phrase "all documents" or "any" record as automatically disqualifying the relevant requests as a "fishing expedition" or "typical of civil discovery" prohibited by Rule 17.  See, e.g., Aviva Mem. 10, ECF No. 177.  However, phrasing a Rule 17 request with the terms "all" or "any" does not render the request *per se* improper as the Moving Insurers have argued.  See, e.g., Rajaratnam, 753 F. Supp. 2d at 321-23 (approving subpoena requests seeking "all documents" reflecting certain topics); Libby, 432 F. Supp. 2d at

---

notes or transcripts, the insurers would attempt to seek out actual recordings of any such calls if available.  With this understanding, the Defendants agree to the proposed approach in Prudential's and Sun Life's Memoranda of Law.  See Prudential Mem. 5, ECF. No. 200; Sun Life Mem. 5-6, ECF No. 189.  The Defendants will also agree to the modified request put forth by AXA in its Memorandum of Law.  AXA Mem. 17, ECF No. 175.

[12] American General Mem. 3-4, ECF No. 202; AXA Mem. 15-19, ECF No. 175; John Hancock Mem. 6-12, ECF No. 193; Lincoln National Mem. 5-7, ECF No. 184; Phoenix Mem. 6-8, ECF No. 197; Security Mutual Mem. 9-14, ECF No. 181; Sun Life Mem. 1-2, 4-5, ECF No. 189.

38 (approving subpoena requests where, "[a]lthough [defendant's] requests seek '[a]ll

documents,' each request provides a narrow subcategory of documents being sought, which

cover a discrete topic and typically limit the pertinent time frame"); United States v. RW Prof'l

Leasing Servs. Corp., 228 F.R.D. 158, 165 (E.D.N.Y. 2005) (approving certain subpoena

requests seeking "all documents" "reflecting," "relating to," or "referring to" relevant topics).  In

United States v. Vought, another mail and wire fraud case, the district court approved a far

broader request than any in the July Subpoenas, granting a motion for a Rule 17 subpoena

requesting the following:

> *Any and all* writings, tapes, computer files and disks...*including, but not limited to*, *documents of any kind*, correspondence, e-mail communications, tape recordings, notes, and written analysis and reports, *reflecting, relating and referring to* the knowledge or awareness of *employees and/or representatives* of the New Haven Savings Bank ("NHSB") *and/or its successor*, Newalliance Bancshares, Inc., and/or its underwriter, Ryan Beck [as to certain facts].

No. 05-cr-268, 2006 WL 1662882, at *17 (D. Conn. June 15, 2006) (emphasis added).  Like the

defendant in Vought, the Defendants here are faced with the daunting task of seeking documents

from corporate third parties, making it particularly challenging to precisely define particular

documents or custodians, despite the fact that the Defendants have gone to great lengths to do

just that.

Moreover, the Moving Insurers fail to appreciate the particular background of this case,

which left the Defendants with no choice but to propound a second set of subpoena requests just

two months before trial.  As we have seen already in the case, a more limited request for

"[d]ocuments setting forth," Ex. 10 (Aug. 20, 2012 Government Subpoena served upon

American General, Requests 1-2), which permits the Moving Insurers to pick and chose among

various responsive documents, is an invitation for the insurers to engage in precisely the kind of

"overly narrow reading" of subpoena requests, Ex. 11 (Affidavit of Christine Nixon, Chief Legal Officer of American General, at ¶ 5 (July 29, 2013)), which has already posed a significant hurdle to the Defendants' requests for relevant evidence in this case, as the Court recognized in its July 24 Order.  Two insurers, American General and Lincoln National, have demonstrated what are at best careless responses to previously-issued subpoenas, both claiming that documents the Defendants consider critical to the defense were inadvertently omitted from prior document reviews and productions.  Id. ¶ 5 (Nixon Affidavit stating that the omission of a document responsive to the Government Subpoena was a "mistake"); Ex. 12 (Letter from Andrew M. Genser, counsel for Lincoln National, to the Court (July 30, 2013), at 3 (stating that Lincoln National's failure to locate a particular document in its narrowed response to the February Subpoena was due to a "technical error").

More importantly, the argument that a request for "[a]ll records concerning" a defined set of criteria are improper under Rule 17(c) because they are "unreasonably broad" or "place an unreasonable burden" on the insurers has already been rejected by this Court.  Ex. 10; Phoenix Mem. in Supp. of Mot. to Quash 10-11 (Mar. 1, 2013), ECF No. 78; AXA Mem. in Supp. of Mot. to Quash 15 (Mar. 1, 2013), ECF No. 77 (arguing the Government's subpoena request for "[a]ll records concerning" certain policy files "lacks the specificity required under the Nixon standard, and is overbroad and unduly burdensome as it calls for the production of 'all records' rather than specifically identified material.").  Both Phoenix and AXA moved to quash Government Request No. 4, which called for "[a]ll records concerning" universal life policies which were (1) submitted through a specific list of sixteen individuals and entities; (2) had a face value of $2 million or more; and (3) the age of the proposed insured was 70 years or older.  Ex. 10.  Those motions were denied.  Ex. 5 (Status Conf. Trans. (July 24, 2013), at 15:3-5).

The Defendants' requests for "[a]ll documents relating to" investigations, audits, fraud alerts or reviews" concerning (1) a specific list of (at most) eighteen individuals and entities; or (2) such documents with respect to a specific list of policy files; or (3) a "watch list or other listing" concerning the suspected "sale of life insurance policies to investors" is comparable in scope if not more circumscribed than Government Request No. 4.  The requests are strictly limited to the Moving Insurers' reviews with respect to the Defendants in this case and associated entities through which the Defendants conducted their activities, or otherwise to the specific life insurance policies at each Moving Insurer upon which this case was brought.

The suggestions that this request would engender "a comprehensive search of [American General's] entire data system [of] 3 terabytes of data," "company-wide search[es]," or otherwise require "significant time and effort identifying potential custodians, potential search terms, and obtaining Binday's consent to limit [the] production to certain custodians, search terms, and date ranges in order to comply," is simply a straw argument for the Moving Insurers to knock down. American General Mem. 3, ECF No. 202; AXA Mem. 16, ECF No. 175; John Hancock Mem. 10, ECF No. 193; Lincoln National Mem. 5, ECF No. 184.  The Defendants should be permitted to rely on the assumption that the vast majority of the Moving Insurers' business is legitimate, and therefore not subject to "investigations, audits, fraud alerts or reviews."  As such, one would expect such materials to be limited in scope, largely confined to a particular department or group of personnel and readily accessible.  See, e.g., Ex. 13, at 13440, 13447 (internal Lincoln National memorandum stating that "Underwriting and Compliance maintain a list of advisors known to produce this type of business.  This list is referenced by our underwriters when other IOLI flags are triggered.  Our systems are programmed to flag cases with certain characteristics," and identifying an "IOLI Working Group" limited to thirteen individuals).

