DA2LBIN1                          Trial

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              12 Cr. 152 CM

5    MICHAEL BINDAY,
     a/ka/ Sealed Defendant 1,
6    JAMES KEVIN KERGIL,
     a/k/a Sealed Defendant 2,
7    and MARK RESNICK,
     a/k/a Sealed Defendant 3,
8
                   Defendants.
9
     ------------------------------x
10

11

12                                            October 2, 2013
                                              10:12 a.m.
13

14

15   Before:

16                   HON. COLLEEN McMAHON,

17                                            District Judge
                                               and a jury
18

19

20

21

22

23

24

25
```

DA2LBIN1                    Trial

1

2

3                              APPEARANCES

4   PREET BHARARA,
         United States Attorney for the
5        Southern District of New York
    SARAH McCALLUM,
6   ZACHARY FEINGOLD,
    EUN YOUNG CHOI,
7        Assistant United States Attorneys

8

9   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
         Attorneys for defendant Binday
10  BY:  ELKAN ABRAMOWITZ, Esq.
         BENJAMIN SEAN FISCHER, Esq.
11       JASMINE MARIE JUTEAU, Esq.
                    Of counsel
12

13

14  GALLET DREYER & BERKEY, LLP,
         Attorneys for defendant Kergil
15  BY:  ROGER LEE STAVIS, Esq.
         ADAM MICHAEL FELSENSTEIN, Esq.
16                  Of counsel

17

18  LAW OFFICES OF JANE ANNE MURRAY
         Attorneys for defendant Resnick
19  BY:  JANEANNE MURRAY, Esq.
                    Of counsel
20

21

22

23

24

25

```
 1              (Jury not present)

 2              THE DEPUTY CLERK:  Case on trial continued.  The

 3     government and defendants are present.  The jurors are not

 4     present.  We're down a juror.

 5              THE COURT:  I can't even attribute this to the

 6     shutdown.  This is a mess.

 7              MR. ABRAMOWITZ:  Madoff related case is picking a

 8     jury, so there's more than the usual number of jurors.

 9              THE COURT:  Even so.  It's just bad.  When we finally

10     get the security pavilion built, hopeful we will --

11              THE DEPUTY CLERK:  We're actually down two jurors.

12              THE COURT:  -- arrange a variety of entrances that

13     will alleviate some of these problems.

14              Okay.  Mr. Stavis, I was told you weren't here but

15     there you are.

16              MR. STAVIS:  Here I am.

17              THE COURT:  Good.  Okay.  So what have we agreed upon?

18     You'll note that I'm confident that we have an agreement.

19              MR. ABRAMOWITZ:  Yes, I think we do.

20              THE COURT:  Okay.  Upon what have we agreed, what

21     shall I expect when I bring the jurors into the room?

22              MR. ABRAMOWITZ:  Well, two separate parts of our

23     presentation.  There are documents apart from the ones we went

24     through on the proffer that I will offer in evidence and have

25     displayed and I'll read from them.  And then we'll go into the
```

DA2LBIN1                          Trial

1      types of exhibits that we talked about yesterday in the proffer

2      where Ms. Juteau will take the stand.  We will show them, and

3      she will read the highlighted portions.

4                    THE COURT:  Boy, is that going to be exciting.

5                    MR. ABRAMOWITZ:  Fascinating.

6                    THE COURT:  Okay.  All right.  Now, does our agreement

7      dispose of all of the outstanding applications including

8      Ms. Murray's separate application or does it not dispose of

9      Ms. Murray's separate application?

10                    MS. MURRAY:  It does not dispose of my separate

11     application, your Honor.  I understand the government still

12     opposes that.

13                    THE COURT:  Okay.

14                    MR. STAVIS:  I have three exciting documents also.  I

15     think one of them has so far received the government's consent

16     and the other two they're thinking about.

17                    MR. FEINGOLD:  Actually, we object to the other two,

18     your Honor.  We can take that up now if you want.

19                    THE COURT:  Yeah.  Let's just do this.

20                    MR. FEINGOLD:  This is my copy from Mr. Stavis, but I

21     think I'm familiar with them.

22                    THE DEPUTY CLERK:  Extra copies?

23                    MR. FEINGOLD:  So, your Honor, first defense

24     exhibit --

25                    THE COURT:  I think I'll let Mr. Stavis offer them and

DA2LBIN1                          Trial

 1   then you can tell me what's wrong with them.

 2            MR. STAVIS:  Yes.  The first is a Defense

 3   Exhibit 1005.

 4            THE COURT:  Yes.

 5            MR. STAVIS:  Which is an email that comes from the

 6   Lincoln files and is indisputably authentic.  It's an email

 7   from Ken Elder, who's the AVP of market conduct compliance at

 8   Lincoln.  Your Honor has heard testimony about him.  And it's

 9   to Thomas McDonald -- he's the case agent in the case --

10   concerning a subpoena.  And he refers to -- Mr. Elder refers to

11   Agent McDonald as Tom and the content is about files.

12            The content is not important.  It's not being offered

13   for its content.  It's being offered to show the

14   interrelationship between the Lincoln Financial Group and the

15   FBI in this case.  It's not collateral because it goes to the

16   bias of Mr. Burns, the Lincoln Financial Group witness who

17   testified for the government.

18            THE COURT:  The government's objection is sustained.

19            Next.

20            MR. STAVIS:  On what grounds, your Honor?

21            THE COURT:  It's irrelevant.

22            Next.

23            MR. STAVIS:  Next is Defense Exhibit 48, which is

24   starts on the bottom with Rose Flanagan, who is an employee of

25   R. Binday Plans & Concepts and your Honor has heard testimony

1    about her from Tracey Robinson, government witness.  She's

2    sending a signed policy over to MetLife and MetLife's response

3    is show us the money.  I'm not being -- it comes from the

4    MetLife files.  That is not being offered for the truth of the

5    statement show us the money, but for the reaction to the

6    receipt of the policy by Rose Flanagan of R. Binday Plans &

7    Concepts Ltd.

8             MR. FEINGOLD:  Your Honor, first, it's not a response

9    to Rose Flanagan.  It's an internal email at MetLife.

10            THE COURT:  Yes, from MetLife to MetLife.

11            MR. FEINGOLD:  Right.  It's hearsay.

12            THE COURT:  Government's objection is sustained.

13            MR. STAVIS:  It's not offered for the truth.

14            THE COURT:  The government's objection is sustained.

15            MR. ABRAMOWITZ:  Your Honor, may we take advantage of

16   the fact that the jury is not here just to offer the defense

17   exhibits into evidence, just the numbers.  I apologize.

18            THE COURT:  I have a long list from Ms. Murray.

19            MR. ABRAMOWITZ:  I apologize.

20            THE COURT:  If there's anything Ms. Murray wants to

21   add to the letter, she's welcome to do so.  You can rest

22   assured from the number of marks on it that I have read it

23   carefully, and I'd like to get right to the government's

24   response thereto.

25            MS. MURRAY:  Your Honor, I have nothing to add.

1            THE COURT:  Thank you, Ms. Murray.

2            Okay.  Now, the government's response to Ms. Murray's

3       letter.

4            MR. FEINGOLD:  Your Honor, I think first we rely on

5       your Honor's initial ruling on this in which you relied I

6       believe on your in limine order.

7            THE COURT:  Forget about in limine and here's why.  As

8       I said yesterday to Ms. McCallum, who had to bear the brunt of

9       this, the reason I detest in limine motions in criminal cases

10      where nobody shows me anything, where I have no background, no

11      immersion in the evidence, unlike every civil case I'm involved

12      in, is you want me to rule in a vacuum.  And then you stand up

13      and say but you've already ruled.

14           For example, yesterday, you've already ruled evidence

15      of negligence can't come in.  Between you, me, and the

16      lamppost, I don't think the emails I saw were evidence of

17      negligence.  So if they were in front of me during the in

18      limine motions, I would have denied the motion as to those

19      documents.

20           So forget about the in limine motion.  We're starting

21      from scratch.

22           MR. FEINGOLD:  Certainly, your Honor.  Let's look at

23      this document where it talks about universal life sales as a

24      whole.  There's no reference of STOLI, IOLI, or any

25      characteristics of it.  I think it's misleading and should not

DA2LBIN1                          Trial

1    be allowed in.

2              MS. MURRAY:  Your Honor.

3              THE COURT:  You can't equate universal life and STOLI.

4    You can't do it.  There is no evidence, unless you put on

5    evidence that equates them, because right now there's no

6    evidence in the record that does; and there's a lot of evidence

7    that draws a very clear line between universal life business

8    and a subset of that business which is STOLI.

9              MS. MURRAY:  But the point is simply to show the size

10   of the universal life profits.

11             THE COURT:  But universal life isn't at issue in this

12   case.  STOLI is at issue in this case.  If this document showed

13   the size of the STOLI business, you'd be on firm ground.  But

14   it doesn't.  It doesn't.  And, therefore, its probative value

15   is negligible and the potential for confusion is very great.

16             MR. STAVIS:  Your Honor.

17             THE COURT:  Yes.

18             MR. STAVIS:  There was an exhibit, a defense exhibit

19   that the government did agree to, and this might be the

20   appropriate time, Defendant's Exhibit 51.  That was the AIG.

21             MR. FEINGOLD:  No objection, your Honor.

22             THE COURT:  Okay.  So that's in.

23             (Defendant's Exhibit 51 received in evidence)

24             THE COURT:  And you want to introduce?

25             MR. ABRAMOWITZ:  A list.

DA2LBIN1                        Trial

