```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/29/17
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-                                                                    12 Cr. 152 (CM)

MICHAEL BINDAY,

    Defendant.

------------------------------------------------------------x

DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL

McMahon, C.J.:

On October 7, 2013, following a twelve-day jury trial before this Court, Binday and his two co-defendants, James Kevin Kergil and Mark Resnick, were found guilty of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349; mail fraud, in violation of Title 18, United States Code, Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with a scheme to defraud insurance companies which the defendants purported to serve as agents.[1]

On July 30, 2014, the Court sentenced Binday to 144 months' imprisonment, to be followed by three years' supervised release. The Court also ordered substantial forfeiture and restitution.

On October 26, 2015, the Second Circuit affirmed the convictions and sentences of Binday and his co-defendants, directing only a limited remand, at the Government's request, for entry of an amended restitution order in a reduced amount of $37,433,914.17. *See United*

---

[1] Kergil and Resnick were also found guilty of conspiring to obstruct justice through destruction of records, in violation of Title 18, United States Code, Section 1512(k). Binday was not charged in that count.

1

*States v. Binday*, 804 F.3d 558, 601 (2d Cir. 2015). On December 14, 2015, the Second Circuit denied Binday's motions for panel and *en banc* rehearing. On June 20, 2016, the Supreme Court denied Binday's petition for a writ of *certiorari*. On June 24, 2016, this Court entered the amended restitution order that the Second Circuit had directed be entered. Shortly thereafter, Binday began serving his sentence.

Now before the Court is Binday's motion for a new trial based on purported "newly discovered evidence" pursuant to Rule 33(b)(1). For the reasons propounded by the Government in its opposition papers and those set forth herein, Binday's Rule 33 motion is denied.[2]

The "newly discovered evidence" that Binday cites comes from an email chain, which—but for one communication (the "3:56 Email" from Prudential Investigator Paul Winecke)—was produced to Binday before trial. Binday nonetheless contends that the 3:56 Email "'is so material and noncumulative that its admission would probably lead to an acquittal.'" (Binday Br. at 14 (quoting *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997)).

The text of the newly discovered email reads as follows:

> FYI . . . . I had a book of business run (doing a wildcard search on "Binday" since the Brokers last name is Binday and the name of the GA is "R BINDAY PLANS & CONCEPTS") based on the findings of the Adler case, and I found this questionable one (Robinson/REDACTED see notes below) that was pending.
>
> Pru also issued a $4 Million policy recently (12/2007) on V1237392 (Espinal). In that case, I found the trustee, who is an attorney, has a questionable disciplinary history from 1997. Specifically, he was suspended by the bar for one year and placed on two years probation for filing papers with the SEC containing false and misleading information and then he attempted to cover up the misrepresentations by instructing his client to compile information to substantiate his misrepresentations. So, we will probably want to look at that one further too.
>
> In any event, the only apps. we have pending are the ones on Adler and Robinson ($4 million) each). Chris Kanehl may be able to get out and see Ms. Adler this week yet.

---

[2] The Court presumes the reader's familiarity with the trial evidence and facts of the case.

> Mike/Jean, attached is the 3 year look-back on the BOB. In addition, I also had a BOB run from 2005 to current on all the informal cases that have been submitted using the same wildcard search. You may want to watch any new business that comes in from this GA since all apps. that have come in since August 2007 have been on individuals that are in their 70s.

(Binday Br. Exhibit B).

Binday argues that "this email demonstrates that Prudential—the only carrier from which the prosecution elicited testimony about the underwriting practices supposedly taken to avoid STOLI—was aware that a STOLI policy was about to be placed in force and yet, with this knowledge on the part of the team of persons charged with due diligence and underwriting, allowed the policy to go into force anyway." (Binday Br. at 2).

> More specifically, the email shows that Prudential's underwriters and Special Investigator's Unit, in the course of their investigation of Binday for STOLI conduct, suspected that the Prudential life policy insuring Martha Espinal (one of the life policies that was the subject of the Government's case) was applied for as part of a STOLI scheme and stated that further investigation into the Espinal policy would take place prior to the date that the Espinal policy went into force. This evidence was only discovered by Jeff Koslowsky, counsel to Binday's company in a civil action commenced by Prudential in federal court in New Jersey seeking to rescind the Espinal policy, when it was produced by Prudential earlier this year in a supplemental production in that civil action that Prudential characterized as "Investigation Documents." The subject email should have been produced by Prudential in response to the subpoenas in advance of the trial of this criminal action, but it was not produced. This newly discovered evidence squarely contradicts the evidence and argument presented by the government at trial, and substantially undermines confidence in the accuracy of the jury's verdict.

(*Id.*).

Relief under Rule 33 based on "newly discovered evidence" may be granted only upon demonstration of all five of the following factors: "(1) that the evidence is newly discovered after trial; (2) that facts are alleged from which the court can infer due diligence on the part of

3

the movant to obtain the evidence; (3) that the evidence is material; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would likely result in an acquittal." *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (internal quotation marks and citations omitted); *United States v. Owen*, 500 F.3d 83, 87-88 (2d Cir. 2007).

Binday's motion fails every prong of the test.

