UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

    - v. -                                   :                    12 Cr. 152 (CM)

MICHAEL BINDAY,                               :

              Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MICHAEL BINDAY'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO TITLE 28, UNITED STATES CODE, SECTION 2255


JOON H. KIM
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Eun Young Choi
Assistant United States Attorney
  -- Of Counsel --

## **TABLE OF CONTENTS**

BACKGROUND ......................................................................................................... 1

   I.    PROCEDURAL HISTORY ........................................................................... 1

   II.   EVIDENCE AT TRIAL .............................................................................. 3

   III.  THE DEFENSE CASE AT TRIAL ............................................................ 7

   IV.  SENTENCING ......................................................................................... 7

   V.   BINDAY'S DIRECT APPEAL ................................................................ 9


ARGUMENT ............................................................................................................ 9

   I.    APPLICABLE LAW ................................................................................ 10

       A.   Section 2255 Petitions ........................................................................... 10

       B.   Ineffective Assistance of Counsel ........................................................ 11

   II.   BINDAY DID NOT SUFFER FROM INEFFECTIVE ASSISTANCE AT TRIAL. ...... 13

       A.   Binday's Defense Pursued Legally Viable Defenses at Trial ................................. 13

       B.   Binday Cannot Establish He Was Prejudiced By His Counsel's Performance. ..... 20

       C.   Binday's Failure to Testify Does Not Constitute Ineffective Assistance. .............. 26

   III.  BINDAY DID NOT SUFFER FROM INEFFECTIVE ASSISTANCE AT SENTENCING. ...................................................................................... 29

       A.   Sentencing Counsel's Failure to Request a *Fatico* Hearing Does Not Constitute Ineffective Assistance. ....................................................................... 29

       B.   Sentencing Counsel's Failure to Retain an Actuary Does Not Constitute Ineffective Assistance. ........................................................................ 33

       C.   Binday Cannot Establish Any Prejudice With Regard to Any Sentencing Error ... 34


CONCLUSION ........................................................................................................ 36

The Court should deny defendant Michael Binday's motion to vacate his conviction and reduce his sentence pursuant to Title 28, United States Code, Section 2255.  In his motion papers ("Motion" or "Petition"), Binday argues that he suffered from constitutionally ineffective assistance of counsel from both his trial counsel, Elkan Abramowitz and Benjamin Fischer of Morvillo Abramowitz Grand Iason & Anello PC, and his sentencing counsel, Andrew Frisch.  Specifically, Binday asserts that his trial counsel failed to understand the legally viable defenses against mail and wire fraud, and as such failed to introduce certain pieces of evidence or make certain arguments and erred in deciding not to call Binday as a defendant at trial.  And with regard to his sentencing counsel, Binday asserts that he should have asked for an evidentiary hearing and retained an actuary so as to challenge the Government's calculation of actual loss.  As is set forth below, each of Binday's claims is meritless, and fails to establish either inadequate performance or prejudice under the standard set forth in *Strickland* v. *Washington*, 466 U.S. 668 (1984), and its progeny.  As such, Binday's Motion should be dismissed without a hearing.

## BACKGROUND

### I.      PROCEDURAL HISTORY

On October 7, 2013, following a twelve-day jury trial before this Court, Binday and his two co-defendants, James Kevin Kergil and Mark Resnick (together, "the defendants"), were found guilty of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349; mail fraud, in violation of Title 18, United States Code, Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with a

scheme to defraud insurance companies which the defendants purported to serve as agents.[1]

On July 30, 2014, the Court sentenced Binday to 144 months' imprisonment, to be followed by three years' supervised release. The Court also ordered very substantial forfeiture and restitution.

On October 26, 2015, the Second Circuit affirmed the convictions and sentences of Binday and his co-defendants, directing only a limited remand, at the Government's request, for entry of an amended restitution order in a reduced amount of $37,433,914.17. *See United States* v. *Binday*, 804 F.3d 558, 601 (2d Cir. 2015). On December 14, 2015, the Second Circuit denied Binday's motions for panel and *en banc* rehearing. On June 20, 2016, the Supreme Court denied Binday's petition for a writ of *certiorari*. On June 24, 2016, this Court entered the amended restitution order that the Second Circuit had directed be entered. Shortly thereafter, Binday began serving his sentence.

On October 6, 2016, a day shy of the three-year anniversary of the jury's verdict, Binday engaged filed a motion for a new trial based on purported "newly discovered evidence" pursuant to Rule 33(b)(1). On August 29, 2017, the Court denied the motion.

On June 20, 2017, Binday filed the instant Motion. On or about August 17, 2017, the Court issued an Order requiring the execution of a waiver of the attorney-client privilege by Binday and for the Government to file its response to the Motion within 60 days; and allowing prior counsel to consult with the Government to determine if testimony from prior counsel is

---

[1] Kergil and Resnick were also found guilty of conspiring to obstruct justice through destruction of records, in violation of Title 18, United States Code, Section 1512(k). Binday was not charged in that count.

necessary and appropriate.[2]

## II.   EVIDENCE AT TRIAL

The evidence at trial established that, from in or about 2006 through in or about early 2009, Binday and his co-defendants, all insurance agents, engaged in a scheme designed to procure so-called "stranger-originated life insurance" (or "STOLI") policies—policies on the lives of seniors for the benefit of investors who were strangers to them—by means of fraudulent applications.  With Binday as their leader, the co-conspirators recruited elderly people of modest means (the "Straw Insureds") to apply to insurance companies (the "Insurers") for universal life insurance policies, with the understanding that the resulting policies would actually be owned, paid for, and controlled by third-party investors.[3]  The defendants secured the Straw Insureds' consent to the scheme with promises of six-figure payouts—payouts that sometimes materialized and sometimes did not.  *See United States* v. *Binday*, 804 F.3d at 565-66 (describing scheme). (Tr. 72-77, 424-26, 611-13).[4]

---

[2] Although Binday's prior trial counsel previously informed the Government of its intention to file a brief affidavit, which was filed earlier today (Dkt. No. 439), Binday's sentencing counsel, Andrew Frisch, has not indicated to the Government upon inquiry whether it intends to submit an affidavit.  For the reasons described in this brief, it is the Government's view that the Court may properly dispose of Binday's Section 2255 Motion without the need for additional testimony or a hearing, for the reasons set forth herein.  *See United States* v. *Kurti*, 427 F.3d 159, 163 (2d Cir. 2005) (rejecting ineffective assistance claim where record, "[v]iewed in its entirety," showed that attorney's "strategic advice" fell "within prevailing professional norms.").  To the extent the Court believes that the record must be supplemented with regard to Binday's sentencing counsel, the Government respectfully requests that the Court order Mr. Frisch to submit an affidavit addressing the claims raised herein before deciding upon whether a hearing is necessary.
[3] The Insurers are American General Life Insurance Co. and its affiliates ("AIG"), AXA Equitable Life Insurance Company, John Hancock Life Insurance Company (U.S.A.) ("Hancock"), The Lincoln National Life Insurance Company and its predecessors and affiliates ("Lincoln"), MetLife Investors U.S.A. Insurance, The Prudential Insurance Company of America ("Prudential"), Security Mutual Insurance Company, Sun Life Assurance Company of Canada, and Union Central Life Insurance Company (now Ameritas) ("Union Central").
[4] "Tr." refers to the trial transcript; "Sentencing Tr." refers to the sentencing transcript; and "GX" and "DX" refer to Government exhibits and Defense exhibits admitted at trial, respectively.

Meanwhile, Binday and his co-defendants deceived the Insurers about who was behind these policies, giving the false impression that wealthy individuals wanted the policies on their own lives for estate planning purposes.  The defendants engaged in this deception because the Insurers expressly prohibited their agents from submitting STOLI business to them.  *See Binday*, 804 F.3d at 565, 567.  (GX 776 at 5-6 (Lincoln anti-STOLI policy, with Binday's certification of compliance); GX 2904 (AIG anti-STOLI policy); GX 2915 (Hancock anti-STOLI policy); GX 2922 (Jefferson Pilot anti-STOLI policy); GX 2943 (Prudential anti-STOLI policy); GX 2951 (Union Central anti-STOLI policy)).  STOLI investors exploited the Insurers' actuarial and underwriting processes—which were developed with the expectation that ordinary human beings rather than professional investment funds would be behind the policies—to profit at the expense of the Insurers.  The Insurers, not surprisingly, did not want to be targets of this kind of arbitrage, which exposed them to unwanted economic risk.  (Tr. 505-06, 512-15, 576, 580-82, 641-43; GX 2970, 2971, 2972).  As executives from two Insurers, James Avery from Prudential and Michael Burns from Lincoln, testified at trial, the Insurers understood that STOLI policies would behave in ways that were less economically advantageous to the Insurers and would reduce the Insurers' profitability.  (Tr. 505-06, 512-15, 576, 580-82).  Most importantly, STOLI policies, unlike non-STOLI policies, were expected to never lapse and thus to result in multi-million-dollar payouts in every case.  (Tr. 514, 642).  Moreover, to the extent STOLI policies were being procured based on lies that inflated the insureds' wealth, the Insurers were taking on a greater risk of earlier mortality than they believed, because wealthier people tend to live longer.  (Tr. 576, 578, 735).

