**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

MICHAEL BINDAY,                          :        Case No. 1:12-cr-00152-CM
                                                                    1:17-cv-04723-CM

       Petitioner

      - v. -                                       :

UNITED STATES OF AMERICA

       Respondent.                        :

-------------------------------------------------------- x

## PETITIONER'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF SECTION 2255 MOTION TO VACATE

Petitioner Michael Binday submits this reply memorandum of law in support of his

Section 2255 Motion to Vacate, Set Aside, or Correct Sentence ("Section 2255 Motion").

As explained in the Section 2255 Motion, Doc. 420,[1] his conviction should be vacated

because he received ineffective assistance of counsel from his trial counsel, Elkan

Abramowitz, due to Mr. Abramowitz's plain misunderstanding of the law supporting the

Government's theory of prosecution. Mr. Binday's 12-year prison sentence should

alternatively be vacated because Mr. Binday received ineffective assistance of counsel

from his sentencing counsel, Andrew Frisch, due to Mr. Frisch's failure to sufficiently

contest the Government's actual loss amount in calculating Mr. Binday's recommended

---

[1] Citation to "Doc. ___" refer to docket entries in Mr. Binday's criminal case, No. 1:12-cr-00152-CM, to comport with the Court's order dated June 20, 2017. Doc. 421 (stating all future documents related to Mr. Binday's 2255 Motion must be filed in the criminal case). Any pinpoint citations to pages in a docket entry refer to the page number in the PACER heading.

sentence under the United States Sentencing Guidelines—the anchor in determining any defendant's reasonable punishment.

The Government has filed a memorandum in opposition ("Response"), Doc. 440, in which it argues Mr. Binday's Section 2255 Motion should be denied without an evidentiary hearing. "A § 2255 petitioner is entitled to a hearing 'unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Severino v. United States*, No. 10 cv 5131, 2011 WL 13176239, at *6 (S.D.N.Y. Aug. 15, 2011) (quoting 28 U.S.C § 2255(b)). "If the petitioner alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim." *Griffith v. United States*, 871 F.3d 1321, 1329 (11th Cir. 2017) (internal quotation marks omitted); *accord Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (holding an evidentiary hearing should be granted for a Section 2255 Motion when the petitioner establishes a "plausible" claim of ineffective assistance of counsel). For the reasons explained in the Section 2255 Motion and below, the Government's arguments are without merit. The Section 2255 Motion should be granted, or an evidentiary hearing should be ordered on all grounds to which there are material factual disputes.

## REPLY MEMORANDUM

## I.    Mr. Abramowitz's representation was constitutionally deficient because he misunderstood the law supporting the Government's theory of prosecution.

Mr. Binday explained in his Section 2255 Motion that Mr. Abramowitz's representation failed the first prong of the *Strickland*[2] test for ineffective assistance of

---

[2] *Strickland v. Washington*, 466 U.S. 668, 686–87 (1984).

2

counsel (deficient representation) because Mr. Abramowitz's defense was premised on his assertions that the victim insurance companies neither were deceived nor suffered actual economic harm. Doc. 420 at 11–17. Notwithstanding Second Circuit precedent and explicit warnings from the trial court that these assertions were not permissible defenses to the Government's allegations of mail and wire fraud, *id.* at 17 n. 2, Mr. Abramowitz continued this defense throughout Mr. Binday's trial—ultimately to Mr. Binday's detriment.

The Government argues in its Response, *inter alia*, that Mr. Binday's claim of ineffective assistance of counsel arises from a "conflation of the terms 'economic loss' and 'tangible economic harm.'" Doc. 440 at 14. The Government's argument, however, is only supported by its own attenuated reading of the trial transcript. Further, its *post factum* justifications for Mr. Abramowitz's defense disregard what is significantly absent from Mr. Abramowitz's court-ordered affidavit—a refutation of Mr. Binday's assertion that Mr. Abramowitz misunderstood the law at trial. Doc. 439. Mr. Binday has sufficiently alleged and proven *Strickland*'s first prong.

### A.  Mr. Abramowitz's opening statement.

The Government characterizes Mr. Binday's excepts from the trial transcript in the Section 2255 Motion as "misleading" and "incomplete." Doc. 440 at 15–16. The trial transcript speaks for itself when it is read in context, and the transcript definitively reflects Mr. Abramowitz's misunderstanding of the law. The Government's speculation as to the meaning behind Mr. Abramowitz's arguments is without legal and evidentiary support.

