

May 7, 2020

Hon. Colleen McMahon
United States District Judge
Thurgood Marshall
United States Courthouse
New York, New York 10007

Re:     *United States v. Michael Binday*
        No. 12-cr-152 (CM)

Honorable Judge McMahon:

    We write to bring three important developments relevant to Michael Binday's
Section 3582 motion to reduce his sentence.

<u>Judge Caproni's Discovery Order</u>

    First, we attach a recent order of Judge Valerie Caproni.  Joseph Percoco, who
suffers from diabetes, moved for compassionate release.  Judge Caproni ordered the
government to provide the following information in one week:  "The Government is
directed to respond to Defendant's motion by May 13, 2020. In its response, the
Government must provide (i) Mr. Percoco's medical and disciplinary records from
Otisville, (ii) current data on how many COVID cases Otisville has had (both inmates
and staff), and (iii) how many inmates at Otisville have been tested for COVID."

    The information to be produced may be relevant to Binday's pending motions.

    In addition, we respectfully request that Your Honor consider the order of Judge
Ronnie Abrams in *United States v. Park*, No. 16-cr-473 (RA), filed on April 24, 2020, in
which Judge Abrams granted a Section 3582 motion because the Bureau of Prisons failed
to comply with its own procedures.  The BOP rejected Binday's request for a furlough
and for compassionate release evidently because of Binday's minor regulatory infraction
in January 2020.

<u>Care At FCI Otisville Camp is Deficient</u>

    Second, with respect to the conditions at FCI Otisville's camp, and its protection
of inmates, Binday advised us that he has now been given a mask that he was told is rated
to be used for one hour along with fabric masks, but their use is at best haphazard with

Hon. Colleen McMahon
May 7, 2020
Page 2

many staff members not wearing masks.  In addition, the staff only checks inmates'
temperature once a day; it does not look for any other symptoms such as coughs,
breathing, congestion, or oxygen levels.  There is anecdotal evidence that some inmates
iced their foreheads (where temperature is measured) because they feared they would not
be released if they tested positive.

"Federal judges across the country have been hearing horrid stories about the
BOP's conditions and the agencies reaction, lack of action, to COVID-19. American
Civil Liberties Union (ACLU) chapters have become involved, attempting to bring to
light a federal agency's inept and cruel response to the contagion of a virus that has
infected over 2,000 inmates and killed 37. The BOP is inflicting even more, unmeasured,
mental distress on both families and inmates." Pavlo, *After Seeing Federal Bureau Of
Prisons Up Close, Federal Judges May See Sentencing Differently In Future*, Forbes,
May 3, 2020.[1]

### The Supreme Court Undermined Binday's Conviction in its *Kelly* Decision

Finally, today the Supreme Court reversed the convictions in *Kelly v. United
States*, No. 18-1059, 2020 WL 2200833, at *1 (U.S. May 7, 2020) in a decision that
seriously undermines Binday's conviction and diminishes or eliminates the "nature and
circumstances" of Binday's offense – a proper consideration on a Section 3582 motion.

In *Kelly*, the Supreme Court reversed the convictions of two government
employees who misused their power to close lanes on the George Washington Bridge to
punish a local mayor for refusing to support ex-Governor Christie's re-election campaign.
Kelly's jury was instructed that it could find the defendants obtained money or property if
the Port Authority "receives false or fraudulent statements that affect its ability to make
discretionary economic decisions about what to do with that money or property."  *United
States v. Baroni*, 909 F.3d 550, 563 (3d Cir. 2018.  (Similarly, Binday was convicted of
depriving insurance companies of "the ability to make an informed economic decision
about what to do with [their] money or property.")

On direct appeal, the Third Circuit identified the objects of Kelly's scheme as
efforts to defraud the Port Authority of physical property (lanes on the bridge) and money
(public employee labor).  *Id*. at 561.  It held that the government offered sufficient
evidence to prove the defendants defrauded their employer of "public employee labor."
*Id*. at 562.  "Their time and wages, in which the Port Authority maintains a financial

---

[1]  https://www.forbes.com/sites/walterpavlo/2020/05/03/after-seeing-federal-bureau-of-prisons-
up-close-federal-judges-may-see-sentencing-differently-in-future/#3b568afe3f2b.

