UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

UNITED STATES OF AMERICA

V.                                                    12 CR 152 (CM)

MICHAEL BINDAY,

                    Defendant.

——————————————————————x

DECISION AND ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

    Michael Binday was sentenced to 144 months' imprisonment after being found guilty

of conspiracy to commit mail and wire fraud, as well as actual mail and wire fraud.  The

evidence at trial established that Binday led his codefendants in a scheme designed to

procure "stranger-originated life insurance" (or "STOLI") policies—policies on the lives of

seniors for the benefit of investors who were strangers to them— by means of fraudulent

applications.

    Binday has served approximately three years and ten months of his twelve-year

sentence. Binday's projected release date is September 20, 2026.

1

Before the Court is Binday's motion for a reduction of sentence and compassionate release pursuant to 18 U.S.C. § 3582(c), as well as a request that the Court recommend to the Bureau of Prisons ("BOP") that Binday be granted a 30-day temporary furlough.

The motion for compassionate release is denied.  The Court declines to make a recommendation to the BOP in support of a furlough.

Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. Once such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

Once a defendant has exhausted administrative remedies, with respect to the substantive determination, and in addition the statutory requirement that the Court consider the factors set

2

forth in Section 3553(a), the United States Sentencing Guidelines contain a provision, Section 1B1.13, applicable to motions for sentencing reductions pursuant Section 3582(c)(1)(A). That section provides, in relevant part, that a reduction in sentence may be appropriate if the Court determines that--

(1)     (A) Extraordinary and compelling reasons warrant the reduction; or

(B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2)     The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3)     The reduction is consistent with this policy statement. U.S.S.G. § 1B1.13.

Subsection (1)(B) is inapplicable. Subsection (1)(A), which relates to "the Application Notes to Section 1B1.13, describe the circumstances under which "extraordinary and compelling reasons" exist. *See id.* § 1B1.13 comment (n.1). The only relevant provision reads as follows:

(A)     Medical Condition of the Defendant.—

(i)     The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

(ii)     The defendant is—

(I)     suffering from a serious physical or medical condition,

(II)     suffering from a serious functional or cognitive impairment, or

3

(III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self- care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

As the proponent of the Motion, Binday bears the burden of proving that "extraordinary and compelling reasons" exist and that he is entitled to the relief he seeks. *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

Attorney General's COVID-19 Initiative

On March 26, 2020, the Attorney General issued a Memorandum to the Director of the Bureau of Prisons (the March 26, 2020 Memorandum), to ensure that, in light of the COVID-19 pandemic, BOP utilizes home confinement, where appropriate, to protect the health and safety of BOP personnel as well as inmates in BOP's custody. *See* Office of the Attorney General, Memorandum for Director of Bureau Prisons: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.justice.gov /file/1262731/download. In assessing whether home confinement should be granted pursuant to the March 26, 2020 Memorandum, the BOP considers the "totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaust list of discretionary factors," including (1) the age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC)

4

guidelines"; (2) the security level of the facility currently holding the inmate; (3) the "inmate's conduct in prison, with inmates . . . who have incurred a BOP violation within the last year not receiving priority treatment"; (4) the inmate's score under PATTERN (the "Prisoner Assessment Tool Targeting Estimated Risk and Needs"); (5) whether the inmate has a verifiable re-entry plan to prevent recidivism and maximum public safety; and (6) the inmate's crime of conviction and assessment of danger posed to the community. *See id.* at 1. In addition, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates will "based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID- 19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement." *Id.*

On April 22, 2020, the Department of Justice issued a memorandum prioritizing for home confinement inmates who have served 50% or more of their sentences or have 18 months or less remaining on their sentences and have served 25% or more of their sentences. *See United States v. Lewis Stahl*, 18 Cr. 694 (RA), Declaration of Jennifer A. Broton ¶ 19 (Dkt. No. 65-1). "[T]hese priority factors are subject to deviation in BOP's discretion in certain circumstances and are subject to revision as the situation progresses[.]" (*Id.*).

Binday's Motion in the Bureau of Prisons

On April 1, 2020, Binday sent a request in writing to the Warden asking for compassionate release and home confinement. On April 13, 2020, Binday sent another request for consideration for release.

