**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

................................................................- x

MICHAEL BINDAY,                              :        Case No. _____

       Petitioner

       v.                                          :

UNITED STATES OF AMERICA,

       Respondent.                                 :

................................................................- x

**PETITIONER MICHAEL BINDAY'S MOTION TO VACATE CONVICTION**

**<u>PURSUANT TO 28 U.S.C. § 2255 AND § 2241</u>**

**Name:**  Michael Binday

**Inmate No.:**  66389-054

**Place of Confinement:**  FCI Otisville, Satellite Camp, Otisville, New York

1. **(a) Name and location of Court that entered judgment of conviction under attack:**

   United States District Court for the Southern District of New York, New York, New York.

   **(b) Case No.:** 1:12-cr-00152-CM

2. **(a) Date of judgment and conviction**: July 31, 2014.  Doc. 341

   **(b) Date of sentencing:**  July 30, 2014

3. **Length of sentence:** 144 months

4.  **Nature of offense of conviction:** Conspiracy to commit mail and wire fraud (count 1); mail fraud (count 2); and wire fraud (count 3), in violation of 18 U.S.C. §§ 1349, 1341, and 1343.

5.  **Trial and sentence:**  Mr. Binday pled not guilty.  An eleven-day jury trial was held between September 17, 2013 and October 7, 2013 for Binday and two co-defendants. The jury convicted Binday on the three counts of the superseding indictment on October 7, 2013.  The court sentenced Binday to prison and ordered him and his co-defendants to pay $39,308,305.63 in restitution (later amended to $37,433,914.17).  Doc. 385.

6.  **Direct Appeal:** Mr. Binday timely appealed from his judgment of conviction.

    (a)  **Name of court:** The United States Court of Appeals for the Second Circuit.

    (b)  **Case number:** 14-2809-cr

    (c)  **Result:** The Second Circuit issued a published opinion in Mr. Binday's direct appeal on October 26, 2015 affirming his conviction. United States v. Binday, 804 F.3d 558 (2d  Cir.  2015).

    (d)  **Grounds raised on appeal**

        1)  Whether the jury instruction on economic harm misstated the law.

        2)  Whether the evidence was legally insufficient judged against a correct jury instruction.

        3)  Whether the indictment was constructively amended.

        4)  Whether the prosecutor's summation argument prejudiced the defense.

5) Whether the "loss amount" for purposes of sentencing and the restitution amount were wildly overstated.

**(e) Petition for rehearing en banc:** On November 10, 2015, Mr. Binday filed a petition for rehearing en banc in the Second Circuit. Doc. 181, Case No. 14-2809. The issue raised was whether recent United States Supreme Court case law overruled the Second Circuit's precedent that a victim's "right to control" its own decision-making is "property" protected under the mail and wire fraud statutes. On December 14, 2015, the Second Circuit denied Mr. Binday's petition for rehearing en banc. Doc. 189, No. 14-2809.

**(f) Petition for writ of certiorari in the United State Supreme Court:** Mr. Binday filed a petition for writ of certiorari from the Second Circuit's opinion on his direct appeal. The Question Presented in the certiorari petition was as follows: Whether a defendant may be convicted of federal criminal fraud when the purported victim has suffered no loss of tangible property, but has instead only been deprived of the intangible "right to control" with whom it does business.

**(g) The petition was denied on June 20, 2016.** *Binday v. United States*, 136 S. Ct. 2487 (Mem.) (2016).

**(h) Grounds upon which this motion is based:** Mr. Binday moves to vacate his conviction because the Supreme Court overruled the Second Circuit's construction of the mail and wire fraud statutes to authorize conviction when a defendant does not scheme to obtain traditional money or property, but rather deceives his purported

victim causing incidental economic loss, as is more fully explained in the attached Memorandum of Law.

7. **Prior motion pursuant to 28 U.S.C. § 2255:**  On June 22, 2017, Mr. Binday filed a motion to vacate his conviction.  On May 23, 2018, the district court denied the motion. Doc. 448.

8. **Prior motion for a new trial**:  On December 26, 2017, Mr. Binday filed a motion for a new trial based on newly discovered evidence.  The Court denied the motion on March 22, 2019.  Mr. Binday did not pursue an appeal from that order.

**MEMORANDUM OF LAW IN SUPPORT OF MOTIONS**
**PURSUANT TO TITLE 28 UNITED STATES CODE SECTIONS 2255 AND 2241**

**TABLE OF CONTENTS**

I.   SUMMARY OF ARGUMENT ........................................................................ 2

II.   FACTUAL AND PROCEDURAL BACKGROUND TO THIS MOTION ......................... 4

  A.   Overview................................................................................................. 4

  B.   The Government's Property Theory as Alleged in the Indictment.................................... 5

  C.   The Government's Opening Statement Identified the Money or Property as Insurance
  Commissions ................................................................................................ 7

  D.   The Government's Evidence Regarding the Economic Harm Caused by the Alleged
  Scheme ...................................................................................................... 7

    1.   Prudential Insurance.................................................................................. 7
    2.   Lincoln Financial ..................................................................................... 9

  E.   The Government's Summations Relied on the Incidental Effects of Binday's
  Misrepresentations ......................................................................................... 11

  F.   The Jury Instruction ................................................................................... 11

  G.   The Direct Appeal....................................................................................... 12

  H.   Binday's Ineffective Assistance of Counsel Claim ...................................................... 14

  I.   Binday's Amicus Briefs in *Kelly* and *Aldissi*.................................................... 15

III.   ARGUMENT .......................................................................................... 15

  A.   THE SUPREME COURT'S DECISION IN *KELLY* REJECTED THE LEGAL BASES
  OF BINDAY'S CONVICTION ............................................................................ 15

i

1.   The Decision in *Kelly*.................................................................................... 15

2.   The Supreme Court Rejected the Incidental Economic Harm Binday Caused to

Insurance Companies as Property Under the Fraud Statutes ................................................ 18

3.   *Kelly* Repudiated Prior Second Circuit Law ........................................................ 20

4.   Binday's Jury Instructions Authorized a Conviction Contrary to *Kelly* ....................... 23

5.   Post-Kelly Litigation—*Blaszczak/Olan*........................................................ 23

B.   BINDAY'S CONVICTION MUST BE VACATED BECAUSE HIS CONDUCT WAS

NOT CRIMINAL UNDER *KELLY* ................................................................................ 26

C.   BINDAY IS NOT PROCEDURALLY BARRED FROM OBTAINING RELIEF ........ 28

IV.   CONCLUSION ............................................................................................ 32

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Banister v. Davis*,
  140 S. Ct. 1698 (2020) ........................................................................................... 29

*Binday v. United States*,
  136 S. Ct. 2487 (Mem.) ............................................................................................ 3

*Bousley v. United States*,
  523 U.S. 614 (1998) ............................................................................................... 27

*Cephas v. Nash*,
  328 F.3d 98 (2d Cir. 2003) ................................................................................ 30, 31

*Cleveland v. United States*,
  531 U.S. 12 (2000) ............................................................................................ 20, 21

*Colino v. United States*,
  2012 WL 1198446 (C.D. Cal. 2012) ...................................................................... 27

*Davis v. United States*,
  417 U.S. 333 (1974) ............................................................................................... 30

*Dhinsa v. Krueger*,
  917 F.3d 70 (2d Cir. 2019) ..................................................................................... 31

*Fountain v. United States*,
  357 F.3d 250 (2d Cir. 2004) ................................................................................... 20

*Goldberg v. Colonial Life Ins. Co. of Am.*,
  134 N.Y.S.2d 865 (App. Div. 1954) ....................................................................... 13

*In re Jones*,
  226 F.3d 328 (4th Cir. 2000) .................................................................................. 31

*Ingber v. Enzor*,
  841 F.2d 450 (2d Cir. 1988) ................................................................................... 27

