**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x

MICHAEL BINDAY,                               :        Case No. 1:12-cr-00152-CM
                                                                 1:17-cv-04723-CM

    Petitioner

    - v. -                                          :

UNITED STATES OF AMERICA

    Respondent.                                :

------------------------------------------------------------ x

## DEFENDANT MICHAEL BINDAY'S RENEWED MOTION
## FOR REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. § 3582

Defendant, Michael Binday, renews his prior motion to reduce sentence pursuant to 18

U.S.C. § 3582(c)(1)(A)(i), Doc. 464.  In the year since Mr. Binday's prior motion was decided,

Mr. Binday's circumstances have substantially changed in ways that demonstrate an increased risk

of contracting COVID-19, place him at greater risk of severe and potentially fatal complications

should he contract COVID-19, and result in him experiencing much more onerous conditions of

incarceration than are warranted for his sentence and risk level.  Mr. Binday's circumstances, and

the medical risks and hardships he faces, are extraordinary and compelling circumstances that

warrant his release.  Additionally, legal developments subsequent to Mr. Binday's conviction,

sentencing, and initial 2255 motion have called into the question the validity of the legal theory on

which he was convicted.  While the government has taken the position that these issues are

procedurally barred, the First Step Act's expansion of the Court's compassionate release authority

provide the Court with an alternative mechanism to address these issues, which implicate the

fundamental fairness of Mr. Binday's continued incarceration.

For these reasons, and the reasons set forth in the following Memorandum, it is respectfully requested that the Court grant compassionate release, reduce Mr. Binday's sentence to time served, and order Mr. Binday's immediate release.  In the alternative, it is respectfully requested that the Court reduce Mr. Binday's sentence by a period of eighteen to twenty-four months to account for the extremely onerous conditions of incarceration he has endured.

## MEMORANDUM

Mr. Binday has already contracted COVID-19 once while in BOP custody, and he remains at grave risk from potentially severe or even fatal complications should he do so again.  While the Court denied Mr. Binday's prior motion to reduce sentence, Doc. 464, in the Compassionate Release Order entered on July 16, 2020, Doc. 475, Mr. Binday's circumstances have significantly changed since that date.  Notably, in July 2020, Mr. Binday received test results definitively showing that he suffers from Type II Diabetes.[1]  A letter from Mr. Binday's physician explaining the serious risk that COVID-19 presents to all individuals with diabetes, including Mr. Binday, regardless of the stage or severity of the disease, is attached to this Motion as Exhibit A.  Further, in January 2021, Mr. Binday received biopsy results showing he suffers from Squamous Cell Carcinoma.  Cancer patients are also at elevated risk from COVID-19.  Additionally, in November 2020, Mr. Binday was in a motor vehicle accident that took place on BOP grounds.  Mr. Binday was a passenger in a van driven by another inmate that was used to transport inmates from the camp to the work locations.  Mr. Binday lost consciousness in the accident and suffered from a torn retina.  Mr. Binday's eye injury required surgery, and he has experienced complications from this injury and the resulting surgery that require further treatment, put his vision in jeopardy, and

---

[1] Mr. Binday's updated medical records were previously filed under seal as Sealed Exhibits B (BOP Medical Records), C (Biopsy Results), and D (Communications Regarding Eye Complications) to Docket Number 481.

has left him currently functionally blind.  These circumstances place Mr. Binday at substantially more risk from COVID-19 than the typical prisoner.  They have also resulted in Mr. Binday being held under much more onerous conditions than are warranted for a non-violent first offender who scores to a security level of Minimum and is designated to a camp, and who has a Minimal PATTERN risk score.  Further, the United States Supreme Court's recent opinion in *Kelly v. United States*, 140 S. Ct. 1565 (2020), calls into question the validity of the theory on which Mr. Binday's conviction rests.  This is an additional factor in establishing the existence of extraordinary and compelling circumstances in this case.  Based on these new circumstances, Mr. Binday renews his request for compassionate release.

## I.     Background and Procedural History

Mr. Binday was convicted following a jury trial of Conspiracy to Commit Mail and Wire Fraud, Mail Fraud, and Wire Fraud in connection with an alleged scheme involving stranger-owned life insurance ("STOLI") policies.  At the time of his conviction, Mr. Binday was 50 years old.  This was his first offense.  PSR ¶ 51.

Mr. Binday was sentenced on July 30, 2014, to concurrent sentences of 144 months (12 years) in prison on each count of conviction. Doc. 341.  Mr. Binday has now served almost five years in prison and has completed nearly half of his sentence if the good time he has earned is taken into account.

In May 2020, Mr. Binday filed a motion for compassionate release.  Doc. 464.  As Mr. Binday's initial motion for compassionate release explained, at the time the motion was filed, Mr. Binday had received an initial hemoglobin A1c result that was indicative for Type II diabetes and he was waiting for a second hemoglobin A1c test to definitively diagnose him with diabetes.  Doc. 464 at 6; Doc. 475 at 9-10.  The motion also described facial lesions that required examination by

a specialist that had not been provided; painful hip, knee, back, and shoulder conditions; an enlarged prostate; and migraine headaches.  Doc. 464 at 6-7.  While Mr. Binday's compassionate release motion was pending, he contracted COVID-19.  Doc. 475 at 9-10

In the initial Compassionate Release Order, the Court held that Mr. Binday's medical condition at the time of his initial motion did not constitute extraordinary and compelling circumstances that warranted compassionate release.  Doc. 475 at 13.  The Court further held that release was not warranted under the factors set forth in 18 U.S.C. Section 3553(a) in light of that fact that at that point Mr. Binday had served less than one-third of his sentence.  *Id.* at 16.

