**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x

MICHAEL BINDAY,                                  :        Case No. 1:12-cr-00152-CM
                                                                         1:17-cv-04723-CM
  Petitioner

  - v. -                                                        :

UNITED STATES OF AMERICA

  Respondent.                                            :

------------------------------------------------------------ x

### DEFENDANT MICHAEL BINDAY'S SUPPLEMENT TO RENEWED MOTION FOR REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. § 3582

Defendant, Michael Binday, respectfully submits this supplement to his pending renewed motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Doc. 491. The pending motion was filed July 2021, and both Mr. Binday's circumstances and the legal landscape have significantly shifted since that time. Following the filing of Mr. Binday's renewed motion, Mr. Binday was released under the CARES Act to home confinement. Mr. Binday has now been on home confinement for nearly three years. Throughout that time, Mr. Binday has been completely compliant with the terms of his home confinement, and he has never had an alleged violation. Mr. Binday's health has recently declined, however, and the terms of his home confinement have interfered with his ability to obtain needed medical treatment, as well as with obtaining a psychiatric evaluation. And significantly, in *Ciminelli v. United States*, 598 U.S. 306 (2023), the United States Supreme Court recently invalidated the legal theory of right to control fraud. This means that the sentence Mr. Binday is presently serving is based on conduct the Supreme Court has determined is not a crime.

This supplement to Mr. Binday's pending motion provides the Court with information regarding these changed circumstances and addresses the reasons they warrant a reduction in Mr. Binday's sentence to time served, with no further penalties.

## SUPPLEMENTAL MEMORANDUM

### I. Mr. Binday's home confinement

As described in Mr. Binday's prior filing, Doc. 491, Mr. Binday suffers from serious medical conditions that place him at high risk of severe and potentially fatal complications from COVID-19. As a result of this risk, as well as the lack of danger that Mr. Binday poses to the community, in August 2021, Mr. Binday was released to home confinement under the CARES Act. While Mr. Binday recognizes and greatly appreciates the degree of safety home confinement has afforded him, being on home confinement has still placed significant restrictions on his liberty, and a reduction in sentence to time served would be meaningful. Additionally, Mr. Binday's medical condition has recently deteriorated further, and the terms of his home confinement have caused delays in him receiving needed medical treatment. The home confinement conditions Mr. Binday is subject to have also hindered Mr. Binday from obtaining a specialized psychiatric evaluation that is needed for potential career retraining.

#### A. The conditions of Mr. Binday's home confinement

Mr. Binday is subject to strict conditions of home confinement. Among many other conditions, Mr. Binday is required to: wear an ankle bracelet at all times; travel to a halfway house in the Bronx twice a week; comply with a 9:00 p.m. curfew to be home, unless he has been given special permission; wake up at various times every night to answer random calls from and "check in" with his supervisor; request permission a week in advance every time he needs to leave his home; obtain permission for medical visits; obtain permission to travel, which is denied on federal

holidays; obtain permission to attend religious services; obtain permission to exercise; obtain permission to take educational courses; and obtain permission to go shopping, which must be requested a week in advance. Mr. Binday is not permitted to leave home on Sundays, which is not his day of rest.

The conditions of home confinement Mr. Binday is subject to interfere with needed medical treatment, the practice of his religion, and his ability to fulfill family obligations. For instance, although the ankle monitor interferes with Mr. Binday's physical therapy, he has not been permitted to remove it even for the limited period of time needed to participate in his physical therapy sessions.

Further, religious men such as Mr. Binday often participate in a mikvah (a ritual bath) to spiritually cleanse, as frequently as every morning. The mikvah ritual requires that the participant have no clothing, jewelry, or other items between himself and the water. Because of the ankle bracelet Mr. Binday is required to wear, he is unable to participate in this ritual.