Despite AXA's objection to the "all documents" formulation of the request, it was

nonetheless able to arrive at a reasonable response to Request Nos. 2, 3, and 4, suggesting the

requests were sufficiently specific to achieve Defendants' goal: the production of "documents

that are both relevant and admissible."  AXA Mem. 19, ECF No. 175.  AXA has offered to

provide, for the years 2007 -2009, "documents sufficient to identify" (1) "investigations of the

Relevant Life Insurance Policies for fraud in the application for insurance," (2) "internal

investigations or audits for fraud in the application process" relating to Defendants Michael

Binday and James Kevin Kergil; and (3) the "relevant portion of any . . . internal watch list or

other listing . . . identifying brokers the Company suspected might be involved in the sale of life

insurance policies to investors" if such list includes Messrs. Binday or Kergil.  Id. at 15, 18.[13]

Contrary to the Moving Insurers assertions, these are the type of "sharply defined" or

"narrow" categories of documents—precisely like Government Subpoena Request No. 4—that

are the appropriate target of Rule 17 subpoena requests.  See, e.g., Libby, 432 F. Supp. 2d at 38

(approving defendant's request for "[a]ll documents," where "each request provides a narrow

subcategory of documents being sought, which cover a discrete topic and typically limit the

pertinent time frame.");  RW Prof'l Leasing Servs. Corp., 228 F.R.D. at 165.  The fact that the

---

[13] The Defendants are prepared to accept these modifications to the requests with two exceptions.  First, the entities Advocate Brokerage, R. Binday Plans & Concepts (of which Mr. Binday is a principal), Potomac Group and Crump, and Messrs. Krupit and Weinstein should also be included.  Documents from AXA's production refute its contention that the Defendants' request does not "relat[e] to the activities specific to their dealings with AXA on the three AXA policies at issue in this case."  See, e.g., Ex. 14 (correspondence between a representative of Advocate Brokerage/R. Binday Plans & Concepts, Potomac Group and AXA pertaining to a relevant policy); see also Ex. 15 ("Licensing and Appointment Validation" for Paul Krupit as Broker and Crump as General Agent); Ex. 16 (AXA "New Business Transmittal" listing writing agent Bruce Weinstein).  Second, we will not accept the limitation of the relevant time period to 2007 – 2009.  For the reasons discussed below, see infra Part II.B.2, AXA's notice, or lack thereof, of the Defendants' alleged behavior both before and after the relevant AXA life insurance policies were issued is relevant.

Defendants are not in a position to know the names of specific documents, employees or

departments at each Moving Insurer related to such internal investigatory activities does not

render the request for this information an impermissible fishing expedition.[14]  Cf. Nixon, 418

U.S. at 700 (upholding subpoena for Nixon tapes that could not be "described fully" where

"there was a sufficient likelihood that each of the tapes contain[ed] conversations relevant to the

offenses charged in the indictment").

      2.      **The Investigations and Watch List Requests Call For Relevant Groups of Documents**

     Several of the Moving Insurers also object to the relevance of responsive investigations

and watch list materials.  For instance, Lincoln National argues that it does "not see why whether

or not Lincoln kept a watch list with the defendants' names on it would be relevant to the issue

of guilt of the crimes charged."  Lincoln National Mem. 6, ECF No. 184.  But the Defendants

were involved in the application for and issuance of 16 relevant life insurance policies at Lincoln

National, and a total of 125 such policies at the 13 insurance companies involved in this case.

The Government contends that these 13 insurance companies are the "victims" of the

Defendants' alleged conspiracy to commit mail and wire fraud.  The question of whether the

Defendants or associated individuals or entities were identified by the so-called victims—

who nonetheless chose to continue doing business with the Defendants and to continue to collect

premiums on policies the Defendants brought to them—is a key consideration in assessing

whether the insurance companies were, in fact, aware of the Defendant's alleged fraudulent

---

[14] Which is not to say that the Defendants did not attempt to provide the insurers guidance on where to locate the relevant materials when possible.  See, e.g., Ex. 4 (July Subpoena for American General, Sch. Part B.2 & B.3, referencing the "Producer Protocol Committee" referred to in American General internal documents); Ex. 17 (July Subpoena for John Hancock, Sch. Part B.1 & B.2, referencing the "[m]onthly large case audits and large case review meetings," "monthly MIS report[s]," and "Trust Review" procedures referred to in John Hancock internal documents).

activities.  That issue goes directly to the materiality of the alleged false representations at issue in this case and supports the Defendants Rule 17 request for such information.[15]  See United States v. Smith, 245 F.R.D. 605, 611-12 (N.D. Ohio 2007) (ordering production of documents showing that alleged victim was aware of allegedly fraudulent financial arrangements); Vought, 2006 WL 1662882, at *17 (granting defendant's motion for a Rule 17 subpoena "to obtain information concerning the Bank's awareness [of alleged fraudulent scheme as] relevant to the issue of whether the Bank was deceived. . . . [I]f the Bank was not deceived, the Government's fraud theory fails.").[16]

Moreover, the *absence* of the Defendants' names and associated life insurance policies from such investigations and watch lists is also a highly relevant fact which would tend to

---

[15] Sun Life seeks to eliminate the following names from the list of individuals and entities associated with the Defendants:  R. Binday Plans & Concepts; Advocate Brokerage; The Potomac Group; BISYS; Crump Life Insurance Services; Insurance Planning Associates ("IPA"); and Capital Creation Group ("CCR").  Sun Life Mem. 1-2, ECF No. 189.  In a meet and confer with counsel for Sun Life, counsel for Mr. Binday agreed to the exclusion of IPA and CCR.  The Defendants will not agree to the exclusion of Advocate Brokerage or R. Binday Plans & Concepts.  Because Mr. Binday is a principal of these entities their inclusion cannot be considered irrelevant and unreasonable given that Sun Life raises no objection to the inclusion of Mr. Binday.  As to Potomac, Crump and BISYS, these entities were the general agents through which Mr. Binday and his companies conducted business with Sun Life, and are relevant for the same reasons that we have previously explained.  The Sun Life documents produced to date demonstrate the relevance of these three entities.  See, e.g., Ex. 18 (document located in the policy file of one of the relevant insureds, a communication from an employee of the "Potomac Office" of Crump, on BISYS letterhead, listing Defendant James Kevin Kergil).