```
 1              THE COURT:  Do we have a list?  Because I like the way
 2     the government was doing this where they would say all the
 3     exhibits on a document that was clearly denominated and a copy
 4     of that document was given to the court reporter and we didn't
 5     have to.
 6              MR. ABRAMOWITZ:  I have a list, but we have to just
 7     take out what's written in between and we will supply the list
 8     to the court reporter and to the Court.  But I'll read it now,
 9     but we will supply a written list to you and the court
10     reporter.
11              We offer Defendant's Exhibit 2, 5, 7, 14, 51, 165,
12     168, 169, 235, 3434, 3455, 3456, 3457, 3458, 3459, 3460, 3461,
13     237, 238, and 239.
14              THE COURT:  And that's without objection from the
15     government.
16              MR. FEINGOLD:  No, your Honor.  The government is just
17     looking at copies right now of the second half of that list.
18              THE COURT:  I knew this wasn't going to be easy.  Get
19     me what you object to.
20              (Pause)
21              MS. MURRAY:  Your Honor, may I supplement my
22     application?
23              THE COURT:  You mean the one I denied?
24              MS. MURRAY:  Yes.
25              THE DEPUTY CLERK:  We're ready with the jurors.
```

DA2LBIN1                        Trial

 1              THE COURT:  I'm ready with the jurors.

 2              Yeah, sure.  Because they're not ready, so go ahead.

 3              MS. MURRAY:  Your Honor, Government Exhibit 2971,

 4    which is an audit memo of the Lincoln Financial Group which is

 5    in evidence, it actually states on page 4 that assuming that

 6    IOLI makes up ten to 15 percent of sales, they're discussing

 7    the return on investment and how it wouldn't have a huge

 8    economic impact.  I think that because there's something in

 9    evidence from Lincoln saying that ten to 15 percent of

10    universal life sales are --

11              THE COURT:  It says assuming.  It doesn't say it is.

12              MS. MURRAY:  Then I think it's a fair argument to be

13    able to argue to the jury that ten to 15 percent of

14    $400 million of profits over two years is something I should be

15    able to argue to the jury as evidence of bias and motive by the

16    insurance witnesses.

17              MR. FEINGOLD:  I need to see the document.

18              Look, I think there's evidence, there's evidence that

19    insurance companies collect and received premiums on these

20    policies.

21              THE COURT:  She's trying to establish the magnitude.

22    That's what this is about.  It's not a bad counter,

23    Mr. Feingold.  It's really she may have gotten me here.  It's

24    your exhibit.

25              MR. FEINGOLD:  Here's the full paragraph.  Although

DA2LBIN1                          Trial

1    difficult to estimate, although difficult to estimate, we

2    regard the overall economic impact of IOLI and life settlements

3    as minor.  In terms of new business, we estimate that IOLI

4    business produces return on earnings in the 7.9 percent range

5    or, I'm sorry, ROEs in the 7 to 9 percent range.  Assuming that

6    IOLI makes up ten to 15 percent of sales, the overall ROE on a

7    new business -- on new business would be affected by less than

8    1 percent.

9              THE COURT:  Okay.  So here's what they say.  They say

10   it's hard to calculate.  It looks like it's seven to 9 percent.

11   Even assuming that it's a little more than that, it's like a

12   1 percent contributor to the bottom line.

13             I have to say I don't think it's unfair given that you

14   introduced that document, for her to introduce a document --

15   not the whole thing, but the financial --

16             MS. MURRAY:  The chart.

17             THE COURT:  -- piece that shows what number would

18   correspond to that 1 percent.  I don't think that's unfair.  I

19   mean 1 percent in a vacuum versus 1 percent of $40 million, it

20   gives it a context.  It makes it concrete.

21             MS. MURRAY:  The 7 to 9 percent deals with returns on

22   earnings.  That's not estimating the amount of IOLI.  They're

23   estimating ten to 15 percent IOLI in that document.

24             MS. McCALLUM:  Your Honor, may we have a moment?

25             THE COURT:  Yes.

DA2LBIN1                        Trial

1              MR. FEINGOLD:  Your Honor, we just received these

2      exhibits to review, so.

3              THE COURT:  Come on.

4              MR. ABRAMOWITZ:  You had them yesterday.

5              THE COURT:  What did you do all afternoon yesterday?

6              MR. FEINGOLD:  Your Honor, Mr. Abramowitz just

7      indicated to us, we were aware of eight of the precise exhibits

8      that he was going to introduce.  I'm not getting to the policy

9      file stuff.

10             MR. ABRAMOWITZ:  I thought --

11             MR. FEINGOLD:  There are 13 exhibits that he's

12     introducing under our authenticity stipulation.  We didn't know

13     they were going to introduce these exhibits.  I think we need

14     to look at them before we state our objection.

15             THE COURT:  You know what, it's 10:30.  I'm putting

16     the jurors in the box.  We're now going to do this one document

17     at a time with the jury in the box.  I'm not going to have them

18     sitting back there.  I sent them home yesterday.  They did no

19     work yesterday and they're probably pissed about it.  I

20     certainly am.

21             MS. McCALLUM:  Your Honor, the government just needed

22     to verify that these exhibits were ones that we had discussed.

23     That's all.  And we have verified and we don't have an

24     objection to their introduction.  We just needed a few minutes

25     to review.

DA2LBIN1                        Trial

1              THE COURT:  What exhibits are you offering again,

2      please, Mr. Abramowitz?

3              MR. ABRAMOWITZ:  In the order on the sheet that I've

4      given to the Court and to the court reporter, Defendant's

5      Exhibit 5, 7, 165, 168, 169, 2, 14, 51, 235, 3434, 3455, 3456,

6      3457, 3458, 3459, 3460, 3461, 237, 238, 239.

7              MR. FEINGOLD:  Now the government has had an

8      opportunity to review those exhibits, no objection.

9              THE COURT:  Admitted.

10             (Defendant's Exhibits 5, 7, 165, 168, 169, 2, 14, 51,

11     235, 3434, 3455, 3456, 3457, 3458, 3459, 3460, 3461, 237, 238,

12     239 received in evidence)

13             THE DEPUTY CLERK:  This sheet is marked?

14             THE COURT:  That sheet is Defendant's Exhibit 1000.

15             MR. ABRAMOWITZ:  Make it 5000.

16             THE COURT:  5000, Defendant's Exhibit 5000.

17             (Continued on next page)

18

19

20

21

22

23

24

25

DA2LBIN1                          Trial

1          (Jury present)

2          THE COURT:  Good morning.  All right.  The government,

3     as you know, has rested.

4          Mr. Abramowitz, does Mr. Binday wish to put in a case?

5          MR. ABRAMOWITZ:  Yes, we do, your Honor.  May I?

6          THE COURT:  And I believe that, Mr. Stavis and

7     Ms. Murray, I believe that some portion of this case is being

8     put in on behalf of all three of the defendants.

9          Is that correct?

10          MR. STAVIS:  That's correct, your Honor.

11          MS. MURRAY:  Correct, your Honor.

12          THE COURT:  Okay.

13          MR. ABRAMOWITZ:  In fact, I believe all of what we're

14     about to do is on behalf of all three defendants.

15          THE COURT:  Okay.  So let me formally ask:  Does

16     Mr. Kergil wish to put in a case, Mr. Stavis?

17          MR. STAVIS:  Yes.

18          THE COURT:  Yes, fine.

19          MR. STAVIS:  Defendant's Exhibit 51 in evidence, which

20     has previously been discussed.

21          THE COURT:  And, Ms. Murray, does your client,

22     Mr. Resnick, wish to put in a case?

23          MS. MURRAY:  Your Honor, I'm joining with Mr. Binday.

24          THE COURT:  Okay, fine.

25          So this evidence is three trials, but all three of

DA2LBIN1                     Trial

1    them have decided that they want to introduce the same

2    evidence.  So instead of introducing it three times, we're

3    going to do it once.

4         Mr. Abramowitz.

5         MR. ABRAMOWITZ:  May I.  Thank you.

6         We're going to look at some Defendant's Exhibits that

7    have previously been admitted into evidence.

8         May we put up Defendant's Exhibit 7, and I'm going to

9    read the highlighted part.  This is I'll read the top.  This is

10   AIG American General Life will no longer approve applications

11   received that are investor owned, stranger owned, or viatical

12   transactions.

13        And I'll read the highlighted section.  In order to

14   verify that applications and quotes received are consistent

15   with this new policy, all of the following documents must be

16   received for any single permanent life insurance application

17   for a proposed insured that is age 70 or greater with a

18   requested death benefit of a million dollars or greater.

19        Third line, third bullet is a copy of the proposed

20   insured's most recently filed tax return, IRS form 1040.

21        The bullet on the bottom is the policy's annual

22   premium cannot exceed 20 percent of the proposed insured's

23   adjusted gross income as stated on their most recent tax return

24   regardless of who is paying the premium or if it is financed.

25        And this is a document that's dated May 18, 2006.

1          Can we put up Defendant's Exhibit 51 in evidence.  And

2     looking at the second bullet, since this date, incoming volume

3     on cases age 70 plus have decreased and pending volume has

4     dropped with many cases being withdrawn.

5          Total pending/cond issued cases have dropped from 659

6     on 5/19 to 372 on 7/6.

7          The next highlighted bullet, field reaction has been

8     mixed, with some producers withdrawing cases and others

9     submitting full financial UW requirements.

10         Can we go to -- is there a second page to that?  No.

11         Can we go to Defendant's Exhibit 2, and read the

12    highlighted portion.  This is dated, first of all, look at the

13    bottom, this is dated 7/25/06.

14         AIG life brokerage.  Effective May 18, life brokerage

15    changed the maximum issue ages to 69 from 80 on ten year LTG

16    Ultra and to 74 from 90 on most single life universal policies

17    in an attempt to curb participation in IOLI transactions.  UL

18    production dropped $2 million in June due to refusing this

19    business.

20         And now can we go to Defendant's Exhibit 5.  This is

21    dated August 29, '06.

22         Notice regarding underwriting guidelines that take

23    effect on September 1, 2006.  For all applications submitted

24    through the independent distribution platform for products of

25    American Life Insurance Company and the United States Life

DA2LBIN1                         Trial

1    Insurance Company in the City of New York.

2               Bullet point:  Formal applications approved, issued or

3    with effective dates on or after September 1, 2006, will be

4    handled under our new underwriting requirements and approach.

5    Tax returns will not be required and the 20 percent of AGI test

6    will not be applied.  New plans and rates will be available.

7               Now can we turn to documents from Lincoln National

8    premier partner program.

9               Can we put up Defendant's Exhibit 237.  237 is a

10   Lincoln -- on the bottom -- a Lincoln document, in the files of

11   Lincoln, that reads:  Contestable death claims on ICAS with

12   issue age 69 and face of greater than $1 million.  Third

13   quarter 2007.  And the highlighted name is Michael Binday,

14   suspected IOLI, trust documents are same format and content

15   used by RangeTree.

16              Can we go to Defendant's Exhibit 168.  This is a 2008

17   life annuity premier partner program.  The premier partner

18   program is designed to recognize the best of our best -- our

19   top producers and managers.  The awards, benefits, and

20   incentives you receive as a premier partner are our way of

21   thanks you for entrusting us with so much of your business, and

22   represent a promise that we will continue to provide the tools,

23   support, and service needed to be the partner of choice.  Being

24   a "member" of this exclusive group provides you with advantages

25   and entitlements.  This brochure gives you an overview of the

1   2008 life and annuity premier partner benefits.

2           Can we go to Defendant's Exhibit 169.  And the date is

3   year end.  This is a premier partnership master report, year

4   end, 2008.  And the names James Kergil, James K. Kergil, Paul

5   A. Krupit, and Mark A. Resnick.  And on financial owners Binday

6   R. Plans and Company and Life Insurance Services Inc., Binday

7   R. Plans and Company.

8           Can we go to Defendant's Exhibit 165.  Can we make

9   that larger, please.  This is reads premier stock option grants

10  have been issued for Crump people that you designated to

11  receive stock.  This is from premier partners and Michael

12  Binday is listed in the highlighted portion.

13          Can we go to Defendant's Exhibit 235, please.  Group

14  policyholder, Lincoln National Group life insurance trust.

15  Insured is Marilyn Nurik.  The date of the policy, this is in

16  Lincoln policies, August 21, 2008.  Age and sex, 83, female.

17  Specified amount, 2,500,000.

18          Can we go to Exhibit 3434, another policy dated

19  August 11, 2008.  The name of Alma Ruth Lapp, age and sex, 76,

20  female.  Specified amount, 2,500,000.

21          Can we go to 3455, please.  This is insured, Elouise

22  Hails.  Age and sex, 77, female.  Specified amount, $4 million.

23  The policy date, December 1, 2007.

24          3456, please.  This is an application from Robert

25  Haug, insured as Robert Haug, 79, male.  Specified amount,

DA2LBIN1                          Trial

1     $2 million.  Excuse me, that's not the application.  It's the

2     policy itself.  The date is July 18, 2008.

3              Can we go to 3457, please.  This is a policy issued to

4     Oswald Heaton.  Age and sex, 80, male.  Specified amount,

5     2,400,000.  And the date is March 13, 2008.

6              Can we go to 3458.  That's a policy from Corrine

7     Roscoe, age and sex, 78, female.  Specified amount, $3 million.

8     The certificate date is July 15, 2008.

9              Can we go to Defendant's Exhibit 3459.  Insured is

10    Opal Headrick, age and sex, 79, female, $3 million.  The date,

11    May 24, 2008.

12             Defendant's Exhibit 3460.  Martin L. Bromberg, age and

13    sex, 74, male.  Specified amount, 3,700,000.  April 26, 2008.

14             And Defendant's Exhibit 3461.  Policy issued to

15    Thomasa Contreras, age and sex, 74, female.  Specified amount,

16    $4 million.  Date is February 19, 2009.

17             And could we just briefly put back Exhibit 237.  And

18    note the date.  It says Michael Binday, suspected IOLI, third

19    quarter, 2007.

20             Now can we go to Defendant's Exhibit 238.  This is a

21    document from Lincoln and it says investor or stranger-owned

22    life insurance.  And I'm only going to read the highlighted

23    portions.  I'll read the sentence starting with, The way most

24    of these sales are structured is that if the insured dies

25    within the first two years, proceeds are paid to the insured's

DA2LBIN1                          Trial

heirs.  Premiums are paid by the investors/lender.  Trusts are

established that allow this transfer.  Inducements are given to

the insured in the form of trips, cash, and the free insurance

for the first two years.

         Then go to the highlighted portion, often applications

are submitted for high amounts and the target age group is 70

and up.  Income and net worth figures are often inflated.

There are questions on the application regarding this type of

sale and premium financing.  The single biggest red flag is the

ratio of premium to income.  If the premium is higher than the

income, most likely premium financing is involved.

         Can we go to Defendant's Exhibit 239, which is from

AXA life insurance company.  And the title is underwriting red

flags for large life insurance policies, financed insurance,

and trust owned policies.

         And the first highlighted paragraph, life insurance

and application issues:  Application is for a large amount of

life insurance, over $2 million.

         Second one is insured over the age of 65.

         And then under paragraph 2, financial underwriting

issues.  Insurance need is vague "estate planning."

         Personal ownership of a large amount of insurance for

a large estate and the purpose is "estate taxes or "estate

planning."

         The next highlighted line, sufficiency of funds to pay

DA2LBIN1                          Trial

large premium from current assets and/or income.

          3.   The application states no financing.  But the

trust states that neither trust corpus nor trust income can be

used to pay for life insurance.

          But the trust states that the grantor recognizes that

contributions to the trust will not be adequate to pay for the

life insurance and authorizes the trustee to borrow to pay the

premium.

          Trust issues.  Highlighted bullet is the trust is of

recent vintage.

          And the last highlighted is trust situs is a different

state than the residence state of the insured and there was no

prior relationship with the trustee or connection with the

state of situs.

          If we can go back and note the title of this memo.

This is underwriting red flags for large life insurance

policies, financed insurance, and trust owned policies.

          Can we go to paragraph 5.  The bullet line, the trust

states that it is irrevocable but authorizes someone other than

the grantor, usually the trustee or trust protector, to change

the beneficiaries of the trust and the list of potential

beneficiaries is not limited to parties that have a natural

insurable interest in the insured.

          Now, your Honor, I'd like to go to -- excuse me a

minute.

DA2LBIN1                        Trial

1          All right.  Apologies, your Honor.

2          Defendant's Exhibit 14, please.  This is from Union

3    Central, 2009 UNIFI individual division field sales

4    distribution VP manager, Estridge, variable compensation plan,

5    summary plan description.

6          And read the highlighted paragraph, due to

7    extraordinary circumstances in 2009, you will be measured on

8    your ability to sustain the key agencies that we have

9    identified in your region rather than the usual measure of

10   increasing productivity.  In order to meet this goal, you will

11   need to sustain a percentage of the key agencies production as

12   compared to 2008.

13         And then under that, Binday is highlighted and other

14   companies are listed as well.

15         Now, your Honor, I'd like to ask my colleague

16   Ms. Juteau to take the stand to read from some other exhibits.

17         THE COURT:  Jim, will you please swear Ms. Juteau.

18    JASMINE JUTEAU,

19        called as a witness by the Defendants,

20        having been duly sworn, testified as follows:

21         MR. ABRAMOWITZ:  It's not just emails.

22         THE COURT:  The documents that have been introduced

23   into evidence.

24         THE WITNESS:  I do.

25         THE COURT:  Thank you.  Would you state and spell your

DA2LBIN1                          Trial

1    name for the record.

2            THE WITNESS:  J-A-S-M-I-N-E, J-U-T-E-A-U.

3    DIRECT EXAMINATION

4    BY MR. ABRAMOWITZ:

5    Q.  Ms. Juteau, can you move closer to the microphone, please.

6            And just for identification, by whom are you employed?

7    A.  The law firm of Morvillo, Abramowitz, Grand, Iason &

8    Anello.

9    Q.  And in what capacity are you employed?

10   A.  I'm counsel of the firm.

11   Q.  Can we put up Defendant's Exhibit 3363, and can you please

12   read the highlighted portions.

13   A.  The name of the applicant is Eva Hartheimer, and her age is

14   80.

15   Q.  And I'd read the top is life insurance application.  Did

16   you read the age?

17   A.  Yes, her age is 80.

18   Q.  And can you go to page 14485.  What amount is being applied

19   for?

20   A.  $2 million.

21   Q.  Can we go to Defendant's Exhibit 3358, please.  Please note

22   the date, read the date.

23   A.  November 8, 2006.

24   Q.  And can you read the highlighted portion of this exhibit.

25   A.  Please be advised that I have not audited these financial

DA2LBIN1                          Juteau – direct

1    statements and they are based solely on information provided by

2    my client.

3    Q.   And can we go to the bottom right portion under the defense

4    exhibit list.  And this is a document from American General; is

5    that correct?

6    A.   That's correct.

7    Q.   Can we go to Exhibit 3352.

8              MR. ABRAMOWITZ:  They are in evidence.

9              I apologize.  I thought they were on the list.  But we

10   offer it in evidence.

11             MR. FEINGOLD:  What are you offering?

12             MR. ABRAMOWITZ:  3352.

13             MR. FEINGOLD:  No objection.

14             THE COURT:  Admitted.

15             (Defendant's Exhibit 3352 received in evidence)

16             MR. ABRAMOWITZ:  And 3358.

17             THE COURT:  Admitted.

18             (Defendant's Exhibit 3358 received in evidence)

19             MR. ABRAMOWITZ:  Maybe I can take a minute, your

20   Honor, and just go over this.

21             THE COURT:  Is there another list we can read?

22             MR. ABRAMOWITZ:  I have another list.  Oral.

23             THE COURT:  Okay.

24             MR. ABRAMOWITZ:  Defendant's Exhibit 3352, 3358, 3363,

25   3364.  Let's start with those.

DA2LBIN1                    Juteau - direct

1           MR. FEINGOLD:  No objection.

2           THE COURT:  Admitted.

3           (Defendant's Exhibits 3352, 3358, 3363, 3364 received

4    in evidence)

5           MR. ABRAMOWITZ:  And we're going to offer at the end

6    of this series 234, which is the policy.

7           MS. McCALLUM:  No objection.

8           (Defendant's Exhibit 234 received in evidence)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              MR. ABRAMOWITZ:  Apologies, your Honor, I thought it

 2     was offered earlier.

 3     BY MR. ABRAMOWITZ:

 4     Q.  Can we go to the application which is 3363.  Can we quickly

 5     go back to that.  That is the application for Eva Hartheimer,

 6     and then.  Can we go to Exhibit 3358 from the files of American

 7     General.  Can we blow up -- start with real estate listed

 8     there, the real estate is -- can you read that?

 9     A.  Real estate, $1.5 million.

10     Q.  Business interest?

11     A.  $2.5 million.

12     Q.  Personal property?

13     A.  $1 million.

14     Q.  Pension, qualified plans and annuities?

15     A.  $3 million.

16     Q.  Less total liabilities?

17     A.  Zero.

18     Q.  Total net worth.

19     A.  $8 million.

20     Q.  And now can we go to the highlighted portion of this

21     document.  Can you read that please?

22     A.  Please be advised that I have not audited these financial

23     statements and they are based SOLI on information provided by

24     my client.

25     Q.  Can we go to Exhibit 3352, please, and particularly to Page

1    14367.  Can you read the highlighted portions of this, Ms.

2    Juteau?

3    A.  Begin date:  2007-01-04.  We have a letter from an attorney

4    who is stating he has helping her with some estate issues.

5    Also provided breakdown of NW, but also stated he did not audit

6    these figures and they are being regurgitated by the proposed

7    insured.

8              UW to CC.  To GA-please note, the letter from the

9    lawyer does not fulfill the third-party financial requirement

10   as he states in the body of the letter that these figures were

11   supplied by the client herself.  We will need verification of

12   finances from a third party (CPA tax preparer, accountant.)

13   Q.  Can we go to Page 14349.  Can you read the highlighted

14   portion there.

15   A.  Begin date, 2007-01-10.  IR:  Inc 200 K and NW 8 million.

16   Financial letter from attorney (BF 7) verifies NW as 8 million

17   with only 1.5 million in real estate.  Okay financially for

18   estate needs.)

19   Q.  What is the date of that comment?

20   A.  January 10th, 2007.

21   Q.  Can we go to 3352, please.  And Page 14375.  Can you read

22   the date?

23   A.  May 24th, 2006.

24   Q.  And can you read the note that is highlighted?

25   A.  The amount of insurance will limited to 20 percent of the

DA2JBIN2                          Juteau - direct

1  applicants adjusted gross income.  We will need tax returns

2  from 2004 or 2005.

3  Q.  And then can we go to Page 14370.  Can you read the

4  highlighted -- first the date?

5  A.  The date is June 2, 2006.

6  Q.  And then can you read the highlighted portion.

7  A.  We can consider the above applicant for up to $3 million of

8  elite UL or elite index UL coverage at possible standard (not

9  preferred) rates plus $5.00 slash $1,000 slash 3 years subject

10  to the application Part A, routine age slash amount

11  requirements, IR completed by one of our approved vendors, NVR,

12  MIB, the most recently filed IRS Form 1040 from '04 or '05, the

13  premium financing disclosure for proposed insureds, and CPA

14  verified third-party financial statement.

15          Please note the premium allocation for this policy

16  cannot exceed 20 percent of the adjusted gross income.

17  Q.  Did you read the date?  I am sorry?

18  A.  June 2, 2006.

19  Q.  Can you go now to Page 14357.  Note the date?

20  A.  December 27, 2006.

21  Q.  Can you read the highlighted note.

22  A.  Bill, this is an older age case.  See Joe's note in the

23  quote file history attached to this case.  I know our

24  guidelines relaxed a little on the IRC Form 1040s (IC basis)

25  note we would neat premium financing disclosure and CPA

1   verified TPF statement.  Note also that the premium allocation

2   for this policy cannot exceed 20 percent of the adjusted gross

3   income.

4          In this case the applicant's premium is 191K and her

5   unearned income is 200K.  Per 9-1-06 guidelines dated we can

6   consider these cases on an individual consideration basis.

7          Based on her net worth, she does qualify for this

8   amount.  My question would be what is her net worth made up of?

9   Real estate?  Stocks and bonds.

10         Do you feel that this case would warrant the exception

11  of going over the standard 20 percent adjusted income?  Here

12  premium is 99 percent of her unearned income.

13  Q.  Can we go to Page 14355.  Can we note the date?

14  A.  This is December 28th, 2006.

15  Q.  Can you read the highlighted portion.

16  A.  Cheryl, remember we do not use the 20 percent rule any

17  more.  We also don't request tax forms or limit the plan.  As

18  long as we receive decent CPA info that justifies estate tax

19  needs, we are okay.

20  Q.  Can we go to Page 14342, please.

21         MR. FEINGOLD:  May I have a moment.  I don't think we

22  have a copy of this part of the exhibit.

23         THE COURT:  Okay.

24         MR. FEINGOLD:  I apologize.  My copy does now.

25         THE COURT:  You have it now?

DA2JBIN2                         Juteau - direct

1      MR. FEINGOLD:  Yes.  Ms. Choi does.

2  BY MR. ABRAMOWITZ:

3  Q.  Can we read the highlighted portion starting with Bill.

4  A.  Bill.  Agency is seeking possible 3-4 million instead of 2

5  million.  Estate preservation for this insured is around 6.7

6  million plus.  No additional coverage in force.  See your notes

7  below.  It appears she qualifies financially for this amount

8  without any additional medical or financial requirements.

9  Q.  Can we go to Page 14341, please.  Can you note the date.

10  A.  January 31, 2007.

11  Q.  Can you read just the highlighted portion.

12  A.  Cheryl, okay for new amount as a limit.

13  Q.  Actually, if you can read the rest of that.

14  A.  But I don't see the agent certification form and proposed

15  insured premium financing disclosure form which is routine for

16  age -- greater than age 70 and $1 million and higher.

17  Q.  Can we go to Defendant's Exhibit 364, just the first

18  page -- excuse me, 3364.  Sorry.  Can you just read the

19  highlighted portion?

20  A.  The Eva Hartheimer irrevocable trust, dated the 28th day of

21  September, 2006.

22  Q.  Can you read the -- you have the date.  Can we go to Page

23  15295, please -- can you read the highlighted language.

24  A.  The trustee, within his or her sole discretion, may apply

25  any cash value attributable to such policy to the purchase of

1    paid-up insurance or extended insurance, or may borrow upon

2    such policy for the payment of premiums due thereon.

3    Q.  Can now we do a split screen between pages 15296 and 15298,

4    please.  Can you read which is the highlighted portion coming

5    from the left side or the right side?  Just the right side.

6    Please read the highlighted portion.

7    Q.  Powers of trustee?

8    A.  Sorry.  Article VII, powers of trustee.

9    Q.  Can you read what the powers include?

10   A.  To make loans in such amounts, upon such terms, secured or

11   unsecured, at such rates of interest, and to such persons,

12   firms, or corporations as they may deem advisable, and to

13   borrow from any source and mortgage or pledge trust property.

14   Q.  Can we go to Page 15296 and 15297.  Can you read the

15   highlighted portion that says A, starts with A?

16   A.  To sell, with or without notice, at public or private sale,

17   partition, exchange, or otherwise dispose of any part of this

18   trusts real or personal property.

19   Q.  Can we go to Exhibit 234 which is the policy,?

20             MR. ABRAMOWITZ:  I offer that in evidence if it hasn't

21   been offered.

22             MR. FEINGOLD:  What is the exhibit?

23             MR. ABRAMOWITZ:  234.

24             MR. FEINGOLD:  It is already in.

25             MR. ABRAMOWITZ:  Can we show Exhibit 234, please.  The