First, the evidence Binday points to is hardly "newly discovered." Binday has long known, and long had ample evidence to support, that Prudential suspected him of bad business practices before February 22, 2008, when the first premium payment was made on the Espinal policy. Most of the email communications that Binday had identified as "newly discovered" were in fact produced to Binday on December 13, 2012, months before trial. (*See* Eddy Decl., Exs. A & B). In these emails, Prudential employees discussed concerns they had about the Adler and Robinson applications submitted through Binday. Binday was well aware of these concerns at the time; he took active steps to obstruct Prudential's investigation of the two cases (*see, e.g.*, GX 161 (email specifying lies Lynch should tell if questioned)), and then lied under oath when the state authorities got involved (GX 363). By no later than February 14, 2008, Binday knew that Prudential's concerns about him had risen to such a level that the company felt it necessary to terminate its agency agreement with him. (*See* Eddy Decl., Ex. B at 15, 25).

The only thing that the 3:56 Email adds is the observation by an internal investigator at Prudential, before the decision to terminate Binday had been made, that the company had already issued another policy associated with Binday: the Espinal policy. The investigator notes that the trustee associated with the Espinal policy "has a questionable discipline history," and suggests "we will probably want to look at that one further too." (Koslowsky

4

Decl., Ex. B at 1). But Prudential's awareness of Binday's association with the Espinal policy is not "newly discovered;" documents that Prudential produced before trial—not to mention documents from Binday's own files—showed that the application for the Espinal policy was submitted to Prudential through Binday's agency, and that Binday was copied personally on related email correspondence. (*See, e.g.*, Eddy Decl., Ex. E). Nor is it "newly discovered" that Prudential's suspicions of Binday predated its acceptance of the first premium on the Espinal policy. The documents Prudential produced before trial made clear that (1) the first premium for the Espinal policy was not paid until February 22, 2008 (*see* Eddy Decl., Ex. D at 1-4), and (2) Prudential had already *terminated* Binday by that time (Eddy Decl., Ex. B at 15).

The only "newly discovered" fact from the 3:56 Email, then, is that a Prudential investigator had learned that the trustee used for the Espinal policy had a "questionable discipline history," and suggested on that basis that the company might "want to look at" the policy further. (Koslowsky Decl., Ex. B. at 1). The undisputed facts, as fully revealed to Binday before trial, were that Prudential so strongly suspected Binday of dubious business practices that it terminated his agency agreement. In one of the emails produced pretrial, a Prudential investigator noted—before Prudential accepted the February 22, 2008 premium payment—that Binday "routinely" engaged in bad business practices, and that further investigation was likely to result in findings of "Fraud." (Eddy Decl., Ex. B at 6-7). If Binday had wanted to argue to the jury that Prudential turned a blind eye to STOLI because it accepted the first premium on the Espinal policy even when faced with evidence of Binday's STOLI activities, he had the material to make that argument. The investigator's observation in the 3:56 Email about the disciplinary history of the Espinal policy trustee would not have tipped the balance.

*Second*, the "newly discovered" evidence—that is, the observations of the Prudential investigator who authored the 3:56 Email—could have been discovered with due diligence before trial. Binday had the name of the email's author; it was in the documents Prudential produced, including the email chain leading up to the 3:56 Email. (Eddy Decl., Ex. B at 1-2, 17). Binday knew that Prudential had accepted the first premium on the Espinal policy, and had even agreed to reissue the Espinal policy on more favorable terms, after terminating him as an agent. If he had wanted to question the 3:56 Email's author, or other investigators whose names were likewise reflected in Prudential's pretrial productions, about those decisions, Binday could have subpoenaed them to testify at trial. He did not, and thus fails the second prong of the Rule 33(b)(1) test.

*Third, fourth, and fifth*, the 3:56 Email—while material—is entirely cumulative, for the reasons stated above, and is in no way exculpatory. To suggest that the contents of this one additional email would have led to Binday's acquittal if introduced is preposterous. Binday knew in advance of trial that Prudential had accepted the first premium on the Espinal policy after it had decided to terminate him. Binday could have argued that this showed Prudential did not really care about STOLI. He declined to make that argument—even as he made similar arguments relating to other Insurers—presumably because the Prudential documents place beyond question that the company took its suspicions of Binday and his potential involvement in STOLI activities extremely seriously, investigated him intensively, refused to accept at face value the representations he was making, and, finally, terminated his agency agreement. The argument that Prudential's failure to take action on a policy it had already issued but not yet accepted a premium on (again, facts all known to Binday pretrial) somehow belies the company's true feelings about STOLI rings as unpersuasive now as it would have at

6

the time of trial, when Binday had ample opportunity to make it. Nothing in the 3:56 p.m. Email renders the argument any more tenable.

*Finally*, the "newly discovered evidence" Binday points to here relates to a single policy issued by a single Insurer, out of a universe of hundreds of policies issued by nine separate Insurers. Binday tries to suggest that the entirety of the evidence supporting the Government's argument that the Insurers did not want STOLI came from Prudential alone. That is wrong. Not only did the Government present the jury with extensive testimony from another Insurer witness, Michael Burns, about his company's efforts to keep STOLI away and the reasons underlying those efforts, but it also presented copious documentary evidence from other Insurers to the same effect. (*See, e.g.*, GX 776 at 5-6; GX 2904; GX 2915; GX 2922; GX 2943; GX 2951). Accordingly, even if—as manifestly is not the case—Binday were now learning for the first time that Prudential accepted a first premium payment on the Espinal policy after having identified Binday as a potential STOLI purveyor, the evidence of that fact certainly would not have "likely result[ed]in an acquittal." *United States* v. *James*, 712 F.3d 79, 107 (2d Cir. 2013). The evidence of his guilt is simply overwhelming; no single email can alter that.

The motion is denied.

This constitutes the decision and order of the Court.

Dated: August 29, 2017

_____
Chief United States District Court Judge

BY ECF TO ALL PARTIES