But the defendants wanted to facilitate issuance of STOLI policies from the Insurers to investors because each such policy generated massive commissions for the responsible insurance

4

agents, paid for by the unwitting Insurer—as long as the STOLI character of the policy went undetected. (Tr. 455, 509-10, 923; GX 892). To circumvent the Insurers' anti-STOLI rules and the terms of their own agency agreements with the Insurers, the defendants littered the applications with lies—not about the Straw Insureds' health, but about their assets and net worth, the existence of third-party financing of premiums for the policies, the Straw Insureds' intent to sell the policies, the purpose of the insurance sought, and whether the Straw Insureds had other life insurance policies or pending applications for such policies. (*See, e.g.*, GX 531, 541, 605, 650, 2000, 2122). This false information was provided in response to specific questions asked by the Insurers to try to detect and weed out STOLI and to ensure that applicants could afford the policies for which they were applying.

Among the particular false applications the Government highlighted at trial were those submitted by Binday and his co-conspirators to Prudential and other Insurers in the names of Straw Insureds Martha Espinal, Florra Adler, and Lillian Robinson. (*See* Declaration of Sarah K. Eddy (Nov. 10, 2016) (Dkt. No. 405) ("Eddy Decl."), Ex. F at 1-2 (Government Exhibit List noting GXs relating to Adler), 9-11 (GXs relating to Espinal), 22-24 (GXs relating to Robinson)). The Government called Ms. Espinal's son to testify about his dealings with Binday and other conspirators, and about the lies on his mother's applications to various Insurers, including Prudential. (*See* Tr. 582-620). These lies succeeded with Prudential, which issued a policy on Ms. Espinal's life.[5] (GX 811). To present evidence about Adler's case and about Prudential's investigation into that case, the Government called Edward Lynch, the insurance

---

[5] Binday's applications to Prudential for policies on the lives of Florra Adler and Lillian Robinson, which came later than the Espinal application, were not successful; Binday withdrew them after Prudential began investigating what it suspected were false representations. (GX 137, 139, 161, 162). In fact, Prudential's concerns about Binday caused the company to terminate him as an agent. (*See* GX 361).

agent who had recruited Ms. Adler to Binday's scheme.  (*See* Tr. 761-818).  Testifying pursuant

to a grant of immunity, Lynch explained that the information Binday supplied to Prudential and

other Insurers about Adler's finances was false, and discussed conversations he had had with

Binday about investigations of the Adler case by both Prudential and the New York State

Insurance Department ("NYSID").  (Tr. 788, 799-801).

       The Government also introduced substantial documentary evidence relating to the Adler

case.  (*See* Tr. 867-899 (reading to jury of GX 144, 151, 154, 156, 117, 119, 134, 136, 135, 158,

159, 121, 137, 139, 161, 162, 361, 362, 363)).  These documents, which consisted principally of

email communications, showed Binday using aggression and blatant lies with Prudential

employees to try to bully them into issuing a multi-million-dollar policy on Adler's life, and

coaching his co-conspirators to support the lies he was telling.  (*Id.*).  They also showed that

Binday pressed forward with his lies even after Prudential terminated Binday as an agent.

Specifically, Binday gave false testimony, under oath, before the NYSID about the Adler and

Robinson cases.  (GX 363 (testimony excerpts)).

       The lengths to which Binday went to try to support his lies to Prudential were merely

illustrative of the tactics used generally as part of the charged scheme.  Binday and his co-

defendants routinely backed up their lies with sham documents, arranged elaborate bank

transactions to make it look like the Straw Insureds—rather than investors—were paying the

premiums on policies, and instructed Straw Insureds they had recruited to refuse to speak to

Insurer representatives and, worse, lie if conversation could not be avoided.  (*See, e.g.*, GX 164,

679, 680 (false "estate plans" and financial documents); Tr. 828-29 (false "inspection reports");

Tr. 145, 391-92, 936 (disguised premium payments); GX 1304, 2841, 3019 (coaching seniors to

lie)).  Binday alone committed perjury in furtherance of the scheme, but all three defendants

conspired to destroy documents and electronic records related to their fraud.  (Tr. 980-81; GX 3073, 3075).

### III.    THE DEFENSE CASE AT TRIAL

At trial,  Binday and the other defendants did not deny that they told blatant and repeated lies to the Insurers, but argued, among other things, that their conduct was not fraudulent because the Insurers "happily issued STOLI policies, while paying lip service to weeding out STOLI policies for public relations reasons," *Binday*, 804 F.3d at 568.  The defendants used this evidence  to argue that the misrepresentations made by Binday and his co-conspirators were not material; that the misrepresentations could not result in tangible economic harm; and that Binday and his co-defendants could not have had the requisite intent to defraud in light of their belief that the Insurers wanted their STOLI business.  To support this defense, Binday called a witness to read portions of Insurers' internal policy files which, according to Binday, showed that the Insurers issued policies even when there were reasons to suspect they might be STOLI.  (Tr. 1303-45).

In summation, Binday's counsel argued strenuously that the Insurers' anti-STOLI policies were just window-dressing, and that the Insurers in fact invited STOLI.  (Tr. 1451-57).

In convicting the defendants on all counts, the jury rejected these arguments.

### IV.    SENTENCING

As noted, the Court sentenced Binday principally to 144 months' imprisonment for his crimes, and ordered substantial restitution and forfeiture.  In advance of sentencing, the Government analyzed records from Binday's company, R. Binday, and from the Insurers to calculate intended and actual losses under Section 2B1.1 of the Sentencing Guidelines.  The total intended loss was calculated principally by adding up the projected death benefits—net of total

expected premiums over the lives of the policies with a 20% discount to control for interest the Insurers' might earn on those premiums—on each of the 92 policies that the defendants sought to have issued through their fraudulent representations, which yielded an intended loss figure of over $130 million.  (Gov't Sentencing Submission at 55-57 (Dkt. No. 323)).  The total actual loss calculation, by contrast, focused on 74 of the 92 scheme applications that were in fact issued by the Insurers.  For these policies, the Government summed all commissions that the Insurers had paid on these policies, plus any death benefits actually paid, minus premiums paid on all policies that had already been terminated (through death, lapse, or otherwise).  (*Id.* at 57-58).  This approach yielded a total actual loss figure of $39,308,305.63.  (Dkt. No. 338).  Several Insurers had asked the Government to include in its loss calculations (which formed the basis of its restitution figure) projected losses on STOLI policies procured by the defendants and their co-conspirators that were still in force.  (*See id.* at 58 n.28).  The Government, however, declined to do so in the absence of clear authority for including such projected losses in the actual loss calculation.

Although the Government submitted voluminous materials to the Court to support its calculations for both intended and actual loss, it also recommended that the court impose sentences lower than those that would be generated by an intended loss approach under the Guidelines.  (*Id.* at 60-61).

At sentencing, in calculating the appropriate Guidelines range for all defendants, the Court elected to measure loss based on actual loss rather than intended loss, resulting in a 22-level increase of the Guidelines for a loss of more than $20 million but less than $50 million.  (Sentencing Tr. 37-38).  The Court then calculated Binday's offense level as 35, which, with a Criminal History Category of I, yielded an advisory Guidelines range of 168 to 210 months for

Binday.  (*Id.* at 39-40).  Having considered the Guidelines, however, the Court elected to

sentence the defendants the "old fashioned way:  Emphasizing who they are, what they did, and

how to punish them, and send a message to the industry that this sort of conduct will not be

tolerated."  (*Id.* at 41).  After a thorough review of the factors set forth in 18 U.S.C. § 3553(a)

and their application to Binday's case, the Court imposed a below-Guidelines term of 144

months' imprisonment to Binday.