Mr. Abramowitz began his opening statement with an incorrect proffer of the jury instructions:

| Mr. Abramowitz: | As the judge will instruct you, if no one has been defrauded, if no one has been defrauded, if no one has suffered economic harm, then Mr. -- |
| Ms. Choi: | Objection, your Honor. |
| Mr. Abramowitz: | -- Mr. Kergil. |
| The Court: | The objection is overruled. |
| Mr. Abramowitz: | -- and Mr. Resnick are innocent, and let me repeat that. If the government does not prove there was economic harm intended by Mr. Binday, by Mr. Kergil and Mr. Resnick, they are innocent of the charges that are being brought against them. If they intended no harm, economic harm to the insurance companies, no crime of fraud against them has been committed. |

Doc. 262 at 26. The Government asserts this excerpt "evidences [Mr. Abramowitz's] argument that if there is no proof that the defendants intended economic harm upon the Insurers, then the jury should acquit." Doc. 440 at 16. The Government's interpretation disregards the first half of the excerpt—a clear misstatement of the law that is distinct from any instruction as to Mr. Binday's intent.[3] The jury would not eventually be instructed that Mr. Binday and his co-defendants were innocent "if no one has been defrauded" or "if no one has suffered economic harm" because those were not defenses to mail and wire fraud. *See United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (holding mail fraud "does not require the government to prove that the victims of the fraud were actually injured"). In fact, the exact opposite instruction was given to the jury. *See* Doc. 282 at 28 ("Because the government need only show that a scheme to defraud existed, not that it succeeded, it

---

[3] Although the Government's grounds for its objection were not stated on the record, this is potentially what drew its objection to the statement.

is not necessary for the government to prove that any insurance company actually lost money or property as a result of the scheme.").

Later in his opening statement, Mr. Abramowitz misapplied the legal principle underlying the Government's right to control theory—tangible economic harm:

Mr. Abramowitz:     In this case, I can tell you the someone that the Government wants you to believe has been deceived are the insurance companies. Let me tell you again as directly as I can. The insurance companies in this case were simply not deceived. No one involved in this investment plan suffered any tangible economic harm. So in reality, there are no victims here.

*****

Mr. Abramowitz:     So why are we here? Why are we here if the insurance companies aren't suffering any tangible economic harm if the person getting the insurance isn't harmed and actually benefits if the insurance companies actually encourage premium financing and life settlements? [sic]

*****

Mr. Abramowitz:     In short, when you get a chance to go through all of the evidence in the case, you will not see that the insurance companies suffered any tangible economic harm period. If they did not suffer any tangible economic harm, there cannot be a scheme to defraud, and any lies that may have occurred on the applications simply do not constitute a crime.

Doc. 262 at 27, 32, 37. As Mr. Binday explained in his Section 2255 Motion, it constitutes mail or wire fraud in the Second Circuit to deprive someone of the right to control how his or her assets are spent. Doc. 420 at 10. Mr. Binday continues to assert that that the right to control theory is inconsistent with United States Supreme Court precedent, including *Skilling* and *Cleveland*, both of which rejected the "right to control" as proof of the property

element of fraud. *Skilling v. United States*, 561 U.S. 358 (2010); *Cleveland v. United States*, 531 U.S. 12 (2000). By raising Mr. Abramowitz's misunderstanding of the Second Circuit precedent discussing the right to control theory, Mr. Binday expressly does not waive his right to re-assert his objection to the right to control theory in a future proper forum— particularly as a claim of actual innocence in a petition for writ of habeas corpus.

The right-to-control theory requires that the defendant's "misrepresentations or non- disclosures *can or do* result in tangible economic harm." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) (emphasis added); *accord United States v. Wallach*, 935 F.2d 445, 462–63 (2d Cir. 1991) ("[A]pplication of the [right to control theory] is predicated on a showing that some person or entity has been deprived of *potentially* valuable economic information.") (emphasis added). It is insufficient for a defendant to argue as a defense that a victim has not actually suffered tangible economic harm because the economic impact of the information being deprived or misrepresented only needs to be potential. *Cf. Finazzo*, 850 F.3d at 111 ("Depriving a victim of 'potentially valuable' information necessarily creates a risk of tangible economic harm."). That is however what Mr. Abramowitz unequivocally argued in these excerpts, and thus his argument was not a defense at all.

The Government claims these excerpts, "when read in context," reflect a permissible defense because "counsel's use of the phrase was shorthand for lack of cognizable economic harm in light of the insurance companies' desire to issue STOLI, and the defendants' knowledge of that fact." Doc. 440 at 16. If the Government's opposition to the Section 2255 Motion is that Mr. Abramowitz intended his argument to mean something other than the plain meaning of the words he used, then Mr. Abramowitz had the

opportunity to explain his defense in his affidavit. He did not do so. Doc. 439. The Government's claim is mere speculation based on its own isolated reading of the record—ignoring, as discussed below, Mr. Abramowitz's continued incorrect references to "tangible economic harm" during the trial. Further, such an argument would be fatally unclear to a juror who is instructed on the elements of mail and wire fraud. The insurance companies' desire to issue STOLI policies was only relevant to the materiality of the statements. *See United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013) ("[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision making body to which it was addressed."). In any event, the Government's interpretation of what Mr. Abramowitz meant—with no evidentiary support from Mr. Abramowitz or elsewhere—is not "conclusive" and thus cannot support the denial of the Section 2255 Motion without an evidentiary hearing.