Hon. Colleen McMahon
May 7, 2020
Page 3

interest, is a form of intangible property." *Id*. at 565.  The court also relied on the Port Authority's right to control the bridge to affirm the convictions:  "The Port Authority has an unquestionable property interest in the bridge's exclusive operation, including the allocation of traffic through its lanes and of the public employee resources necessary to keep vehicles moving. Defendants invented a sham traffic study to usurp that exclusive interest, reallocating the flow of traffic and commandeering public employee time in a manner that made no economic or practical sense." *Id.* at 567.

The Supreme Court rejected all of the Third Circuit's reasoning, including the concept that one is deprived of property when a false statement affects his decision-making process.  It explained that the *Kelly* defendants could violate fraud laws

> only if an object of their dishonesty was to obtain the Port Authority's money or property. The Government contends it was, because the officials sought both to 'commandeer' the Bridge's access lanes and to divert the wage labor of the Port Authority employees used in that effort. Tr. of Oral Arg. 58. We disagree. The realignment of the toll lanes was an exercise of regulatory power—something this Court has already held fails to meet the statutes' property requirement. And the employees' labor was just the incidental cost of that regulation, rather than itself an object of the officials' scheme. We therefore reverse the convictions.

*Kelly*, No. 18-1059, 2020 WL 2200833, at *2.

In other words, Kelly's exercise of her regulatory powers for a bad reason was not a proper substitute for "property," even if her misconduct had an incidental economic effect on her employer.  Similarly, the insurers' lack of correct information about the future disposition of policies was not "property" because the object of Binday's scheme was to *buy and pay for* insurance policies for disfavored insureds – people who planned to sell them to others who would pay the premiums.  The government never charged or argued that Binday defrauded insurers out of insurance policies; the jury instructions also never suggested that the jury could consider the insurance policies to be the object of Binday's alleged "property" fraud.  And for good reason:  even if insurance policies are some form of asset (rather than a contract obligation), Binday's clients *paid* the asking price for them, so the government purposely chose not to characterize the policies as the property at issue.

Binday's deceptive statements to convince insurers to sell were like Kelly's false statements about why she ordered a traffic study.  Binday's commissions on the purchases were no different from the incidental financial impact that Kelly's deception had on the Port Authority.

299 Third Street, Suite 106, Oakland, California 94607

Hon. Colleen McMahon
May 7, 2020
Page 4

Kelly and Binday each deceived others (the Port Authority and insurers) to accomplish her or his goal:  Interfere with traffic in a local town (for Kelly) and buy insurance policies the insurers did not want to sell to particular people (for Binday). Kelly did not convert the George Washington Bridge to her own use; Binday did not convert insurance policies to his own use.  The government never suggested or argued that Binday's clients did not pay the premiums or that Binday defrauded the insurers of policies; it only argued that he improperly earned commissions pursuant to his scheme. But those commissions were incidental to the policies; insurers always pay commissions when premiums are paid.

"[A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."  *Id*. at *6.  For this proposition, the Court discussed Judge Easterbrook's opinion in *United States v. Walters*, 997 F. 2d 1219, 1224 (CA7 1993), one of the leading decisions rejecting the right to control theory.  The Supreme Court explained:

> Without that rule, as Judge Easterbrook has elaborated, even a practical joke could be a federal felony. See *United States* v. *Walters*, 997 F. 2d 1219, 1224 (CA7 1993). His example goes: "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation," thus expending the cost of gasoline. *Ibid.* "But there is no party; the address is a vacant lot; B is the butt of a joke." *Ibid.* Wire fraud? No. And for the reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the [deceitful] scheme rather than a byproduct of it." *Id.,* at 1226.

*Kelly*, No. 18-1059, 2020 WL 2200833, at *6.  "Incidental" does not mean de minimus. At oral argument, Justice Alito asked if the cost to the state of the Kelly defendants' conduct was $1 million, and Kelly's lawyer said no.  Transcript of Oral Argument at 66-67.  In its decision, the Court drew no distinction between small and large incidental costs.  It focused solely on whether the object of the scheme was to defraud another person of property or whether a loss of money or property was incidental to the defendant's object.

The Court's reliance on *Walters* is critical in evaluating Binday's conviction because Walters was convicted of depriving universities of their right to control athletic scholarships by giving money to college athletes.  The Seventh Circuit reversed and ruled that "only a scheme to obtain money or other property from the victim" violates the federal fraud statutes, *id*. at 1227, but Walters only schemed to circumvent the NCAA's rules, not to obtain money or property from the victim through false representations.