On April 17, 2020, the BOP denied Binday's furlough request because he had only served 31.7% of his 144 month sentence, had received four incident reports in the past two years, and was not "identified as having COVID-19 risk factors for serious illness as outlined in CDC guidance." (*See* Govt. Memo in Opposition, Ex. B (Furlough Denial Memorandum (Apr. 2, 2020)).

On May 11, 2020, the BOP denied Binday's request for compassionate release. The BOP noted that Binday is a 56-year old male who had received four incident reports in the past two years. He had one high A1C level in January 2020, with a follow-up blood test scheduled for May 29, 2020 to determine if he has diabetes. After a review of his various medical conditions, the amount of time remaining on his sentence, and his three incident reports that occurred within the past 12 months,[1] the BOP determined that "Binday does not currently warrant an early release from his sentence." (*See id.,* Ex. C (Compassionate Release/Reduction in Sentence ("RIS") Memorandum (May 11, 2020)).

The warden having considered and rejected the administrative motion for compassionate release that Binday filed with the BOP, this Court may now properly consider the compassionate release motion he filed in the district court.

---

[1] Binday has had four incident reports since 2018, three of which have occurred in the past year, including two incident reports for Refusing to Obey an Order (August 23, 2018 and May 10, 2019) and two for Failing to Follow Safety Regulations (May 8, 2019 and January 7, 2020). (*See Ex. D* (Disciplinary History and Incident Reports)). The incidents were all minor procedural violations (e.g., keeping food in cell), so the Court did not consider the violations in any way in deciding the present motion.

6

The Motion Before the District Court

Binday claims that the conditions of confinement at the Otisville Satellite Camp, where he is currently incarcerated, places inmates at an increased risk of contracting COVID-19. He further argues that his generally poor health—he has diabetes, an enlarged prostate, orthopedic pain (hip, knee, back, etc.), dermatological issues, and suffers from migraines—elevates his risk of suffering a severe outcome if infected with the virus.

Regarding the conditions at Otisville Satellite Camp: The Camp was a veritable BOP hotspot in the early days of the COVID crisis, much like the rest of the New York metropolitan area. At least 13 inmates at the Camp had tested positive by early April.  Yet prison official at the Camp took various measures that appeared to beat back the virus at the facility and keep it in check: inmates with confirmed cases were placed in single-cell isolation units, the balance of inmates were quarantined, they reduced the Camp population to 65 inmates, and implemented BOP best practices for dealing with COVID.[2]  As of late May, the camp had not had any new confirmed COVID-19 cases among its inmates since April 14.[3]  BOP appeared to have a handle on the problem at the Camp. However, that  changed after an

---

[2] *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp. This was the initial plan which has been amended and augmented numerous times over the past months in an effort to keep up with the virus pernicious and relentless assault.

[3] These figures were derived from representations Otisville officials made to the Government as detailed in the Government's response papers.

inmate who was due for release tested positive for the virus in in or around June 12. Otisville

Public Information Officer.[4]

Faced with the first positive test since April, prison officials immediately tested the rest

of the 65 prisoners at the Camp, and discovered when the test came back (sometime in the

middle to late June) that 20 inmates had tested positive for the virus. *Id.* The positive inmates

were immediately relocated into single cell isolation units, and the remaining 45 inmates who

tested negative for the virus were placed in quarantine. *Id.* According to the Public Information

Officer at Otisville, as of June 26, Binday  tested negative and was part of the quarantined group.

Apparently, that is no longer the case.

Binday's attorney David Shapiro informed the Court on Monday, July 6,  that Binday that

had advised his lawyer that he and four other inmates had tested positive for the virus. This

information was conveyed to Binday by Otisville staff informed him on Friday, July 3. Shapiro

Letter dated 7/7/2000, ECF Document #472.  The Court directed the Government to respond to

this new development by Thursday (7/10), at noon. Court Endorsement of Shapiro Letter dated

7/7/2000, ECF Document #473.  The Government has filed the requested supplemental response

and confirms that:

> . . . as of July 7, 2020, FCI Otisville had 13 camp inmates in isolation, including Binday,
> due to their testing positive for COVID-19, as well as 4 inmates at the medium security
> FCI who were in isolation also due to positive tests. With regard to the camp, of the 13

---

[4] The Court learned of the latest statistics from inquiries made to the Otisville Public Information Officer on June 25
and 26.

who have initially tested positive and were in isolation, 3 have subsequently tested negative. As a general matter, if an inmate who tests positive for the virus and is placed in isolation subsequently has two negative tests, BOP treats that inmate's condition as resolved, and removes them from isolation. As of July 9, 2020, the BOP website notes that 11 inmates have confirmed "active" cases, suggesting that 6 inmates who were previously isolated at the camp and at the FCI have been categorized as recovered after two negative COVID tests.

Government Letter dated July 9, 2020, ECF Document #474.

The Court concedes that being in prison is not the best place to be during a pandemic.

Binday's Health

Binday argued in his original filings that he has numerous medical conditions that elevate his risk for having a severe outcome if he were to contract COVID-19, and that he has a greater risk of contracting the virus while at Otisville, where he claims the virus is rampant, then if he were released and allowed to live in his Manhattan apartment.  Now that he has actually contracted COVID-19, the only remaining question for the Court is whether his health is so poor that prison medical staff is unable to care for him. It is the Government's position that— notwithstanding Binday's recent positive COVID-19 test—"Binday still does not meet the statutory requirements for compassionate release set forth in 18 U.S.C. § 3582(c)(1)(A)."  *Id.* I agree.

Binday says that he is diabetic. A January 22, 2020 blood test resulted in an elevated A1C level of 6.6%.[5] (*See* Furlough Mot. at 7-8; *see also* Ex. F (excerpts from Binday's medical

---

[5] The A1C test results reflect an individual's average blood sugar level for the past two to three months. Specifically, the A1C test measures what percentage of an individual's hemoglobin is glycated, i.e., coated with sugar. The higher

records) at 141)). This one marginally high reading falls within the goal range for adults with diabetes. *See, e.g.,* Center for Disease Control and Prevention, Living with Diabetes, Manage Blood Sugar, All About Your A1C, https://www.cdc.gov/diabetes /managing/managing-blood-sugar/a1c.html ("The goal for most people with diabetes is 7% [A1C] or less"); *accord* American Diabetes Association, Understanding A1C, https://www.diabetes.org/a1c ("The goal for most adults with diabetes is an A1C that is less than 7%").

Binday claims that he is not receiving adequate medical care for his diabetes because the BOP has not performed another blood test to determine if his A1C level has increased or decreased. Contrary to defendant's assertion, BOP medical staff did schedule Binday for follow up A1C testing in May (*See, e.g.,* Ex. C)—a test we now know from the Government's latest letter was rescheduled because of the pandemic. His A1C retest is now scheduled for the week of July 12. Government Letter, ECF Document #474.

For the purposes of the present motion, the Court accepts that Binday is marginally diabetic or pre-diabetic. I also accept that having diabetes elevates a person's risk for a severe case of COVID-19, (*See, e.g.,* Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov /coronavirus /2019-ncov/need-extra-precautions/people-at-higher- risk.html).

---

the A1C level, the poorer an individual's blood sugar control and the higher the risk of diabetes complications. *See, e.g.,* Mayo Clinic, A1C test, https://www.mayoclinic.org/tests-procedures/a1ctest/about/pac-20384643 (quoted at Furlough Mot. at 7).

Regarding the plethora of orthopedic maladies Binday suffers, the BOP appears to be addressing each one proactively: A review of Binday's medical records shows that his complaints of hip, shoulder, back, and joint pain has led to continuous care and treatment from the BOP since approximately 2016. This includes multiple x-rays of different joints, and a CT and an MRI of Binday's left hip. (*See, e.g.,* Ex. F at 19-20 (Nov. 21, 2016 x-rays of chest, noting "no acute cardiopulmonary disease" "lungs are clear"; spine, noting "minimal anterior chronic wedging" of L1 vertebrae and "very mild" levoscoliosis; and feet, noted as "unremarkable"); 35-36 (Oct. 18, 2017 x-ray of left hip, right knee noted as "unremarkable"), 39 (Feb. 15, 2018 entry noting "[m]ultiple radiology studies have been completed" and "unremarkable" radiographic exams on right shoulder, right knee, and left hip), 111 (Dec. 19, 2018 CT of left hip noting "[n]o acute osseous abnormality in the left hip. If there is a clinical concern for soft tissue abnormality or labral tear, MRI is recommended")), 115-116 (Aug. 14, 2019 x-rays of right hand, right knee, right leg described as "normal" and "unremarkable"), 126 (Nov. 7, 2019 MRI of left hip noting tear of anterior-superior acetabular labrum); 132 (Nov. 14, 2019 notation that MRI is needed of left shoulder), 134 (Nov. 22, 2019 notation that x-ray of left shoulder is needed prior to MRI), 135 (Nov. 27, 2019 x-ray of left shoulder noted as "unremarkable")). These records do not appear to reflect a definitive diagnosis of the necessity of an operation or surgery for any of these issues.

Most relevant for the purposes of adjudicating the present motion, none of Binday's orthopedic issues substantially diminishes his ability to provide self-care in prison, or conditions

from which he would not be expected to recover. According to the Government, the BOP has represented that they have made the assessment that he is able to receive treatment locally, and that he has a pending consultation with the orthopedist (as well as a pending appointment for a follow-up colonoscopy).

Binday also claims that he has an enlarged prostate, "which if and when it worsens can cause kidney damage," and that he has not been examined for "possible prostate cancer." (3582 Mot. at 6). But Binday's medical records are replete with references to Binday's prostate condition as BPH or benign prostatic hyperplasia, a condition that is common in older men, together with related urinary retention issues. Binday had this condition starting well before his sentencing, and his condition has been managed with medication since before his incarceration to the present day. (*See, e.g.,* Ex. F at 1-3 (July 8, 2016 initial screen noting BPH and discussing medication), 5 (Aug. 22, 2016 notation of Binday's medical history of "BPH as well as urinary incontinence over 5 years"), 51-52 (Aug. 15, 2018 notation of BPH meds), 143-44 (Feb. 4, 2020 notation of BPH meds)). Moreover, the BOP has been monitoring his PSA levels since 2016 as a means to screen for prostate cancer; each test has resulted in normal results. (*See, e.g.,* Ex. F at 13, 17, 33, 140 (Sept. 7, 2016, Oct. 7, 2016, Oct. 12, 2017, Jan. 22, 2020 blood tests)).

Medical records also show that Binday's dermatological issues and his migraines—both of which started before the time of his incarceration, and neither of which constitute a "terminal illness" or an increased risk of COVID-19—have been treated by the BOP through consults and various medications such as topical steroids and NSAIDS. (*See generally* Ex. F).

12

Finally, Binday suggests he could get better medical care for his various conditions were he to be released. (*See* 3582 Mot. at 6 (noting certain "kind of examination is not available to Binday in prison"). The Court concedes that better medical care can be found outside prison walls—especially for a man with Binday's financial means. That said, BOP is capable of providing Binday with adequate medical care, and appears to be doing so.

Michael Binday's overall health does not constitute an "extraordinary and compelling" reason to release him from his sentence.  This is so even when viewing Binday's medical condition in light of his recent COVID-19 diagnosis.  *See United States v. Davis, No. 12 Cr. 712 (SHS), 2020 WL 3790562, at \*2-\*3 & n.2 (S.D.N.Y. July 7, 2020)* (concluding no "extraordinary or compelling" reasons for sentencing reduction where defendant had contracted mild case of COVID-19 and was receiving medical treatment at BOP facility, noting "limited scope' of relief under 18 U.S.C. § 3582(c)"); *United States v. Decker*, No. 17 Cr 738 (LAK), 2020 WL 3268706, at \*1-\*2 (S.D.N.Y. June 17, 2020) (denying compassionate release for defendant who had tested positive for COVID-19, noting that "while defendant was infected with COVID-19, the record does not suggest that he suffered any complications from hypertension. To the contrary, he was asymptomatic.").  Binday appears at this time to have an asymptomatic case of COVID-19, that is being closely monitored and cared for by the Ottisville medical staff.

Section 3553(a) Factors Counsel Against Binday's Release

Even if Binday's medical condition made out an arguable basis for release, the factors set forth in Section 3553(a) make clear that no such relief is warranted. Indeed, this is a case where the Section 3553(a) factors trump all other considerations.

Notwithstanding Binday's suggestion otherwise, his crimes were quite serious and far from victimless. Binday and his codefendants "caused actual losses of $38,153,631, consisting of total commissions paid to them on 74 scheme applications, policies that the evidence showed would not have been issued but for the fraud, total death benefits paid on those policies that have settled less the premiums actually paid on those policies, and the premiums on lapsed policies." (Sentencing Tr. at 37-38). The Section 3553(a) factors that weighed so heavily in favor of incarceration at the time of sentencing—including the nature and circumstances of his offenses[6] and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct—now counsel against early release. As I said at sentencing:

---

[6] In his Supplemental Letter, Binday asserts that his conviction is "seriously undermined" by the Supreme Court's decision in *Kelly v. United States*, No. 18-1059 (U.S. May 7, 2020), and as such "diminishes or eliminates the 'nature and circumstances' of Binday's offense." (Supp. Letter at 2-3). This argument is effectively a challenge to the *validity* of Binday's conviction, which can only be brought on direct appeal or in a habeas petition, not in a motion for compassionate release brought under 18 U.S.C. § 3582(c)(1)(A). *See United States v. Lisi*, 2020 WL 881994, at *4; *see also United States v. Rivernider*, 2020 WL 597393, at *4 (D. Conn. Feb. 7, 2020) ("To my knowledge, nobody has suggested that the 'extraordinary and compelling' standard can be satisfied by claims of legal error or other alleged wrongs that are cognizable on direct appeal from a conviction or by means of a habeas corpus petition."); *United States v. Arojojoye*, --- F. App'x ---, 2020 WL 1459064, at *2 (7th Cir. Mar. 20, 2020) (recognizing that arguments in purported Section 3582(c)(1)(A) motion were really arguments that should be brought in Section 2255 motion); *United States v. Handerhan*, 789 F. App'x 924, 926 (3d Cir. 2019) (similar).

14

Forget about the amount of the fraud loss, whatever it was or will turn out to be; in the end, this was a scheme perpetrated over a span of years, brazen, as the government has correctly characterized it, and characterized by a number of truly horrible behaviors on the defendants' part.

Starting with the callous disregard for the little people who were the straw purchasers of these policies: Venality, rampant mendacity, the creation of false documents, obstruction of efforts by the victims to ascertain the truth, obstruction of regulators and the government's efforts to learn the truth. It is precisely the sort of criminality that has left large segments of our society convince that all businessmen are crooks.  And many an honest businessman or woman finds himself or herself unable to overcome the entirely undeserved belief that they are disreputable people and that they ought to be subject to disrepute.

. . .

There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years.

It is precisely in cases like this that for too many years there was an under emphasis on prison time. And it is entirely appropriate in my view to redress that under emphasis so that society understands that the guy who steals money while committing fraud while wearing a suit is no better than the guy who steals it, and a whole lot less of it, while wearing a hoodie.

Insurance fraud may not qualify as a crime of violence within the meaning of our sentencing system and that, unfortunately, is why it is all too often punished not with the severity that it deserves.

There are other types of violence, and business fraud do[es] violence to the thin tissue of trust that holds us together as a society. We cannot afford this sort of antisocial behavior and the cynicism that people will get away with it that is engendered in our citizenry. Only if white collar crime is punished commensurate with the damage it inflicts on society will citizens

15

actually believe that the law metes out equal right[s] to the poor and to the
rich, which words are the cornerstone of the judicial oath.

(Sentencing Tr. at 42, 45-46). Permitting Binday to be released after serving less than

a third of his twelve-year term of imprisonment would neither provide just punishment

nor would it promote respect for the law.

That the COVID-19 outbreak struck during Binday's term of incarceration is

unfortunate—as it has been for other similarly situated inmates—but it does not provide an

extraordinary and compelling reason to release him after having served less than a third of

his sentence for his serious and pervasive fraud.

Binday's motion for compassionate release pursuant to 18 U.S.C. § 3582(c), and his

alternative request for a recommendation that the BOP grant him a 30-day temporary furlough

are denied.

Dated: July 16, 2020

_____
Colleen McMahon
Chief Judge


BY ECF TO ALL PARTIES