*James v. Walsh*,
  308 F.3d 162 (2d Cir. 2002) ................................................................................... 29

*Kelly v. United States*,
  140 S. Ct. 1565 (May 7, 2020) ............................................. 2, 17, 18, 19 and *passim*

*Kramer v. Phoenix Life Ins. Co.*,
    15 N.Y.3d 539 (2010) ................................................................................ 8

*McCleskey v. Zant*,
    499 U.S. 467 (1991) ................................................................................ 29

*McNally v. United States*,
    483 U.S. 350 (1987) .................................................................................. 3

*Panetti v. Quarterman*,
    551 U.S. 930 (2007) ............................................................................ 29, 30

*Sanders v. United States*,
    373 U.S. 1 (1963) ................................................................................... 30

*Skilling v. United States*,
    561 U.S. 358 (2010) ......................................................................... 5, 6, 14

*Stayton v. United States*,
    766 F.Supp.2d. 1260 (M.D. Ala. 2011) ...................................................... 27

*Toulabi v. United States*,
    875 F.2d 122 (7th Cir.1989) ..................................................................... 22

*Triestman v. United States*,
    124 F.3d 361 (2d Cir. 1997) ..................................................................... 31

*United States v. Baroni*,
    909 F.3d 550 (3d Cir. 2018) ..................................................................... 16

*United States v. Binday*,
    804 F.3d 558  (2d  Cir.  2015) .......................................................... 2, 5, 6, 13

*United States v. Blaszczak*,
    947 F.3d 19 (2d Cir. 2019) ............................................................ 4, 24, 25

*United States v. Bruchhausen*,
    977 F.2d 464 (9th Cir. 1992) ............................................................. 13, 23

*United States v. Carlo*,
    507 F.3d 799 (2d Cir. 2007) ..................................................................... 13

*United States v. Finazzo*,
    850 F.3d 94 (2d Cir. 2017) ............................................................... 3, 5, 20

*United States v. Gatto*,
    295 F. Supp. 3d 336 (S.D.N.Y. 2018) ........................................................ 22

*United States v. Gatto*,
   986 F.3d 104 (2d Cir. 2021) ....................................................... 25, 26

*United States v. Gray*,
   96 F.3d 769 (5th Cir. 1996) ............................................................. 25

*United States v. Holzer*,
   840 F.2d 1343 (7th Cir.1988) .......................................................... 22

*United States v. Ochs*,
   842 F.2d 515 (1st Cir. 1988)...................................................... 25, 26

*United States v. Post*,
   950 F. Supp. 2d 519 (S.D.N.Y. 2013) ............................................. 28

*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970) .......................................................... 6, 7

*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) ........................................................... 3, 23

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007) ............................................................... 6, 7

*United States v. Shelton*,
   848 F.2d 1485 (10th Cir. 1988) ...................................................... 27

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ............................................................... 6, 7

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ............................................................ 13

*United States v. Walters*,
   997 F. 2d 1219 (7th Cir. 1993) ........................................... 17, 18, 21, 22

*Welch v. United States*,
   136 S. Ct. 1257 (2016)...................................................................... 27

**Statutes**

15 U.S.C. § 1 .......................................................................................... 22

18 U.S.C. § 1341 ..................................................................................... 2

18 U.S.C. § 1343 ..................................................................................... 2

18 U.S.C. § 1349...................................................................................... 2

28 U.S.C. § 2241 ................................................................................................ 1, 4, 15, 30

28 U.S.C. § 2255 ................................................................................................ 1, 4

N.Y. Ins. Law § 109 .......................................................................................... 8

N.Y. Ins. Law § 7815 (McKinney) .................................................................. 8

## I.    SUMMARY OF ARGUMENT

Michael Binday moves to vacate his conviction and sentence because he was convicted of deceit, not fraud.  His conviction is invalid in light of the Supreme Court's ruling in *Kelly v. United States*, 140 S. Ct. 1565 (May 7, 2020).

In *Kelly*, the Supreme Court held that a person does not violate the mail/wire fraud statutes when his objective is not to obtain the victim's property, but rather is to pursue his own selfish goals, even when he knows the victim would object to the conduct and claim it was harmed economically. 140 S. Ct. at 1572-74. Second, *Kelly* confirmed that schemes to deceive a victim "violate [the fraud statutes] only when . . . they are 'for obtaining money or property'" from that victim. *Id*. at 1568.  Third, *Kelly* held that a person's or entity's "right to control" its decision making, or whether and how to "use" its property is not the kind of property interest the fraud statutes were meant to protect. *Id*. at 1573. Finally, the unanimous Court stressed that the Third Circuit's construction of the statutes violated principles of federalism:  prosecutors may not use the federal fraud statutes to police the prosecutors' "view of integrity." *Id*. at 1574.

A hypothetical example demonstrates the problem at the heart of this case:  Suppose A offers his classic car for sale, with financing to the new owner, through a broker.  B accepts the offer, and the broker falsely tells A that B will not re-sell the car to C, an undesirable owner in A's eyes.  B nevertheless sells the car to C, who, A fears, may pay off the loan quickly, thus depriving A of anticipated profits from interest payments.  A complains that C's ownership of the car reduced A's potential profits and damaged his reputation, and A was tricked into paying the commission paid to the broker.

 Before *Kelly*, the Second Circuit ruled that B and the broker committed fraud because their false statement caused economic and reputational harm to A:  A did not have all of the facts with which to bargain.  The Sixth, Seventh, and Ninth Circuits held that B and the broker did not

commit fraud because B paid A's asking price, and A's economic injuries were not the broker's objective in lying to A:  his objective was to make a deal and be paid the commission included with a sale.  A's damages were incidental to the false statement.

In *Kelly*, the Supreme Court chose the latter construction of the fraud statute.  It held that a person does not commit fraud, even though he engages in deceitful conduct, unless his objective was to obtain some form of traditional property in exchange for the false statement.  As *Kelly* explained (discussing *Cleveland v. United States*, 531 U.S. 12 (2000)), a deceitful defendant is not guilty of fraud when his object was not "to get the employees' labor," but rather was "to gaming licenses"; costs borne by the victim of deceit are merely "incidental" when the defendant's object is not to obtain those costs.  The Second Circuit's construction – that "the mail and wire fraud statutes do not require a defendant to obtain or seek to obtain property," *United States v. Finazzo*, 850 F.3d 94, 107 (2d Cir. 2017) – contradicts the Supreme Court's ruling and is thus overruled.

Binday was no different from the broker in the hypothetical above.  His objective was to buy insurance for clients, knowing that real insurance sales generate commissions.  He did not steal commissions by making false statements; he earned them by selling real insurance to real people.  The insurers would pay the exact same commissions regardless of whether the insureds sold or kept their policies.  To paraphrase Judge Sutton, whose opinion in *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014), echoed *McNally v. United States*, 483 U.S. 350, 360 (1987), and foreshadowed *Kelly*:  The evidence at trial showed that Binday paid full price for the insurance policies and did so on time (just like the broker in *McNally*).  Binday may have had unflattering motives in mind when brokering the insurance agreement, but unfairly depriving the insurers of their property was not one of them.  The insurers' right to accurate information

3

cannot plausibly be said to be an interest that has long been recognized as property, as the Supreme Court requires.

There is no question that the decision in *Kelly* changes Second Circuit law.  Indeed, in another post-*Kelly* case, the Supreme Court granted certiorari, vacated a Second Circuit decision in light of *Kelly*, and ordered the Second Circuit to reconsider its ruling.  *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Robert v. United States*, No. 20-306, 2021 WL 78042 (U.S. Jan. 11, 2021), and *cert. granted, judgment vacated*, No. 20-5649, 2021 WL 78043 (U.S. Jan. 11, 2021).  That change undermines Binday's conviction.  And because *Kelly* constitutes an intervening change in circuit law, under which Binday's conduct can no longer be deemed criminal, he is not procedurally barred from filing this petition.  Even if this petition is not proper under § 2255, this circuit's case law holds that § 2241 provides an alternate vehicle to vacate Binday's conviction.

## II.  FACTUAL AND PROCEDURAL BACKGROUND TO THIS MOTION
### A.  Overview

Michael Binday, an insurance broker, brokered life insurance policies for clients, falsely telling the insurers that his clients did not intend to sell the policies. (Upon sale, life insurance policies are called "stranger owned life insurance" or "STOLI" policies.) In truth, Binday intended to help the insureds sell the policies to investors, who then paid the premiums on the policies.

While insurers may not impede an insured from selling his life insurance policy to anyone else, insurers may refuse to sell life insurance to individuals who admit they plan to sell the policies. Insurance applications thus ask whether the proposed insured intends to sell the policy. The applications asked the question because insurers objected to STOLI policies for "social" and "non-economic" reasons, though they had "characteristics" that could reduce their

ultimate profitability. *United States v. Binday*, 804 F.3d 558, 572 n.14 (2d Cir. 2015).  The

primary such characteristic was that individuals (especially elderly individuals) sometimes forget

and fail to pay their life insurance premiums, which is highly profitable for insurance companies,

while professional investors do not forget to pay.

Binday was convicted of federal fraud charges and sentenced to 12 years in prison for

giving false answers to those insurance application questions.

### B.     The Government's Property Theory as Alleged in the Indictment

The indictment in this case charged Michael Binday with fraudulently procuring life

insurance policies between 2006 and 2011 in order to generate commissions and other profits.

Doc. 1 at ¶ 12.  One month before trial (after motions to dismiss had been considered and

denied), the government filed in limine motions asking this Court to bar the defense from

offering evidence and arguing that the defendants' misrepresentations did not cause actual

economic harm.  It contended that the lack of actual harm was irrelevant; the only thing the

government had to prove was that the defendants contemplated harm to the insurers' "right to

control their assets through discretionary economic decisions."  Doc. 230 at 24 et seq.

Under the right to control theory, the government does not have to prove "the victim's

loss of money or property supplied the defendant's gain, with one the mirror image of the other."

*Skilling v. United States*, 561 U.S. 358, 400 (2010).  Rather, it has to prove that the victim was

deprived of its "right to material information," which would have enabled it to "negotiate[] a

better deal for itself if it had not been deceived." *United States v. Finazzo*, 850 F.3d 94, 109 (2d

Cir. 2017) (internal quotation marks omitted).

For Binday, this meant the government did not have to prove that Binday obtained or

sought to obtain money or property in exchange for the inaccurate statement on insurance

applications about future sales.  Rather, the government only had to prove Binday's

misrepresentations about his clients' intent to sell the polices "were relevant to the insurers'

economic decision-making because they believed that the STOLI policies differed economically

from non-STOLI policies." *Binday*, 804 F.3d at 574.

Trial counsel argued that the government's invocation of the right to control theory was a

constructive amendment of the indictment.  He also argued that there were "fundamental issues

regarding the viability of the government's newly embraced 'right to control' theory in light of

the Supreme Court's decision in [*Skilling*], which limited the government's ability to pursue

fraud charges based on the deprivation of 'intangible rights.'" He noted that he had "not had an

appropriate opportunity to address in the absence of a proper indictment and the chance to move

to dismiss—whether the government's newly articulated theory alleges a violation of the mail

and wire fraud statutes as a matter of law." Doc. 233 at 29 n.9.

This Court rejected Binday's constructive amendment claim without addressing *Skilling*'s

impact on the right to control theory.  Doc. 243 at 6-11. The Court explained that a person who

lies or omits information during contract negotiations can be convicted of fraud if the

government proves that "the victims did not get what they bargained for (rather than exactly

what they paid for), such that there was a discrepancy between the benefits reasonably

anticipated and actual benefits received." Doc. 243 at 8-9 (discussing *United States v. Regent

Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); *United States v. Starr*, 816 F.2d 94 (2d Cir.

1987); *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007)).

*Regent*, *Starr*, and *Shellef* are so-called "no sale" cases:  situations where the defendant

tricks the victim into selling something with false statements about something unessential to the

sale negotiation. In *Regent*, the court explained that a "no sale" case can be criminal fraud,

6

"[w]here the false representations are directed to the quality, adequacy or price of the goods themselves" because "the fraudulent intent is apparent" and "the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." 421 F.2d at 1182. Similarly, in *Starr*, the court held the false statement "must affect the very nature of the bargain itself." The court in *Shellef* admitted there was "a fine line" between "schemes" (or contract negotiations) that can land one party in prison and those that cannot, and the fine line is crossed when the defendant lies about an "essential element of the bargain." 507 F.3d at 108.

### C. The Government's Opening Statement Identified the Money or Property as Insurance Commissions

In its opening statement at trial, the government stated its right to control theory succinctly: "Defendants tricked life insurance companies into issuing these policies by lying to them." Tr. 19:23-24. It argued that Binday lied so he "could make big money on commissions, lots and lots of money," thus contending the insurers suffered financial harm because they paid commissions on the STOLI policies.  Tr. 20:1-2.

### D. The Government's Evidence Regarding the Economic Harm Caused by the Alleged Scheme

The government's theory at trial was that Binday convinced insurers to sell insurance based on the false statement that the insureds did not intend to resell their policies so that he could earn the commissions that are paid whenever insurers sell insurance.

#### 1. Prudential Insurance

James Avery, the President of individual life insurance at Prudential in 2005 (Tr. 495), testified that his company did not want to issue STOLI policies because investors who owned policies insuring strangers were "not in line with how we price our generic business [because they] would not behave the same."  Tr. 513. (Avery also testified that STOLI policies were "illegal" because the owners had no insurable interest in the insured (Tr. 500, 570), but later

testified that it was legal for insureds to sell insurance policies to strangers/investors who had no insurable interest in the insureds.  Tr. 537.)[1]

By "not behaving the same," Avery said he meant that investors would not sell or abandon their policies as often as do ordinary insureds.  In addition, investors who owned policies would be hoping the insured would die, whereas an insured and her family would be hoping the insured would live.  Tr. 515.  Avery's company did not favor issuing policies that would be sold to investors because insureds might sue the insurers or feel duped, and that might negatively impact the insurers' reputations.  Tr. 515.  A bad reputation could hurt profits because people might buy less insurance.  Tr. 516.

If any of the answers to insurance policy application questions demonstrated that the insured intended to sell the policy, Avery's company would not "issue the contract."  Tr. 527. (Avery later testified that the "entire bargain" between insurer and insured was "based on truthful information." Tr. 580.)  On the other hand, if someone owned a policy for "some period of time" and decided to sell it, then she could sell her "interest in that contract" to a "life settlement company [that would] take over ownership of the policy" because an insured has a legal right to sell the policy. Tr. 533.

Insurance brokers who sold Prudential policies received a percentage of the first year's premium as a commission – anywhere from 55% to 100% of that premium – and smaller

---

[1]     In 2010, the New York Court of Appeals held that "New York law permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose." *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 545 (2010).  The New York State legislature made STOLI policies illegal as of May 2010, *see id*. n.5; N.Y. Ins. Law § 7815 (McKinney) ("No person shall directly or indirectly engage in any act, practice or arrangement that constitutes stranger-originated life insurance.").  The penalty for doing so is a "violation." "Every violation of any provision of this chapter shall, unless the same constitutes a felony, be a misdemeanor."  N.Y. Ins. Law § 109.

commissions based on premiums paid in later years.  Tr. 510.  Premiums were based on the age, gender, and health of the insured, factoring in the insurer's experience with "mortality and lapse."  Tr. 510.  "Mortality" meant the insurer's estimate of the "probability of death" of the insured.  "Lapse" meant the insured's decision to give up the policy because of developments like divorce and job loss.  Tr. 511-12.  The insurer depended on a number of insureds paying premiums for a certain number of years and then abandoning the policy because if all insureds kept the policies in force until death, the insurers would have to charge higher premiums.  Tr. 512, 581.

Avery could not say what the premium difference would be for a policy that might lapse from one that was less likely to lapse because the premiums were paid by an investor.  Tr. 569.[2]

## 2.    Lincoln Financial

The government called a second insurance company executive, Michael Burns, a senior vice president of life product management at Lincoln Financial.  Tr. 630.  His testimony paralleled that of Avery.

Burns testified that insurance policies were priced based on expected mortality, the expenses of issuing and maintaining a policy, the investment income earned on premiums paid, anticipated premiums, and anticipated lapse rates.  Tr. 636.  Policies that the insurer thought would not lapse would be priced higher.  Tr. 640.  STOLI polices would lapse less often than policies held by the insureds and would "impair profitability" of the insurance companies.  Tr. 641.  Lincoln also thought such policies turned insurance into an "investor commodity," which

---

[2]     The government did not offer evidence of the actual lapse rate of STOLI policies issued by Prudential or Lincoln at trial.  At sentencing, the government produced evidence to show that STOLI policies lapsed at a greater than 50% rate.  Doc. 327 at 22.

might put some of the "social and tax benefits" of life insurance "at risk."  Tr. 642.  See Tr. 644

(memo reciting "reduced profitability" as a reason insurers eschewed STOLI policies).

Burns testified that Lincoln estimated it would earn between 8 and 9 percent on the

company's investments on STOLI policies, when it really wanted a return of between 12 and 15

percent.  Tr. 664.  Burns also said that his company had repriced the premiums on policies to

take into account that there might be zero lapses on policies that insureds sold so as to reap the

return the company desired, Tr. 669, and there was an "expectation" that non-STOLI policies

would be more profitable than STOLI policies.  Tr. 678-79. Lincoln's screening practices

reduced the possibility that it would lose profits, and so the primary risks of policy sales by

insureds were "social, legal, and tax related; not economic."  Tr. 688.

The government thus proved that insurers (1) believed STOLI policies might reduce the

insurers' profits, negatively affected their reputation, and were socially undesirable, and so did

not want to issue them, and (2) paid commissions on the policies that Binday procured.  There

was no evidence that Binday sought to obtain, or obtained, the potential lost profits when STOLI

policies were sold, nor was there evidence that Binday's commissions were different from the

commissions of other insurance brokers.  There was also no evidence that insurers maintained an

inventory of STOLI and non-STOLI policies that insurers offered at different prices, which

would have been necessary if the government wanted to prove Binday defrauded the insurers of

STOLI policies at non-STOLI prices.

In short, the government proved the insurers believed their profits were lower on STOLI

policies, not that Binday sought or obtained those lost profits.

**E.     The Government's Summations Relied on the Incidental Effects of Binday's Misrepresentations**

In its summation, the government paraphrased the right to control theory, arguing that the misrepresentations caused the insurers to issue "policies they wouldn't otherwise have issued because they were bad for business. They didn't make economic sense." Tr. 1430:20-21.  It then contended that Binday earned "huge commissions" (Tr. 1430:23), asserting that Binday "carried out a massive scheme to defraud life insurance companies. . . for the money. . . . [Binday] did this all for [his] own economic gain, to make the massive commissions [he] got every time a policy issued, to trick the insurance companies into issuing these policies and paying those commissions." Tr. 1432-33.

In its rebuttal summation, the government claimed that the insurers "would have priced these policies a whole lot differently. They would have priced them a lot higher," if they knew the policies would be sold to investors, primarily because insurance policies owned by investors are "always kept valid and in force."  Tr. 1512, 1513. In other words, the owners of STOLI policies stick to the original contractual bargain reflected in the insurance policy, rather than allowing policies to lapse.  Tr. 1513-14.  The government suggested that insurers could only profit on life insurance policies if a percentage of insureds stopped paying premiums. Tr. 1514-15.

**F.     The Jury Instruction**

The jury instruction regarding a scheme to defraud focused almost exclusively on the possible financial impact that STOLI policies had or could have had on the insurers.

> [A] scheme to defraud is a course or a plan of action to deprive someone of money or property. What does that mean, deprive someone of money or property? Well, obviously a person is deprived of money or property when someone else takes his money or property away from him. But a person can also be deprived of money or property when he is deprived of the ability to make an informed economic decision about what to

11

do with his money or property.  We referred to that as being deprived of the right to control money or property.

Because the government need only show that a scheme to defraud existed, not that it succeeded, it is not necessary for the government to prove that any insurance company actually lost money or property as a result of the scheme. Such a loss must, however, have been contemplated by the defendant.

In considering whether loss was contemplated, keep in mind that the loss of the right to control money or property constitutes deprivation of money or property only when the scheme, if it were to succeed, would result in economic harm to the victim. Economic harm is not limited to a loss on the company's bottom line.

In order for the government to prove a scheme to defraud, it must prove that the scheme, if successful, would have created a discrepancy between what the insurance companies reasonably anticipated and what they actually received. If all the government proves is that under the scheme the insurance companies would enter into transactions that they otherwise would not have entered into, without proving that the ostensible victims would thereby have suffered some economic harm, then the government will not have met its burden of proof.

Tr. 1579-80.

The scheme to defraud instruction did not tell the jury that the prosecution was required to prove that the object of Binday's false statements was to obtain money or property from the insurers.  Rather, the instruction authorized a conviction upon proof that Binday deprived the insurers of information and thus caused or could have caused "some economic harm."  It did not instruct the jury that it must find the defendant's false statements were made to obtain particular money or property and the property identified by the government fit within traditional notions of property.  In other words, it did not explain that incidental economic effects on a putative victim, caused by a defendant's deceptive statements (like commissions paid to insurance brokers), are not sufficient to prove the "money or property" or "obtain" elements of fraud.  The instruction may have been consistent with Second Circuit caselaw, but it was not consistent with Kelly.

## G.   The Direct Appeal

On direct appeal, Binday argued that the facts of his case did not fall within conduct proscribed by the Second Circuit's law on the right to control.  United States v. Binday, 14-2809,

12

Doc. 93, at 25 et seq.  He also pointed out that the right to control theory was rejected by the Ninth Circuit in *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992).  *Binday*, Doc. 136 at 3-4.

On October 26, 2015, the Second Circuit affirmed Binday's conviction and sentence.  As the court explained, "we have recognized that the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets." *Binday*, 804 F.3d at 570 (quoting *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007)).  Thus, a defendant commits fraud when he "den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." Id. at 570 (quotation and citation omitted). Under Second Circuit law, the government need only prove that the defendant withheld information that was "'potentially valuable'" to the victim. *Id*. (quoting *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991)).

The court thus held that Binday was guilty because he interfered with the insurers' right to control their assets.[3]  *Id*. at 585.  The court noted that Binday's "commissions were not a stand-alone economic harm, but the object of the scheme."  *Id*.  And it held that commissions represented "an additional economic harm."  *Id*. at 578 (emphasis in original).

The court did not address the fact that Binday's commissions were not the mirror image of the false statements or that commissions are a cost of every insurance policy sale.  If the policies are bought and paid for, then the commissions are built into the price.  At most, commissions are an incidental cost of making a sale through a broker (or they are compensation

---

[3]    Unissued policies are not assets in the hands of an insurer.  They are blank forms and potential contracts.  "There could be no agreement with the company until it accepted the application for insurance."  *Goldberg v. Colonial Life Ins. Co. of Am.*, 134 N.Y.S.2d 865, 868 (App. Div. 1954).

in a defective honest services prosecution because they are unaccompanied by a bribe or a

kickback. *See Skilling v. United States*, 561 U.S. 358, 413 (2010) (a scheme to make false

statements to earn compensation is not honest-services fraud)).

Binday filed a petition for rehearing en banc on November 10, 2015, arguing that the

Supreme Court in *Skilling* had rejected the Second Circuit's characterization of the right to

control property as "property" under the mail and wire fraud statutes. On December 14, 2015, the

Second Circuit denied Binday's petition for rehearing en banc.

Binday sought review in the Supreme Court in a petition for a writ of certiorari, asking

the following question:  Whether a defendant may be convicted of federal criminal fraud when

the purported victim has suffered no loss of tangible property, but has instead only been deprived

of the intangible "right to control" with whom it does business.

Binday's certiorari petition was denied on June 20, 2016.

## H.      Binday's Ineffective Assistance of Counsel Claim

On June 22, 2017, Binday filed a § 2255 motion alleging that his trial counsel was

ineffective because he misstated the right to control theory.  Binday nevertheless reiterated that,

"By raising Mr. Abramowitz's misunderstanding of the Second Circuit precedent discussing the

right to control theory, Mr. Binday expressly does not waive his right to re-assert his objection to

the right to control theory in a future proper forum—particularly as a claim of actual innocence

in a petition for writ of habeas corpus."  Doc. 446 at 6.  In his petition for certiorari from this

Court's order denying his § 2255 motion, Binday argued that his lawyer misapprehended the

right to control theory and that the theory itself never should have been part of the jury

instructions in the case.

I.       **Binday's Amicus Briefs in *Kelly* and *Aldissi***

Binday filed amicus briefs in *Kelly* and in *United States v. Aldissi*, No. 19-5805, in which he argued that the right to control theory was inconsistent with Supreme Court precedent and unconstitutional.  (Copies of the amicus briefs are attached as exhibits to this motion for background on the right to control theory.)


III.       **ARGUMENT**

A.       **THE SUPREME COURT'S DECISION IN *KELLY* REJECTED THE LEGAL BASES OF BINDAY'S CONVICTION**

The Supreme Court's decision in *Kelly* changed the law.  It rejected decision-making and incidental economic harm as property under the fraud statutes.  *Kelly* constitutes an intervening change in law, and that change in law invalidates the legal theory upon which Binday was convicted.  Although Binday previously filed a § 2255 motion alleging ineffective assistance, this petition is not a "second or successive" petition within the meaning of the statute—and, in the alternative, the petition may be considered under 28 U.S.C. § 2241.

1.       **The Decision in *Kelly***

In Kelly, the defendants were convicted of violating the wire fraud statute for pretending that they closed traffic lanes on the George Washington Bridge for a traffic study when in fact they closed them as political payback to a local mayor.  The object of their scheme was not to obtain money for themselves from the traffic study, though their conduct caused an economic loss to the Port Authority in the form of unnecessary employee wages and an interference with the Port Authority's right to control or allocate the lanes' directions.  The jury was told it could convict if it found that the defendants deprived the Port Authority of its ability "to make discretionary economic decisions about what to do with [its] money or property."  *United States*

*v. Baroni*, 909 F.3d 550, 563 (3d Cir. 2018).  That is the right to control doctrine, and the Third Circuit approved that definition of property.

The Third Circuit held that the government offered sufficient evidence to prove the defendants defrauded their employer of "public employee labor."  *Id*. at 562.  "Their time and wages, in which the Port Authority maintains a financial interest, is a form of intangible property."  *Id*. at 565.  In addition, the court held that the "Port Authority has an unquestionable property interest in the bridge's exclusive operation, including the allocation of traffic through its lanes and of the public employee resources necessary to keep vehicles moving. Defendants invented a sham traffic study to usurp that exclusive interest, reallocating the flow of traffic and commandeering public employee time in a manner that made no economic or practical sense." *Id*. at 567.  The circuit court recognized the right to control theory as a "traditional concept of property" that provided "an alternative basis upon which to conclude Defendants defrauded the Port Authority."  *Id*. at 566–67.

On certiorari, the government supported the Third Circuit's reasoning.  In its merits brief, the government argued that "resources—payments to workers who would not otherwise have been on duty, the value of wages paid to salaried employees whom the conspirators unwittingly conscripted into their plans, and the right to control the real property of the George Washington Bridge—are each a 'species of valuable right [or] interest' that constitutes 'property' under the fraud statutes." Brief for the United States, *Kelly v. United States* at 22, No. 18-1059.[4]  It claimed, "the George Washington Bridge itself is real property, as to which an owner has long been understood to have the rights of 'free use' and 'control.'"  *Id*. at 31.  It argued that "[t]he

---

[4]     https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/18-1059.html (citation and internal quotation marks omitted).

right to control the George Washington Bridge, however, is not a regulatory interest, but instead an interest in real property—one of the most fundamental of property rights," and "[t]he scheme in this case required the Port Authority to pay additional wages, redirected the value of the Port Authority's scheduled wage payments, and divested the Port Authority of control of the George Washington Bridge, all to the benefit of Kelly and Baroni." *Id.* at 46. And it favorably quoted the jury instructions and the Third Circuit's opinion on the right to control. *Id.* at 36.

At oral argument in Kelly, the government renamed its right to control the bridge argument as "commandeering fraud," whereby the defendants tried to "take over property that is in the hands of the victim and manage it as if it is his own property. That's what they were doing with the lanes on the bridge and the employee resources." *Kelly v. United States*, No. 18-1059, Tr. of Jan. 14, 2020 Oral Argument at 36.

The Supreme Court rejected all of the Third Circuit's reasoning and the government's arguments. It explained that the *Kelly* defendants could violate fraud laws

> [o]nly if an object of their dishonesty was to obtain the Port Authority's money or property. The Government contends it was, because the officials sought both to 'commandeer' the Bridge's access lanes and to divert the wage labor of the Port Authority employees used in that effort. Tr. Of Oral Arg. 58. We disagree. The realignment of the toll lanes was an exercise of regulatory power—something this Court has already held fails to meet the statutes' property requirement. And the employees' labor was just the incidental cost of that regulation, rather than itself an object of the officials' scheme. We therefore reverse the convictions.

*Kelly*, 140 S. Ct. at 1568 (emphasis added).

Extrapolating from the specific facts of *Kelly* to the general construction of the fraud statutes, the Court held broadly that "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id.* at 1573. For this proposition, the Court discussed Judge Easterbrook's opinion in *United States v. Walters*, 997 F. 2d 1219, 1224

(7th Cir. 1993), one of the decisions rejecting the right to control theory.  The Supreme Court

explained:

> Without that rule, as Judge Easterbrook has elaborated, even a practical joke
> could be a federal felony. His example goes: "A [e-mails] B an invitation to a
> surprise party for their mutual friend C. B drives his car to the place named in the
> invitation," thus expending the cost of gasoline. Ibid. "But there is no party; the
> address is a vacant lot; B is the butt of a joke." Ibid. Wire fraud? No. And for the
> reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the
> [deceitful] scheme rather than a byproduct of it."

*Kelly*, 140 S. Ct. at 1573 n.2 (citing and quoting *Walters*, 997 F.2d at 1226).

In sum, Kelly reaffirmed that actual property must be the object of the scheme.  A

scheme to defraud means a scheme to obtain actual property from the victim.

### 2.     The Supreme Court Rejected the Incidental Economic Harm Binday Caused to Insurance Companies as Property Under the Fraud Statutes

The government's position throughout this case was that Binday deceived the insurance

companies into selling insurance to people to whom the insurers did not want to sell.  The people

were real; their ages and health (the two critical underwriting criteria) were honestly disclosed.

Even though Binday's purpose was not to obtain the potential lost insurer profits, the

government argued Binday was guilty because STOLI policies are "bad for business" and

"didn't make economic sense" to the insurers.

Kelly rejected this theory of wrongdoing because it authorizes a conviction without proof

that the defendant sought to obtain property through false statements, and instead substitutes

incidental economic impacts on a victim for the "obtaining property" elements.  Interference

with a victim's property rights through false statements cannot support a fraud conviction if the

interference is an "incidental (even if foreseen) byproduct" of the alleged scheme.  *Kelly*, 140 S.

Ct. at 1573-74.  The *Kelly* defendants "used" employees' time and "commandeered" bridge

lanes, but those two impacts were not their objective.  Neither defendant actually "sought to

obtain the services" of the employees; the defendants had not "hope[d] to obtain the data that the traffic engineers spent their time collecting" and the toll collectors were not a deliberate feature of their plan. *Id.* (emphasis added). In other words, the wasted employee labor was "an incidental," if foreseeable, "byproduct" of the defendants' scheme to cause political retribution. *Id*. The Supreme Court confirmed that unless the "aim" of defendants' scheme was to obtain the employees' labor, the defendants "could not have violated the…wire fraud [statute]." *Id*. at 1574.

Kelly thus holds that economic harm incidental to a defendant's conduct is insufficient to prove the property element of fraud.  The differential in potential profits between STOLI and non-STOLI life insurance policies – profits that were not quantified at trial and that the insurers never suggested Binday sought to obtain – cannot constitute "property."  Binday did not covet the insurers' profits; indeed, the insurers undoubtedly turned profits from the premiums on the STOLI policies that they otherwise would not have earned had those policies not been bought and paid for.  Binday's goal therefore was not to take something from the insurers.

Nor does it matter that that Binday's deception impacted the insurers economically in some ways because the Supreme Court accepted that the Kelly defendants could not have succeeded without the Port Authority employees' labor and still found that the labor was "incidental" to the defendants' objective of punishing the local mayor of Fort Lee.  *See* 140 S. Ct. at 1574 (even if "all of this work [by Port Authority employees] was 'needed' to realize the final plan—to accomplish what [defendants] were trying to do with the Bridge. . .it would make no difference" under Section 1343 because "the cost of the employee hours spent on implementing [defendants'] plan was its incidental byproduct" and a "property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme.").

*Kelly* holds that foreseeable harms imposed on a victim as a "byproduct" of the defendant's actions and harm that is purposefully inflicted on the victim to obtain traditional property (or money) is the line between lawful and unlawful conduct. Binday's conviction is thus inconsistent with *Kelly*.

### 3. *Kelly* Repudiated Prior Second Circuit Law

On a broader level, the Second Circuit's pre-*Kelly* case law construing the fraud statutes must be reexamined in light of the Supreme Court's directive. In a host of cases, the Second Circuit has said that mere deception can suffice for fraud because the right to "accurate information" it itself a type of property. That rationale of fraud is now invalid.

The Supreme Court had already suggested similar principles in *Cleveland v. United States*, 531 U.S. 12 (2000). But prior to *Kelly*, the Second Circuit interpreted "the Supreme Court's decision in *Cleveland* as effecting a limited alteration in the course of interpretation of the mail and wire fraud statutes rather than as completely redirecting the stream." *Fountain v. United States*, 357 F.3d 250, 260 (2d Cir. 2004).

The Second Circuit avoided Cleveland in *Fountain* by ignoring the "obtain" requirement. It did so again in *United States v. Finazzo*, 850 F.3d 94, 107 n.14 (2d Cir. 2017), where it confined its discussion of *Cleveland* to a footnote, and it rejected the appellant's argument that the property that is subject to the fraud statutes must be "obtainable." That conclusion conflicts with the express words used by the Court in *Kelly*.

In the immediate wake of *Kelly*, in various pieces of litigation, the government has argued that the decision in *Kelly* is nothing new because it relied on *Cleveland*. Indeed, the government argued as much in its opposition to Binday's compassionate release motion. But the government's argument that *Kelly* is not new misses the point: *Kelly* is consistent with

*Cleveland*, but *Kelly* also rejected the Second Circuit's application of *Cleveland* over the past 20 years.  That is new.

In any event, as discussed below, in its recent memorandum to the Supreme Court in *Blaszczak*, the government abandoned its claim that *Kelly* said nothing new.  It has conceded that *Kelly* requires reexamination of Second Circuit law.

* * * *

It is notable in that regard that the Supreme Court chose to rely on *Walters*, an opinion that also conflicts with the Second Circuit's reasoning in *Binday*, *Finazzo* and other fraud cases. In *Walters*, Norby Walters, a sports agent, paid college athletes to sign with him while they were still playing in college, which violated NCAA rules – the athletes were not allowed to receive pay for playing; they would be ineligible to play college sports if the truth came out.  Walters was charged with mail fraud, and the government claimed Walters "obtained" the scholarship money the universities would not have had to pay these athletes if the students and Walters had not kept their agreements secret.

The Seventh Circuit explained that the objective of Walters's scheme was not to obtain the scholarship money or any other property from the universities, but rather to sign future professional athletes and share in their earnings.   In rejecting the government's theory, the court in *Walters* described it (and the right to control theory) as follows: "According to the United States, neither an actual nor a potential transfer of property from the victim to the defendant is essential. It is enough that the victim lose; what (if anything) the schemer hopes to gain plays no role in the definition of the offense."  *Walters*, 997 F.2d at 1224.

21

Judge Easterbrook explained the defect of this theory in his hypothetical joke quoted by

the Supreme Court in *Kelly*.  He also explained that the federal fraud statutes do not cover people

who violate industry rules or policies in connection with sales or purchases.

> Consider a parallel: an association of manufacturers of plumbing fixtures
> adopts a rule providing that its members will not sell "seconds" (that is,
> blemished articles) to the public. The association proclaims that this rule
> protects consumers from shoddy goods. To remain in good standing, a
> member must report its sales monthly. These reports flow in by mail. One
> member begins to sell "seconds" but reports that it is not doing so. These
> sales take business away from other members of the association, who lose
> profits as a result. So we have mail, misrepresentation, and the loss of
> property, but the liar does not get any of the property the other firms lose.
> Has anyone committed a federal crime? The answer is yes—but the statute
> is the Sherman Act, 15 U.S.C. § 1, and the perpetrators are the firms that
> adopted the "no seconds" rule. … The trade association we have described
> is a cartel, which the firm selling "seconds" was undermining. Cheaters
> depress the price, causing the monopolist to lose money. Typically they go
> to great lengths to disguise their activities, the better to increase their own
> sales and avoid retaliation. The prosecutor's position in our case would
> make criminals of the cheaters, would use § 1341 to shore up cartels.

*Id.* (citation omitted).

The *Walters* court expressly rejected the "right to control" theory of property:  "The

United States recasts this argument by contending that the universities lost (and Walters gained)

the 'right to control' who received the scholarships. This is an intangible rights theory once

removed—weaker even than the position rejected in *Toulabi v. United States*, 875 F.2d 122 (7th

Cir.1989), and *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988), because Walters was not

the universities' fiduciary."  Id. at 1226 n.3.  And as Judge Kaplan has previously noted, the

decision in Walters was very much at odds with Second Circuit case law.  *United States v. Gatto*,

295 F. Supp. 3d 336, 344-46 (S.D.N.Y. 2018) (rejecting an argument based on Walters as

inconsistent with Second Circuit law).

Prior to *Kelly*, there was a circuit split.  On one side of that split was the Second Circuit,

with decisions including *Finazzo* and *Binday*.  On the other side was *Walters*, along with similar

decisions in other circuits.  *See United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014);

*United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992).  The Supreme Court sided with

*Walters* and the other circuits.

### 4.      Binday's Jury Instructions Authorized a Conviction Contrary to *Kelly*

The jury instructions in Binday's case, which tracked the Second Circuit's holdings,

provided the jury with none of the limitations that *Kelly* imposed.  They authorized the jury to

find Binday guilty if his scheme was "to deprive someone of money or property," with property

defined as a person's "ability to make an informed economic decision about what to do with his

money or property."  The instructions said that Binday must have "contemplated" a loss by the

insurers and that his scheme "if successful, would have created a discrepancy between what the

insurance companies reasonably anticipated and what they actually received."

None of this was correct, according to the Supreme Court.  Depriving someone of

information is not the same as obtaining property; it is merely deception.  Similarly, even

assuming Binday contemplated that insurers might make less money from STOLI policies, that

falls squarely within Kelly's rejection of incidental damages – which cannot serve as property

unless the government proved that was Binday's goal.  Nothing in the government's case

suggested that Binday sought anything other than to buy insurance and earn his commissions.

### 5.      Post-Kelly Litigation—*Blaszczak/Olan*

The Supreme Court has made clear that Kelly requires reexamination of Second Circuit

case law—and indeed, the government itself has conceded as much.  The Supreme Court vacated

the Second Circuit's decision in *Blaszczak*, remanding for reconsideration in light of *Kelly*.

Defendants Blaszczak, Olan, and others were charged with fraud for trading securities

based on confidential information obtained from government agencies.  In addition to securities

fraud, the government charged the defendants with wire fraud on the theory that they had

defrauded the government out of its property interest in "confidential information."  Relying on its prior case law, the Second Circuit affirmed the conviction, holding that the right to exclude people from access to information is property.  *Blaszczak*, 947 F.3d at 31-33.

Similar to its rulings in *Fountain* and *Finazzo*, discussed above, the Second Circuit essentially limited *Cleveland* to its facts: "While *Cleveland* remains good law, courts have consistently rejected attempts – similar to those advanced by Defendants here – to apply its holding expansively."  *Id*. at 32.  The decision in *Kelly* should have disabused the Second Circuit of its limited application of *Cleveland*.

The defendants sought certiorari.  After arguing in other fora that *Kelly* did not change the law, the government abandoned that argument before the Supreme Court.  In its memorandum asking the Supreme Court to vacate the decision in *Blaszczak*, the government conceded that Kelly rejected the interference-with-decision-making-as property concept and suggested that the Second Circuit be directed to reconsider its decision in *Blaszczak* – which Judge Kearse in dissent explained conflicted with Cleveland.  *See* Memorandum for the United States (Nov. 24, 2020), https://www.supremecourt.gov/DocketPDF/20/20-306/161673/20201124121846171_20-306%20Huber%20GVR%20Memo%20final.pdf.

On January 11, 2021, the Supreme Court agreed – it granted certiorari, vacated the opinions, and remanded for reconsideration in light of *Kelly*.  That established beyond peradventure that the Second Circuit's broad notions of "property" are inconsistent with Supreme Court case law.

\* \* \* \*

Unfortunately, at least some panels of the Second Circuit remain wedded to the theory.  On January 15, 2021, the Second Circuit decided one of the pending right-to-control cases.

*United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021).   The *Gatto* case arose out of the Adidas college basketball bribery scheme.   The defendants were convicted of fraud for paying athletes to attend universities that had marketing deals with Adidas.   The government's theory of fraud was that the defendants defrauded universities of the "financial aid that they could have given to other students."   *Id*. at 110.   That is a dubious theory of fraud because the defendants only violated a regulatory scheme created by the NCAA; their object was not to obtain scholarships or money or property because "regulatory rights of 'allocation, exclusion, and control'" are not property.   Besides conflicting with *Walters* and other cases, the *Gatto* decision revives the non-bribe/kickback self-dealing prong of honest services by re-labelling honest services as the right to control.   *See United States v. Gray*, 96 F.3d 769, 773 (5th Cir. 1996) (affirming fraud convictions of defendants who violated NCAA rules by giving them answers to tests, thereby making the players eligible for scholarships, and distinguishing Walters because Gray was prosecuted as a non-bribe honest services claim); *United States v. Ochs*, 842 F.2d 515, 526-27 (1st Cir. 1988) (reversing honest services convictions of defendants who filed a false building permit application and holding that defendant's profit from lying to his principal was not property within the meaning of the fraud statutes because the profit was not the principal's money:  "we do not think courts are free simply to recharacterize every breach of fiduciary duty as a financial harm, and thereby to let in through the back door the very prosecution theory that the Supreme Court tossed out the front").

        The Second Circuit did not seriously wrestle with the question because it assumed that *Kelly* had virtually no effect on preexisting circuit law.   It said, "[t]his case is different from *Kelly*," and therefore *Kelly* was "inapposite."   Id. at 116 & n.4.   Every case is in some way different from every other case—the question is whether the rationale of prior decisions compels

a certain result, even when applied to different facts.  To the extent that the *Gatto* court offered

an actual legal basis for distinguishing *Kelly*, it stated that *Kelly* only held "the regulatory

decisions were not punishable under a property fraud theory."  *Id*.

The *Gatto* court failed to consider that decision-making is a regulatory act, regardless of

whether a government agency or private company or university is doing the regulating.

"Decision making is the process of making choices by identifying a decision, gathering

information, and assessing alternative resolutions."  https://www.umassd.edu/fycm/decision-

making/process.  "Choosing the logical choice among the options."  Decision Making, Black's

Law Dictionary, https://thelawdictionary.org/decision-making/.  To regulate means: "**1.** To

control (an activity or process) esp. through the implementation of rules. **2.** To make (a machine

or one's body) work at a regular speed, temperature, etc.) REGULATE, Black's Law Dictionary

(11th ed. 2019).  Thus, the NCAA policies and rules are regulations that govern college sports.

Likewise, insurance company rules are regulations that govern the insurers' decision-making.

Confining "regulatory" to the government context is an overly constricted reading of

*Kelly*.  *Kelly*'s rationale was not limited to the government (to the contrary, the Port Authority is

not a government agency). The Supreme Court spoke broadly that "regulatory rights" of

allocation, exclusion, and control are not property.  Rather, *Kelly*'s was based on the core

requirement for all fraud that the defendant must seek to obtain property from the victim, and

that the property in question must fit within traditional notions of property.

### B.    BINDAY'S CONVICTION MUST BE VACATED BECAUSE HIS CONDUCT WAS NOT CRIMINAL UNDER *KELLY*

When the Supreme Court holds that a conviction "is not authorized by substantive law …

'[t]here is little societal interest in permitting the criminal process to rest at a point where it ought

properly never to repose.'" *Welch v. United States*, 136 S. Ct. 1257, 1266 (2016) (citation omitted); *see Bousley v. United States*, 523 U.S. 614, 620 (1998) (when "a substantive federal criminal statute does not reach certain conduct," the decision applies retroactively on habeas review). This retroactive application is necessary to address the "significant risk" that defendants might have been convicted for acts that were not criminal. *Id*. That is what happened to Binday.

In previous cases, when the Court has issued substantive decisions narrowing the scope of federal criminal statutes, courts have allowed retroactive challenges even to final convictions. Thus, after *McNally*, the Second Circuit held that it should be applied retroactively to undo honest services prosecutions. *See Ingber v. Enzor*, 841 F.2d 450, 455 (2d Cir. 1988) ("Because McNally overrules our prior decisions holding certain conduct under the mail fraud statute criminal, reversing years of circuit precedent, we conclude that it should be applied retroactively in Ingber's case."); *United States v. Shelton*, 848 F.2d 1485, 1489–90 (10th Cir. 1988) ("the opinion in McNally must be given retroactive effect in a section 2255 proceeding").

In the wake of *Skilling*, courts also vacated honest services convictions. For example, in *Stayton v. United States*, 766 F.Supp.2d. 1260, 1269 (M.D. Ala. 2011), the court vacated the convictions of two defendants because it determined that the jury instructions were "flawed" and "overbroad" in light of the subsequent *Skilling* decision. Likewise, the court in *Colino v. United States*, 2012 WL 1198446 at *15 (C.D. Cal. 2012), vacated a defendant's honest services conviction on a writ of error coram nobis after it determined that Skilling "radically changed" the definition of honest services, and the pre-*Skilling* jury instructions failed to require a finding that the defendant had received bribes or kickbacks and were thus "clearly erroneous." In *United States v. Post*, 950 F. Supp. 2d 519, 539 (S.D.N.Y. 2013), the court dismissed indictments, after

trial and conviction, and in the wake of *Skilling*, where the government's case embraced "intangible rights fraud," which is "synonymous with 'honest services fraud.'"

Binday is seeking the same relief.  The Supreme Court in *Kelly* narrowed the scope of the fraud statutes, making clear that deceptive conduct is not criminal unless the deception seeks money or property from the victim.  Binday is entitled to have *Kelly* applied to his case, especially because he has argued against the theory used to convict him at every stage of his prosecution.

### C.     BINDAY IS NOT PROCEDURALLY BARRED FROM OBTAINING RELIEF

Binday's claim, based on *Kelly*, is properly presented in this motion.  While defendants who failed to raise the substantive claim about the reach or scope of a criminal statute on direct appeal may have to overcome the procedural hurdle that they defaulted on their claim and show actual innocence, here Binday did not default.  His counsel at trial, on direct appeal, on his petition for rehearing en banc, and on his petition for a writ of certiorari all challenged the right to control theory as an improper extension of the fraud statutes.  Binday thus need not overcome the requirements of a defendant who failed to raise an argument earlier.  In any event, his conviction was firmly grounded in conduct and based on government argument and jury instructions that were rejected in *Kelly*.

Binday previously filed a section 2255 motion asserting that his trial lawyer misunderstood the right to control theory and argued points irrelevant and contrary to prevailing Second Circuit law.  Binday's current motion is not barred by the "second or successive" provision of § 2255(h) for two reasons: (1) it is not second or successive but rather a revival of previous arguments rejected by the circuit court and vindicated by the Supreme Court and (2) it

is authorized by § 2255(e) because § 2255 may be inadequate or ineffective to test the legality of his detention.

"The phrase 'second or successive' is not self-defining." *Panetti v. Quarterman*, 551 U.S. 930, 943 (2007). "It takes its full meaning from our case law, including decisions predating the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Id*. at 943–44. A habeas petition that is filed second in time is not necessarily "second or successive." *Id*. 943-44. Habeas corpus petitions based on claims that were not ripe at the time of an earlier petition are not "second or successive." *Id*. at 945. *See Banister v. Davis*, 140 S. Ct. 1698, 1705–06 (2020) (second or successive analysis looks to "historical habeas doctrine and practice" and asks whether the later filed petition would have "'constituted an abuse of the writ, as that concept is explained in our [pre-AEDPA] cases'" (*quoting Panetti*)).

"Under the abuse-of-the-writ doctrine, a subsequent petition is 'second or successive' when it raises a claim that was, or could have been, raised in an earlier petition." *James v. Walsh*, 308 F.3d 162, 167 (2d Cir. 2002). Conversely, it is not an "abuse of the writ" for a person to file a habeas petition after an intervening change in the law. *See McCleskey v. Zant*, 499 U.S. 467, 520 n.8 (1991) (*quoting* Advisory Committee's Note to Habeas Corpus Rule 9, 28 U.S.C., p. 427 ("A retroactive change in the law and newly discovered evidence are examples" of "instances in which petitioner's failure to assert a ground in a prior petition is excusable")). "[E]ven though the legal issue raised in a § 2255 motion 'was determined against (the applicant) on the merits on a prior application,' 'the applicant may (nevertheless) be entitled to a new hearing upon showing an intervening change in the law . . ..'" *Davis v. United States*, 417 U.S. 333, 342 (1974) (*quoting Sanders v. United States*, 373 U.S. 1, 17 (1963)).

Binday could not have directly attacked the right to control theory in his ineffective assistance petition because the change in this circuit's law had not yet taken place. At every step of the litigation, Binday attacked the government's and the Second Circuit's overbroad construction of the term "property" in the fraud statutes. His arguments were rejected, and he then sought relief because his trial lawyer misstated the law in his arguments to the jury, and still Binday made clear his opposition to the theory.

Kelly has now rejected the right to control theory and it has redirected lower courts' application of the fraud statutes from deprivations of intangible property rights to defendants' efforts to obtain traditionally defined property. Binday could not have filed a habeas petition in the Second Circuit until the Supreme Court decided *Kelly*. This motion is thus not "second or successive." *See Panetti*, 551 U.S. at 945 (2007).

\* \* \* \*

Alternatively, even if the instant motion were determined to be a second or successive petition, it would be permissible because section 2255 is inadequate or ineffective in Binday's circumstance. A person who has argued at every step of the litigation that the construction of the criminal statute with which he is charged may raise that claim again when the Supreme Court rejects circuit law.

In *Cephas v. Nash*, 328 F.3d 98, 104 (2d Cir. 2003), the court held that a petition pursuant to 28 U.S.C § 2241 is permissible whenever "the petitioner cannot, for whatever reason, utilize § 2255, and in which the failure to allow for collateral review would raise serious constitutional questions" (*quoting Triestman v. United States*, 124 F.3d 361, 377 (2d Cir. 1997)). That category of cases includes "cases involving prisoners who (1) can prove 'actual innocence

on the existing record, and (2) 'could not have effectively raised [their] claim[s] of innocence at an earlier time'" (*quoting Triestman*, 124 F.3d at 363).

Binday satisfies the actual innocence test:  the jury was instructed that it could convict on a theory the Second Circuit approved but that the Supreme Court has now rejected.  Just as in the post-*McNally* and post-*Skilling* cases, Binday is actually innocent.

An "intervening change in the governing interpretation of the statute of conviction" satisfies the second prong of the Cephas test.  *Dhinsa v. Krueger*, 917 F.3d 70, 81 (2d Cir. 2019). *See In re Jones*, 226 F.3d 328, 333–34 (4th Cir. 2000) ("2255 is inadequate and ineffective to test the legality of a conviction when: (1) at the time of conviction, settled law of this circuit or the Supreme Court established the legality of the conviction; (2) subsequent to the prisoner's direct appeal and first § 2255 motion, the substantive law changed such that the conduct of which the prisoner was convicted is deemed not to be criminal; and (3) the prisoner cannot satisfy the gatekeeping provisions of § 2255 because the new rule is not one of constitutional law.") (cited with approval by *Cephas*, 328 F.3d at 104 n. 6).

Here, Binday raised his argument about the right to control as violative of *Skilling* in his pretrial motion to dismiss.  He pointed to the circuit conflict over the theory on direct appeal, asked for en banc review of that theory, filed a petition for certiorari, raised his objection to the theory in his ineffective assistance of counsel claim, sought certiorari from the denial of that Sixth Amendment claim, filed amicus briefs in both *Kelly* and *Aldissi* explaining the defects in the theory, and raised his objections to that theory in his compassionate release motion.  In short, Binday never missed an opportunity to challenge the basis for his conviction.  The Supreme Court agreed with him in May 2020.

## IV.    CONCLUSION

The Supreme Court has eviscerated the Second Circuit's construction of the federal fraud statutes regarding the government's burden, and it did so in a way that makes Binday's complained of conduct non-criminal.  This petition should therefore be granted.

The undersigned files this petition on behalf of Michael Binday, who is currently incarcerated and in quarantine at FCI Otisville, and affirms under penalty of perjury that the factual allegations set out above accurately report testimony and evidence in the trial record.

Dated: March 12, 2021

Respectfully Submitted,

_____
David W. Shapiro, NY Bar #2054054
The Norton Law Firm
dshapiro@nortonlaw.com