On March 22, 2021, Mr. Binday filed a motion for reconsideration of the Order denying his prior motion for compassionate release and renewed motion for compassionate release.  Doc. 481.  At the time of that filing, Mr. Binday had not exhausted his administrative remedies regarding his renewed request for compassionate release.  Mr. Binday also filed a motion to file his medical records under seal.  Doc. 480.  The Court entered an endorsed order granting Mr. Binday's motion to file his medical records under seal.  Doc. 482.  In the same order, the Court declined to reconsider its Order denying Mr. Binday's prior compassionate release motion.  The Court noted that the BOP is "in the best position to assess whether [Mr. Binday's] condition has materially changed," and acknowledged that Mr. Binday could file a new compassionate release motion once he had exhausted his administrative remedies with the BOP.

As discussed below, Mr. Binday's medical situation is now markedly different than it was when he filed his original compassionate release motion over one year ago, and Mr. Binday has now exhausted his administrative remedies.

## II.    Mr. Binday has exhausted his administrative remedies.

Mr. Binday has exhausted his administrative remedies with the BOP.   Mr. Binday

submitted a new administrative request to the BOP on Friday, February 26, 2021.  Further, on

March 5, 2021, Mr. Binday's counsel submitted a letter on Mr. Binday's behalf requesting that the

BOP consider Mr. Binday for both compassionate release and home confinement under the

CARES Act.

The BOP denied Mr. Binday's request for home confinement.  It stated that he is not

currently eligible for consideration for home confinement because he has "not yet completed a

sufficient portion of [his] sentence," that is, at least 50% of his sentence.

The BOP has not responded to Mr. Binday's request that it file a motion for compassionate

release on his behalf.  Because the BOP has not acted on Mr. Binday's administrative request for

compassionate release after more than 30 days, that request is now exhausted under the terms of

18 U.S.C. § 3582(c)(1)(a).

## III.   Extraordinary and compelling circumstances support compassionate release here.

The Court should find that extraordinary and compelling circumstances exist here that

support compassionate release for Mr. Binday.  Section 3582(c)(1)(A)(i) provides that the Court

may reduce a sentence upon a finding that "extraordinary and compelling reasons warrant such a

reduction," if the Court finds that the reduction is consistent with the United States Sentencing

Commission's applicable policy statements, and after considering the factors set forth in 18 U.S.C.

Section 3553(a).  Congress directed the United States Sentencing Commission to promulgate a

policy statement describing "what should be considered extraordinary and compelling reasons for

sentence reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C.

§ 994(t).  The resulting Sentencing Commission policy statement is found in U.S.S.G. Section

1B1.13.  Application Note 1 to Section 1B1.13 identifies several specific circumstances that

present "extraordinary and compelling reasons" for a sentence reduction, such as the defendant's

terminal illness or age and medical condition, and includes a final provision that permits a reduction of sentence for "other reasons" that are "extraordinary and compelling."   As explained below, extraordinary and compelling reasons exist in Mr. Binday's case under Application Note 1 subsection (D) because: (1) Mr. Binday is at high risk of potentially fatal complications from COVID-19, and the prison environment generally, and Mr. Binday's circumstances specifically, leave him vulnerable to such an infection; and (2) new legal developments call into question the validity of Mr. Binday's conviction.

> **A.**   **Mr. Binday's medical condition and resulting vulnerability to severe and potentially fatal complications from COVID are an extraordinary and compelling circumstance.**

Mr. Binday's medical history at the time was discussed in detail in his original compassionate release motion. *See* Doc. 464 at 6-7.  In the time since the filing of that motion, there have been four significant developments in Mr. Binday's medical condition.

First, Mr. Binday has received the needed follow-up testing he was waiting for at the time of his prior motion and has now been diagnosed with Type II Diabetes. *See, e.g*, Ex. B at 16, 24, 28, 232.  The CDC has recognized that having "type 2 diabetes can make you more likely to get severely ill from COVID-19."  CDC, "People with Certain Medical Conditions," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.   While Mr. Binday's diabetes has been relatively well-controlled so far, his diabetes being well-managed does not eliminate the risk of COVID poses to him.  Mr. Binday's physician, Jonathan A. Bradlow M.D., FACC, explains in the letter attached as Exhibit A that Mr. Binday's diabetes places him at "risk for complications of COVID-19 (this is a known increased risk factor for severe disease)."  Further, Dr. Bradlow explains, "There is no data that mild disease has less risk than moderate or severe diabetes, as diabetes itself is a risk factor for complications

of COVID-19. This has been clearly borne out in the studies (and CDC guidelines), with no study showing that there is any relation of risk to glucose control." Ex. A. For these reasons, Dr. Bradlow concludes, "[t]he fact that [Mr. Binday] has diabetes places him at elevated risk." *Id.*

Relatedly, Mr. Binday suffers from severe hypercholesterolemia (also known as hyperlipidemia, or high cholesterol). *See, e.g.*, Ex. B at 18. According to Dr. Bradlow, Mr. Binday's severe hypercholesterolemia is caused by his diabetes. Ex. A. High cholesterol is itself believed to increase COVID susceptibility. While the CDC has not at this point identified high cholesterol as a COVID risk factor, early-stage research demonstrates that cholesterol plays a critical role in the entry of the SARS-CoV-2 virus into cells, which may explain in part why the elderly and those with certain underlying conditions associated with high cholesterol are so much more vulnerable to the most severe effects of COVID-19. *See* Hao Wang, Zixuan Yuan, Mahmud Arif Pavel, Scott B. Hansen, "The role of high cholesterol in age-related COVID19 lethality," (May 9, 2020), *available at* https://www.biorxiv.org/content/10.1101/2020.05.09.086249v2.

Second, in January 2021, Mr. Binday was diagnosed as having Squamous Cell Carcinoma, a form of skin cancer, on his face. *See* Ex. B at 15; Ex. C. As Mr. Binday's original compassionate release motion explained, when that motion was filed in May 2020, Mr. Binday had long been requesting that the lesions on his face be evaluated. Doc. 464 at 6; *see also* Ex. B at 446. A biopsy on the lesion on Mr. Binday's face was finally performed in January 2021, and it was cancerous. Ex. C. The CDC has recognized that "[h]aving cancer can make you more likely to get severely ill from COVID-19" and that "having a history of cancer may increase your risk." CDC, "People with Certain Medical Conditions," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Mr. Binday remains at risk of skin cancer. His dermatologist recommended, in a letter that was provided to the BOP in 2018,

that due to Mr. Binday's family history of skin cancer and his skin cancer risk factors, annual full body skin checks should be performed in Mr. Binday.  The letter from Mr. Binday's dermatologist is attached to this motion as Exhibit E.  Despite this recommendation and Mr. Binday's cancer diagnosis, Mr. Binday has not been provided full body checks while in the BOP, with care being limited only to sun-exposed areas, not including Mr. Binday's scalp, which Mr. Binday has notified his care providers contains two suspicious areas.

Third, in November 2020, Mr. Binday was in a motor vehicle accident that resulted in him losing consciousness and suffering a torn retina in his eye.  Ex. B at 335.  Mr. Binday required eye surgery because of the injury.  *Id.*  He continues to experience complications in the injured eye that are causing his vision to deteriorate.  Ex. D.  Mr. Binday's eye surgeon informed him that the surgical technique that was used to restore his retina would result in Mr. Binday developing a cataract within six months to a few years.  The expected cataract has already begun to form; it was first measured at Mr. Binday's eye doctor appointment on March 1, 2021.  Mr. Binday's eye doctor has indicated that Mr. Binday's eye will likely not be ready for another eye surgery for months, subject to the opinion of the cataract surgeon.  The BOP has not yet scheduled an appointment for Mr. Binday with the cataract surgeon.  The doctor treating Mr. Binday's retina is weaning him from eye drops that have been used to treat inflammation that was causing elevated pressure in his eye (glaucoma), with the hope that the glaucoma will not reappear once he has stopped using the drops.  The need for Mr. Binday be off these eye drops for several months before his next eye surgery is contributing to the uncertainty regarding the timing of that surgery.

Mr. Binday additionally has an immediate need to see an optometrist who can test his eyes for a new eyeglasses prescription and determine what level of correction he needs.  His prescription has worsened dramatically as a result of his eye injury and cataract.  How well Mr. Binday will be

able to see once he is able to obtain a new prescription is an open question. His cataract causes darkness and cloudiness, and the surgery he had also causes wavy vision. Mr. Binday's doctors have informed him his vision once ultimately corrected to the degree possible may be significantly impaired. He is currently functionally blind, and the discrepancy between the vision in his eyes and the failure to provide eyeglasses that give the level of correction needed, causes him to suffer from frequent migraine headaches. A letter from the ophthalmologist who treated Mr. Binday before his incarceration is attached to this motion as Exhibit F.

Mr. Binday has required frequent outside appointments to provide care for his injured eye. *See, e.g.*, Ex. B at 4, 10, 24, 34, 46, 52, 64, 67. Outside care is also needed for Mr. Binday's orthopedic condition, and particularly arthritis of his hip that has resulted in a labral tear (an injury to the soft tissue that covers the hip socket). *See, e.g.* Ex. B at 97, 98-99, 151, 438.

Every time Mr. Binday travels outside his facility to attend a medical appointment, he is at increased risk for COVID transmission. Mr. Binday's need for outside treatment has also significantly worsened his conditions of confinement. Each time Mr. Binday has an outside medical appointment, he is required to quarantine for two weeks in advance of the appointment and to quarantine again after the appointment until a COVID test result comes back, which has taken anywhere from a few days to as many as 17 days. Although Mr. Binday is a minimum-security level prisoner and is designated to the satellite camp at FCI Otisville, while in quarantine, he is confined at the Medium Security at FCI Otisville under conditions that are essentially solitary confinement. Given the frequency of Mr. Binday's medical appointments, this means he has been in solitary confinement more or less continuously for months. As of the date of this filing, Mr. Binday has spent at least 251 days in quarantine, with more anticipated in the near future.

The changes in Mr. Binday's medical condition and conditions of confinement are

summarized in the following chart:

| Issue | Last Submission | Current submission |
|---|---|---|
| Diabetes | One test confirmed. Rejected in ruling as insuffienciently serious. | Two tests confirm diabetes diagnosis.  Physician states all diabetes diagnoses are associated with serious COVID risk. |
| BMI | Overweight | Obese with BMI of 30.9; a significant COVID risk factor. |
| Conditions of Confinement | No quarantine | Over 250 days of quarantine/solitary confirment with more to come.  Numerous studies show solitary confinement has deleterious impact on physical and mental health |
| Eye | Healthy | One eye recovering from retina surgery with complications.  Degree of permament loss still unkown, but current vision is severely impaired.  A second surgery (cataract) will be required.  Should the eye be infected with COVID, there is a risk of (additional) permanent vision loss. |
| Cholesterol | Disagnosed with hypercholesterolemia, controlled with medication | Same |
| Cancer | Had requested evaluation of facial lesion, but had not received diagnosis; prior order described as "dermatolocical issues" that involved no increased COVID risk | Diagnosed with Squamous Cell Carcinoma; cancer is a CDC-recognized COVID risk factor |

Finally, as the Court is aware, while Mr. Binday's original compassionate release motion was pending, he contracted COVID-19.  Doc. 475 at 9.  Mr. Binday reported suffering symptoms including tightness in his chest lasting several weeks, two to three weeks of gastrointestinal symptoms, a severe headache that lasted several days, shortness of breath on any exertion, memory

impairment, blurred vision, body aches, and a rash.  Ex. B at 426-27.  An EKG performed on Mr.

Binday during this time period showed heart rhythm abnormalities (an inverted T-wave).  Ex. B

at 133.  Mr. Binday was kept in solitary confinement for approximately 52 days during this time

period.  *Id.* at 427.  As a result of this, Mr. Binday has experienced a great deal of anxiety and

situational depression.  *Id.*  Further, myocarditis, or inflammation of the heart muscle, occurs in an

unknown number of COVID survivors.  *See* "Myocarditis: A Potentially Dangerous Aftereffect

From COVID-19," Clinical Trials Arena (Jan. 28, 2021), *available at*

https://www.clinicaltrialsarena.com/comment/myocarditis-covid-19/.  It is thus recommended that

patients who experience cardiac symptoms after recovering from COVID are screened for

myocarditis "to prevent and mitigate further complications."  *Id.*; *see also* Jordan D. Metzl, M.D.,

"Exercise After Covid-19? Take It Slow," New York Times (Nov. 18, 2020) ("If you experienced

chest pain, shortness of breath or fatigue during your illness, you should see a cardiologist before

restarting sports activity.")   Because Mr. Binday has experienced chest pain, he has requested a

cardiac examination.  This request has not been acted upon.

Mr. Binday is also deeply concerned that if he is reinfected, the results will be worse or

even fatal.   The CDC has acknowledged that reinfection is possible:

> CDC is aware of recent reports indicating that persons who were previously
> diagnosed with COVID-19 can be re-infected…. The immune response, including
> duration of immunity, to SARS-CoV-2 infection is not yet understood. Based on
> what we know from other viruses, including common human coronaviruses, some
> reinfections are expected. Ongoing COVID-19 studies will help establish the
> frequency and severity of reinfection and who might be at higher risk for
> reinfection….

CDC, "FAQs: Transmission," *available at* https://www.cdc.gov/coronavirus/2019-

ncov/hcp/faq.html#Transmission.  Mr. Binday's concern about reinfection is particularly pressing

in light of recent developments showing that prior infection may not protect against newly-

identified COVID-19 variants. *See. e.g.*, Chris Smith, "Brazilian Mutation Reinfected COVID-19 Survivors, Which Is Bad News For Vaccines," BBC News (Mar. 2, 2021), *available at* https://bgr.com/2021/03/02/coronavirus-reinfection-brazilian-mutation-risk-vaccines/; Hannah Miao, "Recovered COVID Patients Have Been Reinfected With New Virus Strains, WHO says," CNBC (Feb, 12, 2021), *available at* https://www.cnbc.com/2021/02/12/recovered-covid-patients-have-been-reinfected-with-new-virus-strains-who-says.html.

Further, the vaccine appears to be less effective against new coronavirus variants. Recent data from Israel, for example, shows that the Pfizer vaccine's efficacy drops to 64% with regard to the Delta variant. Ivana Kottasová, "Pfizer vaccine protection takes a hit as Delta variant spreads, Israeli government says," CNN (July 7, 2021), *available at* https://www.cnn.com/2021/07/06/health/israel-pfizer-efficacy-delta-variant-intl/index.html. Moreover, vaccine refusal has been widespread within the BOP, particularly among guards. AP, "U.S. prison guards refusing vaccine despite COVID-19 outbreaks," Modern Healthcare (Mar. 15, 2021) *available at* https://www.modernhealthcare.com/government/us-prison-guards-refusing-vaccine-despite-covid-19-outbreaks. The combination of reduced vaccine efficacy and poor vaccine acceptance within the BOP further reduces the protection vaccines may provide.

The existence of new variants militates against counting on vaccination to protect Mr. Binday against the virus while he remains in a prison setting. A recent "Perspective" article in the New England Journal of Medicine also makes a compelling case that vaccination alone is not sufficient to protect incarcerated people; instead, what is needed is "vaccination plus decarceration." *See* Benjamin A. Barsky, J.D., M.B.E., Eric Reinhart, B.A., Paul Farmer, M.D., Ph.D., and Salmaan Keshavjee, M.D., Ph.D., "Vaccination plus Decarceration — Stopping COVID-19 in Jails and Prisons," New England J. Medicine (Mar. 3, 2021), *available at*

https://www.nejm.org/doi/full/10.1056/NEJMp2100609.   As the article's authors explain, "the real-world effectiveness of vaccination programs depends on the context in which they are implemented." *Id.*  Research has demonstrated that "even a highly efficacious vaccine will have suboptimal preventive effects in high-spread, congregate settings." *Id.*  Preventing the spread of COVID-19 therefore requires a strategy of combining vaccination with "a sustained commitment to the public health practices and tools known to reduce the spread of Covid-19." *Id.*  (quoting Paltiel AD, Schwartz JL, Zheng A, Walensky RP, "Clinical Outcomes of a COVID-19 Vaccine: Implementation Over Efficacy," 40 Health Aff. 42 (2020)).  As applied to prisons, this means that "[v]accination of incarcerated people … is not enough…. [I]t must be coupled with large-scale decarceration to increase the real-world effectiveness of vaccination, disrupt wide-ranging viral transmission chains, and turn off the epidemiologic pump that puts the health of all at risk from mass incarceration." *Id.*

The district court in *United States v. Ford*, 2:10-CR-00292-01, 2021 WL 2786560 (W.D. La. July 2, 2021), recently granted compassionate release to a defendant who is similar situated to Mr. Binday.  Like Mr. Binday, the defendant in *Ford* is in his mid-50s and suffers from diabetes and hyperlididemia.  *Id.* at *2.  He had survived having COVID-19 while in prison, and he continued to suffer from health effects as a result.  *Id.*  The court in *Ford* granted compassionate release, recognizing that "[d]espite being vaccinated, because of his underlying condition of Type 2 diabetes, Ford remains vulnerable to new COVID-19 variants and is at a greater risk of severe illness or death if he were to re-contract the virus." *Id.; see also United States v. Manglona*, CR14-5393RJB, 2021 WL 808386, at *1 (W.D. Wash. Mar. 3, 2021) (granting motion for compassionate release on reconsideration to defendant who had been vaccinated; recognizing that COVID risk had only been "reduced to an unknown degree" by the vaccination).

13

Mr. Binday's compassionate release request should also be evaluated in the context of the continuing series of outbreaks at Otisville FCI. The facility has had multiple waves of infections. Continuing cases of COVID-19 at the facility, coupled with Mr. Binday's preexisting medical conditions, render him powerless to protect himself from the coronavirus.

The Court should therefore recognize that Mr. Binday's risk of potentially serious or fatal complications of COVID-19 if he contracts it again presents extraordinary and compelling circumstances. A number of courts have granted compassionate release to prisoners who have faced similar health challenges as Mr. Binday. For example, the court in *United States v. Topete*, 305CR00257SLBHNJ15, 2021 WL 842547 (N.D. Ala. Mar. 5, 2021), granted compassionate release to a defendant who is "obese, hypertensive, and has type 2 diabetes," and had suffered severe effects when previously infected with COVID-19. *Id.* at *6. The district court recognized that the defendant was "clearly … at increased risk of getting a severe or fatal case of COVID-19 compared to the average American," and that the prison environment made it impossible to take the necessary precautions to protect his health. *Id.* at *7. It therefore held that the defendant's "health problems – when viewed through the lens of the current COVID-19 pandemic – support a finding of "extraordinary and compelling" circumstances warranting compassionate release." *Id.*

The court in *United States v. Armstrong*, No. 18-cr-5108, 2020 WL 4366015 (S.D. Cal. July 30, 2020), also granted compassionate release to a prisoner with diabetes, hypertension, and high cholesterol who had tested positive for COVID-19 several months before. Like Mr. Binday, the *Armstrong* defendant was concerned about the health risks of potentially becoming reinfected. *Id.* at *1. The court recognized that "the medical evidence is still uncertain as to the effect of a recovery on future infection." *Id.* at *3.

Similarly, the district court in *United States v. Yellin*, 3:15-CR-3181-BTM-1, 2020 WL

3488738 (S.D. Cal. June 26, 2020), granted compassionate release to a defendant who had, among other conditions, diabetes and "a low-grade progression of lymphoma," and was in remission for prostate cancer.  *Id.* at *3.  Although the *Yellin* defendant had recovered from COVID once, the district court notes that "the possibility of reinfection persists."  *Id.*  The district court noted that "[t]his virus is so new that the scientific community does not yet have answers to whether reinfection is possible," and that if the defendant "were to be reinfected, his numerous underlying medical conditions could make COVID-19 infection deadly for him."  *Id.*

The district court in *United States v. Davis*, 06-20020-002, 2020 WL 4049980 (C.D. Ill. July 20, 2020), also granted compassionate release to a defendant with diabetes, high cholesterol, high blood pressure, and obesity.  *Id.* at * 3.  The district court noted that "the CDC recognizes that it is possible for an individual who had COVID-19 to become infected again by the virus," and held that in light of  defendants's health conditions, the risk to his health should become reinfected constituted extraordinary and compelling circumstances warranting compassionate release.  *Id.*; *see also United States v. Meeks*, 10-CR-20388-2, 2021 WL 869669, at *2 (E.D. Mich. Mar. 9, 2021) ("Because there is no scientific evidence from which the Court can conclude that Defendant cannot again contract the virus or that individuals with medical vulnerabilities face less risk of serious outcomes when reinfected, the fact that Defendant tested positive for COVID-19 once before does not militate against finding that an extraordinary and compelling circumstance exists"); *United States v. Malufau*, 474 F. Supp. 3d 1106, 1111 (D. Haw. 2020) (granting compassionate release to defendant with obesity and diabetes, "factors which can substantially increase risk of intensive care unit admission and death if he should contract COVID-19 again").

Mr. Binday has multiple significant health issues that place him at high risk of serious and potentially fatal complications should he again contract COVID-19.  The Court should hold that

this serious risk to Mr. Binday's life and health creates extraordinary and compelling circumstances warranting compassionate release.

> **B.    The United States Supreme Court's opinion in *Kelly v. United States* and its consequences for the validity of Mr. Binday's conviction is an additional extraordinary and compelling circumstance.**

In May 2020, after Mr. Binday's conviction and sentencing, appeal, and 2255 proceedings were concluded, the United States Supreme Court entered a unanimous opinion in *Kelly v. United States*, 140 S. Ct. 1565 (2020), holding that the deceptive acts at issue in that case did not violate the federal fraud statutes because they did not involve a "scheme … to obtain money or property." *Id.* at 1574.  For the reasons explained in the initial compassionate release proceedings, Doc. 465, Doc. 467, as well as in the motion Mr. Binday filed in this Court under 28 U.S.C. § 2241 and 28 U.S.C. § 2255, Doc. 479, the *Kelly* opinion significant undermines Mr. Binday's conviction, given that the evidence at trial was that Mr. Binday's object was to *buy* insurance, not steal it, and the commissions he earned were payments the insurers would make upon the sale of insurance regardless of whether the insureds intend to sell their policies.[2]  Indeed, the harms suggested by the government and the Second Circuit in affirming Mr. Binday's conviction were an "incidental byproduct" of the type that will not support a fraud conviction.  *See Kelly*, 140 S. Ct. at 1573 (a "fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme").

Mr. Binday brought the *Kelly* opinion to the attention of the Court in connection with his initial motion for compassionate release.  Doc. 465, Doc. 467.  In response to Mr. Binday's argument based on *Kelly* in connection with his initial compassionate release motion, the government asserted that a compassionate release motion is not a proper vehicle to assert a claim

---

[2]*Kelly* also undermined the "right to control" theory, which remains an area of active litigation.

of legal error that undermines the validity of the defendant's conviction or sentence.  Doc. 470 at 17-18.  The Court agreed, holding that such a challenge to the validity of Mr. Binday's conviction could be asserted only through a direct appeal or habeas petition.  Doc. 475 at 14 n.6.

In March 2021, Mr. Binday filed a motion in this Court under 28 U.S.C. § 2241 and 28 U.S.C. § 2255 arguing that his convictions are invalid in light of *Kelly*.  Doc. 479.  This Court transferred Mr. Binday's motion to the Second Circuit Court of Appeals.  Doc. 489.  The Second Circuit ordered the government to respond to a series of questions raised by Mr. Binday's motion. In the Second Circuit, the government has opposed Mr. Binday's motion arguing, among other things, that *Kelly* has not been made retroactive and that the claim Mr. Binday asserts is procedurally barred because it could have been previously raised.  *Binday v. United States*, Case 21-1206 (2d Cir.), Doc. 31 at 13, 19-20.  Mr. Binday will reply to the government's opposition on August 10, 2021.

In addition, in another case similar to Mr. Binday's – where the defendants were convicted of depriving the complainant of its "right to exclude" people from learning about its thought process – the Supreme Court vacated the convictions and remanded to the Second Circuit to reconsider its opinion in light of Kelly.  *Blaszczak v. United States*, 141 S. Ct. 1040 (2021).  On remand, the government confessed error and asked the Second Circuit to vacate the convictions and dismiss the indictments.  *United States v. Blaszczak*, Case 18-2811, Doc. 497, 06/04/2021. The Second Circuit has not yet ruled.

While the Second Circuit has not yet decided Mr. Binday's motion, the procedural bar the government asserts in the Second Circuit proceeding does not preclude the Court from acting here through the compassionate release process.  While the Court correctly noted when it denied Mr. Binday's initial compassionate release motion that there was an absence of precedent at that time

for treating a change in the law as grounds to find extraordinary and compelling circumstances, Doc. 475 at 14 n.6, the law relating to compassionate release has developed significantly since, and it is now clear that the law supports such grounds for compassionate release.

Specifically, in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), the Second Circuit held adopted the "majority position" "that the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances." *Id.* at 234. The Second Circuit recognized district court's "broad" "discretion in this area," stating that "[t]he only statutory limit on what a court may consider to be extraordinary and compelling" is that a compassionate release decision may not be based on rehabilitation *alone*. *Id.* at 237-38.

Notably, numerous federal courts have recognized their authority under the First Step Act to grant compassionate release due to a change in the law, particularly in light of the amendment of 18 U.S.C. Section 924(c)'s "stacking" provision. *See, e.g., United States v. McCoy*, 981 F.3d 271, 285 (4th Cir. 2020) (collecting cases); *United States v. Marks*, 455 F. Supp. 3d 17, 26 (W.D.N.Y. 2020) (collecting cases). Further, "there is a growing consensus among courts that there are few if any limitations on what may be considered an extraordinary and compelling reason warranting release, even those claims that have been rejected on direct appeal or collateral attack." *United States v. Trexler*, Case 1:92-cr-10369-WES (Doc. 805), at 34, attached as Exhibit G. The district court in *Trexler* granted compassionate release based on a legal error that resulted in a defendant improperly being sentenced to life in prison, even though the Court of Appeals had concluded the defendant was procedurally barred from raising the error. Ex. G at 8-9, 36-37. As the court in *McCoy* recognized, "while the finality of sentences is an important principle, § 3582(c)(1)(A), represents Congress's judgment that the generic interest in finality must give way in certain individual cases, and authorizes judges to implement that judgment." *McCoy*, 981 F.3d

at 288 (citation and quotation omitted).

For these reasons, the Supreme Court's decision in *Kelly*, and the questions it raises regarding the validity of Mr. Binday's conviction, constitute an additional extraordinary and compelling circumstance supporting compassionate release here.

*** 

The Court should therefore hold that Mr. Binday has established extraordinary and compelling circumstances and grant him compassionate release.

## IV.   Mr. Binday does not pose a danger to the community and the Section 3553(a) factors support his release.

The Court is further required to consider whether Mr. Binday presents a danger to the community and whether compassionate release is consistent with the factors set forth in 18 U.S.C. § 3553(a). Examination of these factors shows compassionate release is appropriate here.

The nature of Mr. Binday's offense was non-violent. Further, his history and characteristics show he does not pose a risk of reoffending if released. Nor is he otherwise a danger to the community. Mr. Binday's PATTERN risk assessment score is "Minimal." His BOP disciplinary history has been minor and low-level. Significantly, Mr. Binday was a true first offender when he committed his offense, which was a non-violent offense that took place when he was in his forties. That is, prior to his arrest in this case, Mr. Binday had never been arrested or charged with any crime. United States Sentencing Commission data demonstrates that true first offenders like Mr. Binday are significantly less likely to recidivate, even than defendants who were criminal history category I but who had prior contact with the criminal justice system. United States Sentencing Commission, "The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders" (Mar. 2017), *available at* https://www.ussc.gov/research/research-reports/criminal-history-and-recidivism-federal-offenders. Mr. Binday's current age of 57 and the

fact that he has graduated from college and has an advanced degree also demonstrates his low recidivism risk. *See* USSSC, "The Effects of Aging on Recidivism Among Federal Offenders," at 24, *available at* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (the recidivism rate of released individuals "decreased with every step of educational achievement" and "[e]very education group experienced a decline in rearrest rates as age increase").

Along with having good conduct while in prison, Mr. Binday has also used his time in prison to improve himself. Mr. Binday has completed over twenty educational courses over the past year, despite the quarantine conditions, in addition to courses he had previously completed. Mr. Binday's Program Review, listing his educational course and other activities, is attached as Exhibit H. Also included in Exhibit H are certificates of completion for several religious courses Mr. Binday has completed that are not included in the list of educational courses.

Additionally, Mr. Binday's release plan will return him to the home he shares with his wife and children. This location was previously approved by Pre-Trial Services for Mr. Binday's pre-trial release. Mr. Binday spent an extended period of time – approximately 4½ years – on pre-trial release with no issues, further demonstrating the lack of risk his release would entail.

Finally, Mr. Binday's offense was a one-time situation that he would not repeat, nor could he given that he is no longer licensed as an insurance agent and may never be again. *Cf. United States v. Prasad*, CR 19-71, 2020 WL 2850147, at *3 (E.D. La. June 2, 2020) (granting compassionate release where medically vulnerable physician defendant had served two months of a 24-month sentence for conspiracy to unlawfully prescribe controlled substances and conspiracy to commit health care fraud; noting that "[w]hile serious, [the defendant's] offenses were non-violent and are unlikely to recur because his medical license has been suspended.") In sum, Mr.

Binday presents no meaningful risk to the community or risk of recidivism.

In the Court's prior Compassionate Release Order, the Court emphasized the need for the sentence imposed to provide just punishment and promote respect for the law and the fact that Mr. Binday had at that time served only one-third of his sentence.  Doc. 475 at 16.  Now, over a year later, Mr. Binday has served nearly half of his term of incarceration if the good time he has earned is taken into account.  Additionally, while implementation of the First Step Act is still in process, if Mr. Binday were to receive 15 days of credit for every 30 days he has served since that statute was enacted, he would receive an additional 16 months of credit.

Further, the Court could not have anticipated at the time it sentenced Mr. Binday to a twelve-year term in prison the harshness of the conditions of confinement he would be subjected to.  Mr. Binday scores Minimum security level, and he was designated to a camp.  As discussed above, however, due to circumstances entirely outside of Mr. Binday's control, he has spent much of the last year at a Medium security facility under solitary confinement conditions.  Moreover, the Court could also not have anticipated when it sentenced Mr. Binday that his incarceration would place his life in grave danger.  *See United States v. Park*, 456 F. Supp. 3d 557, 564 (S.D.N.Y. 2020) (district court expressing that while the defendant "deserve[d] to spend every day of the sentence that she received in prison," leaving her incarcerated "may convert a three-year prison sentence into a death sentence. And that the Court cannot allow."); *see also* Nancy Gertner "Coronavirus can mean a death sentence to prisoners," Boston Globe (May 5, 2020), https://www.bostonglobe.com/2020/05/05/opinion/coronavirus-can-mean-death-sentence-prisoners/?fbclid=IwAR1eDCgcU7wP7AGbs66iASf-TXCr8aTpLOp6aVESWm4Oxqz6RgjidxrsSVk; Keegan Hamilton, Samir Ferdowsi & Rob Arthur, "Prisoners Keep Dying of COVID While 'Compassionate Releases' Stall in Court," Vice

News (Mar. 18, 2021) ("At least 54 federal prisoners have died from COVID-19 after having a compassionate release request denied or left pending.")  Regardless of the seriousness of Mr. Binday's offenses, his just deserts for that offense do not include death or potentially life-long health effects.

For precisely this reason, courts have granted compassionate release to defendants who have served comparable or lower percentages of their sentences as Mr. Binday where the defendant also faced heightened risk from COVID-19.  The defendant in *United States v. Common*, 17-CR-30067, 2020 WL 3412233 (C.D. Ill. June 22, 2020), was sentenced to 120 months in prison for possession with the intent to distribute methamphetamine and possession of a firearm in furtherance of a federal drug trafficking crime.  *Id.* at *1.  He had served 33 months when the district court granted him compassionate release because he was medically vulnerable to severe complications to COVID due to obesity, hypertension, and asthma, and had already contracted COVID-19 once.  *Id.* at *3-4.  The district court held that this reduction in his sentence was warranted because "the possibility of reinfection present[ed] a very real and immediate danger" to the defendant.  *See also United States v. Grubbs*, CR16-228 TSZ, 2020 WL 3839619, at *1 (W.D. Wash. July 8, 2020) (granting compassionate release to child pornography defendant who had served 33 months of 108-month sentence where conditions including diabetes, obesity, hypertension, asthma, and "the lingering effects of [COVID-19]" placed him at risk if reinfected).

Courts have also taken into account in granting a reduction in sentence the harsh conditions of confinement the defendant has experienced.  *See*, *e.g.*, *United States v. Bush*, No. CR06-5504 BHS, 2021 WL 135869, at *3–4 (W.D. Wash. Jan. 14, 2021) (finding that Section 3553(a) "factor relating to the 'need for just punishment' has dramatically shifted since sentencing" because "[t]he lock-down measures" implemented "to mitigate the spread of the pandemic have made

22

confinement much more punitive than was contemplated at sentencing"); *United States v. Indarte*, No. CR17-5554 BHS, 2020 WL 6060299 (W.D. Wash. Oct. 14, 2020), at \*4–5 (same); *United States v. Crawford*, No. CR18-305 BHS, 2021 WL 409973, at \*3–4 (W.D. Wash. Feb. 5, 2021) (same).  For example, Judge Engelmayer of the Southern District of New York granted a motion for compassionate release in *United States v. Lizardi*, 11 Cr. 1032-55 (PAE) (S.D.N.Y. Oct. 9, 2020).  The *Lizardi* compassionate release opinion is attached as Exhibit I.  Judge Engelmayer recognized that the defendant's "term in custody has proven more arduous than the Court – or anyone – could ever have anticipated" when the defendant was sentenced. Ex. I at 6.   The court noted that "[l]ong before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring the just sentence." *Id.* (collecting cases).  It recognized that, "[t]he same logic applies here, stating:

> A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended a punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.

*Id.* at 7.  The court therefore determined that the seven months the defendant had "spent in prison during COVID-19 offsets the need for him, in order to assure just punishment, to serve the next five months in prison, as opposed to in less restrictive confinement." *Id.* at 8.  Similarly, the court in *United States v. Macfarlane*, 438 F. Supp. 3d 125 (D. Mass. 2020), found that the defendant's "two-week confinement in solitary quarantine in a higher security facility is the equivalent of two months in the Camp to which he was originally assigned." *Id.* at 127.  *Cf.* Stephen Rex Brown, "NYC federal jail is so bad inmates get 'time and a half': Judge," New York Daily News (May 24, 2021), *available at* https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html (reporting on Judge Oetken's remarks at a sentencing that "I do believe that because it's been harsher than a usual period that it's more punitive, that it's

essentially the equivalent of either time and a half or two times what would ordinarily be served
…. So I think having served 24 months is equivalent to having served three years."); Stephen Rex
Brown & Noah Goldberg, "Brutal conditions in NYC jails during COVID pandemic caused federal
judges to impose lighter sentences: analysis," New York Daily News (July 11, 2021), *available at*
https://www.nydailynews.com/new-york/ny-federal-judges-gave-lighter-sentences-nyc-jails-
covid-20210712-owlofn4wzngmfmcgb6raighkvq-story.html.

Along with having served nearly half of his sentence, Mr. Binday has spent over 251 days
in harsh conditions of solitary confinement, in a higher security facility, due to quarantines
resulting from his medical condition. Moreover, each of Mr. Binday's upcoming appointments
for his eye, cancer, and orthopedic treatment will result in an additional quarantine and solitary
confinement of at least 2½ weeks. While the circumstances here merit a grant of compassionate
release and a reduction of Mr. Binday's sentence to time served, if the Court is not inclined to
reduce Mr. Binday's sentence by that significant a degree, the Court should at least take into
account the harshness of the conditions in which Mr. Binday has served his sentence and reduce
his sentence to account for that. It is respectfully suggested that the Court should reduce Mr.
Binday's sentence by eighteen to twenty-four months to account for the onerous conditions of
confinement Mr. Binday has experienced thus far. A sentence reduction of eighteen to twenty-
four months would effectively give Mr. Binday additional credit of approximately two days for
each day he has served or expects to serve under especially onerous terms of confinement.

Further, if the Court determines that the term of incarceration Mr. Binday has already
served is inadequate to fulfill the punitive purposes of sentencing, the Court has the option to
impose special conditions of supervised release to address that, including home confinement. For
example, the court in *United States v. Delgado*, 457 F. Supp. 3d 85 (D. Conn. 2020), granted

compassionate release to a medically vulnerable defendant who had served 29 months of a 120-month sentence for conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine.  Although the district court described the reduction of the *Delgado* defendant's sentence to time served as "not ideal," the court recognized that his release was necessary to protect his health.  *Id.* at 92.  The district court addressed this concern by ordering that the defendant would be required to serve his term of supervised release on home incarceration.  *Id.* at 93; *see also United States v. Rountree*, 460 F. Supp. 3d 224, 228, 235, 241 (N.D.N.Y. 2020) (granting compassionate release to career offender defendant with diabetes and hypertension who had served 85 months out of a 188-month sentence; modifying terms of supervised release to require that the first two years supervised release would be served on home confinement).  While Mr. Binday does not believe that such a modification of the terms of his supervised release is necessary here – he has served significantly more time and a greater percentage of his sentence than the defendant in *Delgado*, under harsher conditions – such a modification is available to the Court should the Court deem it necessary to fulfill the purposes of sentencing.

Should the Court reduce Mr. Binday's sentence to time served, with or without imposing a term of home confinement, the Court should further order that Mr. Binday serve any quarantine period at home.  He has already served a lengthy period of time in solitary confinement and should not be required to serve any more time there than necessary.

The Court should therefore hold that Mr. Binday's release is consistent with public safety and the statutory purposes of sentencing.

## CONCLUSION

For these reasons, the Court should grant Mr. Binday compassionate release, and reduce his sentence to time served.

Respectfully submitted,

/s/ *James E. Felman*
James E. Felman

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 25, 2021, the foregoing has been filed with the Clerk of Court through the CM/ECF System which will send a notice of electronic filing to all counsel of record.

/s/ *James E. Felman*
James E. Felman (Florida Bar No. 0775568)
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, FL 33601
(813) 229-1118
(813) 221-6750
jfelman@kmf-law.com

*Pro Hac Vice Counsel for Defendant*