Sadly, Mr. Binday has recently experienced several deaths of people who were important to him. Mr. Binday's religion observes Shiva, a gathering of friends and family to spend time with the family of the deceased, which also includes a religious service where participants say prayers for the deceased. These events require special permission for Mr. Binday to attend them, and obtaining approval to attend events in a private residence is difficult. Mr. Binday was recently unable to obtain permission to attend a Shiva in the apartment of a deceased friend, and he was able to attend only because the location of the Shiva was changed to the synagogue the day before it took place.

Further, Mr. Binday regularly experiences technical problems with his ankle bracelet. When he is home and in bed, the system often shows him as being anywhere from a few hundred

yards away to a few miles away – sometimes even showing him in the middle of the Hudson River. While the staff members who supervise Mr. Binday understand the issue and even find it humorous, it impacts Mr. Binday's sleep and health. Every time the government's monitoring center registers Mr. Binday as being "out of zone," BOP personnel call his home. On multiple occasions, Mr. Binday has received ten to twenty calls in the middle of the night, waking him and his family each time. This extreme interruption of Mr. Binday's sleep interferes with his functioning the next day and has triggered migraine-like headaches that sometimes last for days.

The restrictions on Mr. Binday's movement also make it difficult for him to gather with his family. Mr. Binday is unable to attend any event that would require more than one overnight stay or any air travel. As a result, Mr. Binday has been denied permission to attend weddings and Bar Mitzvahs and cannot visit his elderly parents in Florida. Mr. Binday's family gathers for holidays at his sister's home or his parents' home, and approval to attend these gatherings is not always granted; he was denied permission to attend his family's Thanksgiving celebration in 2023. Mr. Binday has also missed family events because he is only permitted to go to a restaurant once a month. Further, Mr. Binday must obtain permission to drive to and from his children's colleges (Lehigh University in Bethlehem, Pennsylvania, and the University of Pennsylvania in Philadelphia). Because Mr. Binday observes the Jewish sabbath and the BOP will not authorize more than one night away from home, he could only possibly travel early on Friday and return very late Saturday or Sunday.

### B.    The deterioration of Mr. Binday's health

Unfortunately, while on home confinement, Mr. Binday has experienced a significant decline in his health. Mr. Binday recently experienced a medical episode in which he was experiencing flu-like symptoms and feeling under the weather for a long period of time. Mr.

Binday's physician ordered immediate lab work. Mr. Binday's lab testing results are attached as Exhibit A to this supplement.[1] The lab tests revealed that Mr. Binday's blood sugar level was 527 mg/dL, and he had a hemoglobin A1C level of 10.3%. A blood sugar level over 300 mg/dL is "dangerously high,"[2] and the over-500 mg/dL blood sugar level Mr. Binday had at the time of testing was described in his medical results as "critical," Ex. A. Hemoglobin A1C tests measure a person's average blood sugar level over the prior three months.[3] A hemoglobin level A1C over 9% is considered "dangerous," and comes with increased risk of long-term diabetes complications such blindness, nerve damage, and kidney failure.[4] Mr. Binday's lab results also showed that he was suffering from prostatitis and anemia. Ex. A.

Mr. Binday is under treatment with his physician to address his health conditions. He is deeply concerned about the exacerbation of his diabetes and worried about potential permanent damage that may result if he is unable to keep his blood sugar better controlled.

The conditions of Mr. Binday's home confinement hinder Mr. Binday from obtaining adequate medical treatment. Medical appointments require weeks of advance planning. While Mr. Binday must request in writing permission to see a doctor, the RRM will not act on a request until the appointment is less than a week away, and sometimes it fails to process requests at all. Because there is no structure to inform Mr. Binday whether his requests to obtain medical care

---

[1] Mr. Binday has filed along with this Supplement a motion for leave to file his medical test results under seal. Upon the Court's entry of an order on his motion, Mr. Binday will file Exhibit A.

[2] Carisa Brewster, "Blood Sugar Level Chart: Readings in Older Adults," *Verywell Health* (Feb. 17, 2024), *available at* https://www.verywellhealth.com/elderly-blood-sugar-levels-chart-5176546.

[3] Kimberly Charleson, "What High A1C Levels Mean," *Verywell Health* (Aug. 10, 2023), *available at* https://www.verywellhealth.com/what-happens-when-a1c-is-too-high-5118384#:~:text=A%20high%20hemoglobin%20A1c%20%2C%20or,nerve%20damage%2C%20and%20kidney%20failure.

[4] *Id.*

have been approved, or even submitted, Mr. Binday has on multiple occasions had to call a day or two before a scheduled appointment to find out whether he had approval to attend, only to learn that the request had never even been processed.

The worsening of Mr. Binday's diabetes in particular has resulted in him needing frequent medical attention. Even going to the pharmacy to obtain diabetic supplies such as test strips and lancets requires advance permission. Mr. Binday has been instructed to meet with a nutritionist, but the logistics of obtaining approval to attend such an appointment have so far prevented him from being able to do so. His nutritional needs have become more complex, but he is only allowed to go to the grocery store once per week, and that trip requires him to seek permission one week in advance. This has on some occasions made it impossible for Mr. Binday to adhere to the nutritional guidelines he has been advised to follow, simply because he does not have the necessary foods available to him.

The restrictions on Mr. Binday's movement are particularly problematic in an emergency medical situation. Mr. Binday is never permitted to go to an urgent care center. He may only go to an emergency room if he is transported by ambulance. Otherwise, he may obtain medical treatment only by requesting advance permission to see his doctor, which as discussed above, results in delays in his care.

The delays in Mr. Binday's medical care resulting from his home confinement status have recently severely impacted his health. In December, Mr. Binday had prostatitis (a urinary tract infection). Mr. Binday's primary care doctor advised him to see a urologist. Because Mr. Binday had to obtain permission to see the urologist, it took over a week for Mr. Binday to receive treatment of a condition that is painful and can cause other medical complications. Had Mr. Binday

6

instead been able to walk two blocks away to an urgent care office, this medical condition, and resulting pain, would have been resolved within days.

Similarly, symptoms of Mr. Binday's uncontrolled diabetes were present for weeks before that condition could be diagnosed and treated, due to delays in obtaining medical and laboratory appointments caused by bureaucratic issues. Those delays put Mr. Binday's health and life at risk – he was on the verge of diabetic ketoacidosis when he was finally diagnosed.

### C. Employment retraining

Mr. Binday is no longer able to work in his career field, and he needs to find a new occupation. Mr. Binday has prior flying experience, and he wishes to retrain as a pilot. While Mr. Binday has made every effort to pursue this career path, the restrictions on psychiatric evaluation and treatment that he is subject to while on home confinement have made doing so impossible.

In July 2022, Mr. Binday first sought approval from the RRM to enroll in an aviation academy to obtain the training necessary to apply for a pilot's license. In his request, Mr. Binday explained that, while he recognized that he may not be permitted to work as a pilot while on home confinement, he wished to complete the initial classroom and airplane training. After an initial denial, Mr. Binday obtained approval from the RRM to attend flight school.

Mr. Binday completed the initial levels of review with the Federal Aviation Administration ("FAA") to request a medical certification for flight training, including a medical examination and providing information regarding his criminal conviction. Due to Mr. Binday's criminal conviction, however, the FAA has required him to complete a forensic psychiatric examination in order to obtain his medical certification. Mr. Binday sought permission from the RRM to obtain the required forensic psychiatric examination. The RRM informed Mr. Binday that he is not permitted to go to a psychiatrist of his choice, but he was told that he could be referred to Tri Center, a BOP-

approved treatment center. In April 2023, Mr. Binday underwent a psychiatric evaluation with Tri Center, which was the most thorough examination Mr. Binday was able to obtain with the approval of the RRM. This evaluation was inadequate to satisfy the FAA's requirements. It was not a "forensic" examination and was not conducted by a professional with the necessary forensic specialty. Mr. Binday learned that a forensic psychiatric evaluation is a specialized type of evaluation with specific requirements, which would include a detailed review of Mr. Binday's background, a detailed clinical interview of Mr. Binday, Mr. Binday's performance of specific tests, a review of Mr. Binday's criminal history, and "collateral" interviews of Mr. Binday's family members and co-workers.

Although a forensic psychiatric examination is required for Mr. Binday to pursue aviation training, the RRM has continued to refuse to allow Mr. Binday to undergo such an evaluation. Mr. Binday's case manager informed him that the BOP's position was that Mr. Binday can pursue this path when he is on supervised release. A copy of the email from Mr. Binday's case manager is attached to this motion as Exhibit B. Mr. Binday has sought review of this decision, but he has not been able to gain approval from the BOP to undergo a forensic psychiatric evaluation. As a result, Mr. Binday has not been able to pursue career retraining.

As described above, Mr. Binday has recently experienced medical issues. If granted release, the FAA would require Mr. Binday to control his medical conditions to its satisfaction. Once he is able to do so, he could then pursue the training that the BOP has approved in theory but has prevented him from actually obtaining.

## II. The *Ciminelli* opinion

Mr. Binday was convicted of mail and wire fraud based on a "right to control" theory. In 2023, the United States Supreme Court in *Ciminelli* rejected the right to control theory that was the foundation of Mr. Binday's conviction. The Court held that this theory "vastly expands federal jurisdiction without statutory authorization" because it "treats mere information as the protected interest," making "almost any deceptive act" potentially criminal. 598 U.S. at 315.

Mr. Binday has sought relief based on the invalidity of the legal theory that underlies his conviction at every stage in this proceeding. Among other avenues that Mr. Binday has pursued, in 2021, Mr. Binday filed a motion in the Second Circuit for leave to file a second-in-time motion under 28 U.S.C. Section 2255. The Second Circuit denied Mr. Binday's motion, and Mr. Binday filed a petition for a writ of certiorari in the United States Supreme Court. Shortly after the Supreme Court decided *Ciminelli*, the Court granted Mr. Binday's petition, vacated the Second Circuit's order, and remanded the case for reconsideration in light of its opinion in *Ciminelli*. On remand, the Second Circuit denied Mr. Binday authorization to file a Section 2255 motion because, according the Second Circuit, the proposed petition was a "second or successive" Section 2255 motion, *Ciminelli* was not a new retroactive constitutional rule, and thus Section 2255(h) prohibited him from obtaining relief, even though he was one of the first, and most persistent, challengers to right to control fraud.

Mr. Binday has filed a new petition for a writ of certiorari, a copy of which is attached to this motion as Exhibit C. In this petition, Mr. Binday asserts that the Court should recognize that *Ciminelli* announced a retroactive constitutional decision. *See* Ex. C. at 12-24. Mr. Binday argues further that the Second Circuit applied a test for second and successive petitions that is inconsistent with Supreme Court precedent. *Id.* at 24-35. Among other points, Mr. Binday explained in his

9

certiorari petition that the Second Circuit's denial of Mr. Binday's initial application for authorization rested in part on its then-recent reaffirmance of the right to control theory, which it said meant that Mr. Binday was not "actually innocent." Ex. C at 26.  Once *Ciminelli* invalidated the right to control fraud offense, by the Second Circuit's own reasoning, Mr. Binday became actually innocent.  He has nonetheless been denied relief based only on a tortured application of Section 2254(h).

The Supreme Court has set Mr. Binday's pending petition for a writ of certiorari for conference on September 30, 2024.

Additionally, Mr. Binday recently filed a motion under Federal Rule of Civil Procedure 60 directed to the Court's denial of Mr. Binday's initial 2255 motion.  Doc. 514.

On one hand, the Supreme Court's decision in *Ciminelli* is critical to the Court's analysis of Mr. Binday's pending compassionate release motion because the Court is entitled to consider changes in the law that undermine the validity of Mr. Binday's conviction.  *See* Doc. 491 at 16-19.  Mr. Binday's conviction was invalid.  He is presently serving a sentence – under the onerous conditions described above – that is predicated on conduct the Supreme Court has determined is not a crime.  It is difficult to imagine circumstances more "extraordinary and compelling" than these.

On the other hand, the limits on second or successive Section 2255 motions are not an impediment to granting compassionate release.  Regardless of the Second Circuit's view of *Ciminelli*'s constitutional foundations, the Supreme Court abrogated the Second Circuit's opinion affirming Mr. Binday's conviction and has eviscerated right to control fraud as a legal theory.  These are the relevant facts, not an over-technical reading of Section 2255(h) that was intended to

cut down on prisoners filing multiple, repetitious, and meritless habeas petitions. There is nothing in the compassionate release statute that incorporates the provisions of section 2255(h).

## III. Danger to the community and the Section 3553(a) factors

Mr. Binday described in detail in his pending motion the reasons that he is not a danger to the community and that a reduction in his sentence is consistent with the factors set forth in 18 U.S.C. Section 3553(a). *See* Doc. 491 at 19-25. The developments since the filing of Mr. Binday's pending motion described above reinforce that conclusion.

First, the BOP itself has determined that Mr. Binday is not a danger to the community. As noted, Mr. Binday was redesignated to home confinement under the CARES Act. The BOP's criteria for CARES Act home confinement required consideration of the totality of circumstances relating to each inmate, including an assessment of the danger the inmate would pose to the community.[5] Before Mr. Binday was redesignated to home confinement, the BOP necessarily evaluated his security level, prison conduct, PATTERN score, re-entry plan, and offense of conviction, and made a determination that Mr. Binday would not pose a danger to the community.[6]

Second, Mr. Binday's present circumstances demonstrate that reducing Mr. Binday's sentence to time served will further the purpose of sentencing of providing Mr. Binday with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D). As described above, the conditions of Mr. Binday's home confinement are interfering with both his ability to receive both needed medical care and vocational training.

---

[5] Memorandum for the Director, Bureau of Prisons from the Attorney General, Re: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), *available at* https://www.justice.gov/file/1105491/dl?inline=.
[6] *See id.*

11

Third, the requested reduction in sentence is modest. Mr. Binday has already served nearly all of the sentence that was imposed on him. His current anticipated release date is September 20, 2025, a little more than a year from now.

Fourth, reducing Mr. Binday's sentence to time served is necessary to effectuate the statutory purposes of sentencing of reflecting the seriousness of the offense, promoting respect for the law, affording adequate deterrence, and protecting the public. *See* § 3553(a)(2)(A)-(D). Unlike the typical case in which some level of punishment and/or incapacitation is necessary to further these purposes of sentencing, here, the Supreme Court has determined that the conduct that is the basis of Mr. Binday's conviction is not a crime. Reflecting the seriousness of Mr. Binday's conduct and promoting respect for the law require that Mr. Binday be released from incarceration rather than being further punished for that which is not a crime. Likewise, society is not protected by further punishing a person who has not committed a crime. Mr. Binday should be released from any further penalties than the time he has already served in custody.

Fifth, the combination of Mr. Binday's medical situation and the Supreme Court's rejection of the theory on which he was convicted make Mr. Binday uniquely situated among compassionate release petitioners. Mr. Binday is not just another defendant undergoing the typical hardships all defendants experience. The issues Mr. Binday is presently experiencing literally endanger his life and well-being. And he is suffering these hardships as a person who is not guilty of the crime he was charged with, but is trapped in an unwarranted sentence due to the Second Circuit's overly restrictive reading of Section 2255(h).

Consideration of the Section 3553(a) factors thus supports a reduction of Mr. Binday's sentence.

## CONCLUSION

12

For these reasons, the Court should grant Mr. Binday compassionate release, and reduce his sentence to time served, with no further penalties.

Respectfully submitted,

/s/ *James E. Felman*
James E. Felman

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 28, 2024, the foregoing has been filed with the Clerk of Court through the CM/ECF System which will send a notice of electronic filing to all counsel of record.

/s/ *James E. Felman*
James E. Felman (Florida Bar No. 0775568)
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, FL 33601
(813) 229-1118
(813) 221-6750
jfelman@kmf-law.com

*Pro Hac Vice Counsel for Defendant*