[16] Phoenix contends that this information cannot be relevant as to it and that this and other subpoena requests must be quashed, in part due to "the Government's decision not to pursue a case that Phoenix was defrauded."  Phoenix Mem. 7, ECF No. 197.  However, the Court has now made clear in two rulings that Phoenix remains part of the case.  See Ex. 1, at 4:17-22; Order 2, ECF No. 171 (noting that the deadline for Phoenix's response to the Government Subpoena "is long since past" and ordering Phoenix to certify the completeness of its production).  Not only is Phoenix's conduct potentially relevant to showing Mr. Binday's lack of intent to defraud, but should the Government choose to reverse course and include Phoenix, which was referenced in its Indictment, in its case-in-chief, these materials would be highly relevant to the Defendants for the reasons explained above, particularly in light of Phoenix's current position that it has "not yet identified responsive documents."  Burr Decl. in Supp. of Phoenix Mot. to Quash ¶ 10 (July 31, 2013), ECF No. 198.

controvert the Government's claims that the insurance companies in this case were "victims" of an alleged scheme to defraud. The Government will likely present evidence at trial demonstrating the insurance companies' extensive efforts to detect and root out STOLI business being generated by various agents. See, e.g., Ex. 13, at 13440 (memorandum discussing the list of producers "referenced by our underwriters when other IOLI flags are triggered. Our systems are programmed to flag cases with certain characteristics"). A demonstration that the policies at issue in this case exhibited the relevant "characteristics" but nonetheless did not prompt further review of Defendants by the insurers is tantamount to the so-called victim conceding *there was no crime*.

### D. The Motions to Quash Requests for Select Emails from Specific Custodians Should Be Denied

Eight of the Moving Insurers object, on various grounds, to the July Subpoena request that the insurance companies search the email of several specifically identified custodians and unidentified custodians defined by narrowly-tailored criteria, for six specific search terms.[17] These objections fall primarily into three categories: specificity, relevance and the "unreasonable and oppressive" nature of the requests.

Before addressing each of these objections individually, we note that courts in this circuit have long recognized that subpoena requests for email and other electronic documents relating to a circumscribed topic or including specified search terms are acceptable. See, e.g., Vought, 2006 WL 1662882, at *17 (granting motion for subpoena requesting, *inter alia*, email communications relating to particular topics); In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993, 846

---

[17] American General Mem. 5-6, ECF No. 202; Aviva Mem. 7-11, ECF No. 177; AXA Mem. 17-22, ECF No. 175; John Hancock Mem. 6-12, ECF No. 193; Lincoln National Mem. 8-9, ECF No. 184; Phoenix Mem. 5-6, ECF No. 197; Security Mutual Mem. 9-14, ECF No. 181; Sun Life Mem. 6-7, ECF No. 189.

F. Supp. 11, 13 (S.D.N.Y. 1994) (reasoning that a subpoena "demanding documents containing specified key words," rather than one seeking entire electronic devices, "would identify relevant documents without requiring the production of irrelevant documents"); cf. Rajaratnam, 753 F. Supp. 2d at 320 n.1 (noting that requiring a defendant to "specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity").  The email requests here are no different.

### 1.   The Email Request Calls For Emails Pertaining Directly to the Defendants Sent or Received by Specific Individuals

The Moving Insurers object that a "request for *all* emails and documents sent to and from eight custodians does not fall within the confines of a Rule 17(c) subpoena," and that a request for "e-mails from 'sales, marketing, underwriting, legal or compliance'" is impermissibly broad and unduly burdensome.  American General Mem. 5, ECF No. 202; John Hancock Mem. 12, ECF No. 193.  Were these accurate characterizations of the request at issue, the insurers objections might be warranted.  But, as we demonstrated above, even a request for "[a]ll records concerning," particularly when confined to a specifically defined set of criteria, is a proper 17(c) subpoena request.  The requests at issue surpass this hurdle.  The fact that a request calls for "all emails" is not sufficient, on its own, to render a Rule 17(c) request improper.  See Vought, 2006 WL 1662882, at *17 (granting a motion for a 17(c) subpoena request for "[a]ny and all . . . e-mail communications"); see also Rajaratnam, 753 F. Supp. 2d at 321-23; Libby, 432 F. Supp. 2d at 38; RW Prof'l Leasing Servs. Corp., 228 F.R.D. at 165.

Contrary to the Moving Insurers' contentions that this request "is nothing more than an attempt by Binday to revisit a request which was previously quashed" and requires an effort by the insurers that is no "different than what would have been required to comply with the quashed requests in the Prior Subpoenas," there is a demonstrable difference between the July Subpoenas

27

and the Defendants' February Subpoenas.  Sun Life Mem. 6, ECF No. 189; John Hancock Mem.

10, ECF No. 193.  The February Subpoena introduced two very broad concepts—IOLI and

STOLI—and requested all "policies," "training materials and/or other official or unofficial

communications" about STOLI/IOLI that the "Company" (not limited to particular custodians)

disseminated to agents or general agents during the relevant time frame.  See, e.g., Ex. 26

(February Subpoena served upon American General, Sch. Parts I.A. & B).

    The Defendants concede that the attempts by prior counsel for Mr. Binday to negotiate

search terms and custodian lists only further broadened these requests through a proposed list of

seventy-five search terms, including such general terms as "[s]enior life," "[s]enior policy,"

"change of ownership," and "red flag."  Ex. 19 (email from Michael Miller, prior counsel for Mr.

Binday, to Anthony Candido, counsel for Security Mutual (Mar. 1, 2013)).  Moreover, these

searches were not crafted, in any way, to be relevant to the Defendants; rather they sought a host

of emails concerning a variety of STOLI / IOLI information available from the insurers' files

generally.

    In stark contrast, the July Subpoena is expressly limited, on the face of the subpoena

schedule, to just six search terms, each of which is tied directly to this criminal prosecution.

Three of the six terms are the unique surnames of the three Defendants in this case (i.e., Messrs.

Binday, Kergil and Resnick), and a fourth, "Advocate Brokerage," is an entity controlled by Mr.

Binday through which many of the policies at issue were submitted.  Messrs. Pellicone and

Krupit, whose unique surnames are the final two terms, are cooperating with the Government

and are expected to appear as witnesses during the trial.

    Moreover, the July Subpoenas specifically identify between one and ten custodians who

dealt directly with the Defendants or otherwise were involved in the sale and underwriting of the

relevant life insurance policies at each insurer. Generally these lists of specific custodians were derived from a painstaking review of the documents already produced in this case (to the extent available—some insurers produced almost no documents in advance of the July Subpoenas). Some of the custodians identified are known to have been in a legal or compliance function and to have conducted a review of some or all of the relevant life insurance policies. See, e.g., Ex. 20 (email from Lincoln National employee, Kenneth Elder, pertaining to a review of a Binday-related policy). To the extent the requests call for email "sent or received by Company personnel in a sales, marketing, underwriting, legal or compliance function and who communicated about the Relevant Life Insurance Policies," see, e.g., Ex. 17, this was not, as some Moving Insurers have contended, a "demand that [the insurer] undertake company-wide searches of its records," or "to identify any and all of [the insurer's] thousands of employees" in the specified functions. AXA Mem. 17, ECF No. 175; Lincoln National Mem. 9, ECF No. 184.[18]

Instead, recognizing that the Defendants cannot possibly know the specific identities of all the relevant employees who communicated about the policies at issue, this was an attempt to ensure that the subpoena request was not read so narrowly as to focus solely on the named custodian(s) to the exclusion of individuals in core functions who played a role in underwriting, approving or investigating the relevant life insurance policies or Defendants' business with the insurance company. While we are mindful of the Court's admonition during the April 16 hearing, quoted by several Moving Insurers, that revised subpoenas would "have to specify e-

---

[18] Defendants concede that the exact language used in the requests, referring to emails "which were sent or received by Company personnel in a sales, marketing, underwriting, legal or compliance function and who communicated about the Relevant Life Insurance Policies," may be susceptible to a broader interpretation than was intended. See, e.g., Ex. 17. Defendants intended this to be a compound requirement, limiting the scope of employees to those where were both in one of the functions listed and "who communicated about the Relevant Life Insurance Policies."

mail from whom to whom on what date," Ex. 1, at 6:11-12, we respectfully submit that this is an overly-narrow articulation of the Rule 17 requirements.  As Judge Holwell explained in Rajaratnam, "in the context of a subpoena to a third party to whom Rule 16 does not apply, requiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity."  753 F. Supp. 2d at 320 n.1.

Though the Defendants were not able to narrow this request to particular emails, from particular custodians on particular dates, this request is still much narrower than those that other district courts have approved implicating a significantly broader group of relevant personnel.  See, e.g., Vought, 2006 WL 1662882, at *17 (approving a request for documents concerning "employees and or representatives of the New Haven Savings Bank . . . and/or its successor, Newalliance Bancshares, Inc."); Rajaratnam, 753 F. Supp. 2d at 322 (denying motion to quash and rejecting argument "that application of the request to documents reflecting communications between [a third party] and 'any agent or employee of Galleon . . . takes [the request] out of the realm of what is relevant and into the ambit of an improper fishing expedition for discovery purposes'").

### 2.     The Email Request Calls for Relevant Documents

The specificity of the request will also ensure that the responsive materials will be sufficiently relevant, despite the Moving Insurers' assertions to the contrary.  As we explained above, the proposed search terms are strictly limited—the names of the Defendants and one associated entity, and two cooperating witnesses who worked with the Defendants in submitting the life insurance applications at issue.  The custodians specifically identified in the subpoena requests worked directly with the Defendants, or we otherwise have reason to believe that they were involved in underwriting or approving the relevant life insurance policies, or in reviewing

the policies relating to the Defendants in a compliance capacity.  Lastly, to the extent the requests included unidentified custodians, the requests were expressly limited to individuals "who communicated about the Relevant Life Insurance Policies."

Because the Defendants are on trial for alleged misrepresentations made to the insurers, through life insurance applications, these criteria are specifically tailored to capture communications about the Defendants which will produce relevant evidence of the insurance companies' awareness of the Defendants' alleged activities.  See, e.g., Ex. 6 (an internal email between Security Mutual employees stating that "I have reviewed a number of trusts, including ones related to Binday cases . . . .  In conclusion, there is nothing in any of the files . . . to suggest [IOLI].  Subject to medical underwriting they are ready to go.").

The combination of the specified search terms, the identified custodians, and unidentified custodians who communicated about the relevant policies contradicts the Moving Insurers who have asserted that the email request is not "limited by *any* subject matter," or was made "without even any effort to specify a topic."  Phoenix Mem. 5, ECF No. 197; Security Mutual Mem. 11, ECF No. 181.  The communications by relevant underwriting, sales, marketing, legal and compliance personnel about the Defendants and associated individuals, will, by their very nature, be limited to the Defendants' activities as agents for the insurers and, most importantly, the *insurers' internal views* concerning the Defendants.  This is precisely the relevant topic that the request attempts to address.  See Vought, 2006 WL 1662882, at *17 (subpoena request approved for documents "reflecting, relating and referring to the knowledge or awareness of employees and/or representatives" of a third party of the Defendant's activities).

Some of the Moving Insurers suggest that all relevant emails will be in the policy files themselves and no further production is needed.  See, e.g., Phoenix Mem. 5, ECF No. 197

("policy files already contain emails relevant to those policies"). However, while Exhibit 6 was indeed found in policy file materials produced by Security Mutual, the email in the policy file was incomplete. Without an additional email search for this *and related* email correspondence, Mr. Binday will have no way to know precisely the role the "BINDAY CASES" played in Security Mutual's effort to "*track[] and facilitate[]* as many large cases as we can," a potentially crucial revelation concerning Security Mutual's awareness of Mr. Binday's activities. Ex. 6 (emphasis added); cf. Vought, 2006 WL 1662882, at *17 (granting Defendant's motion for a Rule 17 subpoena "to obtain information concerning the Bank's awareness [of alleged fraudulent scheme as] relevant to the issue of whether the Bank was deceived. . . . [I]f the Bank was not deceived, the Government's fraud theory fails.")

As the above example illustrates, the criteria for the requests were specifically tailored to produce documents relevant to the insurance companies' business relationship with the Defendants during the alleged conspiracy period, which, according to the Government's allegations, was primarily defined by the Defendants' alleged efforts to procure life insurance policies for sale to investors. In Rajaratnam, 753 F. Supp. 2d at 322, a third party moved to quash a 17(c) subpoena request for "[a]ll documents reflecting communications," not limited to any topic, between himself, the defendant, and others. The district court denied the motion, reasoning that because the defendant was alleged to have conspired to engage in insider trading on the basis of such communications, a request for such communications did not constitute "a general fishing expedition." Id. (internal quotation omitted). Similarly here, the nature of the business relationship between the Defendants and the insurance companies ensures that this request is not an unbounded exploration of the insurance companies files, but a targeted search for documents relevant to the crimes charged. AXA's bald assertion that these search terms

"will surely produce documents that simply have nothing to do with the upcoming trial" is plainly not correct.  AXA Mem. 19, 21, ECF No. 175.

### 3. The Email Request is Not "Unreasonable and Burdensome"

Several of the Moving Insurers have asserted that the email request contravenes Rule 17(c) because it is unreasonable and burdensome.  Like the previous objections, this argument essentially boils down to the claim that email, beyond a small set of individual email messages, can never be requested under Rule 17(c).  As the cases we have cited above demonstrate, that is simply not the case.  Email requests, even broad email requests concerning communications with numerous unnamed individuals about vaguely defined, or wholly undefined, issues—*unlike* the subpoenas issued here—can and have been approved by district courts.

The Moving Insurers take several approaches to demonstrating "burden."  American General and Security Mutual present evidence as to the technological hurdles that they will face in collecting the email from back-up tapes and "over 50 data sources where emails may reside." Anderson Aff. in Supp. of American General Mot. to Quash ¶ 8, ECF No. 207; Christopher Decl. in Supp. of Security Mutual Mot. to Quash, ECF No. 182.  The Defendants are cognizant of these issues and continue to be willing to work with any insurer to mitigate, to a reasonable extent, the practical complications imposed by this request.  Indeed, understanding the technological issues which Security Mutual faces, as explained in its prior motion to quash, counsel for Mr. Binday and Security Mutual held a telephonic meet and confer in which counsel for Mr. Binday offered to restrict the email request to email that is available on the company's network, eliminating the need to restore back-up tapes, and also offered to restrict the request to three Security Mutual employees.  Counsel for Security Mutual has not responded to this offer.[19]

---

[19] Similarly, the Defendants have worked cooperatively with non-moving insurers on the

Phoenix faces no such problems, as it has already conducted a search and located approximately 22,000 emails and email attachments responsive to the subpoena request.[20]  Thus, Phoenix focuses its objection solely on the number of emails which it has located and the "time and costs required to cull, process, and review" the emails in order to produce them.  Phoenix Mem. 5, ECF No. 197.  Defendants recognize the time and expense involved in responding to a subpoena; R. Binday Plans & Concepts, a third party entity associated with Mr. Binday, produced upwards of 500,000 pages in response to a Grand Jury subpoena in this case.  Nevertheless, the unfortunate expense involved in conducting a document review is not an appropriate basis on which to move to quash the subpoena request.

> [A]s a general rule, a witness or the recipient of a subpoena duces tecum is required to bear the costs of compliance. . . . Rule 17(c)'s provision that the court may quash a subpoena "if compliance would be unreasonable or oppressive" must be read to mean that in the main run of cases the cost of compliance will be assumed as part of the public duty of providing evidence.

In re Grand Jury Subpoenas to Midland Asphalt Corp., 616 F. Supp. 223, 225 (W.D.N.Y. 1985) (denying motion to quash) (internal quotation omitted).[21]  The apparent extent of Phoenix's

---

email request.  As to MetLife, the Defendants agreed to forego emails pertaining to one of three listed custodians, and as to Union Central, the Defendants agreed to accept production of emails collected in response to the February Subpoena in lieu of asking Union Central to collect and review emails specifically responsive to the email request in the July Subpoena.

[20] We note that Phoenix states that compliance with the subpoena request would entail additional searches because "the search functionality does not permit simultaneous searches within the subject line and other data fields, which may yield additional results," and because the search conducted may not have pulled all related attachments or parent emails not containing the search terms.  Fletcher Aff. in Supp. of Phoenix Mot. to Quash ¶ 4, ECF No. 199.  In the interest of expediency, Defendants would be willing to forego any further searches in response to this request if Phoenix would agree to produce the non-privileged results of the current search.

[21] Phoenix also insists that the "vast majority of those hundreds of thousands of pages would relate to other unrelated insureds whose private medical, financial, and personal information would need to be redacted, another costly and time-consuming endeavor.  First, the insurance companies have already produced copious policy files for insureds that are not relevant to this case in response to the Government Subpoena—this would not be the first time such

communications about the Defendants and relevant individuals and entities underscores the relevance of these documents with respect to the Defendants' dealings with Phoenix.

Several Moving Insurers appear not to have undertaken any effort to conduct a search to assess the alleged burden of these requests, but nonetheless claim "the information sought is voluminous" and the request is "unduly burdensome and oppressive."  Aviva Mem. 9, ECF No. 177; Lincoln National Mem. 9, ECF No. 184.  Lincoln National claims that the burden arises from the alleged requirement to "identify any and all of its thousands of employees," in addition to the ten identified custodians, who may have played some role in the sixteen relevant life insurance policies at that company.  Id.  As noted above, the Defendants are open to working with Lincoln National and other insurers to reasonably limit the request.  In this case limiting the request to just the ten identified custodians is a reasonable compromise that cures the alleged burden.  And if it would agree to a similar compromise, John Hancock's concern that the request will require it to "spend significant time and effort identifying potential custodians, potential search terms, and obtaining Binday's consent to limit John Hancock's production to certain custodians, search terms, and date ranges," is moot.  John Hancock Mem. 10, ECF No. 193.  The July Subpoena already provides the name of one custodian—Randy Zipse—as well as the search terms and the date range.

In short, the Defendant's request for a targeted email production, focused on the Defendants and particular personnel at each insurance company, is specific, will produce relevant and admissible evidence, and does not present an unreasonable burden.  These requests, which are significantly narrowed from the prior subpoena requests, should not be quashed.

documents were produced.  Second, the July Subpoenas clearly instruct that "[w]henever possible, documents should be produced in complete, unredacted form," and explain that the insurance companies are not constrained by certain federal privacy provisions that they have previously cited to justify redactions in prior productions.  See, e.g., Ex. 4 (Sch. Part A.12 n.1).

**E.      The Motions to Quash Requests for Compensation Information Should Be Denied**

An important element of the defense in this case involves the fact that the insurance companies actively sought out and encouraged precisely the type of life insurance applications that the Defendants brought to them.  They desired the lucrative premiums associated with the STOLI business, reflected at the individual level in increased compensation.  The insurance companies saw the dramatic increase in premiums associated with senior life policies issued through the Defendants, and the relative growth in employee compensation, but nonetheless continued to write these policies and encourage additional business with the Defendants with little or no substantive improvements to the financial underwriting process.  See Ex. 21 (relevant portions of a 2009 compensation plan for a Field Sales Distribution VP Manager stating that compensation "will be measured on your ability to sustain the key agencies that we have identified in your region . . . . In order to meet this goal you will need to sustain a percentage of the key agencies production as compared to 2008," and listing "Binday" as one such "key agency").[22]

The subpoena requests for the production of compensation information for particular employees known to have worked with the Defendants have drawn objections from five of the Moving Insurers, largely on the basis of relevance.[23]  Three of the Moving Insurers, Mass Mutual, Lincoln Benefit and Prudential, raise the same objections and move to quash the relevant

---

[22] This document has been redacted by the Defendants for purposes of this motion briefing in light of the particular sensitivity of compensation plan information and concerns about sharing such information among competitors.

[23] American General Mem. 4-5, ECF No. 202; Aviva Mem. 7-9, ECF No. 177; Lincoln Benefit Mem. 4-5, ECF No. 186; Mass Mutual Mem. 4, ECF No. 191; Prudential Mem. 5, ECF No. 200.

request in part.  These insurers have agreed to produce some of the relevant employees'

compensation information, including:

- "[T]he dollar value of the premiums generated by that individual due to policies procured by the Defendants and/or Associated Individuals and Entities";

- "[T]he percentage or proportion of the total premiums generated by that individual due to policies procured by the Defendants and/or Associated Individuals and Entities"; and

- "[T]he compensation paid to that individual for policies procured by the Defendants and/or Associated Individuals and Entities."

However, the Moving Insurers object to the request for the employees' "compensation structure,

including total compensation and any premium targets, benchmarks or quotas," e.g. Ex. 4 (Sch.

Part B.8), as not relevant.  As noted above, the key issue here is the growth in the relevant

employees' total compensation, year over year, as the premiums associated with the Defendants'

business with the insurer also grew.  Absent figures on total compensation, it will be impossible

to show the increasing proportion of that compensation attributable to the Defendants—"key

agency" contacts according to one insurer—which goes directly to the employees' interest in

sustaining the relationship despite the insurance companies' purported anti-STOLI policies.

Contrary to the Moving Insurers' assertions, this and all the compensation information requested

is directly relevant to the whether the alleged insurers were the "victims" of a scheme to defraud

with which the Defendants are charged, or merely the willing participants in a "win-win-win"

investment mechanism.[24]

---

[24] Aviva raises the additional *pro forma* objection that the request should be quashed because "the information sought is voluminous and not sufficiently specific."  Aviva Mem. 9-11, ECF No. 177.  However, the request is limited to three employees and provides explicit detail on the precise information sought.  We do not expect documents concerning the compensation of three particular employees for seven years of their employment to be particularly voluminous, nor does Aviva offer any support for its objection to this request.

**F.      The Motions to Quash Requests for "Cost of Insurance" Information Should Be Denied**

All of the Moving Insurers object, in part or in whole, to the requests for documents pertaining to the calculation of the cost of insurance for the relevant life insurance products.[25] The Moving Insurers object that the information is not relevant, that it is proprietary and confidential information, and that it is otherwise publicly available to the defendants.  None of these arguments support a motion to quash the requested information.

**1.      The Cost of Insurance Information is Relevant**

Cost of insurance ("COI") charges associated with a particular life insurance policy have a direct impact on the premium—the higher the cost of insurance charge, the higher the premium.  Thus, the COI rate, the formula that an insurer uses to calculate the COI charge as to any given policy, is a critical reflection of the factors which the insurance company considers relevant to pricing the life insurance policy.  COI is so important to the pricing of premiums for a life insurance policy that typically the factors relevant to the COI rate are spelled out in the policy terms and conditions.  A Security Mutual policy, for example, states that "the monthly Cost of Insurance Rate is based on the sex, attained age and premium class of the Insured."  Ex. 22, at 14297.  The maximum rate for the policy is "based on the 1980 CSO-NA mortality table for a Male Standard Non-Smoker."  Id. at 14292.  Notably, not listed as factors in the calculation of COI, are "income," "net worth," any financial factors or any factors pertaining to the financing of or intent to sell the policy.  The subpoena requests seek relevant evidence from the insurance companies about what components are, and are not, part of COI because the factors

---

[25] See American General Mem. 6-8, ECF No. 202; Aviva Mem. 7-11, ECF No. 177; AXA Mem. 22-24, ECF No. 175; John Hancock Mem. 13-14, ECF No. 193; Lincoln Benefit Mem. 2, 5-6, ECF No. 186; Lincoln National Mem. 9-11, ECF No. 184; Mass Mutual Mem. 2, 5-6, ECF No. 191; Phoenix Mem. 3-4, ECF No. 197; Prudential Mem. 2, 5-7, ECF No. 200; Security Mutual Mem. 14-16, ECF No. 181; Sun Life Mem. 2, 7-8, ECF No. 189.

that make up the COI rate reflect the insurers' own judgments as to the information about the insured which is truly material to their pricing models and profitability.

If, as the Government contends, the insurance company "victims" in this case truly considered the alleged misrepresentations a critical element of the life insurance policies they issued, then one would have to assume that that information is a core component of the insurers' premium pricing strategy, as implemented through the COI rate. Despite the Moving Insurers' characterization of COI as an irrelevant "red-herring," see, e.g., AXA Mem. 23, ECF No. 175, this information is critically important to demonstrating that the alleged misrepresentations had no financial import to or impact on the insurers whatsoever—a crucial fact in undermining the Government's scheme to defraud theory.

AXA's own example bears this out. As AXA-BINDAY 504, Ex. 23, states: "The Cost of Insurance (COI) charge is determined by multiplying the Net Amount of Risk . . . by the monthly COI rate *applicable to the insured person at that time. The COI rate generally increases as the insured gets older.*" Id. (emphasis added). As this document demonstrates, the COI rate is determined by the aspects of the "insured person at that time" that are relevant to AXA's pricing determination, which can also change as the "insured gets older." Understanding the extent to which the alleged misrepresentations—the insured person's net worth, intention to sell the policy, other policies in force and use of financing to pay the premiums—affects COI, *if at all*, is relevant.[26]

---

[26] Phoenix's objection to the relevance of the request rests entirely on its position that the Government no longer intends to include Phoenix as a victim in this case. However, as discussed supra note 16, Phoenix is still very much a part of this case and is under an obligation to comply with proper Rule 17(c) requests regardless of its view of the matter.

### 2.     The Cost of Insurance Information is Not Otherwise Publicly Available

Several moving insurers have also grounded their objections on the contention that with respect to the request for COI information submitted to state insurance agencies, that information is otherwise publicly available to the Defendants and this is not a proper subject for a 17(c) subpoena.  In fact, this proposed alternative means of discovery is illusory and the requested materials are certainly not "otherwise procurable reasonably in advance of trial by exercise of due diligence."  Sun Life Mem. 7-8 (quoting In re Irving, 600 F.2d 1027, 1034 (2d Cir. 1979)). Over three months ago, on May 10, 2013, the Defendants submitted requests for "[a]ll product filings for universal life insurance policies in New York" for the relevant insurance companies covering the years 2006 through 2011 with the New York State Department of Financial Services ("DFS") pursuant to the New York State Freedom of Information Law.  Floy Decl. ¶¶ 2-3; id. Ex. A.  In response to that request, we were advised by a representative of DFS that the request would require up to a year to fulfill, and that the release of much of the materials would likely be contested, as confidential trade secret information, *by the very same insurers who are moving to quash these subpoenas.*  Id. ¶¶ 5-8.

The COI information requested in the July Subpoenas are not simply available like filings concerning publicly-traded companies, but rather would require, at this late stage, yet another subpoena to be issued to a new third party (a government agency), inviting additional motion practice and quite possibly another round of motions from the presently Moving Insurers. Contrary to the Moving Insurers' contentions, the documents sought "are not otherwise available" as a practical matter.  Cf. United States v. Shanahan, 252 F.R.D. 536, 542-43 (E.D. Mo. 2008) (denying motion to quash request for versions of public filings available on the SEC website based on defendants' evidence that the actual documents sought were not, in fact,

available from the relevant website).  Meanwhile, the relevant regulatory filings are no doubt

readily available to the current subpoena recipients and easily produced.[27]

### 3.      The Cost of Insurance Information is Subject to a Protective Order

The last objection, raised by American General, John Hancock, and Lincoln National, is

that the request seeks "highly sensitive proprietary information concerning . . . pricing of . . .

insurance products, a quintessential 'trade secret' within the insurance industry."  American

General Mem. 7, ECF No. 202; see also John Hancock Mem. 13, ECF No. 193 ("such

documents may contain sensitive competitive information"); Lincoln National Mem. 10, ECF

No. 184.  But "confidentiality concerns raised by the subpoenas can be dealt with by means of a

protective order."  Quotron Sys., Inc. v. Automatic Data Processing, Inc., 141 F.R.D. 37, 41

(S.D.N.Y. 1992) (citing Culligan v. Yamaha Motor Corp., 110 F.R.D. 122, 125 (S.D.N.Y.

1986)); see also In re Subpoena Duces Tecum Served on Bell Comm. Research Inc., No. 96-cv-

45, 1997 WL 10919, at *3 (S.D.N.Y. Jan. 13, 1997) (protective order is sufficient to preserve

confidentiality of customer information produced pursuant to a third-party subpoena under Fed.

R. Civ. P. 45); Fischer v. Cirrus Design Corp., No. 03-cv-0782, 2005 WL 3159658, at *7

(N.D.N.Y. Nov. 23, 2005) (same for confidential information produced pursuant to FOIA

request); United States v. Debolt, No. 09-cr-24, 2010 WL 4281699, at *6 (N.D. W. Va. Oct. 19,

2010) (same for confidential information produced pursuant to Rule 17(c) subpoena).

The Moving Insurers seem to have ignored the carefully crafted protective order in place

in this case for precisely this contingency.  That order, which applies to "discovery materials

---

[27] During a telephonic meet and confer, counsel for Mr. Binday and Security Mutual
agreed to limit the relevant request for state agency COI and price filings to the states in which
the relevant life insurance policies for Security Mutual were filed.  See Security Mutual Mem. 8
n.3, ECF No. 181.  The same compromise was offered to counsel for Mass Mutual, Lincoln
Benefit, Prudential, and Sun Life, but those insurers have not responded.

reflecting proprietary information . . . produced by the . . . life insurance providers," expressly

prohibits disclosure "in any form by the defendants or their counsel." Order 1-2, Sept. 28, 2012,

ECF No. 25. Consistent with that order, the Defendants will use all appropriate means to protect

information produced pursuant to the subpoena from disclosure. The Moving Insurers motion to

quash the subpoena request due to concerns about the protection of confidential information

must be denied.[28]

> ### G.     The Moving Insurers' Remaining Objections Are Also Meritless

Some of the Moving Insurers have also moved to quash, in whole or in part, certain

particularized subpoena requests. In particular, Lincoln National objects to requests for the

production of information concerning the current status of the relevant life insurance policies,

including the premiums paid in connection with those policies, and to requests for certain

communications between a specifically identified employee and law enforcement. Lincoln

National and other Moving Insurers also object to requests for certain specifically identified

documents. These objections also have no merit.

---

[28] American General also objects to the request for COI information on the grounds that the request is "unreasonable and oppressive in its sheer scope," and that the request "contains no limiting parameters of any significance" and is not sufficiently specific. American General Mem. 6, ECF No. 202. The objection ignores the language of the request, which is specifically limited to "the type(s) of life insurance product(s) represented by any of the Relevant Life Insurance Policies, or (if less burdensome), specifically . . . to each of the Relevant Life Insurance Policies." Ex. 4 (Sch. Part B.10). Moreover, by requesting "documents sufficient to show," it was clearly not the Defendants' intention to require production of documents from "entire departments" or a "vast number of documents" as American General's motion implies. American General Mem. 6, ECF No. 202. Lastly, the specificity of the request is demonstrated by American General's ability to identify responsive materials such as "experience tables, actuarial studies and pricing memoranda," which may very well satisfy the subpoena requirements. Id.

### 1. Lincoln National's Motion to Quash Current Policy Status and Premium Information Requests Should be Denied

Lincoln National objects that requests for information concerning the current status of each relevant life insurance policy, and premiums associated with those policies, are "irrelevant to the crimes with which Defendants are charged" and that such information "will have no logical relevance to the charges or defenses in this case." Lincoln Mem. 7-8, ECF No. 184. However, Lincoln National's argument ignores the Indictment, which expressly charges that the Defendants' alleged conspiracy to commit mail and wire fraud harmed the insurance company "victims" by, *inter alia*, providing the insurance companies with "less income from premium payments," and that in general the insurance companies suffered economic harm due to the Defendants' alleged activities. Indictment ¶¶ 10, 10(a), ECF No. 1. The current status of the life insurance policies procured by the Defendants, including the premium payments received on those policies, goes directly to whether "such policies caused a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received," id. ¶ 9, a specific element of the mail and wire fraud allegations charged in this case. Information concerning the policies and premiums is the proper subject of a Rule 17 subpoena and the Defendants' requests for the same should not be quashed.[29]

### 2. Lincoln National's Motion to Quash the Request for Kenneth Elder Law Enforcement Communications Should be Denied

Lincoln National objects to a particular request seeking communications between one of its employees, Kenneth Elder, and state or federal government agencies in connection with any criminal prosecution or investigation. Lincoln National Mem. 13-15, ECF No. 184. Based on the Government's productions of Rule 16 and Brady materials to date, the Defendants have

---

[29] AXA has moved to partially quash and modify these requests. AXA Mem. 15, ECF No. 175. The Defendants do not oppose the requested modifications proposed by AXA.

reason to believe that Mr. Elder was a central figure in convincing the Government to bring this

case and that he will be a witness for the prosecution.  Mr. Elder's motivation for doing so is a

key issue in this case, and the evidence will show, the Defendants believe, that this case was not

brought for the purpose of imposing justice for economic harms to a group of insurance company

"victims," but rather to provide the insurance companies with a cudgel in their ongoing fight to

refuse to pay STOLI-related death benefits, when such claims arise, while keeping the lucrative

premiums those policies generated.  As such, communications relating to Mr. Elder's efforts to

encourage law enforcement interest in STOLI activities are, contrary to Lincoln National's

objections, relevant and admissible.  See Carollo, 2012 WL 1195194, at *2 (denying motion to

quash documents that may "illuminate the factors which led [the witness] to become a

prosecution witness and the benefits he obtained by doing so").

### 3.    The Moving Insurers' Motions to Quash Requests For Specifically Identified Documents Must Fail

Several insurers have also objected to certain requests for particular documents which the

Defendants derived from their painstaking review of the documents previously produced in this

case.  These requests identified—by specifically referencing a document by name and providing

the document in which it is referenced—additional relevant materials that were likely responsive

to the previously-issued Government Subpoenas and/or the February Subpoenas, but nonetheless

have not yet been produced by the relevant insurers.[30]

---

[30] In its objection to subpoena requests based on particular documents, John Hancock asserts that it "has already conducted a diligent and reasonable search of its files and has produced [relevant] documents in response to the Prior Subpoenas."  John Hancock Mem. 11, ECF No. 193.  However, were that the case, the Defendants would not have felt it necessary to issue the instant requests.  After our diligent review of the materials produced to date, by this and several other insurance companies, we have identified specific, relevant and admissible documents that were not, in fact, produced.

These objections illustrate the "can't win" position in which the Defendants have repeatedly found themselves while attempting to use the Rule 17 mechanism to secure relevant evidentiary materials from the insurance company "victims" in this case.  When the relevant subpoena requests call for "all documents" pertaining to a particular narrow topic or discreet set of materials, the Defendants are nonetheless castigated for issuing "broad, civil-style" discovery requests and conducting a "fishing expedition" contrary to Rule 17.  However in the instances when the Defendants provide concrete examples of documents *from the company's own files* which are relevant to the defense, the insurers balk that the requests for these and related documents are "patently burdensome" and assert that the requests convey only "broad or vaguely defined topics."  John Hancock Mem. 11, ECF No. 193; Aviva Mem. 10, ECF No. 177.

Requests for materials such as "Cynthia Crino's report on financial underwriting," or the "initial project outline" for the establishment of Financial Underwriting Guidelines (both taken directly from John Hancock documents), and related documents and communications, are the epitome of a sharply defined group of documents properly sought under Rule 17(c).  Ex. 17 (July Subpoena to John Hancock, Sch. Part B.14, 21); see Ex. 24 (July Subpoena to Aviva, Sch. Part B.12, requesting documents in connection with the "Monthly STOLI working group meetings"); Ex. 25 (July Subpoena to Lincoln National, Sch. Part B.14 requesting "[a] written report by Deborah Zahorodni regarding the relationship between Lincoln Financial Advisors and Life Settlements Insights").  The Defendants' subpoenas provided document support for each such request, included as exhibits to the subpoenas, listing, among other information, the relevant personnel and the relevant time frame for the documents sought.  See Libby, 432 F. Supp. 2d at 38 (approving defendant's subpoena where "each request provides a narrow subcategory of

documents being sought, which cover a discrete topic and typically limit the pertinent time frame").

## CONCLUSION

While we recognize (and have strong suspicions as to why this is the case) that most of the third party insurance companies have no desire to participate in this matter, the Defendants' use of the tools available to them under the Federal Rules of Criminal Procedure should not be impeded by the insurance companies' exaggerated claims of burden.  Thus far in this case the insurance companies have evaded, objected, moved to quash and, in some instances, outright neglected to produce responsive documents.  We are six weeks from the commencement of trial and further obstruction should not be tolerated.

We respectfully request that this Court deny the Moving Insurers' motions and permit the Defendants access to critical materials relevant to and necessary for their defense in this case.


Dated:  August 7, 2013
         New York, N.Y.

Respectfully Submitted,


_____s/ Elkan Abramowitz_____
Elkan Abramowitz
Benjamin S. Fischer
Jasmine Juteau
Sean R. Nuttall
MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Defendant Michael Binday*