```
 1   United States life insurance company, City of New York.

 2   BY MR. ABRAMOWITZ:

 3   Q.  Can you read the name of the insured without the policy

 4   number?

 5   A.  Eva Hartheimer.

 6   Q.  Would you read the highlighted portion, the age and the

 7   base coverage.

 8   A.  The age is 81.  Base coverage is $4 million.

 9           MR. ABRAMOWITZ:  Can we go to Lincoln National, and in

10   that connection I offer Defendants' Exhibit 8, 3108, 3178,

11   3179, 3181 and 3182.  This is the same applicant, Eva

12   Hartheimer for Lincoln National.

13           MR. FEINGOLD:  No objection.

14           THE COURT:  Admitted.

15           (Defendant Exhibits 8, 3108, 3178, 3179, 3181, 3182

16   received in evidence)

17           MR. ABRAMOWITZ:  Can we show Exhibit 3178.

18   BY MR. ABRAMOWITZ:

19   Q.  This is an application Jefferson Pilot Life Insurance

20   Company, and the applicant is Eva Hartheimer.

21           Is that correct?

22   A.  That's correct.

23   Q.  Can we go to 3179, please.  Just read the highlighted name?

24   A.  Eva Hartheimer.

25   Q.  Can we go to 3178, at Page 36310 and Defendant's Exhibit
```

DA2JBIN2                          Juteau - direct

1    3179.  Would you read the highlighted portion on the left.

2    A.  Annual earned income, 100K plus.  Annual unearned income,

3    zero.

4    Q.  Can you read the highlighted portion on the right side.

5    A.  Annual earned employment income, zero.  Annual unearned

6    investments income, 200,000.

7    Q.  Can we go to Exhibit 3108, please.  Read the -- first of

8    all, what date is it?

9    A.  December 18th, 2006.

10   Q.  Can you read the highlighted portion.

11   A.  Eva Hartheimer general trust.

12   Q.  Can we go to Page 33617.  Can you read the highlighted

13   portion.

14   A.  Memo to agent:  Please advise if premium financing will be

15   used.  Also, note premium of 211K exceeds annual income.

16   Please provide details of source of funds for premiums.

17   Q.  Can we go to Page 33624, please.  Can you read the

18   highlighted portion.

19   A.  IOLI detection.  Owner state of residence is different from

20   the insured state of residence.  Review case for possible

21   non-recourse premium financing.

22         IOLI detection.  Multiple applications exist for the

23   insured.  Review case for possible non-recourse premium

24   financing.

25   Q.  Can we go to Exhibit 3181, please, at Page 36322.  Can you

1    read the date and the highlighted language in the whereas

2    clause.

3    A.   November 17th, 2006.  An irrevocable trust consisting of

4    the life insurance policy or policies.

5    Q.   Can we go to Page 36335, and read the highlighted portion.

6    A.   The trustee, within his or her sole discretion, may apply

7    any cash value attributable to such policy to the purchase of

8    paid-up insurance or extended insurance, or may borrow upon

9    such policy for the payment of premiums due thereon.

10   Q.   Can we go back to 3108 for a moment, defense exhibit.  The

11   highlighted language, could you just read that again, please.

12   A.   The Eva Hartheimer general trust.

13   Q.   Can we go to 3182, please, Exhibit 3182.  Could you read

14   the highlighted portion.

15   A.   Jefferson Pilot Life America Insurance Company.  Insured:

16   Eva Hartheimer.  Policy No. LF15567044.

17   Q.   Can you go to Page 36206, please, and read the highlighted

18   portion.

19   A.   Planned premium, $205,800 annual.

20   Q.   Can we go back to 3178 and 3179, and compare the premium to

21   the income listed on that exhibit.

22   A.   The planned premium is $205,800 annually.  The annual

23   earned income is 100,000 plus.

24   Q.   Can we go back to 3179 and read the highlighted portion of

25   the planned premium and then the income.

1  A.   The planned premium is $205,800 annual.   The annual

2  unearned investment income is $200,000.

3  Q.   Can we go to Defendant's Exhibit 8, please, at Page 88563.

4  Can you read the highlighted portion.

5  A.   Financial guidelines-7-24-08.   Yes, the income should be

6  reviewed and compared to the illustrated premium, especially at

7  the older ages (70 plus) to be sure the premium is an

8  acceptable percentage to income.

9         As a general rule of thumb, the premium should not be

10 more than 25 percent of annual income.

11 Q.   What is the date of Defendant's Exhibit 8?

12 A.   July 24th, 2008.

13 Q.   Can we go to Exhibit 3182, please.   Can you read the

14 highlighted portion, please?

15 A.   Insured:  Eva Hartheimer.   Age and sex, 80, female.

16 Specified amount, $4 million.   Policy date, December 1, 2006.

17        MR. ABRAMOWITZ:   We are going on to another group

18 group of exhibits from American General.   Defendants offer into

19 evidence 3271, 3272, 3273, 3275.

20        MR. FEINGOLD:   No objection.

21        THE COURT:   Admitted.

22        (Defendant Exhibits 3271, 3272, 3273 and 3275 received

23 in evidence)

24        MR. ABRAMOWITZ:   Can we show 3273 and go to Page

25 16305, please.

DA2JBIN2                    Juteau - direct

1    BY MR. ABRAMOWITZ:

2    Q.  Ms. Juteau, can you read the highlighted portion on this

3    application to American General.

4    A.  Yes.  The name is Myra Davis, her current age is 78.  Her

5    household income is $540,000.  And her net worth is 15 million

6    $470,000.

7    Q.  Can we go to Defense Exhibit 3272, at Page 16276.  Can you

8    read the highlighted portions.

9    A.  AIG-senior market comprehensive inspection.  Name:  Myra

10   Davis.

11   Q.  Can we put up also 3273 and Page 16305.  Can you read the

12   highlighted portion on the top of net worth.

13   A.  $15,470,000.

14   Q.  Can you read the highlighted portion of the net worth on

15   the second.

16   A.  $10,828,000.

17   Q.  Can you go to Page 16272.  What is the total income listed?

18   A.  $260,000.

19   Q.  And can you go to Page 16273, and just read the net worth

20   statement on that page.

21   A.  $10,828,000.

22   Q.  Back to Page 16305, what is the net worth listed on that

23   one?

24   A.  Net worth is $15,470,000.

25   Q.  Now, can you look at the highlighted portion of the income

DA2JBIN2                        Juteau - direct

1    on the first document.

2    A.  $540,000.

3    Q.  And the highlighted portion of the income on the second

4    one?

5    A.  $260,000.

6    Q.  Can we go to Defendant's Exhibit 3275, please, at page

7    OO16220.  Go back to 3275 for a moment.  Can you read that?

8    A.  Myra Davis, personal financial statement, May 15th, 2008.

9    Q.  And now can we go to Page 16220 and read the highlighted

10   text?

11   A.  A compilation is limited to presenting your representations

12   in the form of a financial statement.  I am not independent

13   with respect to this personal financial statement, nor did I

14   examine, review or otherwise try to verify the amounts used in

15   the statement.  Accordingly, I do not express an opinion or any

16   other form of assurance on it.

17   Q.  Now can we go to 3271, and can we go to page OO16557.  Can

18   you read the highlighted portion.

19   A.  Begin date:  2008-08-20.  Financially:  I did a Zillow dot

20   com check on the two residences mentioned on the IR.

21        11305 Westland Circle in Boynton Beach, Florida does

22   not exist but neighborhood houses only in the upper 300,000 to

23   low 400,000 range.

24        320 Portofino Place in Melville, New York is only

25   worth $773,000.  This does not come close to their admitted

1    real estate holdings that they mention on the IR.  She says she

2    has other real estate holdings.  Should we pursue or do you

3    feel okay as is.

4    Q.  Can you go to page OO16540, please.  Can you read the

5    highlighted text.

6    A.  Begin date is 2008, 10-10.  Looking at the picture on

7    Zillow, it appears to be a condo complex, which I doubt is in

8    the $3 million range.

9             Secondly, Page 1 lists a different owner of the

10   Boynton Beach, Florida residence, but lists her as the owner on

11   Page 2.

12   Q.  Can you, in the first paragraph, can you read where it says

13   I find it useless.

14   A.  I find it useless as Page 1 says the average price of a

15   house in the Long Island neighborhood is in the $300,000 range,

16   but on Page 2 it says it is worth over $3 million.

17   Q.  Can you go to page OO16539, please.  Can you read the

18   highlighted text.

19   A.  Begin date, 2008-10-13.  So adding it all up, I get a

20   little over 1 to $1.5 million in real estate holdings and not

21   much else.  So I don't see the financial justification.  Her

22   CPA didn't verify the holdings so that doesn't help us.  So

23   whether they need to show stock slash brokers statements

24   showing the 7.3 million in holdings along with real estate

25   holdings, or I wouldn't issue since the evidence we have isn't

DA2JBIN2                          Juteau - direct

1   holding up to the amount she is telling us.

2   Q.  Can you please go to Page 16524 and read the highlighted

3   text.

4   A.  Begin date: 2008-12-05.  As far as the real estate

5   holdings, senior management ran a detailed property search

6   (which we paid for) and it did not list Myra Davis as owner of

7   many of the properties you list.  It listed a total of about $1

8   million of real estate holdings.  It did not list any

9   apartments in the Great Neck or Riverdale.  It did mention a

10  small home in Far Rockaway, some Florida properties and the one

11  in Melville.

12          If you have documentation to support her ownership in

13  additional properties such as Riverdale and Great Neck, please

14  forward it over.

15          Again, willing to up to $5 million but will need to

16  amend that the guardian policy listed on the application was in

17  error and is not in force.

18  Q.  Can we go up to the top of that right under comments, and

19  read sent to GA, and read the first full paragraph, too.

20  A.  Sent to GA (in response to e-mail).

21          Michael, good morning.  I did not make it to the life

22  supervisors last night as our company did not purchase a table

23  this year.  Sorry I was not able to finally meet you.  As the

24  guardian policy is no longer in force, I will be able to offer

25  $5 million.  Regret this fact was never placed in the file.

1   Q.  Can we then go to page OO16522, please, and read the

2   highlighted portion.

3   A.  Begin date:  2008-12-16.  These are certificates of

4   ownership for three cooperative apartments in in New York (2 in

5   the Bronx, one in Great Neck).

6        I Zillowed all three.  The 2 in the Bronx probably go

7   for about $250,000 apiece as that is what comparable apartments

8   near -- apartments appear to be going for in that building.

9        The other apartment, in Great Neck, is not found on

10  Zillow.

11       Thoughts:  Do these certificates distributed in 1985

12  and 1986, prove current ownership?  They are not listed on the

13  e-search.

14       This just appears to be another agency trying to over

15  insure an elderly life.  If these properties are being used to

16  generate rental income, I would presume they would be listed on

17  her tax returns (with addresses and income generated).

18       I had already increased this to $5 million.

19       MR. ABRAMOWITZ:  I offer Defense Exhibit 233, which is

20  the policy.

21       MR. FEINGOLD:  No objection.

22       THE COURT:  Admitted.

23       (Defendant Exhibit 233 received in evidence)

24  BY MR. ABRAMOWITZ:

25  Q.  Can we show Defendant's Exhibit 233 and can you read the

1   highlighted portion, please.

2   A.  Myra Davis Policy Number U10019421L.

3   Q.  Can we read the base coverage.

4   A.  The base coverage is $5 million.

5   Q.  I am not sure, did you read the date?

6   A.  The date of issue is December 28th, 2008.

7           MR. ABRAMOWITZ:  We offer Defendant Exhibits 30, 38

8   and 3140.

9           MR. FEINGOLD:  No objection.

10          THE COURT:  Admitted.

11          (Defendant Exhibits 30, 38 and 3140 received in

12  evidence)

13  BY MR. ABRAMOWITZ:

14  Q.  Can we go to Exhibit 3140, please.  Can you look at the top

15  and read which company this is being exhibited to?

16  A.  Jefferson Pilot Financial.

17  Q.  What is the name of the applicant?

18  A.  James T. Farrell.

19  Q.  And the date of birth was?

20  A.  March 12, 1935.

21  Q.  Can you look at Item No. 28.  What is the amount of the

22  insurance listed there?

23  A.  $4 million.

24  Q.  Can we go to Exhibit 3038.  Go to Page 33828 and read the

25  highlighted portion.

DA2JBIN2                        Juteau - direct

1   A.  Have received the Form LF06658, and if this case is not

2   being premium financed then how is this 170K premium going to

3   be paid?  Please give specific details.

4   Q.  Can you read the highlighted text above that.

5   A.  Assessment:  Need an accountant's statement with a

6   breakdown of all assets and liabilities.  Need a copy of the

7   estate plan.

8   Q.  Can you go to Page 33830 and please read the highlighted

9   text.

10  A.  Age 72 and worried about income replacement but the

11  majority of income is in unearned.  The trust was set up

12  5-07-same address as the applicant-no planning done?

13          No inforce insurance and now at 72 he is convinced to

14  purchase $4 million worth with a 4.5 million net worth and

15  154K?

16  Q.  Can you read the next entry.

17  A.  Problem is finances.  Case is indicated as not being

18  premium financed.  Has no formal estate plan, and balking

19  regarding getting an accountant's statement.  Should I let this

20  go with an IOLI amendment?

21  BY MR. ABRAMOWITZ:

22  Q.  Look at Government Exhibit 606 which was previously

23  admitted.  That is the Jefferson Pilot policy that was issued.

24  Is there a date on that page?  Maybe not on that page.

25          What is the -- there we go.

DA2JBIN2                         Juteau - direct

1    A.  The date is September 9th, 2007.

2    Q.  And the specified amount?

3    A.  $4 million.

4    Q.  And the insured is Mr. Farrell.  Is that correct?

5    A.  That's correct.

6              MR. ABRAMOWITZ:  We offer Defendant's Exhibit 3042 and

7    3101 into evidence.  This is from Lincoln.

8              MR. FEINGOLD:  No objection.

9              THE COURT:  Admitted.

10             (Defendant Exhibits 3042 and 3101 received in

11   evidence)

12   BY MR. ABRAMOWITZ:

13   Q.  Can we go to Exhibit 3101, please, and go to the Page 33857

14   and please read the highlighted text.

15   A.  Cover letter from agent explaining how the 251K of premium

16   is to be paid with income of 225K.  Per e-mail 8-30, savings

17   and income will be used to pay premiums.  Thank you.  Okay with

18   that information on the premium.  Just need IOLI form for

19   issue.

20   Q.  Can we go back to 3042 and see for whom this note applies.

21   Silas -- can you RE that, please?

22   A.  Insured:  Silas Griffin, Jr.?

23   Q.  Can you read the highlighted portion on the right side.

24   A.  Planned premium, $270,840.00.

25   Q.  Can we go to Page 33866 and 33867 and look at the

1   highlighted portion.  Please read it.

2   A.   Dawn, please advise if Jefferson Pilot and/or Lincoln Life

3   will do a personal history report in conjunction with the

4   inspection report that the agent will provide.

5   Q.   Is that whole portion of the exhibit that you read?

6   A.   No, just the portion on the right.

7   Q.   Can we please see the highlighted portion on the left.

8   A.   No, we should not request a PHI, if the agent is ordering

9   the inspection report.

10  Q.   Can we go to Page 33957, and can you read the highlighted

11  portion.

12  A.   June 7, 2007, IOLI detections.  Multiple applications exist

13  for the insured.  Review case for possible non-recourse premium

14  financing.  No financials on app.  Retention amount exceeded UW

15  amount exceeds financial guidelines.

16  Q.   Can we go to Exhibit 3042, please.  Read the highlighted

17  portion as to who the insured is.

18  A.   Silas Griffin, Jr.

19  Q.   And can you go to Page 33857 and also keep up 3042.

20           According to Exhibit 3101, what was the annual income

21  reported?

22  A.   Income of 225,000.

23  Q.   Looking at 3042, what was the planned premium?

24  A.   $270,000.

25  Q.   Can we show Government Exhibit 951, please.  It is already

1    in evidence.  That is the policy that was issued to

2    Mr. Griffin.  Can we show the amount and the date.

3    A.   The specified amount is $4 million.  The policy date is

4    December 31st, 2007.

5              MR. ABRAMOWITZ:  We are moving on to another group of

6    witnesses, your Honor, if you want to take a break?

7              THE COURT:  I am okay.  Are you okay?  Let's keep

8    going.

9              MR. ABRAMOWITZ:  Defendants offer into evidence

10   Exhibit 202, 3060, 3061, 3062.  This deals with Maria Ramos.

11             MR. FEINGOLD:  No objection.

12             THE COURT:  Admitted.

13             (Defendant Exhibits 202, 3060, 3061, 3062 received in

14   evidence)

15             MR. ABRAMOWITZ:  Can we show 3060, please.

16   BY MR. ABRAMOWITZ:

17   Q.   Can you just read the name on the application.

18   A.   Maria E. Ramos.

19   Q.   Can you read the amount of insurance applied for.

20   A.   $4 million.

21   Q.   And the date of the insurance, the application would be at

22   Bates 89898.

23   A.   May 30th, 2007.

24   Q.   Could you look at the Bates No. 89897, and what was her

25   birth date listed?

DA2JBIN2                         Juteau - direct

1    A.  November 15th, 1932.

2    Q.  Can we go to 3061, please.  Can you go to 3061 with 3060,

3    please.  Can you see the highlighted portion of 3061?  Is that

4    the one in yellow?

5    A.  $4,650,000.

6    Q.  As total assets?

7    A.  That's correct.

8    Q.  And on 3060, what is the total assets listed there?

9    A.  $5,250,000.

10   Q.  Can we go to Defendant's Exhibit 3062 and read the

11   highlighted language.

12   A.  Lifewriter notes for Policy No. ML5583366.

13   Q.  Can we go to the Bates number Lincoln 091653 and read the

14   highlighted text.

15   A.  IOLI, multiple applications exist for the insured.  Review

16   case for possible non-recourse premium financing.

17   Q.  Can we go to Exhibit 202, please.  Can you read the

18   highlighted text.

19   A.  Financial guidelines.  Yes, the income should be reviewed

20   and compared to the illustrated premium, especially at the

21   older ages (70 plus) to be sure the premium is an acceptable

22   percentage to income.

23        As a general rule of thumb, the premium should not be

24   more than 25 percent of annual income.

25   Q.  Can we show Government Exhibit 1940.  It has already been

1    admitted.  That is a policy to Maria E. Ramos.

2              Can we go to the date, please.

3    A.  The date is October 9th, 2007.

4    Q.  Can we go to Bates No. 15856 and read what the planned

5    premium was.

6    A.  $190,640.00 annual.

7    Q.  Looking at 3060 again, at Bates number 89893, what portion

8    of the income would be taken up by the premium?

9    A.  Over 50 percent, up to 65 percent, it looks like.

10             MR. ABRAMOWITZ:  Can we next go to another applicant,

11   Alma Lapp, Lincoln National, and we offer Defendants' Exhibits

12   3043, 3044, 3045,3434, 3435.

13             MR. FEINGOLD:  No objection.

14             THE COURT:  Admitted.

15             (Defendant Exhibits 3043, 3044, 3045, 3434, 3435

16   received in evidence)

17   BY MR. ABRAMOWITZ:

18   Q.  Can we show Exhibit 3435, please.  Would you just read what

19   it says.

20   A.  Applicant for life insurance Alma Ruth Lapp, date of birth

21   May 27th, 1932.

22   Q.  Can we go to Page 36564, please, and what is the date of

23   the application?

24   A.  June 12th, 2008.

25   Q.  Can we go to 3043, please.  Can you read the highlighted

DA2JBIN2                    Juteau - direct

1    portions.

2    A.   Financial supplement for business and personal insurance.

3    Proposed insured:  Alma Lapp.  Cash in banks, $1,400,000.  Real

4    estate/home, $550,000, personal property, $1 million.

5    Q.   Can we go to 3044.  Can we look at 3043, at Page 36760, and

6    36924 of Exhibit 3044.

7          What does the right side list as the real estate?

8    A.   I think the second line is home -- sorry.  Which side?

9    Q.   Both sides.

10   A.   On the left side, the value for home/real estate is

11   $550,000.  On the right side the right value for home is

12   $400,000.

13   Q.   On the left side, what is the list for liabilities?

14   A.   Zero total liabilities.

15   Q.   And on the right side what is the list for liabilities?

16   A.   $259,111.00.

17   Q.   And on the left side what is the list for personal

18   property?

19   A.   $1 million.

20   Q.   And on the right side what is the list for personal

21   property?

22   A.   $500,000.

23   Q.   On the left side what is the list, the highlighted portion

24   for cash?

25   A.   $1,400,000.

1329

1    Q.  And on the right side what is the listing for cash?

2    A.  $550,000.

3    Q.  On the left side what is the listing for stocks and bonds?

4    A.  Zero.

5    Q.  And on the right side what is the listing for stocks and

6    bonds?

7    A.  $1,500,000.

8    Q.  Can we go to Exhibit 3045, at Page 33698.  Read the

9    highlighted portion.

10   A.  IOLI detection.  Owner state of residence is different from

11   the insured state of residence.  Review case for possible

12   non-recourse premium financing.

13   Q.  Can you go to Page 33699.  Read the highlighted portion,

14   please.

15   A.  Standard subject to outstanding IOLI question and annual

16   premium of $100,700.00.

17          UW amount exceeds financial guidelines.  Owner

18   relationship unacceptable, beneficiary relationship

19   unacceptable.

20   Q.  Can you go to Page 33701, please.  Read the highlighted

21   portion.

22   A.  Also this is coming up as an IOLI ---will need to question

23   for premm financing.

24   Q.  Can we go to Page 33705, please.

25   A.  Agree okay for $2.5 million.  Would obtain the agent IOLI

DA2JBIN2                         Juteau – direct

1    cert form.

2    Q.  Can we go to Exhibit 3434.  This is a National Life

3    Insurance policy.  Can you read the name of the insured.

4    A.  Alma Ruth Lapp.

5    Q.  Can we go to Page 36528.  What is the date of the policy?

6    A.  August 11th, 2008.

7    Q.  And the specified amount?

8    A.  $2.5 million.

9    Q.  Can we go to Page 36529.  What is the planned premium of

10   the policy?

11   A.  $101,225.00.

12          MR. ABRAMOWITZ:  We are going to another applicant,

13   your Honor --

14          THE COURT:  Yes.

15          MR. ABRAMOWITZ:  -- Tomasa Contreras.  We offer into

16   Exhibits 3083, 3084, 3085, 3086, 3088, 3146, 3149, 3153, 3159,

17   3160, 3161, 3162.

18          MR. FEINGOLD:  No objection.

19          THE COURT:  Admitted.

20          (Defendant Exhibits 3083, 3084, 3085, 3086, 3088,

21   3146, 3149, 3153, 3159, 3160, 3161, 3162 received in evidence)

22          MR. ABRAMOWITZ:  Can we show Exhibit 3146, please.

23   BY MR. ABRAMOWITZ:

24   Q.  Can you just read what this is.

25   A.  Application for life insurance, the Lincoln National Life

DA2JBIN2                           Juteau - direct

1   Insurance Company.

2   Q.  Can you go to Page 43685.  Can you read who the name of the

3   applicant is.

4   A.  Tomasa Contreras.

5   Q.  Can you go to Page 43692.

6          The date of the application?

7   A.  August 26th, 2008.

8   Q.  Can you go to Page 43686.  Did we get the date first?

9   43685, please?

10  A.  The date of birth is December 29th, 1934.

11  Q.  Can we go to Page 43686, please.  Can you please read

12  Question 37 and the answer.

13  A.  Is this policy being funded via a premium financing loan or

14  with funds borrowed, advanced or paid from another person or

15  entity?  The answer is yes.

16  Q.  And then can you, the same page, look at the handwritten

17  note.  What does that say?

18  A.  37.  Ridge Capital.  All appropriate documents to follow.

19  Q.  Can we go to Exhibit 3086.  This is Info-Link, and can you

20  read the highlighted portion.

21  A.  Date of report, August 22, 2008.  Name of applicant, Tomasa

22  Contreras.

23  Q.  Can you go to Page 49186, please.  Can you read what that

24  says.

25  A.  No portion of the initial or future premiums for the

1    proposed policy will be borrowed, loaned or otherwise financed.

2    Q.  Now can we go to 3083, please.  Can you read just the

3    highlighted portion.  First on the upper left, can you read

4    what this is?  "Automated underwriting," is that right?

5    A.  That's correct.

6    Q.  And then read the highlighted portions on the lower right?

7    A.  Rider insured:  Tomasa Contreras.

8    Q.  Can you go to Page 42467, please.  Can you read that.

9    A.  We need to obtain the medical requirements, inspection

10   report, trust documents, premium financing forms to proceed.

11   Q.  Can we go to 3088, please.  Can you read the highlighted

12   portion?

13   A.  August 29th, 2008, Tomasa Contreras.  Program:  Premium

14   financed with Ridge Capital.

15   Q.  Can we go to Exhibit 3149.  What is that?

16   A.  That's another application with the Lincoln Financial Group

17   for life insurance by Tomasa Contreras.

18   Q.  Can we go to Page 48826.  Can you read the date of the

19   application?

20   A.  October 10th, 2008.

21   Q.  Can we go to Page 48820 and read Question 37.

22   A.  Is this policy being funded via a premium financing loan or

23   with funds borrowed, advanced or paid from another person or

24   entity?  Answer:  Yes.

25   Q.  Can we go to Exhibit 3159, at page 50823.  Can you read the

DA2JBIN2                    Juteau - direct

1   highlighted portion.

2   A.   Insured and owner premium financing questionnaire.

3   Q.   Can we go to the date.

4   A.   October 10th, 2008.

5   Q.   Can we go back to page 50823, and can you read Question No.

6   2 and the answer.

7   A.   Please provide the name, address, and contact information

8   for the lender (or other person or entity who is providing the

9   funds to pay the premiums for this new life insurance policy.)

10            Name of lender.  Ridge Capital flexible Premium

11   Finance Loan Program.  Lender's address, 10 Churchill Finance,

12   LLC, 625 Margarette Avenue, 11 Floor, Minneapolis, Minnesota,

13   5549.  Lenders contact person:  Attention corporate trust

14   services.  Telephone number --

15   Q.   You don't have to read the telephone number.  Can we go to

16   Exhibit 3084.  Can you read the top.

17   A.   From Rhonda Allen, sent Friday, October 24, 2008, 10:58 am,

18   to Lindsay Jones.

19   Q.   And the subject?

20   A.   The subject is Tomasa Contreras, Lincoln, Ridge Capital.

21   Q.   Can you read the highlighted portion.

22   A.   This is a premium financing deal for Ridge Capital, per

23   Lucy, this is to be grandfathered under the old rules for

24   premium financing per our previous exception that we received

25   last week.

DA2JBIN2                    Juteau – direct

1    Q.  Now can we go to Exhibit 3153, please.  What is Exhibit

2    3153?

3    A.  This is another application for life insurance to Lincoln

4    Financial Group from insured Tomasa Contreras.

5    Q.  Can we go to page 48928.  What is the date of the

6    application?

7    A.  February 26th, 2009.

8    Q.  Can we go to Page 48926.  Please read Question No. 53 and

9    the answer.

10   A.  Is this policy being funded via a premium financing loan or

11   with funds borrowed, advanced or paid from another person or

12   entity?  Answer:  No.

13   Q.  Can we go to page 48929 and read Question 4 A and B and the

14   answers.

15   A.  A.  Is this policy being paid for with a premium financing

16   loan?  Answer:  No.

17        B.  Is this policy being paid for with funds from any

18   person or entity whose only interest in the policy is the

19   potential for earnings based on the provision of funding for

20   the policy?  Answer:  No.

21   Q.  Can you go to Exhibit 3161.  Just read the highlighted

22   portion.

23   A.  The Tomasa Contreras 2008 irrevocable trust.

24   Q.  Go to Page 51259 and read the highlighted language.

25   A.  The trustee shall have, with respect to any policy of life

DA2JBIN2                        Juteau - direct

1    insurance at any time held as part of the trust estate, the

2    sole and exclusive right --

3    Q.  Can you just finish the sentence.

4    A.   -- sole and exclusive right exercisable by the trustee from

5    time to time and in his or her discretion.

6    Q.  Can you read the highlighted portion.

7    A.  To borrow upon the policy from the insurer or from any

8    other person for any purpose (including the payment of premiums

9    or other charges) and to pledge or hypothecate the policy for

10   any loan.

11   Q.  Can we go back to 3159, please, at Page 5024.  Can you read

12   the question and the highlighted answer.

13   A.  Have you had any discussions about the eventual sale of

14   this new life insurance policy, including any indirect sale of

15   the trust, partnership, or any other entity that owns the

16   contract?  The insured checked yes.

17          While there are no plans to sell this policy at this

18   time or in the future, we have discussed the secondary market.

19   Q.  Can you go to Exhibit 3162, please, at Page 51345.  Read

20   the highlighted title.

21   A.  Required producer and representative certification

22   regarding the stranger originated life insurance.

23   Q.  Can you go to Page 51346, please, and read the question and

24   answer.

25   A.  Have you been involved in any discussion with the

DA2JBIN2                        Juteau - direct

1   insured/annuitant and/or owner/applicant about the possible

2   sale or assignment of a beneficial interest in a trust, limited

3   liability company, or other entity created or to be created on

4   the insured annutant's and/or owner/applicant's behalf?

5           Answer:  No.

6   Q.  Let's go back to Exhibit 3085, please, and read the note

7   there.

8   A.  IOLI detection.  Multiple applications exist for the

9   insured.  Review case for possible non-recourse premium

10  financing.

11  Q.  Can you go to Page 42459, please, and read the highlighted

12  language.

13  A.  More than half of income is paying out premiums -- need

14  exit strategy.

15  Q.  Can we go to Exhibit 3160, please, and this is -- who is

16  the insured on this policy?

17  A.  Tomasa Contreras.

18  Q.  Can we go to page 50939.  What is the date of the policy?

19  A.  February 27th, 2009.

20  Q.  What is the face amount of the policy?

21  A.  $4 million.

22  Q.  What is the planned premium?

23  A.  $36,480.00 quarterly.

24          MR. ABRAMOWITZ:  Now go to the American General

25  documents for James Farrell.  We offer Exhibits 3277, 3280,

DA2JBIN2                    Juteau - direct

1    3281.

2              MR. FEINGOLD:  No objection.

3              THE COURT:  Admitted.

4              (Defendant Exhibits 3277, 3280 and 3281 received in

5    evidence)

6              THE COURT:  Do you want to take a five-minute break,

7    folks?  Let's take a five-minute break.  Don't discuss the case

8    with anyone.

9              (Jury excused)

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA2LBIN3

1              (Jury not present)

2              MR. ABRAMOWITZ:  While the jury is out, we have some

3    documents to move into evidence.

4              MR. FISCHER:  With the government's consent.

5              THE COURT:  I'm sorry?

6              MR. ABRAMOWITZ:  There are two more documents to be

7    introduced into evidence with the government's consent.

8              THE COURT:  All right.  Do so.

9              MR. FISCHER:  The defense offers Defendant's Exhibit 1

10   and 2.  DX1, DX2.

11             MR. FEINGOLD:  No objection.

12             THE COURT:  Admitted.

13             (Defendant's Exhibits 1, 2 received in evidence)

14             THE COURT:  I'm down Jim.  Is that why we're all

15   standing here because we don't have Jim?  I'll find him.

16             MS. MURRAY:  Your Honor, with the government's

17   consent, I'm also moving in three sets of medical records.

18             THE COURT:  No, you're offering.

19             MS. MURRAY:  I'm offering.  I'm offering three sets of

20   medical records from policy files.  And they are Defense

21   Exhibits 2016, 2019, and 2020.

22             MR. FEINGOLD:  No objection.

23             THE COURT:  Admitted.

24             (Defendant's Exhibits 2016, 2019 and 2020 received in

25   evidence)

DA2LBIN3                    Juteau - direct

```
 1                (Jury present)

 2                THE COURT:  Okay.

 3                MR. ABRAMOWITZ:  May I, your Honor?

 4                THE COURT:  You may continue.

 5                And, of course, you're still sworn to read carefully

 6     and accurately.

 7                MR. ABRAMOWITZ:  Sorry, I didn't hear you.

 8                THE COURT:  You may go.

 9                MR. ABRAMOWITZ:  Thank you.

10                Can we put up Defendant's Exhibit 3280, please.

11     BY MR. ABRAMOWITZ:

12     Q.  And can you read the highlighted portion, Ms. Juteau,

13     please.

14     A.  Part A, life insurance application.  Name, James Farrell.

15     Age, 71.  Personal income, $407,000.  Net worth, $4,550,000.

16     Q.  And can we go to the next page, please.  How much insurance

17     is being applied for?

18     A.  $4 million.

19     Q.  Now can we go to Defendant's Exhibit 3280, please.  And

20     please read the line where it says net worth.

21     A.  $4,550,000.

22     Q.  And can we go to Defendant's Exhibit 3277, please.  And

23     what is the net worth listed there?  3277, page 29, excuse me.

24     A.  $1,330,000.

25     Q.  And can we go to Exhibit 3280, please, 3280.  What's the
```

DA2LBIN3                    Juteau - direct

1    income -- I'm sorry.  Can you read the income line?

2    A.  $407,000.

3    Q.  And can we go to page 00028 and see what the total income

4    is listed there?

5    A.  $175,000.

6    Q.  Can we go to 3281, please.  And go to page 260 and read the

7    note.

8    A.  Income, 175K; total assets, 1,570,000; LIAB, 240K; NW,

9    1,330,000.

10   Q.  And can you read the next line.

11   A.  IOLI answers no.

12   Q.  Can you go to page 254, please.  And can you read the

13   highlighted portion in blue.

14   A.  Total income, $407,500.  Personal assets, $4,750,000.

15   LIAB, 200,000.  NW, $4,550,000.

16   Q.  And can we go to Government Exhibit 556.  And that is the

17   policy -- was that the policy issued to Mr. Binday, is that

18   correct -- excuse me -- Mr. Farrell?

19   A.  That's correct.

20   Q.  Can you read the highlighted portion.

21   A.  Insured, James Farrell.  Initial specified amount,

22   $4 million.  August 23, 2007, date of issue.

23           MR. ABRAMOWITZ:  And can we now go to another

24   applicant, Marilyn Nurik.

25           We offer into evidence Defendant's Exhibit 3047, 3048,

1    3049, 3051, 3052.  These are from Lincoln National.

2              MR. FEINGOLD:  No objection.

3              THE COURT:  Admitted.

4              (Defendant's Exhibits 3047, 3048, 3049, 3051, 3052

5    received in evidence)

6              MR. ABRAMOWITZ:  Can we go to Exhibit 3048, please.

7    Q.  Can you read the highlighted portions, please, Ms. Juteau.

8    A.  The name of the applicant is Marilyn Nurik.  Her date of

9    birth is February 24, 1925, and her annual unearned income is

10   200K plus.

11   Q.  And can we go to Exhibit 3047, please, and go to

12   page 51677.  What is the -- can you read the highlighted

13   portion.

14   A.  Annual unearned investment income, $250,000 plus.

15   Q.  Can we go to 3042 -- 3052, please, at page 52028.  And can

16   you read the highlighted portion.

17   A.  September 18, 2008.  Lincoln Benefit Life Company, re

18   Marilyn Nurik.  She anticipates that this insurance will be

19   paid through current income.  They may also liquidate assets

20   such as both personal and investment real estate to increase

21   this investment income.  Mrs. Nurik did not pursue coverage

22   with that company and decided to apply to Lincoln benefit life.

23   Michael Binday.

24   Q.  And can we go to 3151, please, at page 52036.  Can you read

25   the highlighted portion, please.

DA2LBIN3                         Juteau – direct

1    A.   Financial supplement for business and personal insurance.

2    Proposed insured, Marilyn Nurik.   Real estate value, zero.

3    Q.   And can you look at 3051.   Have you added the figures on

4    3051?

5    A.   Yes, I have.

6    Q.   And do they add up?

7    A.   No, they do not.

8    Q.   And what is the difference?

9    A.   The figures add up to $4 million.   The total figure given

10   here is $4,750,000.

11              MR. ABRAMOWITZ:   We offer Defendant's Exhibit 235 into

12   evidence, which is the policy.

13              MR. FEINGOLD:   No objection.

14              MR. ABRAMOWITZ:   Can we show 235, please.

15              THE COURT:   It's admitted.

16              (Defendant's Exhibit 235 received in evidence)

17   Q.   Can you read the highlighted portion.

18   A.   Group policyholder, Lincoln National Group life insurance

19   trust.   Insured, Marilyn Nurik.

20   Q.   And what's the face amount of the policy?

21   A.   $2,500,000.

22   Q.   And can we go to page 484322.   What is the amount of the

23   premium?

24   A.   $160,566 annual.

25              MR. ABRAMOWITZ:   Can we go to another group of

DA2LBIN3                         Juteau - direct

1    exhibits involving James Farrell again.

2              We offer into evidence 3303, 3301, 3302, 3436.

3              THE COURT:  Any objection?

4              MR. FEINGOLD:  No objection, your Honor.

5              THE COURT:  Admitted.

6              (Defendant's Exhibits 3303, 3301, 3302, 3436 received

7    in evidence)

8              MR. ABRAMOWITZ:  Can we show Defendant's Exhibit 3436,

9    please.

10   Q.  And can you read the highlighted portion, please.

11   A.  The name of the applicant is James Farrell.

12   Q.  And can we go to page 1551, what's the date of the

13   application?

14   A.  It's November 18, 2008.

15   Q.  Can we go to Exhibit 3303 at page 189, and can you please

16   read the highlighted -- is there a highlighted portion?  Okay

17   this is it.

18              Can you read the highlighted portion for real estate.

19   A.  $2 million.

20   Q.  Can we go to Exhibit 3301, can you read the highlighted

21   portion.

22   A.  Underwriting decision and issue instruction sheet.

23   Q.  And can you go to page 53 or page 60, excuse me.  Can you

24   read the highlighted text.

25   A.  Zillow residence, 835K.  If the trustee is not a known

1    family member, let's re-review at that time.  I will want to do

2    a full Google search.  If the person comes up as an attorney,

3    I'll really want to stop, drop, and roll, and at that time

4    reconsider all financial requirements, etc.

5    Q.  Can we go to page 57, please.  Can you read the highlighted

6    portion, please?

7    A.  Will want to pay special attention to nature of CPA and

8    trustee relationships.

9    Q.  Can we go to page, excuse me, Exhibit 3302, and read the

10   highlighted portion.  What is this?

11   A.  This is an email from Maureen Tarr to Jessica Worman,

12   subject, re Farrell J.

13   Q.  Can you go to page 136 of this exhibit, please, and please

14   read the highlighted portion.

15   A.  I note the insured lives and works in New York.  Please

16   advise circumstances surrounding the application taken in New

17   Jersey.

18   Q.  Can you please go to 135, page 135, and read the

19   highlighted portion.

20   A.  The client has a New Jersey attorney and anticipates

21   getting a New Jersey trust.

22   Q.  Can you go to Exhibit 3301, at page 62, and read that

23   highlighted text.

24   A.  Although I do not find language that indicates a

25   relationship to the secondary market, the trust is a bit

DA2LBIN3                    Juteau – direct

1    sparse.  Is this case a premium financed case?

2    Q.  And can we go to page 63, please, and read the highlighted

3    text.

4    A.  The amount of shopping still is a concern to me.  The trust

5    seems vague, and the trustee is a little atypical.  I am still

6    somewhat uncomfortable with this case and would use a very

7    specific amendment in relation to the total line.

8    Q.  And can we show Exhibit 535, Government Exhibit 535.  And

9    what is that?

10   A.  That's a policy from Sun Life Assurance Company of Canada

11   issued to James Farrell.

12   Q.  And what's the date of the policy?

13   A.  December 28, 2008.

14   Q.  Face amount of the policy?

15   A.  $3 million.

16   Q.  And the premium, the annual planned premium?

17   A.  $113,490.

18   Q.  Excuse me, it's a periodic premium.

19              MR. ABRAMOWITZ:  May I have a minute, your Honor.

20              THE COURT:  You may.

21              MR. ABRAMOWITZ:  We have no further questions.

22              THE COURT:  Anybody else from the back table?

23              From the government?

24              MR. FEINGOLD:  No, your Honor.

25              THE COURT:  Thank you, ma'am.  You may step down.

```
1              (Witness excused)
2              THE COURT:  Okay.  What else from the back table?
3              MR. STAVIS:  All of the documents were submitted on
4     behalf of all the defendants, and even ones we had admitted
5     were covered in Mr. Abramowitz's presentation.
6              THE COURT:  Fine.
7              Mr. Abramowitz.
8              MR. ABRAMOWITZ:  We rest.
9              THE COURT:  Mr. Stavis.
10             MR. ABRAMOWITZ:  On behalf of Mr. Kergil, the defense
11    rests, your Honor.
12             MS. MURRAY:  Your Honor, a brief side bar.
13             (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

DA2LBIN3

1            (At the side bar)

2            THE COURT:  You never did get a final ruling.

3            MS. MURRAY:  That's correct.

4            THE COURT:  Ms. Murray would like a final ruling on

5    her application.

6            Does the government have anything?

7            MR. FEINGOLD:  We don't have anything further, your

8    Honor.

9            THE COURT:  Okay.  Fine.  I'm prepared to let in the

10   little financial box.

11           MS. MURRAY:  Your Honor, I would ask that it be -- I

12   highlighted a different one, but it would include that whole

13   section just to explain.

14           THE COURT:  That's fine.  I'm admitting it's page 7 of

15   the 10-Q.

16           Is it a Q or a K?

17           MS. MURRAY:  It's a K.

18           THE COURT:  Okay.  Of the 10-K on actually from the

19   word individual markets-life insurance down to the bottom of

20   the page.  Okay.

21           MS. MURRAY:  Your Honor, may I publish it to the jury

22   on my case then?

23           THE COURT:  You may.  Yes.

24           MS. MURRAY:  Okay.  Thank you.

25           MR. ABRAMOWITZ:  Thank you, your Honor.

DA2LBIN3

1          (In open court)

2          THE COURT:  All right.  The document is admitted.

3          (Defendant's Exhibit 2023, redacted received in

4     evidence)

5          THE COURT:  Ladies and gentlemen, this is actually a

6     document where I have to explain something.  A portion of a

7     page is being admitted.  And we're going to make a photocopy

8     that will white out the top portion of the page and the bottom

9     portion of the page is being admitted.  That's called

10    redaction.  Don't worry about what it is we whited out.  It's

11    not something that's relevant to the case.  So nobody is trying

12    to pull the wool over your eyes or anything like that.  I just

13    want to assure you of that.

14          Ms. Murray.

15          MS. MURRAY:  Your Honor, may I include the first page?

16          THE COURT:  It's Defendant's Exhibit what?

17          MS. MURRAY:  Defendant's Exhibit 2023.

18          THE COURT:  Thank you.

19          MS. MURRAY:  Your Honor, may I include the first page

20    of the form 10-K?

21          THE COURT:  You may.

22          MS. MURRAY:  Put the Elmo on, please.

23          This is form 10-K, 2007, Lincoln National Corporation.

24    And the portion that's going into evidence is on page 7.

25          And may I read it, your Honor?

DA2LBIN3

1              THE COURT:  You may.

2              MS. MURRAY:  Products.  The life insurance segment

3     sells primarily interest/market sensitive products (UL and VUL)

4     as term products.

5              The segment sales (in millions) were as follows:

6     Universal life, total universal life for the year 2007 was

7     637 million.  Total universal life sales for 2006 were

8     467 million.  And total sales for universal life in 2005 were

9     226 million.

10             And with that, Mr. Resnick rests, your Honor.

11             THE COURT:  Okay.  Now, the government has a rebuttal

12    case, I believe; is that correct?

13             MR. FEINGOLD:  Yes, your Honor.  Can we have a brief

14    side bar?  I think it might help for scheduling purposes.

15             THE COURT:  Do you want to do it after lunch?  What I

16    would like to do is send the jurors to lunch and we can talk

17    about the scheduling.  It can happen after lunch.

18             MR. FEINGOLD:  I think your Honor may appreciate if we

19    have a brief side bar.

20             THE COURT:  Apparently, I'm supposed to have a side

21    bar.

22             (Continued on next page)

23

24

25

DA2LBIN3

1          (At the side bar)

2          MR. FEINGOLD:  We're going to put in a handful of

3    documents that have not been admitted in our rebuttal case.

4    We're not planning on publishing any of them to the jury.

5          THE COURT:  That's it, you're not calling any

6    witnesses?

7          MR. FEINGOLD:  We're not calling any witnesses.  Just

8    putting in documents.  We're not publishing.

9          THE COURT:  Let's do it, get it done.

10          MS. McCALLUM:  We're just collecting the last of them

11    and the defense counsel needs to review them.

12          THE COURT:  That's the problem.  I have to send them

13    to lunch and then send them home in five minutes.  I'll warn

14    them in advance okay.

15          MR. ABRAMOWITZ:  No, no, no.

16          THE DEPUTY CLERK:  How long will it take?

17          MR. ABRAMOWITZ:  I haven't seen them, but I'm told I

18    shouldn't be worried about them.

19          THE COURT:  It's not controversial.  You have to look

20    at them.

21          MR. ABRAMOWITZ:  They said that before.

22          MR. FEINGOLD:  Have we been wrong?

23          THE COURT:  You have to.

24          MR. ABRAMOWITZ:  I don't want to have the jury come

25    back and send them home.

DA2LBIN3

1          THE COURT:  We're going to have to because I have a

2     1 o'clock lunch meeting so I actually have to take lunch at

3     1 o'clock.  I can't keep them here for half an hour or 40

4     minutes because I can't be here.  I can't be here.

5          MR. ABRAMOWITZ:  I think they're saying to me it's not

6     going to take me that long.

7          THE COURT:  Really?

8          MS. McCALLUM:  It really isn't.

9          (In open court)

10         THE COURT:  We're going to try this, okay.  We're

11    going to try this.  I told you the government has a rebuttal

12    case.  It turns out overnight it's thought about that and its

13    rebuttal case is simply going to be documents and it's not even

14    going to read them to you.  So the rest of the evidence is

15    going to come in in about a five-minute thing.  If you run into

16    the jury room, don't discuss the case and keep an open mind, I

17    think we can do this before the lunch hour.  Then I can dismiss

18    you for the day because I have two hours' worth of stuff to do

19    with them on the charge.  Okay.

20         (Jury not present)

21         THE COURT:  Start looking people.  Start looking.

22         (Pause)

23         THE COURT:  How are we doing?

24         MS. McCALLUM:  Almost done, your Honor.

25         MR. ABRAMOWITZ:  I have to put on the record what I

DA2LBIN3

1    told Mr. Feingold, that they are indeed relatively

2    uncontroversial.

3              THE COURT:  That's wonderful news.

4              MR. ABRAMOWITZ:  For a change.

5              THE COURT:  I'm sure you'll make them controversial

6    eventually.  That's what closings are for.

7              (Pause)

8              THE COURT:  We're running out of time.

9              MR. FEINGOLD:  Your Honor, I think we're ready to

10   offer.

11             THE COURT:  Let's bring the jurors in, please.

12             (Jury present)

13             THE COURT:  Okay.  Does the government wish to put in

14   a rebuttal case?

15             MR. FEINGOLD:  Thank you, your Honor.

16             At this time the government offers Government Exhibits

17   9000, 9001, 9002, 9003, 9004, 9005, 9006, 9007, 9008, 9009,

18   Government Exhibits 9100, and 9101, Government Exhibit 9300,

19   9301, 9302, 9303, Government Exhibits 9400, 9401, 9402, and

20   9403, Government Exhibits 9500, 9501, 9502, 9503, 9504, 9505,

21   9506, Government Exhibit 9600, Government Exhibit 9700, and

22   Government Exhibit 9701.

23             And the government rests, your Honor.

24             MR. FISCHER:  No objection, your Honor.

25             THE COURT:  They were supposed to say that in reverse

DA2LBIN3

1   order but that's okay.  They're admitted without objection.

2              (Government's Exhibits 9000, 9001, 9002, 9003, 9004,

3   9005, 9006, 9007, 9008, 9009, 9100, 9101, 9300, 9301, 9302,

4   9303, 9400, 9401, 9402, 9403, 9500, 9501, 9502, 9503, 9504,

5   9505, 9506, 9600, 9700, 9701 received in evidence)

6              THE COURT:  The government has rested.  Okay.  So

7   everyone has rested.  All the evidence is in.  I have given the

8   parties a draft charge which they will read over lunch and then

9   they will come and we will duke it out over the charge and

10  we'll decide what I'm going to say to you.  It would obviously

11  not be fair if the lawyers didn't know what the charge was

12  going to say before they closed.  It would be hard for them to

13  tailor their remarks to what has to be discussed, which is what

14  the government has to prove and whether the government has in

15  fact managed to prove beyond a reasonable doubt that the

16  presumption of innocence is wrong.  And you're going to hear a

17  lot about that tomorrow and the summations may spill over into

18  Monday.  I don't know.  It depends on how long they go.  I know

19  there's really only so much that you can digest in a single

20  day.

21             You going to work very hard tomorrow just listening,

22  but you're going to work very, very hard.  So get a good

23  night's sleep tonight, all right.  Come here rested and ready

24  to go.  They're picking a jury in some other case and that's

25  why there are all these people here and they have a big

DA2LBIN3

1    overcall, they have a lot of extra people, even more than we

2    had.  So that's why the lines are so long.

3              If you have a problem getting in tomorrow, call Jim,

4    call Mariela, my deputy, we'll come down.  We'll pull you off

5    the line, we'll get you into the building.  I'd like for the

6    government to start its summation at 10 o'clock.  So I'd like

7    all of us to be here at 10 o'clock ready to go.

8              Don't discuss the case tonight.  Don't think about the

9    case tonight.  Keep an open mind.  But please, please get some

10   good rest because you're going to have to concentrate very hard

11   tomorrow.  All right.  I'll see you then.

12             (Jury not present)

13             THE COURT:  Folks, you all have draft charges.  I will

14   see you at 2:30.

15             MR. FEINGOLD:  2:30.

16             (Luncheon recess)

17             (Continued on next page)

18

19

20

21

22

23

24

25

DA2JBIN4                          Trial

1          AFTERNOON SESSION

2          2:30 pm

3          (Trial resumes)

4          (In open court; jury not present)

5          THE CLERK:  Come to order, please.  Case on trial

6    continued, the government and defendants are present.  The

7    jurors are not present.

8          THE COURT:  They've given you back your case.  They've

9    sent away your posse.  We are where we began.

10         MS. McCALLUM:  That's right.

11         THE COURT:  Okay.  Here is here I would like to do a

12   charge conference.  Obviously you're proposed charges,

13   including the supplemental defense charges, proposals are a

14   part of the record.  I have considered everything.  I have come

15   up with a charge.

16         I would like to go through it first with the

17   government, then Mr. Binday, Mr. Kergil, and then Mr. Resnick,

18   for your suggestions, your questions, et cetera, and put all

19   the other things that I am not going to charge on the record at

20   the end, and then we'll done.

21         The McMahon rule on charges is fewer words are better,

22   which is why I cut so much repetition, redundancy and excessive

23   verbiage out of charges that seem like to grow like --

24         MR. STAVIS:  We met over the lunch break.  I would for

25   the most part -- I shouldn't say that -- I would join in

DA2JBIN4                          Trial

 1     counsel for Binday's comments, additions, objections.

 2                THE COURT:  We'll get there and you can join.

 3                MR. STAVIS:  If I need to supplement those, I will.

 4                THE COURT:  That is great.  Ms. McCallum has to go

 5     first, and please be patient.

 6                MS. McCALLUM:  Your Honor, the first page that we have

 7     any comments on is 11, the use of evidence obtained pursuant to

 8     search.  I don't think there was any evidence introduced.

 9                THE COURT:  I don't think there was, either.  I don't

10     know how that got in here.  Out!

11                MR. FISCHER:  No objection.

12                MS. McCALLUM:  The next page is 17, expert testimony.

13                THE COURT:  Again Jim had a big question mark.  You

14     can see it is highlighted.  I said what expert?

15                MS. McCALLUM:  And then the government, the first

16     substantive suggestion is on Page 30, and I circulated over the

17     lunch hour to your Deputy Clerk and to the defense a

18     proposed --

19                THE COURT:  By the way, Jim is my senior law clerk.

20     He is actually my law clerk.  My deputy is Mariela DeJesus, who

21     is never in the courtroom.

22                MS. McCALLUM:  -- to Mr. O'Neill.

23                THE COURT:  He has seen it.  I haven't.

24                MS. McCALLUM:  I circulated by e-mail.

25                THE CLERK:  I did not see it.  I was out.

DA2JBIN4                          Trial

1              MS. McCALLUM:  I have one copy remaining, but I can

2     hand it up to the court.

3              THE COURT:  You keep your copy.  We'll print it out.

4              MS. McCALLUM:  It is a revision to the middle two

5     paragraphs of that charge.

6              THE COURT:  Okay.  Jim, if you send me the e-mail, I

7     will open it and I will have it.

8              THE CLERK:  I will do both, okay?  Printing.  I have

9     to send it to you because I have to change the ink.

10             (Pause)

11             THE COURT:  Just talk to me.  It is not coming up --

12    now it just came up.  It just came up.  Now I am reading what

13    you -- yes, I'm cool with that.

14             MS. McCALLUM:  If the court would like me to explain

15    what the changes were, I am happy to do that.  They were to

16    clarify things.

17             THE COURT:  You added a sentence which is a good

18    sentence.

19             MS. McCALLUM:  And take out the words "tangible" as

20    well and I can explain why that is.

21             THE COURT:  Okay.  Take out the word "however,"

22    because we don't need a "however" in the second sentence.

23             MS. McCALLUM:  Yes.

24             THE COURT:  All right.

25             MS. McCALLUM:  This is just with reference to a Second

DA2JBIN4                          Trial

1   Circuit case United States versus Carlo from 2007.

2            THE COURT:  Cite?

3            MS. McCALLUM:  The cite is 507 F.3d 799, and the pin

4   site is 801 to 802.

5            THE COURT:  Thank you.

6            MS. McCALLUM:  I can read the relevant passage.

7            THE COURT:  Please.

8            MS. McCALLUM:  "While the interests protected by the

9   mail and wire fraud statutes do not generally extend to

10  intangible rights except as modified by 18 U.S.C. 1346, they do

11  extend to all kinds of property rights, both tangible and

12  intangible."

13           So that is why the word "tangible" --

14           THE COURT:  That is a probably pretty good change.

15           MR. FISCHER:  Your Honor --

16           THE COURT:  You will have a minute to respond, okay?

17           Please, please let me run my own charge conference,

18  please!  I have never, ever not allowed the defense to respond

19  to anything the government has said.  It has never happened.

20  Never happened!

21           So that is the change you propose?

22           MS. McCALLUM:  Those two paragraphs, yes, those as

23  amended.  Then the only other comment the government has is on

24  Page 50, the similar acts evidence.  Again Mr. O'Neill

25  highlighted I believe so we are all on the same page.  I think

DA2JBIN4                         Trial

 1    there is no similar act evidence.

 2              THE COURT:  So that goes out.

 3              Now, do you want to address what the government's one

 4    proposed change first and then you can go through with your

 5    own?

 6              MR. FISCHER:  Why don't I do that, your Honor.  I

 7    think that makes sense.

 8              THE COURT:  Fine.

 9              MR. FISCHER:  To get into the tangible economic harm

10    point, the court already obviously spent a tremendous amount of

11    time on this issue in the motion in limine.

12              THE COURT:  I didn't use the word, "tangible."

13              MR. FISCHER:  You did, your Honor.

14              THE COURT:  Well, that was a mistake.  I didn't read

15    Carlo.  I don't understand what "tangible" is.

16              MR. FISCHER:  It was in the motion in limine.  We

17    opened on it for sure.

18              THE COURT:  Then you will have an issue on appeal if

19    you have to go up, won't you?

20              MR. FISCHER:  The motion in limine says the government

21    intends to rely on a right to control theory.  It must prove

22    the insurers would have suffered some sort of tangible economic

23    harm.  We think what that dovetails with is the Skilling case,

24    among the other cases that go directly into this analysis.

25              THE COURT:  Give me the Carlo case, please.

1        507 F.3d 799.  I think that was a direct quote from

2   Steele.  I know what Skilling is.  Skilling is a right to

3   honest services case, okay?  I know what Skilling is.  There is

4   no more right to honest services.

5        MR. ABRAMOWITZ:  There is other language in there

6   about tangible versus intangible in Skilling.

7        THE COURT:  That is fine.

8        MR. ABRAMOWITZ:  That is after the --

9        THE COURT:  The holding in Skilling is about the

10   holding, not the dictum, but the holding in Skilling abolished

11   this concept of the right to honest services.  That is what

12   Skilling was.  It said that was not an economic injury.

13        I have been struggling with this word "tangible"

14   because I don't understand what it means.  I know what it

15   doesn't mean.  It doesn't mean loss on the bottom line.

16        I would like to read the Carlo case with which I am

17   not familiar.

18        MR. FISCHER:  Your Honor, look, we agree that the

19   charge cite to be broader than harm on the bottom line.  We

20   think the charge does a nice job of explaining to the jury

21   exactly what tangible harm means.

22        THE COURT:  It doesn't.  It just says here is what it

23   is not.  I may include the paragraph from Carlo and then I'll

24   know I am doing exactly what the Second Circuit says is okay.

25        MR. FISCHER:  We would like an opportunity to review

1    that case, your Honor.

2              THE CLERK:  I am printing it.

3              (Pause)

4              THE COURT:  It is a per curiam so it is not

5    particularly long.  It seems to be argued in the circuit by

6    Judge Failla.

7              (Pause)

8              MR. FISCHER:  All right, your Honor, I just had a

9    moment to look at the 2007 Carlo case.  Our position, your

10   Honor, is a couple of points:

11             First, I think the court, when it was presented with

12   these arguments at length by the parties in motion in limine,

13   were focusing on what the harms can be in this case and tying

14   them back into the indictment, properly found that this was a

15   case or could be a case about the economic harm in the

16   indictment which was tangible economic harm.  So it is not in a

17   vacuum.

18             THE COURT:  The word "tangible" doesn't appear in the

19   indictment.

20             MR. FISCHER:  It is a conclusion the court drew --

21             THE COURT:  Guess what?  It was loose language.  Loose

22   lips sink ships.  I take the blame.  Had I read the Supreme

23   Court's decision in Carpenter, I would have known that the

24   interest protected by the mail and wire fraud statutes extend

25   to all kinds of property interests, both tangible and

DA2JBIN4                          Trial

1    intangible.

2              I now have an opportunity to correct an error of law

3    that I made by using loose language when I was trying to parse

4    through -- please don't stand up.  One at a time -- when I was

5    trying to parse through a whole bunch of cases that were being

6    cited to me, notably Shellef, whichever I was citing for

7    dictum.  I actually didn't get the law wrong.  I actually

8    didn't get the law wrong.

9              What I did was exactly what you wanted.  You wanted me

10   to say that there had to be economic harm, and there does.  I

11   said that.  I haven't changed my mind about that.  It

12   doesn't -- economic harm?  The government is going to argue

13   there was economic harm.  The government is going to argue

14   there was economic harm because your clients received

15   commissions.  The government is going to argue there was

16   economic harm because it is going to have to pay out on

17   policies because it is underwriting guidelines were wrong and

18   it made incorrect assumptions.  Those are all economic harms,

19   and they're real money harms, okay?

20             You wanted me to say, you wanted me to say that if

21   they didn't lose money on the bottom line on these policies,

22   there was no economic harm.  That I did not say, and that was

23   an absolutely correct statement of the law.

24             But I did say in your favor that the government had to

25   prove real economic harm, real economic harm which, by the way,

DA2JBIN4                          Trial

```
 1    is what I think tangible economic harm is, real economic harm,
 2    real economic harm.
 3                MR. FISCHER:  We can take, "real."  We'll take,
 4    "real."
 5                THE COURT:  Fine.  "Real" is fine, but real economic
 6    harm can be, according to Carpenter, tangible or intangible.
 7                They're not arguing intangible economic harm.  They're
 8    not trying to prove intangible economic harm.  They're arguing
 9    there is real monetary, a real fiscal consequence.  It is not
10    just the psychic knowledge that you don't have control over
11    your money.
12                MR. STAVIS:  It is theory.
13                THE COURT:  That is not the government's theory.
14                MR. STAVIS:  Not the government's theory?
15                The government is arguing a theory of the insurance
16    companies, that is why we are asking for real economic harm.
17    It is a theory.  You can't say the policies are going to lapse,
18    not lapse.  The potential for lapsing is less, this, that and
19    the other thing.  These are insurance company theories of how
20    they're harmed.  That is why it is so important to get this
21    language correct.
22                MR. FISCHER:  That is the government's position.
23                THE COURT:  Ms. McCallum.
24                MS. McCALLUM:  Your Honor, I think you have in here
25    language economic harm.  That captures the law, it captures our
```

1    argument, it captures any defenses that have been presented.  I

2    think inserting the word "real" or "tangible" is unnecessary,

3    potentially confusing and not actually in line with Carlo,

4    tangible at least.

5           Your Honor, I would just also add, I don't know what

6    it would mean to have real versus what exactly, real versus

7    unreal economic harm.  I think that is just raises a prospect

8    of confusion in the jurors' minds.

9           MR. ABRAMOWITZ:  But then Ms. McCallum adds this

10   language which takes it right, says it need not be

11   quantifiable.  It is not real if it is not quantifiable.  So

12   you should take that language out and then leave real --

13          THE COURT:  I am happy to take that language out

14   because my original language is not limited to loss on a

15   company's bottom line.

16          MR. ABRAMOWITZ:  That is fine.

17          THE COURT:  Okay.  What else?

18          MR. FISCHER:  One more, a minor point.  After the

19   right to control money or property and Ms. McCallum's

20   insertion, I would add "can constitute," rather than

21   "constitute."

22          THE COURT:  In considering whether loss was

23   contemplated, keep in mind that loss, the right to control

24   money or property constitutes deprivation of money or property

25   only when the scheme, if it were to succeed, would result in --

1    I see no need to change that at all.  The word "can" is

2    unnecessary.

3           All right.  Now, I assume the defense has a whole lot

4    more things they want to talk about in the charge.

5           MR. FISCHER:  I wouldn't say a whole lot, your Honor.

6           THE COURT:  But some?

7           MR. FISCHER:  A couple of things.

8           THE COURT:  Talk to me.

9           MR. FISCHER:  They're mostly also focused on Page 30,

10   on Page 30, your Honor, in the third full paragraph.

11          THE COURT:  There is one more -- oh, I caution you,

12   yes?

13          MR. FISCHER:  "I caution you about one thing."

14          I think, your Honor, that is a good place to put the

15   following language which I will suggest basically tracks the

16   language of the indictment and gets in some of the issues we

17   were getting into on the motion in limine, and I will read it

18   to you what my suggestion is.

19          The insurance companies -- I want to make sure I am

20   reading the right thing.  Right before I caution you, "In order

21   for the government to establish its burden of proving a scheme

22   to defraud, it must prove beyond a reasonable doubt that the

23   defendants' conduct resulted in a discrepancy between the

24   benefits the insurance companies expected and those they

25   actually" --

DA2JBIN4                          Trial

1            THE COURT:  No, that is not the theory they're

2    pursuing.  I said why aren't you pursuing the Steele theory?  I

3    now know the answer to that question.  You guys showed me the

4    answer to that question.  That is why they're not pursuing that

5    theory, all right?

6            In the motion in limine, I said I don't know why the

7    government isn't pursuing this theory because I thought that's

8    the theory that they were going to pursue, that they didn't

9    know what they were getting.

10           They thought they were insuring young, healthy,

11   vigorous old people who would pay their own premiums, and

12   instead they ended up insuring old, unhealthy -- although I

13   point out everybody who testified is alive.  It turned out they

14   were pretty healthy after all -- old, unhealthy people who

15   couldn't afford to pay their own premiums.  That, it turns out,

16   is not the way the government has chosen to present the case.

17           After seeing the defense case, I understand why.

18           MR. FISCHER:  Your Honor --

19           MS. McCALLUM:  I think the government is continuing to

20   pursue that theory of the discrepancy between the benefits --

21   part of the right to control theory, but again it is not the

22   only theory we are pursuing.  We are pursuing the deprivation

23   of --

24           THE COURT:  In that case, I am really looking for

25   forward to tomorrow.

DA2JBIN4                      Trial

1                MR. ABRAMOWITZ:  We need to know the language, though.

2                MR. FISCHER:  That is the language I would propose

3     including, your Honor, because it tracks the indictment in this

4     case.  It is really pulled from the indictment.

5                THE COURT:  It is not going to be included.  Your

6     objection is sustained.

7                MR. FISCHER:  We may get into that constructive

8     amendment problem, your Honor?

9                THE COURT:  I hear you.  You can go up on it.  I lost

10    on D'Amato on that.  I think I'm okay here.

11               MR. FISCHER:  I think the government's position is

12    their right to control is a subset of that anyway.  That is

13    why --

14               THE COURT:  If that turns out to be the government's

15    position, we may have to revisit this before you close, after

16    you hear the government's summation.

17               MR. ABRAMOWITZ:  Your Honor, I think we may be making

18    a mountain out of a molehill.  I think the issue is the

19    language about the benefits expected versus the benefits

20    received, contemplated.  It is precise language from the

21    indictment and the motion in limine and I really don't think it

22    is objectionable.

23               THE COURT:  This is why I am never going to decide

24    another motion in limine.  I am never going to decide another

25    motion in limine.  I will deny without prejudice to renew

1   sometime during the trial when I have real evidence in front of

2   me.

3              MS. McCALLUM:  May we confer for a moment?

4              THE COURT:  Sure.  Be my guest.

5              (Off-the-record discussion)

6              THE COURT:  The government's new proposal for Page 30

7   is Court Exhibit 1.

8              (Court Exhibit No. 1 received in evidence)

9              MR. ABRAMOWITZ:  Your Honor, I think we can agree on

10  language here.

11             THE COURT:  Great!  I am certainly not going to fight

12  the agreed-upon language.

13             (Off-the-record discussion)

14             MS. McCALLUM:  Your Honor, if we could actually just

15  return to this point later this afternoon.

16             THE COURT:  Sure.  I am very happy to return to this

17  point later this afternoon.  Let's see what else the defense

18  has.

19             MR. FISCHER:  Moving on.  At the end of the next

20  paragraph, the paragraph starts there is one more thing.

21             THE COURT:  "Probed more deeply"?

22             MR. FISCHER:  Sorry.

23             THE COURT:  The last words of the next paragraph are,

24  "probed more deeply"?

25             MR. FISCHER:  We suggest the following language.

1    But if you find that the government has not proved

2  beyond a reasonable doubt that the insurance companies were

3  deceived, they could not have been victims of a scheme to

4  defraud.  The insurance companies would not have been deceived

5  if you conclude they were aware of the misrepresentations or

6  turned a blind eye toward them.

7    THE COURT:  Ms. McCallum.

8    MS. McCALLUM:  The government would object to the

9  insertion of that language, your Honor, for a number of

10  reasons.  The first is that as the charge properly lays out,

11  reliance is not an element of the crimes charged.

12    THE COURT:  It is not, indeed.  Materiality is only

13  "could influence."

14    MS. McCALLUM:  Yes.

15    THE COURT:  I am familiar with the D'Amato case, very

16  familiar with the D'Amato case.

17    MS. McCALLUM:  Those are the reasons why the

18  government would object to the insertion of that language.

19    MR. FISCHER:  It is not just D'Amato.  It is Russo and

20  other cases, and there is language, I could go on the court's

21  decision on the motion in limine.  It is taken from the case.

22  If the insurers were not deceived, they could not have been

23  victims of a scheme to defraud.

24    Russo, if you find the government has failed to prove

25  beyond a reasonable doubt that the victim was deceived, you may

DA2JBIN4                          Trial

1    not convict on the conspiracy charge based on the alleged

2    scheme to defraud.  That is what we are asking for.  If we want

3    the Russo charge, we can take something along those lines.

4    That is literally what we are asking for.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. McCALLUM:  Your Honor, both Russo and D'Amato are

2       about intent to defraud.  They're about that element, and it's

3       about the defendants' states of mind.  And the issue in both --

4              THE COURT:  Certainly D'Amato is about intent to

5       defraud because the issue was whether Mr. D'Amato could have

6       had the intent to defraud when he knew that the people in the

7       company knew everything that was going on.

8              Now, here we have a case where unlike D'Amato -- I'm

9       remembering back a long way and, of course, our firm wasn't

10      involved in it until appeal -- I can't remember whether

11      Mr. D'Amato testified or did not testify in that case.

12      Mr. Abramowitz might.

13             MR. ABRAMOWITZ:  I don't remember, your Honor.

14             THE COURT:  But somehow the record contained

15      information about what Mr. D'Amato himself knew about what was

16      going on at the victim company.  Not sure I've heard any

17      evidence about what Mr. Binday or Mr. Kergil or Mr. Resnick

18      knew about what was going on at the insurance companies.  Very,

19      very different set of circumstances.

20             MR. FISCHER:  But your Honor, putting even D'Amato

21      aside, the Russo case has that charge not on the intent issue,

22      but on the scheme to defraud.  Could there have been a scheme

23      to defraud if the so-called victim --

24             THE COURT:  Can you give me Russo, please.  What's the

25      cite?

DA2LBIN5                          Trial

1              MR. FISCHER:  74 F.3d 1383.

2              THE COURT:  Lot of loose language in the Second

3     Circuit.

4              MR. ABRAMOWITZ:  It bears back on the intent, your

5     Honor.  If --

6              THE COURT:  Can I read it first before we talk about

7     it.

8              MR. ABRAMOWITZ:  Sure.

9              THE COURT:  Thank you.

10             THE DEPUTY CLERK:  That cite, the cite again?

11             THE COURT:  74.

12             MR. FISCHER:  74, your Honor.

13             THE COURT:  F.3d.

14             MR. FISCHER:  1383.

15             (Pause)

16             THE COURT:  Do you have a jump cite on it?

17             MR. FISCHER:  139293, your Honor.  Roman numeral --

18             THE COURT:  Roman numeral II.  I know where it is.

19             MR. FISCHER:  You got it.

20             THE COURT:  Well, of course, all the circuit did was

21    say the defendant's argument before us, which is that their

22    proposed instructions should have been given to the jury rather

23    than the one the district court gave -- and it's the reasonable

24    doubt instruction that you quote is from the district court's

25    instruction.  All the circuit said is, no, the defense wasn't

DA2LBIN5                          Trial

1     entitled to its own -- to the charge that it wanted.  The

2     charge it wanted would be misleading.

3              MR. FISCHER:  What we wanted was the district court

4     instruction.

5              THE COURT:  But the circuit never opined on the

6     propriety of the district court charge except to say the

7     defense charge was inappropriate.

8              MR. FISCHER:  But in that case, your Honor, the theory

9     of the defense was exactly the same as the theory of the

10    defense in this case that if the victim of a fraud, the

11    so-called purported victim of a fraud isn't deceived, then

12    there is no fraud.  There can be not a fraud.  Putting aside

13    the state of mind, putting aside reliance, we're not even

14    talking about reliance, which was the point of the underwriting

15    exercise that we went through and consistent with --

16             THE COURT:  That's true if fraud is what is charged,

17    but we've got a scheme to defraud charged here.  Scheme to

18    defraud, a scheme doesn't have to succeed.  If the scheme

19    doesn't have to succeed, that means the victim doesn't have to

20    be deceived.

21             MR. ABRAMOWITZ:  That's true of any mail fraud,

22    there's a scheme to defraud.  That's the charge given.

23             This is the heart of the defense.  When there is no

24    deception, there is no scheme.  And there's no contemplated

25    scheme if the victim knows that it's not a lie.  It's as simple

DA2LBIN5                         Trial

1    as that.  And that was the charge given in that case and it's

2    been given in other cases as well.

3            MS. McCALLUM:  Your Honor, this case -- it's not even

4    clear what count this was on.  Russo was a case that charged

5    manipulative and deceptive devices as well under the 10b-5.  I

6    think the law is absolutely clear that reliance, first of

7    all --

8            THE COURT:  Sand is absolutely clear.

9            MR. FISCHER:  It's not reliance, your Honor.  It

10   cannot be reliance without saying reliance.

11           THE COURT:  But Sand does not have this language in

12   his charge.  It's not there.  I looked for it.

13           MR. FISCHER:  But, your Honor, this is relevant to the

14   specific defense theory in this case and has been given in

15   other cases where similar defendants have made similar defense

16   theories.  And it's your Honor's motion in limine about exactly

17   what we could do and why it's relevant.

18           MR. ABRAMOWITZ:  It's not reliance, your Honor.  It's

19   knowledge.

20           THE COURT:  I know it's not reliance.

21           MR. ABRAMOWITZ:  It's the knowledge -- there can't be

22   a victim.

23           THE COURT:  It's not a knowledge crime.  This is an

24   intent crime, not a knowledge crime.

25           MR. ABRAMOWITZ:  It's an intent crime and the argument

1    is they knew it.  And if they knew it, there could not have

2    been a false statement and, by inference, no intent.

3              MS. McCALLUM:  Your Honor, that's just not the law.

4              THE COURT:  That's not the law of intent.  That's not

5    the law of intent.

6              MR. ABRAMOWITZ:  But it's the law of the question

7    whether there's a victim, your Honor.  You cannot have a lie if

8    the person is not deceived, a material lie.

9              MS. McCALLUM:  Your Honor, materiality is a different

10   question.  And materiality is what the defense has been

11   essentially in the underwriting files that were presented.

12   That is a different question, and it's not about whether or not

13   somebody was deceived.  Materiality is a --

14             THE COURT:  That is absolutely true.  That is true.

15             MR. FISCHER:  It's not just materiality, your Honor.

16   It goes to whether they knew exactly what it is that they were

17   getting.  If they weren't deceived, then there's no victim in

18   this case and then there could not have been a fraud.  It's

19   critical to our defense theory, your Honor, consistent with law

20   of the Second Circuit law.  And it's not a reliance issue, as

21   your Honor recognized.

22             THE COURT:  It's not.  So find me something else

23   because --

24             MR. FISCHER:  Your Honor, I think what we found you is

25   cases where the defense theory has been exactly our theory,

where they argued to the jury that these defendants did not

commit a fraud and were not engaged in a scheme to defraud

because the victim, the so-called victim wasn't deceived.  They

knew what they were getting.  And if they knew what they were

getting, there has not been a fraud, there could not be a

fraud, and there could not be a deception.  It's a critical

component of our case.  It's what the underwriting exercise was

all about.

THE COURT:  I hear you and I'm totally sympathetic,

but as I immersed myself in these charges and in Judge Sand, it

appears, weird though it may sound, that deception is not

required.  What's required is an intent to deceive.

MR. ABRAMOWITZ:  And we can disprove an intent to

deceive if there is no deception.

THE WITNESS:  No, no.

MR. ABRAMOWITZ:  Yes.

THE COURT:  No.  You're leaving out a word.  You're

leaving out a phrase.  You can disprove intent to deceive if

you can prove -- you have nothing to prove.  Let me make that

real clear so that if you ever find yourselves in the circuit,

nobody can suggest that I somehow imposed a burden on the

defense.  You have nothing to prove.

But if your defense is no intent to deceive, then what

your client knew about what the insurance companies were doing

suddenly becomes very important because the mere fact that the

1    insurance companies were doing it doesn't say anything about

2    your client's state of mind.  An intent is your client's state

3    of mind, not the insurance company's state of mind.

4            MR. ABRAMOWITZ:  There is at least one exhibit that

5    the government put in today -- and we haven't had a chance to

6    review it -- that proves just that.

7            THE COURT:  Well, great.  I haven't even seen the

8    exhibit that came in today.

9            MR. ABRAMOWITZ:  It's in evidence.  It's a letter from

10   the underwriter to Mr. Binday saying all this stuff is all

11   wrong, but I hope you have a happy new year.  I'm giving you

12   the policy.

13           We can show you that exhibit.  And that's the kind of

14   thing that this whole case has been about, that they knew

15   exactly what they were getting.  They were putting blind eye,

16   as you put it yesterday, because they wanted the IOLI business.

17   They had the tax returns, then they did away with the tax

18   returns.  The whole point -- and that goes to what my client

19   knew.  If my client knows that they're not requiring tax

20   returns and they're not requiring all these other things and

21   accepted that nonsense letter from accountants, then they are

22   not being deceived.  And that is the whole point.

23           MS. McCALLUM:  Your Honor, that's a defense.  Of

24   course Mr. Abramowitz can raise that defense based on intent to

25   defraud.

DA2LBIN5                          Trial

1              THE COURT:  So what you're saying is I can put the

2      language as long as I put it in the right place, which is the

3      intent paragraph.

4              MS. McCALLUM:  Right, your Honor.

5              MR. ABRAMOWITZ:  It should be around the negligence

6      part.

7              THE COURT:  It's not about negligence.  I'm sorry.

8      It's not.  I will not put it there.  I may consider putting

9      some language of that ilk close to the word intent, which is on

10     the preceding page.

11             MR. ABRAMOWITZ:  Okay.

12             THE COURT:  And let me think about how I would do

13     that.  But it has nothing to do with negligence, nothing.

14             It is certainly fair argument, Mr. Abramowitz, for you

15     to argue that your client could not possibly have had an intent

16     to deceive the insurance companies because he was receiving

17     letters from insurance companies saying we knew, we know you're

18     sending us false information.  We don't care.  We're going to

19     give you the policy.  That is an argument that you can make if

20     there's evidence in the record to support it.

21             MR. ABRAMOWITZ:  There is.  But there's also, your

22     Honor, what's going through the insurance company's mind.  It

23     also goes to the credibility of the insurance company witnesses

24     because --

25             THE COURT:  What's going through the insurance

DA2LBIN5                        Trial

1      company's mind has nothing to do with your client's state of

2      mind.

3              MR. ABRAMOWITZ:  It does because it gets communicated

4      by conduct, your Honor.

5              THE COURT:  Only if it gets communicated.  You can

6      argue that it has been communicated.  But it's still only

7      relevant to your client's state of mind.

8              MR. ABRAMOWITZ:  And but there's an inference to be

9      drawn from the conduct of the insurance companies.

10             THE COURT:  I don't disagree.  You can argue that and

11     it's relevant to your client's state of mind.

12             MR. ABRAMOWITZ:  Wherever you put it, as long as

13     there's language to that effect, that's fine.

14             THE COURT:  I'm going to have to play with this.

15             What else do you have?

16             MR. FISCHER:  Your Honor, just on the victim point, if

17     we're here and the law is you need -- if there's no deception,

18     if the victim is not deceived there isn't a fraud, then we have

19     a big problem.  We heard a lot from insurance companies about

20     how they didn't want these policies, didn't want these

21     policies.  And then we showed some evidence that maybe they

22     did.

23             And now we're going to be in a situation where we

24     should be able to argue to the jury, ladies and gentlemen of

25     the jury, there is no victim in this case because the victim

1    that the government says is a victim wanted exactly what they

2    said they didn't want.

3         THE COURT:  And here are the two things that follow

4    from that that are relevant to the argument you will make to

5    the jury.

6         One, so they can tell you, they can sit on this stand

7    and tell you that these representations were material in the

8    sense that they could, they could induce someone to make a

9    decision.  But in point of fact, ladies and gentlemen, actions

10   speak louder than words and they're obviously not material to a

11   reasonable insurance company because AIG is a reasonable

12   insurance company, Lincoln is a reasonable insurance company.

13   These are the biggest insurance companies in the country.

14   They're all reasonable insurance companies and they knew and

15   they issued the policies anyway.  So you are perfectly free,

16   ladies and gentlemen, to conclude that this was not the kind of

17   misrepresentation that could, that was calculated to influence

18   an insurance company.  You can conclude that these were not

19   material.  That's one thing that you can argue.

20        And the other thing that you can argue, if there is

21   evidence that Mr. Binday or Mr. Kergil or Mr. Resnick knew that

22   the insurance companies had it all figured out and were

23   nonetheless issuing the policies, if there is such evidence,

24   you can say how can my client possibly have intended to deceive

25   the insurance companies?  My client was made perfectly aware of

DA2LBIN5                          Trial

1    the fact that the insurance companies were on to this and they

2    were issuing the policies and they issued them and they issued

3    them and they issued them.

4           Those are your arguments and they fit perfectly in

5    with the screwy law of mail and wire fraud, which is not the

6    same law as state law fraud which doesn't involve things like

7    schemes.  It's just fraud.  Did you fool someone?  You're

8    guilty.

9           MR. FISCHER:  Your Honor, you're going to play with

10   that.

11          THE COURT:  I'm going to play with this.  I'm going to

12   play with this because I don't disagree with you that that has

13   some relevance to intent.

14          MR. FISCHER:  Okay.  And materiality.

15          THE COURT:  Well, materiality, I'm --

16          MR. FISCHER:  I understand.

17          THE COURT:  In the end, folks, you got to make your

18   own arguments to the jury.  Much as I would love to jump over

19   the bench and do it for everybody in the room -- I'd like to

20   make hers, I'd like to make yours.  It would be a whole lot of

21   fun.  There are those who say I should never have stopped doing

22   it.  But I'm not going to do it, okay.  You have to do that for

23   yourself.  And the jury charge is not -- that's why I don't

24   marshal because the jury charge is not the time for me to make

25   your arguments.  It's just not.

```
 1              Okay.  What else does the defense have?

 2              MR. ABRAMOWITZ:  One minute, your Honor.

 3              MR. FISCHER:  We need a second to confer.

 4              Okay, your Honor, I think we can move away from

 5    page 30.

 6              THE COURT:  Okay.

 7              MR. FISCHER:  The next thing I would raise is page 36.

 8    I just don't know why we need an aiding and abetting charge in

 9    this case, your Honor.

10              THE COURT:  Why do we need an aiding and abetting

11    charge in this case?

12              MS. McCALLUM:  It's charged in the indictment, your

13    Honor.

14              THE COURT:  So what?

15              MS. McCALLUM:  Can I confer for a moment, please.

16              THE COURT:  Either they did or they didn't do it.

17              Maybe for Mr. Kergil.  I do have to remember here that

18    there are three defendants and it's entirely possible, I

19    suppose, that at least one of them could be found guilty as an

20    aider and abettor of someone else's scheme.

21              MS. McCALLUM:  Your Honor, I think that is correct and

22    the government would request that we maintain that charge.

23              MR. STAVIS:  I don't believe there's any view of the

24    evidence in the light most favorable to the government that

25    would support such a charge, your Honor, just speaking on
```

 1    behalf of Mr. Kergil.

 2              MR. FISCHER:  We agree with that, your Honor, and

 3    that's why I raised the issue.

 4              THE COURT:  Okay.  I'm going to keep it.

 5              Next.

 6              MR. FISCHER:  Your Honor, I want to move to two

 7    supplemental requests we raised.

 8              THE COURT:  I got to find your piece of paper.

 9              MR. FISCHER:  I might even have an extra copy.

10              THE COURT:  I've got it.  There it is.  Got it.

11              MR. FISCHER:  Page 5, your Honor, supplemental request

12    No. 4, breach of a corporate policy alone does not constitute

13    mail or wire fraud.

14              THE COURT:  That's true, but we don't have a corporate

15    defendant.  We don't have an employee of a corporation; we

16    don't have an employee of an insurance company here as a

17    defendant.  If we had an employee of an insurance company here

18    as a defendant, I would have to tell the jury just because this

19    employee breached company policy, it's not necessarily a crime.

20    There's no issue of that with these three gentlemen.  They were

21    not employed by insurance companies.

22              MR. FISCHER:  Well, I think the government would take

23    the position that you have people who were expect -- people,

24    including these defendants, who were expected to abide by

25    certain corporate policies, certain corporate policies of the

DA2LBIN5                        Trial

1    insurance companies.

2              THE COURT:  Are you arguing they were bound by

3    corporate policies, Ms. McCallum?  It's a yes or no question,

4    Ms. McCallum.

5              MS. McCALLUM:  It's not essential to our argument, but

6    yes.

7              THE COURT:  Fine.  If you're making it, I'm charging

8    it.

9              MS. McCALLUM:  That's fine.  We don't have an

10   objection to this charge.  Nor do we have an objection I think

11   to the next one is page 6, right?

12             MR. FISCHER:  Your Honor, page 6, supplemental request

13   No. 5, legality of stranger-owned life insurance, STOLI, not at

14   issue in this case.  I can get into the reasons why, your

15   Honor, but the government doesn't object.

16             THE COURT:  If the government doesn't object, fine.

17   Personally I think it's pertinent to materiality, but okay.

18   The government doesn't object.  I'm charging it.

19             MR. ABRAMOWITZ:  So we're left with the one that

20   Ms. McCallum.

21             THE COURT:  There's one I'm working on.

22             Let me address all of your supplemental requests.

23             MR. FISCHER:  Your Honor, I think we may be in a

24   position where all of them have now been addressed.

25             THE COURT:  That's good because like articulating the

DA2LBIN5                          Trial

1    defense theory of the case was not something I planned to do.
2    I thought you should do that yourself.
3            MS. MURRAY:  We were taking notes though.
4            THE COURT:  I can't restrain myself, as Ms. Murray
5    knows entirely too well.
6            Okay.  All right.  So I'll figure out a place for
7    these two things to go.
8            Can Mr. O'Neill send you -- can I go grapple with
9    this?  And you really have work to do.
10           MR. ABRAMOWITZ:  I need to know the benefit.
11           THE COURT:  You'll know, but you'll know within an
12   hour.
13           MR. ABRAMOWITZ:  All right.
14           THE COURT:  Why should you sit here -- off the record.
15           (Discussion off the record)
16           MR. ABRAMOWITZ:  Were you describing me, your Honor?
17           THE COURT:  No.  I described someone else, a very
18   famous story in the New York Times Magazine which led to a lot
19   of jokes where I worked at the time.
20           Okay.  So I'm going to go and I promise you within an
21   hour you will know what I have in mind.  And I'm sure that it
22   won't be exactly what the defense wants and the government will
23   be more outraged than the defense, I'm pretty positive.  But I
24   need some time to work it out.
25           MR. ABRAMOWITZ:  On this issue on the benefits issue

1    though, I think we have --

2              THE COURT:  Benefits issue, what's the benefits issue?

3              MR. ABRAMOWITZ:  Benefits expected and contemplated

4    and expected, received -- we're trying to work out an agreement

5    as to what.

6              THE COURT:  Anything you work out will be in this

7    charge in haec verba even if I would say it differently.  I

8    promise you anything you work out will be in this charge.

9              MS. McCALLUM:  If the parties can't reach agreement on

10   that particular language, what does the Court propose we do?

11             THE COURT:  I propose that you each submit to me what

12   language you think is appropriate since there seems to be some

13   ability to believe that you can come to an agreement.  So I

14   would appreciate it if you would do it like, again, in the next

15   hour.  In fact, if you're going to sit here and talk, I'm going

16   to disappear.  I'll be happy to come back up.

17             I have a sentencing at what time?

18             THE DEPUTY CLERK:  Twenty minutes.

19             THE COURT:  It's not going to be a long sentence.  In

20   some manner, shape or form, either by bringing me back here or

21   sending it to me in writing.

22             MS. McCALLUM:  Thanks, your Honor.

23             MS. CHOI:  Thank you, your Honor.

24             MS. MURRAY:  Your Honor, I have one issue on the

25   obstruction charge.

1        THE COURT:  Oh, the obstruction charge.

2        MS. MURRAY:  Yes.  It charges multiple objects.

3        THE COURT:  Page?

4        MS. MURRAY:  Well, I was looking at page 49, which

5   deals with the second object of the conspiracy.  Just overall,

6   the indictment charges a multiple object obstruction

7   conspiracy.  However, there's a "to wit" clause, so there's

8   only one thing they're supposed to have done that meets the two

9   objects.

10        THE COURT:  Yes, the to wit clause.

11        MS. MURRAY:  Yes.

12        THE COURT:  You would think the government would have

13   learned by now to get rid of to wit clauses.

14        MS. MURRAY:  They only do them in indictments in front

15   of you, your Honor.

16        THE COURT:  Apparently so.  They cause me no end of

17   grief.

18        MS. MURRAY:  Your Honor, the problem here is that

19   there really is only one obstruction issue here, which is the

20   supposed agreement to destroy documents in connection with a

21   grand jury proceeding, and that's what the to wit clause says.

22   I don't see why there should be two objects then because then

23   it just is confusing to the jury.

24        So I would move to dismiss the second object.  And if

25   not, I would ask on page 49, essentially the charge says this

```
 1    is basically the same thing as the other one.  So you
 2    absolutely have to find beyond a reasonable doubt that they
 3    conspired to destroy documents.  Otherwise, the problem is that
 4    it's possible the jury could think that my client's role in
 5    calling up insureds and telling them not to talk to
 6    investigators after he knows that the FBI has arrived on the
 7    scene could amount to obstruction of an official, a judicial
 8    proceeding, and that definitely was not what the grand jury
 9    voted because there was a very clear to wit clause in the grand
10    jury and these two overt acts mentioned relate to obstruction
11    of documents.  They don't relate to telling insureds not to
12    talk.
13              THE COURT:  Do you have a copy of that almost
14    irrelevant document, the indictment?
15              MR. STAVIS:  I would join in the application --
16              THE COURT:  I'm sure you do.
17              MR. STAVIS:  -- on behalf of Mr. Kergil, the
18    application that's been made by my cocounsel.
19              MR. ABRAMOWITZ:  Do you need it?
20              THE DEPUTY CLERK:  Got it.
21              MS. McCALLUM:  Your Honor, can I confer with counsel
22    one more time here?
23              THE COURT:  Yes, you can.
24              MS. McCALLUM:  Your Honor, we can, I think we can
25    resolve this issue.  The government will consent to deleting
```

DA2LBIN5                         Trial

1    page 49 and references to a second object.  Our theory is the

2    destruction of emails and documents.  We're not going to be

3    arguing anything else.

4              THE COURT:  Okay.

5              MS. MURRAY:  It's a one object conspiracy.

6              THE COURT:  Fine.  I'm really happy about that.  I'll

7    take care of that problem.

8              Let me go work on your other problem and you work on

9    your other problem.

10             (Adjourned to October 3, 2013, at 10 o'clock a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1390

```
 1                       INDEX OF EXAMINATION

 2     Examination of:                          Page

 3     JASMINE JUTEAU

 4     Direct By Mr. Abramowitz . . . . . . . . . .1303

 5                      GOVERNMENT EXHIBITS

 6     Exhibit No.                              Received

 7      9000, 9001, 9002, 9003, 9004, 9005, . . . . .1353

 8              9006, 9007, 9008, 9009, 9100,

 9              9101, 9300, 9301, 9302, 9303,

10              9400, 9401, 9402, 9403, 9500,

11              9501, 9502, 9503, 9504, 9505,

12              9506, 9600, 9700, 9701

13                      DEFENDANT EXHIBITS

14     Exhibit No.                              Received

15      51    . . . . . . . . . . . . . . . 1288

16      5, 7, 165, 168, 169, 2, 14, 51, 235,  . . . .1293

17              3434, 3455, 3456, 3457, 3458,

18              3459, 3460, 3461, 237, 238,

19              239

20     3352    . . . . . . . . . . . . . . 1304

21     3358    . . . . . . . . . . . . . . 1304

22     3352, 3358, 3363, 3364 . . . . . . . . . .1305

23     234    . . . . . . . . . . . . . . . 1305

24     8, 3108, 3178, 3179, 3181, 3182   . . 1312

25     3271, 3272, 3273 and 3275   . . . . . 1315
```

1    233   . . . . . . . . . . . . . . 1320

2    30, 38 and 3140  . . . . . . . . . 1321

3    3042 and 3101  . . . . . . . . . . 1323

4    202, 3060, 3061, 3062  . . . . . . 1325

5    3043, 3044, 3045, 3434, 3435   . . . 1327

6    3083, 3084, 3085, 3086, 3088, 3146, . . . . .1330

7              3149, 3153, 3159, 3160, 3161,

8              3162

9    3277, 3280 and 3281  . . . . . . . 1337

10   1, 2 . . . . . . . . . . . . . . . .1338

11   2016, 2019 and 2020  . . . . . . . . . .1338

12   3047, 3048, 3049, 3051, 3052  . . . . . . .1341

13   235  . . . . . . . . . . . . . . 1342

14   3303, 3301, 3302, 3436  . . . . . . . . . .1343

15   2023, redacted   . . . . . . . . . 1348

16

17

18

19

20

21

22

23

24

25