## V.    BINDAY'S DIRECT APPEAL

On appeal to the Second Circuit, Binday's principal arguments were that (1) the Court

erred in its instructions to the jury defining a scheme to defraud; (2) there was insufficient

evidence against Binday; and (3) the indictment was constructively amended; (4) the

Government's rebuttal summation was prejudicial to the defense; and (5) the loss calculation was

erroneous.  The Second Circuit, in affirming the convictions and sentences of Binday and his co-

defendants, rejected each of these arguments.  *See Binday*, 804 F.3d at 576-77 (rejecting

Binday's attack on sufficiency of indictment); *id.* at 578-80 (rejecting his challenge to

sufficiency of intent evidence); *id.* at 581-82 (rejecting claim of instructional error); *id.* at 584-85

(rejecting constructive amendment claim); *id.* at 585-87 (rejecting challenge to summation); *id.*

at 597-99 (rejecting challenge to loss calculation for sentencing purposes).  It also rejected

Kergil's argument on appeal as to the substantive unreasonableness of his sentence.  *Id.* at 600-

01.

## <u>ARGUMENT</u>

Learned and experienced counsel deftly and aptly represented Binday throughout his trial

and at his sentencing.  Although he now complains of specific decisions his prior counsel made

in his representation, none of these complaints establish that any of his prior counsel were

objectively unreasonable so as to suggest that their performance was constitutionally inadequate under *Strickland*.  At best, they amount to meritless Monday morning quarterbacking on the part of his new counsel, based on a strained reading of the cold record.  But to whatever extent one could countenance or indulge this second-guessing of the strategies employed by counsel, Binday's claims also fail because he cannot articulate any prejudice from these tactical decisions so as to undermine the reliability of the convictions against him.  Because it is plain from the motion papers, the exhibits attached thereto, and the voluminous record in this case that Binday's claims are without merit, the Court should deny Binday's Motion without a hearing, and should deny any request for a certification of appealability.

## I.      APPLICABLE LAW

### A.      Section 2255 Petitions

Pursuant to 28 U.S.C. § 2255, a prisoner sentenced in federal court may "move the court which imposed the sentence to vacate, set aside or correct the sentence" when the petitioner claims "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).  Section 2255 states that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).  However, Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss

the motion."  Rules Governing § 2255 Proceedings for the United States District Courts, Rule
4(b), 28 U.S.C. foll. § 2255.

### B.    Ineffective Assistance of Counsel

To establish an ineffective assistance of counsel claim, "a defendant must show: (1) that
counsel's representation fell below an objective standard of reasonableness; and (2) that there is
a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding
would have been different." *United States* v. *Brown*, 623 F.3d 104, 112 (2d Cir.
2010); *see Strickland* v. *Washington*, 466 U.S. 668, 688-89, 693-94 (1984).  Only if both
elements are satisfied can a reviewing court conclude that "counsel was not functioning as the
'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.

With respect to the first element—the "performance" prong—to eliminate the "distorting
effects of hindsight," *Strickland*, 466 U.S. at 689, a reviewing court "'must indulge a strong
presumption that counsel's conduct falls within the wide range of reasonable professional
assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any
given case' and that '[e]ven the best criminal defense attorneys would not defend a particular
client in the same way.'"  *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting
*Strickland*, 466 U.S. at 689); *Parisi* v. *United States*, 529 F.3d 134, 141 (2d Cir. 2008) (noting
that reviewing courts should be "mindful of the diversity of the bar and the variety of approaches
effective attorneys might employ when dealing with a particular set of facts").  Accordingly,
"[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not
constitute ineffective assistance." *Henry* v. *Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal
quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689); *accord United States* v. *Smith*,
198 F.3d 377, 386 (2d Cir. 1999) (reasonably made strategic calls do not support ineffective

assistance claim); *United States* v. *Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) ("decisions that fall squarely within the ambit of trial strategy, . . . if reasonably made, cannot support an ineffective assistance claim").

With respect to the second element—the "prejudice" prong—a defendant must meet the "heavy burden" of showing "actual prejudice"; in other words, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 692, 694.  A defendant cannot establish prejudice by merely showing that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. Only where both prongs of the *Strickland* test are satisfied can it be concluded that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* at 687.

In applying these principles, the Supreme Court has noted that the "object of an ineffectiveness claim is not to grade counsel's performance," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.  Applying this teaching, the Second Circuit has often rejected ineffectiveness claims by determining that, in view of the strength of the prosecution's case, the defendant is unable to establish prejudice.  *See*, *e.g.*, *Strouse* v. *Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (court declines to address alleged deficiencies of counsel given the overwhelming evidence of guilt at trial); *United States* v. *Simmons*, 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against [appellant], there is little reason to believe that alternative counsel would have fared any better."); *United States* v. *Reiter*, 897 F.2d 639, 645 (2d

Cir. 1990) (although counsel's performance at times fell below professional standards, Sixth

Amendment claim fails "given the overwhelming evidence against [the defendant]").

## II.  BINDAY DID NOT SUFFER FROM INEFFECTIVE ASSISTANCE AT TRIAL.

Binday finds fault with the performance of his trial counsel, Elkan Abramowitz and

Benjamin Fischer of Morvillo Abramowitz, and asserts that they were constitutionally

ineffective.  There is not a scintilla of evidence in the record to support Binday's accusations.

This much is self-evident by the fact that, in support of his present complaints, Binday carefully

cherry-picks isolated statements and questions from Binday's counsel over the course of the trial

to present a counterfactual account of the thrust of Binday's defense.  Binday's counsel focused

their case on the fact that the Insurers continued to issue STOLI to Binday and his co-

conspirators, despite public protestations of their desire not to issue STOLI policies, to argue to

the jury that the Insurers in fact desired to court STOLI business.  They, as well as counsel for

Binday's co-defendants, did so in an effort to establish that any misrepresentations by their

clients were immaterial; that they could not have resulted in economic harm as alleged by the

Government; and that the defendants could not have intended to defraud the Insurers.  Despite

Binday's arguments to the contrary, the trial record makes plain that not only did counsel

perform reasonably by presenting legally viable defenses to the jury and counseling their client

about the risks of taking the stand, but also that Binday did not suffer any demonstrable prejudice

from the purported failures Binday now articulates.  As such, his claims regarding Messrs.

Abramowitz and Fischer are utterly without merit.

### A.  Binday's Defense Pursued Legally Viable Defenses at Trial

Binday first argues his trial counsel's performance was constitutionally deficient because

they fundamentally and "obviously" "misunderst[ood]" the law governing mail and wire fraud.

13

(Mot. at 17).  Binday asserts that there were three "permissible defenses" to the fraud charges against him:  "(1) the defendant's lack of intent to defraud; (2) that any misrepresentations were not material, and (3) that the misrepresentations could not result in tangible economic harm, or stated another way, the victim was not deprived of 'potentially valuable economic information.'" (Mot. at 10-17).  Binday then complains that his trial counsel, instead of crafting a defense around questions of intent, materiality, and economic harm, erroneously argued only that there was no "actual economic loss," even though such a fact "was irrelevant to Mr. Binday's case." (Mot. at 11-17).  This interpretation of the arguments set forth by defense counsel at trial can only be reached by a simplistic and misleading characterization of the trial record, and a conflation of the terms "economic loss" and "tangible economic harm."

It is true that an absence of "actual economic loss" (Mot. at 11) to an Insurer's bottom line is not in fact a viable defense to mail or wire fraud, since the Government is not required to establish that the economic harm that the defendants' contemplated was in fact realized.  *See Binday*, 804 F.3d at 569 ("It is not required that victims of the scheme in fact suffered harm, but 'the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims'" (quoting *United States* v. *Novak*, 443 F.3d 150, 156 (2d Cir. 2006)).  But the absence of "actual economic loss," by itself, was not the gravamen of Binday's defense at trial.  Rather, as he himself described in his Rule 33 motion, "Binday's argument at trial" was "that Prudential and the other insurers had engaged in a wink and a nod practice of bashing STOLI publicly, while secretly letting such policies 'slip through the cracks' so that they could earn the hefty premiums that the policies generated."  Binday Mem. in Support of Rule 33 Motion at 13 ("Rule 33 Mem.") (Dkt. No. 395).  Binday's defense focused on the following interrelated propositions:  that the defendants' "conduct was not fraudulent because the insurers

in fact happily issued STOLI policies while paying lip service to weeding out STOLI policies for public relations reasons" (i.e., an argument as to materiality and lack of a cognizable scheme to defraud); and that the defendants "did not intend to inflict, and the insurers had not in fact suffered, any harm" (i.e., that there was no intent to defraud) because "their deceit had caused no discrepancy between the benefits reasonably anticipated by the insurers and what they actually received," given that there is "no meaningful economic difference between STOLI and non-STOLI policies" (i.e., that the misrepresentations were not material and that there was no cognizable economic harm). *United States* v. *Binday*, 804 F.3d at 568.

Against this backdrop, it is evident that each reference Binday now makes to support his characterization that his defense focused on a purported lack of "actual economic loss" is based on Binday's confusion between a simple argument about the lack of realized economic loss to the Insurers' profits (which would not constitute a viable defense), and what the defense in fact argued to the jury: that, in light of the Insurers' willingness to accept STOLI policies from the defendants, there was no cognizable or tangible economic harm, the defendants could not have intended any such harm, and any misrepresentations made by the defendants were immaterial to the bargain at hand. These were the legally viable theories of the defense case, which the defense argued from pre-trial motions to summation. (*See*, *e.g.*, Binday's Opposition to Government's Motions in Limine and Federal Rule of Evidence 404(b) at 3 (Dkt. No. 233) (noting that the defendants "intend to present evidence concerning the Insurers' *institutional awareness and encouragement* of the Defendants' activities to demonstrated not only that the Insurers were not defrauded, but that there was no scheme to defraud anyone here").

Nevertheless, Binday attempts to establish his counsels' deficient performance through what can most charitably described as a misleadingly incomplete compilation of portions of the

15

trial transcript.  First, Binday complains that Mr. Abramowitz erroneously "continued to focus on the lack of actual economic harm" by quoting limited statements in isolation from Mr. Abramowitz's opening.  (Mot. at 11-12).  But placing the defendant's selective recitation of Mr. Abramowitz's opening in proper context, it is apparent that Mr. Abramowitz's arguments went straight to the legally valid defense themes that the defendants presented to the jury.  For instance, Binday begins his critique of Mr. Abramowitz's defense opening with quoting one incomplete sentence, which, when read in full, evidences his counsel's argument that if there is no proof that the defendants intended economic harm upon the Insurers, then the jury should acquit.  (*Compare* Mot. at 11 (*quoting* Tr. 33) *with* Tr. 33 (ABRAMOWITZ:  "As the judge will instruct you, if no one has been defrauded, if no one has been defrauded, if no one has suffered economic harm then, Mr. . . . Kergil . . . and Mr. Resnick are innocent, and let me repeat that.  If the government does not prove there was *economic harm intended* by Mr. Binday, by Mr. Kergil, and Mr. Resnick, they are innocent of the charges that are brought against them.  If they *intend no harm*, economic harm to the insurance companies, no crime of fraud against them has been committed" (emphases added)).  Binday then further complains of instances in which Mr. Abramowitz uses the phrase "tangible economic harm" (Mot. at 11-12).  This is curious, since by Binday's own admission arguments that the misrepresentations at issue "could not result in tangible harm" constituted a "permissible defense" (Mot. at 10).  But in any event, it is evident that, when read in context, counsel's use of the phrase was shorthand for lack of cognizable economic harm in light of the insurance companies' desire to issue STOLI, and the defendants' knowledge of that fact.  (*Compare* Mot. at 12 (quoting Tr. 39) *with* Tr. 39-42 ("It was intended always as a win-win for the insured and for the insurance companies. . . .   The government is charging that there is a discrepancy between the benefits reasonably anticipated

and the actual benefits received. . . .  That charge is simply untrue, period.  [W]e will show that
the insurance companies . . .  got exactly what they bargained for.  There was no discrepancy
between bargain anticipated and bargain delivered.”); *also compare* Mot. at 12 (quoting Tr. 44)
*with* Tr. 44-47)).  Thus, Binday’s opening statement cannot provide proof of Mr. Abramowitz’s
substandard performance, or his misapprehension of the viable defenses available to him.

Binday next points to instances in which his trial counsel illustrated that “there was no
economic harm to the person whose life was insured,” (Mot. at 12 (quoting Tr. 38)), arguing that
it was “flawed” for the defense to cross examine Silas Griffin, one of the senior Straw Insureds,
as to whether he personally paid any money toward life insurance premiums.  (Mot. at 12
(quoting Tr. 107)).  The defense can hardly be faulted for attempting to make clear to the jury
that the elderly Straw Insureds that testified at trial, including the Government’s first witness,
Mr. Griffin—an Army veteran with 42 years of federal service (Tr. 72-73) and failing eyesight
(*cf.* Tr. 73-74)) —were not victims and did not lose money by participating in the defendants’
fraudulent scheme, lest sympathy for these witnesses be a source of confusion for the jury in
their deliberations.  (*Cf.* Sentencing Tr. 42 (Court noting its concern for the “callous disregard”
defendants showed for the “straw purchasers”)).  Efforts by trial counsel to establish a lack of
harm to the Straw Insureds was an entirely reasonable strategic choice.

Binday next asserts that Mr. Fischer’s argument with regard to the jury charge evidenced
further confusion on the part of his defense, in assuming that “there was no scheme to defraud
unless the insurance companies were deceived.”  (Mot. at 13).  But again, Binday neglects to
provide the full context of counsel’s arguments.  As Mr. Abramowitz argued during the charge
conference, if Insurers knowingly turned a blind eye and issued STOLI, and the defendants had
“knowledge” of that fact, there was a viable defense because fraud is an “intent crime and the

17

argument is [the Insurers] knew it.  And if they knew it, there could not have been a false

statement and, by inference, no intent."  (Tr. 1375).  Mr. Abramowitz explained that the Insurers

"knew exactly what they were getting" and that Binday was aware of the Insurers' issuance of

policies while knowing their true STOLI nature.  (Tr. 1377).  As an example, Mr. Abramowitz

pointed out the fact that the Insurers had eliminated a requirement that the Straw Insureds

provide tax returns to support their representations as to their wealth, which was evidence of

"what [Binday] client knew.  If my client knows that they're not requiring tax returns and they're

not requiring all those other things and accepted that nonsense letter from the accountants, then

they are not being deceived."  (Tr. 1377).  Ultimately, the Court agreed that the inference could

be drawn that if the insurers were knowingly issuing STOLI, it could be relevant to Binday's

state of mind (Tr. 1378), as well as, after prompting from Mr. Fischer, relevant to materiality as

well. (Tr. 1381).  Given this full context of the charge conference, it can hardly be said that

Binday's trial counsel was confused as to the applicable law, or unreasonable in its arguments

during the charge conference.

      With regard to the summation, Binday concedes that Mr. Abramowitz's closing

"formulated and implemented" a "lack-of-materiality" defense, but by then it was "too late to

present any evidence to support it."  (Mot. at 23).  But "trial counsel's choice of what to argue in

summation may permissibly be viewed as a strategic decision" that should not be second-

guessed, *Henry* v. *Stinson*, No. 96-2522, 120 F.3d 113, 1997 WL 664631, at *1 (2d Cir. Oct. 17,

1997)), and "even the failure to make any argument at all on summation is generally considered

merely to be a matter of trail strategy and not one to be second-guessed by a reviewing court,"

*Virella* v. *United States*, 750 F. Supp. 111, 118 (S.D.N.Y. 1990) (Leisure, J.); *see also Curry* v.

*Burge*, No. 03 Civ. 901 (LAK) (AJP), 2004 WL 2601681, at *28 (S.D.N.Y. Nov. 17, 2004)

(collecting cases).  And as Binday himself concedes "[t]here was ample evidence introduced at trial that many applications were flagged as STOLI, but the applications continued to be approved by the insurance companies." (Mot. at 18).  From that evidence, Mr. Abramowitz started his closing by arguing to the jury that "[w]hat these defendants participated in with the insurers and the insureds . . . was really an investment scheme [which] intended to have everyone involved in the investment make money, everyone, and not lose money, including the insurance companies." (Tr. 1436).  He argued that there was a lack of materiality in the misrepresentations made by the defendants, because, as per James Avery's testimony, age, gender, and health were the most important factors in pricing life insurance, not health.  (Tr. 1436-39).  In comparing STOLI to life settlements policies, Mr. Abramowitz made the point that the two would have behaved in the same fashion with regard to lapse rates and premium payments, relying on testimony from both Messrs. Avery and Burns, to further establish that the Insurer's publicly announced anti-STOLI positions were fiction.  (Tr. 1441-44).  Mr. Abramowitz carefully weaved together the evidence that the Insureds had issued STOLI policies to the defendants despite red flags suggesting their true STOLI nature, and despite Binday being identified as a STOLI producer.  (Tr. 1451-57).  The closing further made the point, with regard to materiality, that had the insurers truly cared about the defendants' misrepresentations in an effort to weed out STOLI, they would have taken straightforward steps, such as verifying an applicant's net worth, as part of their processes in reviewing applications.  (Tr. 1457-65).

Mr. Abramowitz then turned to the defendants' intent, and argued that "they did not think while they were processing these STOLI applications that they were committing any crime whatsoever." (Tr. 1466-67).  This was supported, according to counsel, by the fact that Binday and the defendants operated openly and advertised their scheme, and nevertheless Insurers

19

continued to issue policies to Binday, and awarded Binday and his co-conspirators for their rates of production.  (Tr. 1467-68).  Counsel for both Kergil and Resnick followed in this theme regarding the lack of the defendants' intent to defraud.  (*See*, *e.g.*, Tr. 1471, 1488 (Kergil's counsel describing insurance companies as "partners of these three gentlemen at the table" and arguing "[t]here was no intent to deceive them when the insurance companies were their partners"); Tr. 1502 (Resnick's counsel arguing that "[t]he very reason why the lies at the issue of this case are not material to the insurance company dovetailed with the reasons why Mr. Resnick did not act with intent to defraud. . . .  [E]ssentially Mr. Resnick, Mr. Kergil, Mr. Binday were the partners of the insurance companies in having this business come in.").[6]  In sum, counsel's closing expertly marshalled two-plus weeks of trial evidence, including the defense case, in setting forth the legally viable defenses against the mail and wire fraud charges.  The record cannot support a conclusion that he was unreasonable in his performance during summation.

### B.    Binday Cannot Establish He Was Prejudiced By His Counsel's Performance.

In an attempt to establish prejudice to meet *Strickland*'s second prong, Binday asserts that "[t]here is a substantial likelihood that the evidence that Mr. Abramowitz neglected to present and the examinations he failed to conduct would have altered the outcome other case."  (Mot. at 18).  Putting aside the fact that "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect,'"

---

[6] To the extent that Binday's argument can be construed as a complaint that his counsel's closing was not express in arguing Binday's lack of intent, Binday cannot argue that he suffered any prejudice in this regard.  As described above, the express characterization was made by both of his co-defendants that the insurance companies functioned as co-conspirators in arguing that there was no intent to defraud.  The jury thus considered this argument against the Government's evidence to the contrary, and rejected it in its quick, unanimous verdict of guilty on all counts.

*Harrington* v. *Richter*, 562 U.S. 86, 111-12 (2011) (quoting *Yarborough* v. *Gentry*, 540 U.S. 1, 8 (2003)), each example Binday provides to establish prejudice falls far short of the mark.

First, Binday attaches emails from January and February 2006, between himself and Lily Levith, Prudential's Regional Brokerage Director, and argues they should have been introduced by the defendant to demonstrate that "Binday had no intent to harm the insurance companies because together they achieved an arrangement that he would continue to produce the [STOLI] business they wanted privately but could not accept publicly due to purely social and non-economic concerns." (Mot. at 20 (citing Pet. Exh. A)). This argument about the purported import of these early 2006 emails simply blinks reality. To begin, these emails—sent near the very inception of Binday's business, when it was "still ramping up [its] production with Prudential (Pet. Exh. A at 2 (Binday Email dated Jan. 24, 2006))—make no mention whatsoever of STOLI, IOLI, or even premium financing therein.[7] As the Government established at trial, although Prudential was aware of STOLI's existence at this time (*cf.* Tr. 499 (Avery testimony that he first became aware of STOLI in approximately 2004 or 2005)), its efforts to combat STOLI over time evolved, and in April 2007, Prudential started requiring proposed policyowners to execute a certified statement designed specifically to ensure that STOLI policies were not issued by the company. (GX 2943 at 6-7 (Policyowner Statement containing questions to identify STOLI policies); *see also id.* at 1 (noting that "[m]ore recently, there has been a

---

[7] Binday argues because he mentioned the need to procure trusts for these cases in these emails, Prudential in early 2006 clearly knew he was discussing STOLI applications. (Mot. at 19). This argument fails, because "[t]rusts are a common estate planning tool used to hold life insurance policies so that, after an insured passes away, the policy proceeds may be used to pay his or her estate taxes," *Life Insurance Co.* v. *Gordon R.A. Fishman Irrevocable Life Trust*, 638 F.Supp.2d 1170, 1174 (C.D. Cal. 2009) (cited by Binday at Mot. at 23), and reference to a trust without other indicia of STOLI could not have been sufficient for Prudential to assume that Binday was referencing STOLI when describing his "large case" business.

proliferation" of STOLI policies "in which the intent, from the outset, is to settle the life insurance policies"); *id.* at 4 (noting that Prudential "will not issue insurance if it is determined that the policy is likely being applied for" STOLI)).  And after Prudential imposed the requirement of execution of the Policyowners Statement, Binday and his co-conspirators continued to execute and submit Prudential applications with false answers as to these STOLI-related questions, with an aim of collecting commissions on Binday's "large case" business by tricking the Insurers into issuing the policies.  (*See*, *e.g.*, GX 112 (Adler Prudential Application, dated Aug. 30, 2017); GX 118, 132 (Prudential Policyowner Statement for Adler, with "no" answers, dated Jan. 2, 2008); GX 805, 806, 826 (Espinal Prudential Applications, dated May 29, Sept. 20 and Dec. 14, 2007); GX 825 at 13, 827 at 8 (Prudential Policyowner Statement for Espinal, with "no" answers, dated Sept. 20, 2007); GX 2350 at 25 (Robinson Prudential Application and Policyowner Statement, with "no" answers, dated Dec. 14 2017)).  Against the extensive evidence at trial regarding Binday's business at Prudential (including Prudential's investigation of Binday) in 2007 and 2008, it is evident the jury would have readily rejected any arguments from Binday based on these early 2006 emails.  Thus, Exhibit A to Binday's Motion cannot undermine confidence in the verdict against him so as to establish prejudice.

Binday next points to (speculative and hypothetical) evidence that could have been presented regarding "Binday's knowledge of economic similarities between STOLI policies and other acceptable forms of life insurance," such as those which use "hybrid premium financing" and "single premium immediate annuities." (Mot. at 20).  Binday further asserts (without support) that "[m]any carriers, including Lincoln, continued to generate the same business that non-recourse lending generated, STOLI, by fiction of "hybrid" loans."  (Mot. at 21).  Assuming *arguendo* that there is evidence of these assertions, it would have done nothing to tip the scales

in Binday's favor at trial.  First, Binday and his co-defendants in essence made this same

argument by highlighting the economic and behavioral similarities between STOLI policies on

the one hand and policies sold in the secondary life settlements market to argue that the anti-

STOLI policies of the Insurers were fiction.  That argument was considered and rejected by the

jury.  Second, the overwhelming evidence of the Insurers' desire not to issue STOLI policies in

particular, so as to warrant the crafting of specific questions designed to weed out and detect

STOLI, would defeat any analogy posited to other types of financing programs.  (*Cf.* Pet. Ex. B

at 1-2 ("John Hancock has not approved these 'hybrid' arrangements. . . .  We will continue to

see insurance carriers challenge sales where fraud or misrepresentation occurred" and "will

continue to support a limited number of traditional premium financing programs . . .  but which

do not present any of the insurable interest issues of IOLI.")).  Thus, these arguments about

Insurers' acceptance of other forms of insurance do not undermine confidence in the conviction.

Binday next argues that the defense erred in not attacking "the reasonableness of the

insurance companies' expectations that STOLI policies would potentially cause tangible

economic harm" by failing to cross-examine the Insurance company witnesses "regarding the

basis for their companies' concerns" or by "present[ing] other evidence[8] that the insurance

---

[8] The cases cited by Binday as evidence that "Lincoln knowingly issued dozens, possibly
hundreds, of STOLI policies," (Mot. at 23) do no such thing.  For instance, in *Lincoln National
Life Insurance Co.* v. *Gordon R.A. Fishman Irrevocable Life Trust*, 638 F.Supp.2d 1170 (C.D.
Cal. 2009), the district court made clear that the facts concern certain STOLI policies applied for
in 2005 that had been non-recourse premium financed by the defendant, including those in the
name of Mr. Fishman, had been issued "despite Lincoln's efforts to keep them out" through its
"increased efforts to identify and prohibit STOLI policies," noting that Mr. Fishman had "denied
any intent to use premium financing" for the policies.  *Id.* at 1173.  And in *Life Product
Clearing, LLC* v. *Angel*, 530 F. Supp. 2d 646 (S.D.N.Y. 2008), Judge Chin considered a Lincoln
Life policy, procured in 2005, and whether the insured obtained the policy without prior intent to
transfer it to a stranger such that there would be no insurable interest for the policy.  *Id.* at 648-49
(noting that STOLI policies "are lawful only if the insured purchases the policy with a good-faith
intent to obtain insurance for the benefit of his family, loved one, or business; they are not

companies' decisions were not adequately informed." (Mot. at 23).  To the extent Binday argues

that counsels' cross examinations of Messrs. Avery and Burns did not constitute reasonable

performance, he ignores the principle that "[d]ecisions whether to engage in cross-examination,

and if so to what extent and to what manner, are . . . strategic in nature." *United States* v. *Eisen*,

974 F.2d 246, 265 (2d Cir. 1992) (quoting *United States* v. *Nersesian*, 824 F.2d 1292, 1321 (2d

Cir.), *cert. denied*, 484 U.S. 957 (1987)).  Defense counsel can hardly be faulted for declining to

attempt to establish that the views of the two insurance company witnesses—one with four

decades and the other with a quarter century's worth of insurance and actuary experience (Tr.

493, 630-31)—regarding STOLI were "entirely unreasonable or idiosyncratic" (Mot. at 23).[9]

---

lawful."). Moreover, as is explained above in the context of the early 2006 Prudential emails, these policies were issued early in the inception of STOLI as a scheme, and any inferences drawn therefrom would more than be rebutted by the Government's evidence at trial that, by 2007, it was without question that the carriers were undertaking significant efforts to combat stealth STOLI applications.

[9] In an attempt to illustrate prejudice, Binday, again hypothesizing about what might have been established at trial by his counsel, relies on a civil pleading from Sun Life to argue that its assumptions regarding STOLI lapse rates is "directly at odds" with Prudential and Lincoln. (Mot. at 24 (citing Pet. Ex. D)).  Again, Binday's new counsel confuses the issue at hand.  The Sun Life pleading explains its view that investors were looking only to invest in those policies for "insureds with higher anticipated mortality rates," choosing to fund those policies in lieu of those for "healthy individuals" which would prove less profitable.  (Pet. Ex. D. at 1).  This was precisely what both Avery and Burns testified was their concern as to lapse rates for STOLI policies:  that STOLI investors would select to invest in policies for specific straw insureds who were anticipated to yield better returns due to their shorter expected lifespans, and then would continue to fund those policies until the insureds' deaths.  (*See., e.g.,* Tr. 514 (Avery, in explaining lapse rates, noting STOLI investors "would continue to pay premiums and that they would try to select insureds where they believe based on their evaluation that the premiums were inadequate for the death benefit eventually to be received.  They were betting against their house and their behavior would be so different than a normal insured who is hoping to live, not hoping to die"); Tr. 642, 664 (Burns testifying that for STOLI policy "the policy would never be expected to lapse" and "[t]he elimination of lapses reduces our profitability").  And this is precisely the same view espoused by Binday when explaining to agents the types of straw insureds that they sought for investors:  people who were "healthy . . . but not too healthy" because the process would involve the generation of life expectancy reports for investors, who would not want to invest in insurance on someone who was going to live too long, and thus diminish the return on their investment. (Tr. 906-07 (testimony of Paul Krupit)).  In other words,

What the defense did accomplish on cross-examination was elicit points designed to undermine the insurance company witnesses' assumptions regarding the economic impacts of STOLI. For instance, Mr. Abramowitz elicited from Michael Burns that he believed the most significant IOLI risks were "social, legal, and tax-related," and not "economic," and that any such economic impact would be "difficult to estimate" and "minor" (Tr. 699-702). Mr. Abramowitz also introduced evidence through Burns that Lincoln was "exploring opportunities to leverage [its] mortality and risk management expertise into new, nontraditional businesses" such as life settlements to "provid[e] institutional investors with opportunity for attractive returns," (Tr. 722-23 (DX 13)) and that there would be little difference in the economic consequences to Lincoln of a STOLI policy versus a life settlement policy sold immediately upon issuance (Tr. 727-31). Further, Mr. Abramowitz elicited that, in October of 2008, Burns had concluded that "STOLI activity ha[d] not had an adverse impact on [Lincoln's] mortality experience" (Tr. 731-32 (GX 2972 at 3)). And with regard to James Avery, after the Government had established on direct examination that the pricing of insurance policies at Prudential was based on "historical experience of" the performance of "classic," non-STOLI policies (Tr. 505), Mr. Abramowitz elicited on cross-examination that, if STOLI policies had in fact been issued by Prudential, it would have resulted in changes to product pricing to reflect the performance of STOLI within the pool. (Tr. 544). Mr. Abramowitz further established through Mr. Avery that Prudential did not vary the cost of its insurance depending upon the intent of the insured to sell, premium financing, the purpose behind the purchasing of the insurance, and whether other applications were pending—each indicia of STOLI policies. (Tr. 547). All those

---

they wanted "people in good enough health to get preferred health or standard health rates," but not people who would live "too long, to the point where the investors of the trust would be paying the premium too long." (Tr. 775 (testimony of Ed Lynch)).

points were artfully elicited by Mr. Abramowitz to illustrate the difficulty of establishing

"tangible economic harm" resulting to the insurance companies from the defendant's scheme.

And no prejudice lies from Mr. Abramowitz's choice in strategy with regard to undermining the

Government's theory of economic harm.

### C.     Binday's Failure to Testify Does Not Constitute Ineffective Assistance.

Remarkably, Binday faults his defense counsel for failing to call him as a witness at trial.

It is a well-established principle that "counsel's decision as to whether to call specific

witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse

in professional representation." *United States* v. *Best*, 219 F.3d 192, 201 (2d Cir. 2000) (internal

quotation marks omitted); *United States* v. *Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("The

decision not to call a particular witness is typically a question of trial strategy that appellate

courts are ill-suited to second-guess.").  This is because the "decision whether to call any

witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of

the sort engaged in by defense attorneys in almost every [case]." *United States* v. *Smith,* 198 F.3d

377, 386 (2d Cir. 1999) (quoting *United States* v. *Eisen,* 974 F.2d 246, 265 (2d Cir. 1992)).

Reflecting this principle, it is "a reasonable tactical decision to rely exclusively on attacking the

Government's witnesses . . . rather than to subject [a defendant] to all of the risk attendant on

cross examination."  *United States* v. *Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (rejecting

ineffective claim that lawyer should have advised defendant to testify on his own behalf).

As set forth in his affidavit, Mr. Abramowitz, in conjunction with others at his firm,

"advised [Binday] of his right to testify on his own defense on numerous occasions," during

which he discussed with Binday "the potential benefits of his testimony as well as the significant

potential risks associated therewith," including warning him "that his testimony could

significantly jeopardize his credibility with the jury." (Abramowitz Aff. ¶¶ 3-4 (Dkt. No. 439)).

These risks included being "confronted with the numerous false statements set forth in the

insurance applications," as well as "the statements he made under oath during his testimony

before the New York State Insurance Department." (*Id.* ¶ 4 (citing Order (Aug. 29, 2017) (Dkt.

No. 431) (noting that Mr. Binday "lied under oath when the state authorities got involved.").

These are precisely the risks that any reasonable attorney would have outlined to Binday while

discussing his right to testify in his defense, and as such, Binday cannot establish *Strickland*

ineffectiveness with regard to his counsel wisely advising him about the obvious risks to taking

the stand. This is because "a defendant's decision to offer testimony on the issue of mens rea

can [ ] be fatal to his attempt to exculpate himself," for "a statement by a defendant, if

disbelieved by a jury, may be considered substantive evidence of the defendant's guilt." *United*

*States* v. *Tobin*, 676 F.3d 1264, 1287 (11th Cir. 2012), *abrogated on other grounds by United*

*States* v. *Castro*, 736 F.3d 1308, 1313 (11th Cir. 2013) (cited at Mot. at 22).[10] And to the extent

that Binday believes these risks attendant to his decision to testify could have been mitigated by

the introduction of a purported prior consistent statement that was recorded between Binday and

the family member of an insured's family member regarding his beliefs on lapse rates and

economic harm (Mot. at 22 (citing Pet. Ex. C at 17)), that argument too fails. The statement

would more likely have been viewed by the jury as a self-serving falsehood pitched by Binday to

---

[10] The Eleventh Circuit authorities cited by the defendant are easily distinguished from this case.
(*See* Mot. at 22). In *Nichols* v. *Butler*, 953 F.2d 1550 (11th Cir. 1992), the court found
*Strickland* ineffectiveness in a trial attorney who threatened to withdraw during a trial to coerce
the defendant to relinquish his right to testify, in a case where the defendant's conviction turned
on the eyewitness identification of him by a store employee who had glimpsed the perpetrator
"only briefly," and thus the defendant's testimony took on "even greater importance." *Id.* at
1553. And in *United States* v. *Tobin*, 676 F.3d 1264 (11th Cir. 2012), the court was not
considering counsel's performance, but rather the effect of the district court's errors upon the
outcome of the case. *Id.* at 1287.

a straw insured's family member to convince them that the scheme was not in fact fraudulent. This lack of prejudice is established by both of his co-defendants attempting to rely on similarly self-serving lies to establish lack of intent, and failing in both instances. With regard to Kergil, his counsel relied upon testimony from cooperating witness Paul Krupit that Kergil had told Krupit that the insurance companies had wanted to issue STOLI, and insurers' financial statements indicating that universal life sales increased dramatically during the period that STOLI was popular, in arguing that the proof as to intent was insufficient at trial. *See Binday*, 804 F.3d at 580. In rejecting this argument, the Second Circuit noted that "[d]espite Kergil's unsupported and self-serving statement to Krupit, the jury was certainly entitled to infer, based on [anti-STOLI] certifications and other facts of the case, that Kergil was aware that the insurers did not want to issue STOLI policies, and that he intended that the numerous misrepresentations in the applications would cause the insurers to do so against their wishes." *Id.* Similarly, Resnick's counsel argued in summation that Resnick lacked requisite intent as evidenced in part to Krupit's testimony that Resnick had told Krupit that "[t]he insurance companies wanted these policies and turned a blind eye to all the red flags popping up in the policies . . . because they knew the truth. They knew that it was STOLI." (Tr. 1491). The jury, in convicting Resnick on all counts, necessarily rejected this argument too.

In sum, far from a strategic error, defense counsel's advice to Binday about the negative consequences of his taking the stand, and the risk that he would be confronted with his systemic and repeated pattern of lies (on applications, to Straw Insureds, and under oath to a regulatory body), was sound and reasonable. And Binday's failure to take the stand in no way undermines the confidence in the jury's verdict.

## III.   BINDAY DID NOT SUFFER FROM INEFFECTIVE ASSISTANCE AT SENTENCING.

Binday's sentencing counsel, Andrew Frisch, demonstrated his effectiveness by successfully arguing that the Court should rely not on intended loss but instead actual loss, which resulted in a difference of four offense levels from the Guidelines calculation.  Nevertheless, Binday now argues that Mr. Frisch was constitutionally ineffective by "fail[ing] to properly challenge the Government's calculation of actual loss" in two ways.  (Mot. at 26).  First, Binday faults Mr. Frisch for failing to pursue an evidentiary hearing so that he could challenge the Government's decision to include loss from "insurance companies for which there was no evidence at trial that Mr. Binday intended to deprive them of 'potentially valuable economic information.'" (Mot. at 29).  Second, Binday asserts that it was unreasonable for Mr. Frisch not to have retained an actuary to determine a "reasonable alternative to the Government's actual loss calculation."  (*Id.*).  Because sentencing counsel performed reasonably, Binday's claims regarding Mr. Frisch also fail.  And, in any event, because any change in the actual loss calculation by the Court would have had no effect on the Court's sentence, in light of the Court's express statement that it was sentencing Binday without regard to the loss amount or the Guidelines calculation, but instead the "old-fashioned way," no prejudice can lie.

### A.   Sentencing Counsel's Failure to Request a *Fatico* Hearing Does Not Constitute Ineffective Assistance.

To begin, it is well-established that a defendant's counsel may properly decide to forego a *Fatico* hearing as a reasonable, tactical "matter of strategy," *United States* v. *Lee*, 818 F.2d 1052, 1056 (2d Cir. 1987); *see also United States* v. *Costa*, 423 Fed.Appx. 5, 8-9 (2d Cir. 2011) (summary order) (decision not to request a *Fatico* hearing fell "within the range of reasonable professional assistance"); *United States* v. *Santiago*, 330 F. App'x 234, 238-39 (2d Cir. 2009);

*Brito* v. *United States*, No. 13 Cr. 589 (PKC), 2017 WL 3142074, at *3 (S.D.N.Y. July 24, 2017)

(collecting cases); *Papetti* v. *United States*, No. Civ. 09-3626 (DRH), 2010 WL 3516245, at *6

(E.D.N.Y. Aug. 31, 2010) ("[T]he decision to forego a *Fatico* hearing is a matter of strategy and

[a court will] presume that such a strategy is sound absent a strong showing to the contrary.")

(internal quotation marks and citations omitted).   In this case, Binday's sentencing counsel

prepared a thorough and well-reasoned sentencing memorandum, vigorously arguing for a non-

incarceratory or short period of imprisonment. (*See* Dkt. No. 327).   In support, he argued that

there was no causal link between the "idiosyncratic fraud at issue" and the economic harm as

reflected in the Government's loss calculations.   (*See id.* at 2-25).   And, with regard to the actual

loss calculation, Mr. Frisch argued specifically that the Government, by "excluding policies still

in force on which the owners are still paying premiums, and may continue to do so for years,"

arrived at an "artificially high" loss amount by "exclud[ing] the most profitable period of life

insurance" during which an Insured "exceeds his or her life expectancy."  (*Id.* at 13).   Mr. Frisch

also argued, among other things, that the Government erred in calculating loss on a policy-by-

policy basis instead of looking at the pool as a whole (*id.* at 21-22), and argued that the

Government's calculation of actual and intended loss did not adequately account for the

investment returns from premiums paid (*id.* at 22-23).   Binday cannot simply point to Mr.

Frisch's failure to ask for an evidentiary hearing as evidence of his deficient performance, in

light of the many ways in which Mr. Frisch argued against the Government's method in

calculating loss by way of his papers, and at the sentencing itself.

But assuming *arguendo* that Mr. Frisch's failure to request a *Fatico* hearing could be

construed as unreasonable, Binday cannot sustain his claim in light of the absolute absence of

what evidence, if any, a *Fatico* hearing might have established, so as to constitute prejudice to

him.  *See United States* v. *Costa*, 423 F. App'x 5, 8-9 (2d Cir. 2011).  The crux of Binday's

argument appears to be that, had sentencing counsel requested a *Fatico* hearing, he may have

been able to elicit evidence that seven insurance companies (other than Prudential and Lincoln)

may have not have been deprived of economically valuable information or exposed to economic

risk as a result of the defendants' scheme.  Binday, however, provides no guidance as to what a

"reasonable" actual loss calculation would have been.  *Cf. Binday*, 804 F.3d at 597 ("Notably,

the defendants have not offered an alternative calculation for actual loss, nor is one readily

apparent.").  Indeed, Binday's failure to establish prejudice beyond mere hypothesis is evidenced

by the conditional way in which his argument is couched:  "*If* an insurance company did not

believe the issuance of STOLI policies could result in tangible economic harm or *if* it did not

otherwise use the financial information in pricing its policies, any loss incurred could not be part

of [Binday's] scheme."  (Mot. at 28).  But the Government established at trial, through the

testimony of Messrs. Avery and Burns as well as documentary evidence, the industry as a whole

did not want STOLI for the same reasons as were explained specifically for Prudential and

Lincoln.  (*See, e.g.*, Tr. 496-97 (Avery, noting from his capacity at Prudential as well as his role

on the American Council of Life Insurance Committee, that "the industry, as they began to

understand it, . . . never wanted to issue a STOLI policy"); Tr. 536 (Avery noting that National

Council of Life Insurance Legislators and the National Association of Insurance Commissioners

had passed model regulation to make STOLI illegal)).  And although the Government did limit

its testimony to two industry witnesses (Prudential and Lincoln) at trial, it further introduced

policy statements not only from those two (GX 2922, 2943), but also from AIG (GX 2904),

Hancock (GX 2915), and Union Central (GX 2951), and then presented the STOLI-targeted

questions from each of the nine Insurers to which the defendants supplied false answers.  (*See,*

31

*e.g.,* GX 413 at 13 (Security Mutual questions); GX 531 at 5-6, 12-13 (Sun Life questions); GX 541 at 13 (AIG questions); GX 605 at 1-2 (Lincoln questions); GX 650 at 13 (Union Central questions); GX 1324 at 2-4, GX 1325 at 6-7 (AXA questions); GX 2000 at 2, 9, 16 (Hancock questions); GX 2350 at 25 (Prudential questions)).  This evidence was more than sufficient for the Government to meet its burden to prove that the scheme included all nine Insurers by a preponderance for purposes of sentencing, and it also establishes that Binday's assertion as to prejudice on this count is nothing more than hypothetical speculation.[11]

Indeed, it is equally plausible that, had sentencing counsel insisted on a *Fatico* hearing, testimony and further evidence from the seven Insurance companies may have yielded evidence supporting an even greater loss amount.  For instance, certain of the Insurers had taken the position prior to sentencing that they were entitled to estimated losses based on in-force policies (*see* Gov't Sentencing Submission at 58 n.28) which the Court risked considering if further evidence from the Insurers had been taken.  As such, defense counsel cannot be faulted for declining to rolling the dice in this regard, especially when, as the Second Circuit noted on appeal, there are no "readily apparent" alternative measures of actual loss.  *See generally Greiner* v. *Wells,* 417 F.3d 305, 319 (2d Cir.2005) ("We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside." (internal quotation marks omitted)).

---

[11] To further buttress the conclusion of a lack of prejudice here, Binday's own Exhibit D, a court filing from Sun Life, establishes that it too had the same view of the economic harm posed by STOLI as did Prudential and Lincoln.  (*See* Pet. Ex. D at 1 (noting that "Sun Life determined years ago" it would not "knowingly issue life insurance policies intended for investors rather than consumers," because, "[a]mong other reasons" STOLI policies "are less profitable" and "[i]nvestors fund policies at lower levels and often terminated policies on healthier individuals but keep policies in force for the insureds with higher anticipated mortality rates" leading to "unsustainable loss ratios and unprofitable business.")).

**B.      Sentencing Counsel's Failure to Retain an Actuary Does Not Constitute Ineffective Assistance.**

Similarly, Binday cannot find *Strickland* fault or prejudice in his sentencing counsel's

failure to hire an actuary.  To begin, "there is no *per se* rule that requires trial attorneys to seek

out an expert."  *Cromitie* v. *United States*, No. 09 Cr. 558 (CM), 2017 WL 1383982, at *8–9

(S.D.N.Y. April 7, 2017) (quoting *Gersten* v. *Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005)

(internal quotation marks omitted)).  This is in part due to principle that "*Strickland* . . . permits

counsel to 'make a reasonable decision that makes particular investigations

unnecessary.'" *Harrington* v. *Richter,* 562 U.S. 86, 106 (2011) (quoting *Strickland,* 466 U.S. at

691).  Moreover, "[e]ven if it had been apparent that expert . . . testimony could support [a

certain] defense, it would be reasonable to conclude that a competent attorney might elect not to

use it." *Id.* at 108; *see also id.* at 111 ("*Strickland* does not enact Newton's third law for the

presentation of evidence, requiring for every prosecution expert an equal and

opposite expert from the defense.").

Here, Binday has again failed to even proffer what helpful testimony an actuary would

have provided, much less show that any such testimony would have resulted in a different actual

loss calculation so as to have impacted his sentencing or undermine confidence in his sentence.

Binday speculates that, if sentencing counsel were to have retained such an expert, that expert

might have adopted "a better and more reasonable estimate of loss" by "compar[ing] the

profitability of or loss from the policies at issue in this case with non-STOLI policies originated

during the same time period."  (Mot. at 29).  But Binday "must do more than assert in a

conclusory fashion that an expert's testimony was required for effective representation and

would have made a difference" at sentencing.  *Cromitie* v. *United States*, 2017 WL 1383982, at

*8 (collecting cases); *see also United States* v. *Vargas*, 920 F.2d 167, 170 (2d Cir. 1990)

33

(holding that a "conclusory" affidavit that defendant had "no knowledge" of crimes was not sufficient); *Rosario* v. *Bennett*, No. 01 Civ. 7142 (RMB) (AJP), 2002 WL 31852827, at *33 (S.D.N.Y. Dec. 20, 2002) ("Rosario does nothing but assert that an investigation might have revealed witnesses who might have supplied relevant testimony that might have been exculpatory. Such speculation satisfies neither *Strickland*'s deficient performance nor prejudice prongs"); *United States* v. *Holland*, No. 01 Cr. 135 (WKS), 2013 WL 5915199 (D. Vt. Nov. 5, 2013), at *9 ("[Movant's] contention that her sentence would have been different had [counsel] retained an expert witness is based upon nothing more than her own speculative assertions. Significantly, she has not come forward with affidavits or other evidence showing that there was, in fact, an expert witness who would have testified that she suffered from Schizoaffective Disorder-Bi Polar Type when she was sentenced.").  Because Binday provided no counterfactual evidence as to what an actuary would have established, he cannot establish that he was prejudiced by his counsel's failure to retain one.

## C.   Binday Cannot Establish Any Prejudice With Regard to Any Sentencing Error

Finally, even if Binday could do more than speculate as to whether either a *Fatico* hearing or an actuary would have resulted in a different Sentencing Guidelines range, Binday cannot establish any prejudice with regard to his sentence, because the Court in this case sentenced the defendants "the old-fashioned way" without regard to the loss amounts calculated for the Guidelines.  (Sentencing Tr. 41-42 (the Court noting "[f]orget about the amount of fraud loss, whatever it was or will turn out to be; in the end, this was a scheme perpetrated over a span of years, brazen . . . and characterized by truly horrible behaviors on the defendants' part"); *see also id.* at 11 (noting that this case is "a perfect example of why [the Guidelines] should be abolished" in light of "[t]he amount of time, the amount of money, the amount of effort that has

been expended arguing about the guidelines and how they should be calculated instead of arguing about Mr. Binday"); *id.* at 40 (describing case as, after "long time discussing the calculation," one that proves the "idiocy" of the Guidelines).  As the Court made clear in fashioning Binday's sentence, "[t]he fact that the nominal victims here are major insurance companies does not and ought not lessen the discuss with which we view the defendants' behavior."  (*Id.* at 43).  On appeal, the Second Circuit emphasized that, even if the loss calculations were imprecise for purposes of sentencing, it took "comfort in the district court's emphatic statement that it would have imposed the same sentence regardless of the loss amount, which renders any error in the loss calculation harmless."  804 F.3d at 598.  For the same reason, this Court can take comfort in the fact that, even if Binday could articulate another strategy that might have led to a different calculation, he could not establish prejudice in light of the fact that this Court's sentence of Binday was made independently of the loss calculation.

Similarly, although the defense asserts in a conclusory fashion that their desired "successful challenge of the actual loss amount"—by only counting the actual losses to Lincoln and Prudential—would have decreased Mr. Binday's sentence by at least four levels," (Mot. at 27-29), *i.e.*, from between $20 to 50 million to $2.5 to 7 million, that argument too fails.  As the Second Circuit noted, "even if no loss is attributed to the policy outcomes on the STOLI policies that defendants fraudulently imposed on the insurers, the approximately $11.7 million that the defendants received in commissions constitutes an actual loss to the insurers," which still resulted in a "20-level increase" in the Guidelines sentence, or two levels below what the Court found.  *Id.* at 599.  Binday's Guidelines range under this calculation would have been 135 to 168 months, and Binday's sentence would have squarely been within that range.  Thus, Binday can simply not provide any argument that undermines confidence in the Court's sentence of the

defendant, because even if alternative strategies could have resulted in another actual loss calculation, it could not have resulted in one beneath that of actual commissions issued by the Insurers.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Binday's Section 2255 Motion, and deny a certificate of appealability.

DATED:      October 16, 2017
              New York, New York

                                  Respectfully submitted,

                                    JOON H. KIM
                                    Acting United States Attorney

                    By: ___/s/_____
                                    Eun Young Choi
                                    Assistant U.S. Attorney
                                    Southern District of New York
                                    Tel. (212) 637-2187