## B.    Mr. Abramowitz's motion for judgment of acquittal.

Mr. Abramowitz's misunderstanding of the right to control theory and the mail and wire fraud charges is highlighted in his mid-trial motion for a judgment of acquittal. The Government, in its Response, fails to discuss this inexplicable part of the trial transcript, despite it being cited in the Section 2255 Motion. Doc. 420 at 12–13. Mr. Abramowitz's argument proceeded as follows:

> Mr. Abramowitz:    I want to focus on the meager. Your Honor's ruling on the motion in limine, which we are not rearguing now, did say that the government would have to prove that the insurers would have suffer [sic] some sort of tangible economic harm as a result of the loss of the right to control their decision to issue STOLI policies.

*****

| | |
|---|---|
| Mr. Abramowitz: | [T]he second arm of that is that that's insufficient, according to your Honor's ruling, and there additionally has to be a tangible economic harm. |
| | Now, with respect to that issue, 16 witnesses were called by the government. Only two were in a position to speak to the alleged impact, and that is Messrs. Avery and Burns. They simply proved that there was no tangible economic harm, and I make reference to the fact Mr. Avery's testimony…, he was asked how STOLI entering the market impacted Prudential's bottom line, to which he responds – and it is not only the bottom line that I am talking about – |
| The Court: | But the question -- I remember the question vividly because the question was bottom line. The question wasn't directed to anything else. We have already established beyond peradventure that the bottom line is not the only indicia of economic, tangible economic injury. |
| Mr. Abramowitz: | I agree with you. It could be an indication. It isn't in this case. That is my point, and we are going to move down to other aspects of economic harm. |

*****

| | |
|---|---|
| Mr. Abramowitz | Loss of reputation and some worry about tax status is an intangible right. It is not, has no economic impact whatsoever, and if it does, it wasn't proved. |
| | There wasn't a witness that said we suffered any tangible economic harm here. They said the opposite. They didn't want the STOLI policies, there is no question about that, but there was no economic harm offered, no dollars and cents on a balance sheet and no tangible economic harm. |

*****

Mr. Abramowitz:    So all we are getting from the government's case is pure right to control. We bring you back to Shellef. Shellef is a case that says that pure right to control is not a tangible economic harm.

                                 Your Honor, I urge you to consider these arguments. I think McNally is the case, even though it is a 1987 Supreme Court case, that takes us there. The cases cited for -- and also if your Honor had told the government they should prove the harms in the indictment, they didn't come near proving the harms in the indictment.

The Court:          We don't know. They don't have to prove the ones alleged in the indictment. What I said was if they proved those, that would be sufficient.

Mr. Abramowitz:    Well, they didn't. Therefore, what is left is testimony that really is clear that there was no economic harm. STOLI is a controversial type of life insurance. It can be dealt with in different contexts. It cannot be dealt with in the context of a crime of mail fraud because there was no economic harm, or at least we didn't hear any. Thank you.

Doc. 276 at 14–20.

Mr. Abramowitz's misunderstanding of the law is obvious. Contrary to his argument and as explained above, the right to control theory is neither distinct from tangible economic harm nor does it require tangible economic harm to actually occur. Mr. Abramowitz stresses in his argument there was no "tangible economic harm" because the insurance companies' "bottom line" was not eventually impacted by issuing the policies at issue in this case. *Id.* at 15. A defendant is prosecuted under the right to control theory because tangible economic harm was a possible result of his misrepresentation or non-disclosure, not because it occurred "as a result of the loss of right to control." *Id.* at 14; Doc. 420 at 10. Mr. Abramowitz's interpretation of the law and subsequent argument was

therefore incorrect. To the extent Mr. Abramowitz is referring to "tangible economic harm" as the absence of any other actual economic harm to the insurance companies, that is also irrelevant in a mail or wire fraud prosecution.

### C.   The charge conference.

After the Defense rested its case-in-chief, Mr. Abramowitz and Benjamin Fischer proposed a jury instruction during the charge conference based on the misunderstanding proffered in opening statement—actual deceit. Mr. Binday quoted the relevant portions of the charge conference in the Section 2255 Motion. Doc. 420 at 13–15. Simply put, Mr. Binday's trial counsel sought to instruct the jury that the Government was required to prove Mr. Binday deceived the insurance companies, and they would not have been deceived if "they were aware of the misrepresentations or turned a blind eye toward them." Doc. 278 at 89. Mr. Fischer explained the defense in this case: "that if the victim of a fraud…isn't deceived, then there is no fraud." *Id.* at 93. Mr. Abramowitz described the issue of actual deceit as "the heart of the defense." *Id.* This argument, however, was contrary to the law of the Second Circuit, Doc. 420 at 17 n. 2, and the Court explained that repeatedly to trial counsel. Doc. 278 at 100–01.

Trial counsel's error here being apparent, the Government again attempts to explain the misunderstanding by looking at the end result of the charge conference. The Government cites to the Court's clarifications of and inferences from trial counsel's argument to assert that the evidence trial counsel elicited for their defense was potentially relevant to Mr. Binday's intent and the materiality of any fraud. Doc. 440 at 17–18. This conflates the two prongs required under *Strickland.* The first prong is counsel's deficient

performance, which was his trial counsel's misunderstanding of the law. Doc. 420 at 19.

Whether Mr. Binday was prejudiced by this error is a separate issue addressed below.

**D.    Closing argument.**

Finally, the Government argues Mr. Abramowitz was not deficient because in closing argument he touched on the materiality and intent defenses he should have focused on prior to and during the entire trial. Doc. 440 at 22. By that point, however, Mr. Abramowitz had failed to introduce any direct evidence of Mr. Binday's lack of intent. In fact, Mr. Abramowitz's discussion of intent lasts one page of an approximately 35-page closing argument. Doc. 280 at 75–76. The Government's assertion that Mr. Abramowitz's failure to sufficiently argue these defenses in his closing should be forgiven because counsel for Mr. Binday's co-defendants discussed these defenses is also without legal support.

Mr. Binday does not assert Mr. Abramowitz's closing argument was deficient on its own to support an ineffective assistance of counsel claim. Mr. Abramowitz's closing argument merely reflected his continued misunderstanding of the law—emphasizing the lack of actual economic harm to the insurance companies, *id.* at 56, 59, and arguing, again, that the insurance companies were not deceived, *id.* at 60. *See id.* at 65 ("In the context of fraud charges, a lie is not criminally material if the person or the company to whom the lie is directed is not deceived."). While the Government now asserts Mr. Abramowitz's arguments were pertinent to a "lack of materiality" defense, Doc. 440 at 21, Mr. Abramowitz was setting himself up to be directly contradicted by the Court's jury instructions—"The government is not required to establish that anyone actually relied on

any false or fraudulent statement or representation…Whether it actually influenced the insurance company is of no moment." Doc. 282 at 27. There was thus no broader context in which to put these statements, such that a reasonable jury would have understood they refuted any element of mail and wire fraud.

*****

Mr. Abramowitz presented a defense at trial unsupported by Second Circuit precedent while unreasonably ignoring other legally permissible defenses to the crime charged. This misunderstanding of the law "is a quintessential example of unreasonable performance under *Strickland*" that infected Mr. Binday's entire trial. *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014); *see also Lawhorn v. Allen*, 519 F.3d 1272, 1295 (11th Cir. 2008) ("Tactical or strategic decisions based on a misunderstanding of the law are unreasonable."); *United States v. Gray-Burriss*, 251 F. Supp. 3d 13, 19 (D.D.C. 2017) ("[T]rial decisions avowedly based on ignorance of governing legal principles cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions.") (internal quotation marks omitted). Mr. Binday has sufficiently alleged and proven Mr. Abramowitz's representation was constitutionally deficient.

## II.   Mr. Binday was prejudiced by Mr. Abramowitz's misunderstanding of the law.

Mr. Binday argued in his Section 2255 Motion that he was prejudiced by Mr. Abramowitz's failure to understand and properly implement the law underlying the Government's theory of prosecution because it deterred Mr. Abramowitz from pursuing other legally viable defenses prior to and throughout his trial, including Mr. Binday

testifying on his own behalf to refute the significant intent element of mail and wire fraud. Doc. 420 at 18–24. The Government argues in its Response that the additional evidence to which Mr. Binday cites in the Section 2255 Motion is insufficient to establish a substantial likelihood that the outcome of Mr. Binday's case would have been different had the evidence been admitted and properly argued to the jury. Doc. 440 at 20–21. The question at this stage of the litigation is different when the Government disputes material facts in Mr. Binday's petition: Whether Mr. Binday alleged sufficient facts to state a plausible claim of ineffective assistance of counsel? The answer is yes. Mr. Binday cites to evidence in his Section 2255 Motion that support a substantial likelihood he would have been acquitted had Mr. Abramowitz presented legally viable defenses throughout trial. An evidentiary hearing would allow Mr. Binday to prove that substantial likelihood.

A.      **Evidence of lack of intent.**

Mr. Binday cites to several pieces of evidence which would have supported a defense addressing his lack of intent to defraud the insurance companies. Like the trial excerpts discussed above, the Court should not view this evidence piece by piece in a vacuum, as the Government does in its Response. Collectively, these pieces of evidence would have supported a defense asserting Mr. Binday lacked fraudulent intent. Despite random and unstructured references to lack of intent at trial, Mr. Abramowitz never formulated this argument and did not admit evidence supporting it. Had this evidence been presented to the jury, there is a substantial likelihood the jury would have acquitted Mr. Binday.

The Government asserts Mr. Binday's emails with Prudential's senior employees,[4] Doc. 420, Ex. A, would not have swayed a jury to find in Mr. Binday's favor because (1) they "make no mention whatsoever of STOLI, IOLI, or even premium financing therein," and (2) Binday later executed and submitted Prudential applications following the company's implementation of its STOLI-detection policies. Doc. 440 at 23–24. The Government's arguments fail because they ignore the relevance of these emails. The Prudential emails would not have been admitted to prove the insurance companies had actual knowledge that Mr. Binday was submitting STOLI policies. As the Court stated, Mr. Binday was not charged with "a knowledge crime." Doc. 278 at 94.

The emails were relevant to whether Mr. Binday intended to defraud the insurance companies. The emails included unambiguous references to "large cases," "non recourse [sic] premium finance," multi-million dollar benefits, and trusts created for the payout of the insurance benefit. Doc. 420, Ex. A. In fact, Mr. Binday offered Prudential a policy that would generate a conspicuous $200,000 or more in estimated annual premium payments— nearly fulfilling the extraordinary target of $250,000 in annual premium payments that Prudential established for Mr. Binday. *Id.* at 2, 6. These were all hallmarks of STOLI policies that Mr. Binday believed the insurance carrier recognized without having to make any overt reference to the actual transaction Prudential publicly claimed to reject. Doc. 268 at 43, 47, 64; Doc. 270 at 62. Mr. Binday thought he was putting Prudential—one of only two insurance companies whose representatives testified at trial—on notice before

---

[4] Lily Levith, Prudential's Regional Vice President and Regional Brokerage Director, and Chuck Anderson, Prudential's Senior Vice President.

submitting STOLI policies and that, by welcoming his business, it was granting him permission.

The Government next turns to Mr. Binday's knowledge of the economic similarities between STOLI policies and other acceptable forms of life insurance, Doc. 440 at 24–25, claiming the similarities suggested by Mr. Binday in the Section 2255 Motion are "speculative," "hypothetical," and "without support." This again ignores the purpose for this evidence—to dispute the Government's allegation of fraudulent intent. Mr. Binday could have proven at trial the objective similarities between the allegedly banned STOLI policies and the permitted SPIA and hybrid-financed policies, as well as Lincoln's documented acceptance of non-recourse premium financed insurance policies. This evidence, however, would have been relevant to whether Mr. Binday, an experienced life insurance professional, thought the insurance companies had any actual economic aversion to STOLI. The Government claims that the jury would have rejected this argument as it did with the evidence regarding the similarities between STOLI and the life-settlements market. Doc. 440 at 25. The Government further asserts any such evidence of economic similarities would have been outweighed by the Government's evidence of the insurance companies' STOLI detection policies. These claims are pure conjecture.

The jury could have weighed this evidence, which more closely aligns STOLI with the permissible practices of insurance companies prior to a policy's issuance, than the life settlement market, which focuses on the post-issuance transferability of a life insurance policy benefit. Moreover, Mr. Binday's understanding of the similarities was supported by the informed opinions of other insurance professionals, as evidenced by the article from

the former President of John Hancock Life Insurance. Doc. 420, Ex. B at 1 ("'[H]ybrid' arrangements are still designed solely to put returns from life insurance policies into investor hands."). The Government asserts that John Hancock ultimately chose not to accept hybrid-financed arrangements in 2007 because it understood the similarity between the arrangement and STOLI, Doc. 440 at 25, but Hancock and other insurance companies were accepting hybrid-financed arrangements during the time period pertinent to this case. Doc. 420, Ex. B at 1.

Finally, the Government asserts that Mr. "Binday's failure to testify does not constitute ineffective assistance." Doc. 440 at 28. The Government again urges the Court to consider Mr. Binday's testimony separate and apart from the other evidence Mr. Abramowitz should have admitted. *Id.* While the importance of Mr. Binday's testimony cannot be overstated and deserves substantial consideration, it should be weighed with all of the evidence refuting the intent element to the Government's charges—as it would have been at trial by the jury.

Mr. Binday's testimony would have been pivotal to a defense of lack of fraudulent intent. The fact that the Eleventh Circuit was not considering an ineffective assistance of counsel claim in *Tobin* does not detract from the court's declaration: "A defendant's decision to take the stand and testify to his own state of mind provides the rare opportunity for direct evidence to be presented to the jury." 676 F.3d 1264, 1287 (11th Cir. 2012) *abrogated on other grounds United States v. Castro*, 736 F.3d 1308 (11th Cir. 2013). The Government claims any testimony by Mr. Binday would have failed to persuade a jury because it would have been "self-serving." Doc. 440 at 30. The Government makes the

same argument to discredit statements Mr. Binday made during a recorded conversation with an insured's family member that reflect a lack of fraudulent intent. *Id.* at 29.

"Evidence is always 'self-serving' in the sense that it is intended to benefit the party who offers it." *Gibbs v. State Farm Mut. Ins. Co.*, 544 F.2d 423, 428 (9th Cir. 1976). This is not a basis to presume Mr. Binday was not prejudiced because Mr. Abramowitz failed to offer this evidence at trial. Just as the jury could have considered his testimony as substantive evidence of guilt, the jury also "remained free to consider the value and weight of" Mr. Binday's testimony or prior statements regarding his state of mind. *Id.* Mr. Binday's testimony would have been substantiated by, *inter alia*, the above-mentioned evidence. Moreover, the recorded conversation to which Mr. Binday was a party, Doc. 420, Ex. C, occurred well before any government investigation or civil action pertaining to STOLI policies, thus he would have stated he did not have any fraudulent intent because it was his genuine belief.

Undersigned counsel is aware of Second Circuit precedent holding the Court may resolve a Section 2255 Motion without a "full-blown testimonial hearing," but it can otherwise expand the record to address an ineffective assistance of counsel claim. *See Foster v. United States*, 581 F. App'x 105, 106 (2d Cir. 2014). Mr. Binday urges this Court to grant the Section 2255 Motion or order an evidentiary hearing to resolve any disputes between the parties as to material facts—at which Mr. Binday could testify. Should the Court desire to expand the record, without an evidentiary hearing, to address what Mr. Binday would have said had he been properly advised by his counsel and elected to testify at trial, Mr. Binday respectfully requests the Court grant him leave to submit a sworn

affidavit addressing that testimony.[5] Such an affidavit would include detailed accounts of his interactions with the insurance companies regarding the submitted STOLI policies, his observations of how STOLI policies operated economically based on his experience in the life insurance business, and his overall lack of intent to defraud the insurance companies who he thought knew the nature of the business he submitted.

The Government further relies on Mr. Abramowitz's affidavit to dispute Mr. Binday's claim that he was misadvised about his right to testify. Doc. 440 at 28–29 (citing Doc. 439). Mr. Abramowitz does not dispute that Mr. Binday "offered to testify on his own behalf to directly refute the intent element of the fraud charge" or that he told Mr. Binday "the Government had not proven economic harm." Doc. 439 at 2. Mr. Abramowitz claims Mr. Binday's decision to not testify was based on the fact that he would have been confronted on cross-examination with the false statements he made in the insurance applications, which were admitted at trial in opening statement, and the statements made during his testimony before the New York State Insurance Department. *Id.* at 1–2.

Mr. Abramowitz's affidavit is insufficient to refute Mr. Binday's account of the events without, at least, an evidentiary hearing. Mr. Abramowitz may have provided advice to Mr. Binday regarding his potential impeachment because that is a risk for any testifying defendant during a skilled cross-examination. The evidence remains unrefuted by Mr. Abramowitz that he advised Mr. Binday—when it mattered most to Mr. Binday—that the

---

[5] The Court provided the Government with this opportunity by permitting Mr. Binday's former counsel to file affidavits with the Court contemporaneously with the Government's Response. Mr. Binday also personally makes this request in a letter included as Exhibit A to this memorandum.

Government did not prove its case because it failed to establish any economic harm. This legally incorrect advice unfairly and unconstitutionally deterred Mr. Binday from testifying. Furthermore, for the Court to rely solely on Mr. Abramowitz's affidavit without the additional presentation of evidence at a hearing, including the cross examination of Mr. Abramowitz, would improperly "credit counsel in [a] case of conflict." *Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999).

Finally, the cases to which the Government cites, Doc. 440 at 28, are factually and legally inapposite. Mr. Binday was not just any defense witness; he had a constitutional right to testify in his own defense and was the only person who could offer direct testimony as to his state of mind. Moreover, Mr. Abramowitz's advice could not have been trial strategy because it relied on his misunderstanding of the law—that the Government failed to prove the actual occurrence of economic harm to the insurance companies. Doc. 420 at 22–23. This error and prejudice amount to ineffective assistance of counsel.

## B. Evidence supporting other valid defenses.

Mr. Binday explained in the Section 2255 Motion that it is likely the jury would have acquitted Mr. Binday had Mr. Abramowitz presented evidence attacking the materiality element of mail and wire fraud or the insurance companies' expectations of tangible economic harm. Doc. 420 at 23–24. The cases to which Mr. Binday cites, *id.* at 23, illustrate Lincoln's continued issuance of STOLI policies despite, as the Government points out, Lincoln's public "efforts" prohibiting such policies. The jury could have inferred Lincoln had the same approach to issuing STOLI policies despite the public "anti-STOLI" procedures it implemented in 2007.

19

Moreover, the insurance companies' alleged economic expectations for STOLI policies were ripe to be challenged. The jury heard from Michael Burns of Prudential that the "most significant risks of [STOLI] are social, legal, and tax-related; not economic." Doc. 270 at 41. Further, Sun Life, one of the insurance companies Mr. Binday was accused of defrauding, publicly stated economic expectations of STOLI policies that were different than those discussed by Prudential and Lincoln at trial. Doc. 420, Ex. D at 1. The Government contends that Sun Life's expectations were "precisely what both [James] Avery and [Michael] Burns testified was their concern as to lapse rates for STOLI." Doc. 440 at 26 n. 9. The record speaks for itself. Sun Life stated investors "selectively terminated half of the policies in the portfolio," Ex. D at 1, while Mr. Burns testified policies would "never lapse, so always the death benefit would be paid…." Doc. 268 at 165. These are two inconsistent positions, the latter of which was unsupported by any data at trial. While the insurance companies asserted they had "minor" economic concerns, Doc. 270 at 54, there is a substantial likelihood the jury would have found them unreasonable had Mr. Abramowitz properly challenged their veracity throughout trial and during closing argument.

Had Mr. Abramowitz not misunderstood the law, he could have raised these additional defenses likely to strike at the heart of the Government's case. Mr. Binday was therefore prejudiced by Mr. Abramowitz's deficient representation.

### III.    Mr. Frisch was constitutionally ineffective because he failed to properly challenge the Government's actual loss calculation.

Mr. Binday argued in his Section 2255 Motion that his sentencing counsel, Andrew Frisch, was constitutionally ineffective for failing to challenge the Government's calculation of actual loss. Doc. 420 at 26–30. Mr. Binday was convicted of executing a scheme to defraud. The scope of that scheme was exceptionally important to calculating his recommended sentence under the United States Sentencing Guidelines. *See United States v. Cusumano*, No. 1:14-cr-1-MW-GRJ, 2015 WL 10324107, at *5 (N.D. Fla. Dec. 31, 2015) ("The fraud loss table not only drives the seriousness of the penalty, but it does so with precision, providing incrementally longer prison terms as the amount of the loss increases.") (internal quotation marks omitted). Even when, as in this case, "the sentencing judge sees a reason to vary from the Guidelines…the Guidelines are in a real sense the basis for the sentence." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (internal quotations omitted).

The scope of Mr. Binday's alleged scheme was never determined, but it could have—and should have—been determined at an evidentiary hearing to calculate actual loss. The Government first argues that Mr. Frisch was not ineffective for failing to request an evidentiary hearing because "a defendant's counsel may properly decide to forego a *Fatico* hearing as a reasonable, tactical matter of strategy." Doc. 440 at 31 (internal quotation marks omitted). The Government's argument may be a correct statement of the law, but there is no evidence that Mr. Frisch waived a *Fatico* hearing for a strategic reason. Mr. Frisch did not submit an affidavit when the Court presented him the opportunity to

refute the allegations in the Section 2255 Motion. The Government's speculation that Mr. Frisch tactically waived an evidentiary hearing is without support. Moreover, as Mr. Binday explained in the Section 2255 Motion, a strategic decision can still be constitutionally deficient under *Strickland*'s first prong if it is unreasonable. Doc. 420 at 28. Here, such a waiver was facially unreasonable because there is a profound lack of proof as to whether the losses from any insurance company were the result of their right to control their assets.

The Government charged an intricate theory of mail and wire fraud that required it to prove the victims were deprived of "potentially valuable economic information." *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991). If the insurance companies did not have an economic concern as to STOLI, the answers to the STOLI questions were not "potentially valuable economic information." Contrary to the Government's position in its Response, Doc. 440 at 33–34, it was not enough that the companies did not want to issue STOLI policies for non-economic reasons. The Government thus attempted to portray the concerns of nine different life insurance companies as uniform when it extrapolated the $3.275 million loss it proved at trial (for Lincoln and Prudential) to a $38 million actual loss amount. The evidence, however, refuted such an assertion. The Government's own witnesses at trial contradicted one another as to their companies' economic concerns, and the "anti-STOLI" policies to which the Government cites in its Response do not address

22

whether American General ("AIG"), John Hancock, or Union Central had any economic reason to not issue STOLI policies.[6]

Without further evidence, Mr. Binday could not be held responsible for any losses from policies other than those Lincoln and Prudential issued. Mr. Frisch failed to bring this to the Court's attention and hold the Government to its burden. Waiving an evidentiary hearing was an unreasonable decision for such a factually specific theory of fraud.

An evidentiary hearing would have also resolved the factual issue of whether the scheme to defraud alleged by the Government was the "but for" cause of any actual loss to the insurance companies. *See United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017). Mr. Frisch did not address this issue at sentencing, and the Government did not respond to Mr. Binday's argument regarding causation, Doc. 420 at 28, in its Response. Mr. Binday therefore satisfies *Strickland*'s first prong.

The Government alternatively argues that Mr. Binday has failed to prove prejudice "beyond mere hypothesis" because he could not disprove "the industry as a whole did not want STOLI," "further evidence from the seven Insurance companies may have yielded evidence supporting an even greater loss amount," and because "the Court in this case sentenced the defendants 'the old-fashioned way.'" Doc. 440 at 33–34, 36 (quoting Doc.

---

[6] *See* GX 2904 (stating STOLI transactions "present a variety of risks for insureds, policyholders, producers and [AIG]," but not expressing any economic concerns); GX 2915 (stating only, "John Hancock does not support the use of its products in stranger-owned…or investor-owned life insurance transactions."); GX 2951 (addressing non-economic concerns, "SOLI/IOLI transactions endanger the tax-favored status of life insurance and generally fail state insurable interest requirements.").

349 at 41–42). As explained above, the evidence does not support the premise that each insurance company had reasonable economic concerns about issuing STOLI. The anti-STOLI policies indicate the opposite—that the concerns were non-economic. GX 2904; GX 2915; GX 2951. Further, an evidentiary hearing was unlikely to result in a worse sentence for Mr. Binday. The Court held him responsible for the entire amount of actual loss, and rightfully held it would not use the Government's intended loss figure at sentencing because it was "difficult to estimate future losses." Doc. 349 at 38. Whether there existed some hypothetical sequence of events by which the Government could have affirmatively proved a reasonable estimate of intended loss at an evidentiary hearing is unsupported and speculative.

Finally, the Court in this case expressed its desire to sentence "the old-fashioned way," Doc. 349 at 41, but the law frames the sentencing process around the Sentencing Guidelines. If the Government could only prove $3.275 million in loss, the recommended sentence under the Sentencing Guidelines would have been less than Mr. Binday's 12-year sentence—108 to 135 months.[7] It is unlikely the Court would have imposed an upward variance so as to sentence Mr. Binday for a potential $3 million fraud in the same way it sentenced him for a $38 million fraud. Rather, it is substantially likely the Court would

---

[7] As Mr. Binday explained in the Section 2255 Motion, Doc. 420 at 27 n. 6, the Government attributed a $3.275 million death benefit paid by Lincoln to Mr. Binday's actual loss amount without objection by Mr. Frisch. The policy was not submitted by Mr. Binday or his co-defendants. This error should have been discovered during an evidentiary hearing, and the actual loss amount could have been as low as $242,461.00 (the amount of a commission payment by Prudential to Mr. Binday from an open policy for which Prudential received $1,044,146.00 in premium payments that did not offset the commission payment at sentencing). The Sentencing Guidelines for this loss amount would be an Offense Level 25—a recommended sentence of 57 to 71 months.

have accounted for the ways in which the Sentencing Guidelines often inflate the recommended sentences for fraud offenses and thereafter sentenced Mr. Binday to a low-end or below-guidelines sentence. If the Court finds it would not have imposed an above-guidelines sentence of 12 years imprisonment, then the Court should vacate Mr. Binday's sentence due to ineffective assistance of counsel.

## CONCLUSION

Mr. Binday was unconstitutionally deprived of the effective assistance of counsel at both his trial and sentencing. At trial, Mr. Binday's trial counsel focused his efforts on the non-defense of absence of actual loss. At sentencing, Mr. Binday's sentencing counsel abdicated his responsibility to require the Government to present evidence substantiating its proposed figure for actual loss. Counsels' deficient performance at both stages was ultimately to Mr. Binday's detriment because they failed to pursue courses of action that were substantially likely to change the outcome of the verdict or sentence in Mr. Binday's favor.

For these reasons, this Court should vacate Mr. Binday's trial verdict or sentence, or, in the alternative, order an evidentiary hearing to resolve any disputes of material fact as to the Section 2255 Motion.

Dated:          December 15, 2017

/s/ *James E. Felman*
James E. Felman

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 15, 2017, the foregoing has been filed with the Clerk of Court through the CM/ECF System which will send a notice of electronic filing to all counsel of record.

/s/ *James E. Felman*
James E. Felman (Florida Bar No. 0775568)
Brandon K. Breslow (Florida Bar No. 0123755)
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, FL 33601
(813) 229-1118
(813) 221-6750
jfelman@kmf-law.com
bbreslow@kmf-law.com

*Pro Hac Vice Counsel for Defendant*