Hon. Colleen McMahon
May 7, 2020
Page 5

The Seventh Circuit rejected the government's attempt to recast the intangible right rejected by *McNally* as the "'right to control' who received the scholarships," and rejected it as an "intangible rights theory once removed." *Id*. at 1226 n.3.  In words particularly apt for Binday's situation, the court stated: "In this case the mail fraud statute has been invoked to shore up the rules of an influential private association." *Id*. at 1224.

The Supreme Court's decision in *Kelly* undermined the right to control theory in the same way that *McNally* and *Cleveland* rejected honest services in the private sector – which the Supreme Court recognized in *Skilling v. United States*, 561 U.S. 358, 400 (2010).  In *Skilling*, the government contended that honest services also ought to be construed to protect people from "undisclosed self-dealing by a public official or private employee," *id.* at 409, but the Supreme Court disagreed, finding a lack of consensus among lower courts about the meaning of "schemes of nondisclosure and concealment of material information" and concluding that the "self-dealing" category was too amorphous.  *Id*. at 410.  Self-dealing is a synonym of the right to control.  *See United States v. Rybicki*, 354 F.3d 124, 140 (2d Cir. 2003) (en banc) (self-dealing was fraud if the defendant failed to disclose his "secret interest" in a business deal and thereby possibly caused "some detriment—perhaps some economic or pecuniary detriment—to the employer").

Coupled with his medical condition that puts his life and health at significant risk as a result of the pandemic, the decision today by the Supreme Court further supports granting Binday's motion for a reduction of his sentence.

Very truly yours,

/s/ *David W. Shapiro*

David W. Shapiro

## MEMO ENDORSED

WALTER P. LOUGHLIN
Attorney-at-Law
1225 Park Avenue
Suite 3D
Tel. (203) 2163445
walter.loughlin@gmail.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  5/6/2020

May 5, 2020

BY ECF

Honorable Valerie E Caproni
United States District Judge
Thurgood Marshall
United States Courthouse
New York, New York 10007

Re: United States v. Joseph Percoco, 16 CR 776 (VEC)

Dear Judge Caproni:

I write to submit the letters which were to be annexed to the motion, filed May 4, 2020,

for compassionate release for Mr. Percoco, which was denied earlier today, and to respectfully

ask for reconsideration of the motion.

The denial cited Mr. Percoco's unexcused failure to first seek compassionate release

from the Bureau of Prisons and await a decision on that petition for 30 days. Mr. Percoco's

failure to do so is attributable to at least two factors that should justify equitable waiver of that

 requirement.

First, as the motion addressed, on April 11, Mr. Percoco was identified by BOP staff at

FCI Otisville as a candidate for transfer to home confinement due to his vulnerability to

 to COVID-19, and the seriousness of his medical condition. As a consequence of being

placed in pre-transfer quarantine, with the expectation that this would be for 14 days, and

 having signed paperwork referring to his release on April 27, it would have bordered on the

irrational for Mr. Percoco to then submit an application to the same Otisville officials, and wait 30

 days for a response from them, at the same time they were advising him that he was to be

transferred to home confinement  in 14 days.

Second, once in quarantine, Mr. Percoco has been able to communicate with counsel with whom he could confer about the circumstances of what he should do to protect his right to seek judicial review of the circumstance that has now kept him in quarantine for 25 days, in extremely restrictive isolation, for what appears to be an indefinite period of time until a decision is reached by about whether and when Mr. Percoco will be transferred to home confinement. Persons in quarantine have very limited access to the telephone and are only permitted to contact family members. They cannot send or receive email. All visitation has been suspended.

Respectfully submitted

/s/ Walter P. Loughlin

Walter P. Loughlin

cc: All Counsel of Record (Via ECF)

Application GRANTED.  The Government is directed to respond to Defendant's motion by **May 13, 2020**.  In its response, the Government must provide (i) Mr. Percoco's medical and disciplinary records from Otisville, (ii) current data on how many COVID cases Otisville has had (both inmates and staff), and (iii) how many inmates at Otisville have been tested for COVID.

SO ORDERED.

5/6/2020

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE